Exhibit 8 (cont.)

1

STATE OF NORTH CAROLINA   VS. SHAWN GIOVANNI MASSEY, 98 CRS

33738, 33739, 33740, 33741, 98 CRS 141972

MR. COTTRELL:  Good morning, Your Honor.

THE COURT:   Good morning, sir.

MR. COTTRELL:  Eric Cottrell, for the state.

MS. THOMAS:  Janet Thomas, for the defendant, Mr. Massey; Shawn G. Massey.

MR. COTTRELL:  Your Honor, the first case that the state will call is Margin No. 5, Shawn Giovanni Massey.  Your Honor, it is my understanding there is a pre-trial motion for this case.  The defendant is not in court; he is in custody, Your Honor.

MS. THOMAS:   We are waiting for a family member to bring his clothing.  May I be excused to go look for them, in 3303?

THE COURT:   Yes.  Could we go-ahead and hear the motion, do you think, before the jury comes?

MS. THOMAS:  We could hear one of the motions.  I do have a Motion to Suppress  I would like to address.

THE COURT:   Yes.  You may go.

{Thereupon, the following proceedings take place in open court, in the presence of all attorneys and the defendant.}

Ms. Thomas,  is the defense ready to proceed?

MS. THOMAS:  We are, Your Honor.

THE COURT:   All right.  On my calendar it appears

1  that Mr. Massey is charged with three counts of second-degree

2  kidnapping and one count of felonious breaking and entering.

3           Is that correct?

4           MR. COTTRELL:  And, a count of robbery with a

5  dangerous weapon, Your Honor.

6           THE COURT:  All right.  And, looking at the court

7  file again, it appears to me that we have a state's Motion

8  for Joinder.  Has that been heard before?

9           MR. COTTRELL:  That has not, Your Honor.

10          THE COURT:  Okay.  The state wish to present its

11 motion then, at this time?

12          MR. COTTRELL:  Yes, Your Honor.  The state would

13 make a Motion for Joinder to join these several offenses.

14 Your Honor, we would proffer to the Court that all of these

15 charges arise out of the same incident; occurring on the same

16 day; and, in the same location; during the course of probably

17 about one-half hour.

18          And, I -- it will be exceedingly difficult to try

19 them separately, Your Honor; and, could be prejudicial to the

20 defendant.

21          THE COURT:  All right.  Thank you very much.  Does

22 the defense wish to be heard on the state's Motion to Join?

23          MS. THOMAS:  We do not object to that motion, Your

24 Honor.

25          THE COURT:  All right.  MOTION ALLOWED; and, the

1  five charges then; robbery with a dangerous weapon, three

2  counts of second-degree kidnapping, breaking and entering

3  said to have occurred on May 22, 1998, shall be joined for

4  trial.

5  Any other motions for the state?

6  MR. COTTRELL: No, Your Honor.

7  THE COURT: Very well. Turn then to the motions

8  for the defense.

9  MS. THOMAS: Your Honor, on behalf of Mr. Shawn

10  Massey, I have a Motion to Withdraw from representation. Mr.

11  Massey expressed concerns about my representation in the past

12  and he recently stated that he is planning on preparing

13  litigation in the event things do not go well.

14  I do feel somewhat compromised because of that.

15  THE COURT: Okay. Has that been reduced to a

16  written motion?

17  MS. THOMAS: It has not, Your Honor. This was a

18  very recent occurrence.

19  THE COURT: Thank you. Well, I'll hear you

20  further as to your Motion to Withdraw then; if the defendant,

21  wishes to address the Court, on the Motion to Withdraw, I'll

22  hear from the defendant, as well.

23  MS. THOMAS: I understand Mr. Massey would like to

24  be heard on that, if he could, Your Honor.

25  THE COURT: All right. Mr. Massey, your attorney,

1  Ms. Thomas, has presented to the Court a Motion to Withdraw

2  as your attorney. I'm going to give you a chance then to be

3  heard as to if you agree with her motion; if you wish for her

4  motion to be allowed; if you have problems with her

5  representation, etc.

6  Mr. Massey, I do need to advise you sir, you are,

7  of course, here, charged with five serious offenses. You

8  could -- you do, at all times, have a right to remain silent.

9  I must advise you that anything you say, should you begin to

10 address matters concerning the charges, possibly can be used

11 against you.

12 So, I'll be happy to hear you as to your attorney's

13 Motion to Withdraw. I think it, of course, would be wide and

14 prudent for you to limit your comments though to anything you

15 would like to say to the Court, to her Motion to Withdraw,

16 not to discuss the case or any elements of the case.

17 Do you understand that, Mr. Thomas -- Excuse me,

18 Mr. Massey?

19 MR. MASSEY: Yes, sir.

20 THE COURT: All right, sir. I'll hear you then,

21 sir, if you wish to be heard concerning your attorney's

22 Motion to Withdraw.

23 MR. MASSEY: I would like to keep her on as my

24 counsel and my attorney.

25 THE COURT: All right, sir. Mr. Massey, how long

1  has Ms. Thomas been representing you in these cases; if you

2  know, sir?

3         MR. MASSEY: For seventeen months.

4         THE COURT: Okay. And, I know you are in custody.

5  Judges see cases often for the first time on the date the

6  case is called for trial. You are in custody, obviously.

7  Are you in custody just on these charges and no other

8  charges?

9         MR. MASSEY: I have a prior charge which is what

10  I'm waiting to go to trial on, in custody, too.

11         THE COURT: How long have you been in custody on

12  these charges, sir?

13         MR. MASSEY: Seventeen months.

14         THE COURT: All right, sir. And, you have been

15  awaiting trial then and been in custody then on these charges

16  that you're in court for today, for about 17 months. Is that

17  correct?

18         MR. MASSEY: Yes, sir.

19         THE COURT: All right, sir. Mr. Massey, you

20  attorney has indicated that the statements made by you

21  indicate to her that you might be somewhat dissatisfied by

22  her representation. At least I get that from her indication

23  of her mention of a lawsuit or litigation or possibility of

24  that.

25        Mr. Massey, are you satisfied with Ms. Thomas'

1  representation?  And again, do you wish to keep her as your

2  attorney?

3      MR. MASSEY:  Well, as far as her performance in

4  being my attorney, I'm -- I'm all right with that.  I want to

5  keep her on as my counsel.

6      THE COURT:  All right, sir.  Okay.  Mr. Massey, do

7  you feel that your working relationship, -- do you feel, sir,

8  that your working relationship with Ms. Thomas, your

9  attorney, is such that there is anything at least from your

10  end, of the relationship that would prevent you from being

11  able to work with her as your attorney?

12      MR. MASSEY:  No, sir.

13      THE COURT:  Do you feel then you would be able to

14  cooperate with her fully in the trial of the case and rely on

15  her as your attorney in representation?

16      MR. MASSEY:  Yes, sir.

17      THE COURT:  All right.  Thank you.  Ms. Thomas, it

18  appears then that Mr. Massey has indicated to the Court that

19  he is, as we go to trial, satisfied with your representation

20  and does desire that you stay on in the case.

21      I'll hear you further then, if you wish to make any

22  argument or present any evidence in further support of your

23  Motion to Withdraw.

24      MS. THOMAS:  Your Honor, I have nothing further.

25      THE COURT:  Okay.  Well, the Court will find, as

1   brief FINDINGS OF FACT, I'll just make this in a narrative

2   form, and, you can be seated Mr. Massey, if you wish.

3        That the state has called for trial the cases of

4   **State of North Carolina Vs. Shawn Massey**, in File Nos. 98 CRS

5   33739, 33740, 33741, and 141972, 33738; the charges of three

6   counts of second-degree kidnapping, charge of breaking and

7   entering, charge of robbery with a dangerous weapon.

8        The state contends that the offenses occurred on

9   May 22, 1998.

10       Present in court for, at the time the cases were

11  called for trial, was Mr. Eric Cottrell, Assistant District

12  Attorney and Ms. Janet Thomas, attorney for the defendant;

13  and, the defendant, Shawn Massey.

14       The state first addressed the Court to join all the

15  offenses for trial. Without objection, the offenses were

16  joined for trial.

17       The defense presented to the Court an oral Motion

18  to Withdraw, citing some difficulty in the working

19  relationship between her and her client, Shawn Massey.

20       The Court, upon advising Mr. Massey as to his right

21  to remain silent and anything that he said could be used

22  against him and cautioning the defendant that he should limit

23  his comments to his attorney's Motion to Withdraw, has

24  addressed the Court and has indicated that he in fact

25  satisfied with his attorney's representation. He does feel

1    that he can work with his attorney in representation of his -

2    - of the charges he faces and does not wish that  Ms. Thomas

3    be relieved of representation.

4            Upon hearing this, the Court allowed counsel for

5    the defendant to be heard further, at which time, counsel for

6    defendant did not further wish to argue or present evidence

7    to the Court.

8            And, based upon these **FINDINGS OF FACT**, the Court

9    will **CONCLUDE** that there does still exist a working

10   relationship between the defendant and defendant's attorney

11   and that the defendant is in fact satisfied with the

12   representation of himself by Ms. Thomas and that he, as

13   defendant, feels like Ms. Thomas can and is in a position to

14   represent him in the charges which he now faces and has faced

15   for some 17 months.

16           Let me stop right here and just make one inquiry,

17   Ms. Thomas. Ms. Thomas, having heard the information that

18   Mr. Massey just provided to the Court, which I have not

19   adopted as findings of fact, do you feel, Ma'am, that you,

20   having represented Mr. Massey for the 17 months that you

21   have, are in a position to proceed as counsel?

22           MS. THOMAS: I do.

23          THE COURT: All right. The Court, upon further

24   inquiry of counsel for the defendant, Ms. Thomas, has also

25   determined that Ms. Thomas feels that she can represent Mr.

1    Massey and is prepared to do so.

2            The Court will determine then that the defendant --

3    the defendant's counsel's Motion to Withdraw should not be

4    allowed.  And, pursuant to 15A-144 -- well, in the interest

5    of time, for the record, I'll just say 15A-[blank].  I can't

6    remember the statute number, at the moment.

7            That there has not been shown sufficient cause and

8    good cause or just cause for the withdrawal and a motion to

9    be allowed.

10           **AND, THEREFORE, IT IS ORDERED THAT THE MOTION TO**

11   **WITHDRAW IS DENIED.**

12           Okay.  We'll proceed then to the next motion.  The

13   next motion is what?

14           MS. THOMAS:  Your Honor, the next motion is a

15   Motion to Suppress the out of court identification.

16           THE COURT:  Okay.  And, that is a written motion

17   which has been filed.  Is that correct?

18           MS. THOMAS:  It is, Your Honor.

19           THE COURT:  Okay.  Thank you.  Let me have just a

20   moment then to read the motion.

21           Okay,  Thank you.  I've had an opportunity to read

22   now the Motion to Suppress the identification testimony and

23   affidavit.  It does seem to deal specifically with Samantha

24   Wood.  Is that correct?

25           MS. THOMAS:  It is, Your Honor.

1    THE COURT:  All right.  I'll hear you, if you wish

2  to make oral argument or give me any introduction to your

3  motion.  I'll then allow the state to be heard as to the

4  Motion to Suppress.  Anything else you wish to provide, at

5  this time?

6    MS. THOMAS:  Your Honor, I would just ask that the

7  state present the evidence first.  And then, have a chance to

8  be heard, at the end.

9    THE COURT:  All right.  Thank you.  Very well.

10  What says the state, as to the defendant's Motion to

11  Suppress?

12    MR. COTTRELL:  Your Honor, this motion was only

13  served on me this morning.  In fact sir, the Certificate of

14  Service says it was issued on 14th day of September.

15    Ms. Wood is present in the courtroom.  The state

16  could provide evidence from her.  However, the officer who

17  showed her the photographic line-up is not here nor is he

18  available until tomorrow morning.

19    I believe we probably could provide enough evidence

20  for the Court to rule on this motion, through her.  But, I

21  wanted to make the Court aware of that.

22    THE COURT:  I frankly don't know whether you could

23  or not.  Sir, it would probably be necessary for me to hear

24  the testimony of the officer.  And, as I say that, because

25  what I would be most interested in would be the manner in

1  which photographs were chosen.

2  　　　　MR. COTTRELL:  I understand.

3  　　　　THE COURT:   The array and how they were show to

4  Ms. Wood.  It might certainly be necessary to hear from Ms.

5  Wood, as well.  I will tell you, I would like to hear from

6  the officer.

7  　　　　MR. COTTRELL:  I understand, Your Honor.  I would

8  certainly had him standing by, had I had more notice of this

9  motion.

10  　　　　THE COURT:   All right.  Well, what we can do then

11  -- I'll hear from the state or the defense.  I don't know how

12  we can proceed with the testimony of Samantha Wood until this

13  motion is ruled on.

14  　　　　MR. COTTRELL:  Your Honor, I think at this point, I

15  would OBJECT to the motion, as to the lack of timeliness.  It

16  was not filed in the week preceding court.  And, I believe it

17  is objectionable on that basis.

18  　　　　THE COURT:   Okay.

19  　　　　MR. COTTRELL:  We could, Your Honor, if the Court

20  wishes, we could hold a voir dire, at the appropriate point

21  in the trial, of the officer, I'm speaking of.

22  　　　　THE COURT:   Do you wish to be heard on the timing

23  of the motion?

24  　　　　MR. COTTRELL:  Yes, Your Honor.  Just that it was

25  not filed until --

1    THE COURT:  All right.  We'll look at 15A-975,

2  15A-976 then.  And, I take it the state is referring to 15A-

3  976, the timing of the pre-trial suppression motions and

4  hearings; 15A-976 reads:   [Reading.]

5         "A Motion to Suppress  evidence in Superior Court

6  may be made at any time, prior to trial, except as provided

7  in Sub-section D."

8         "D" reads: [Reading.]

9         "If the state gives notice, not later than 20

10 working days before trial, of its intention to use evidence

11 and that the evidence is at a time listed in 15A-976(b), the

12 defendant may move to suppress the evidence, only if it's

13 made not later than 10 working days following receipt of

14 notice from the state."

15         MR. COTTRELL:  That's correct, Your Honor.

16         THE COURT:  Okay.  Well, does the state contend

17 this is a time --

18         MR. COTTRELL:  Yes, sir.  The state contends it

19 would have given notice when discovery was sent out, of this

20 evidence.  All the evidence that's being moved to be

21 suppressed, Your Honor, was contained in the initial

22 discovery packet.  And, my records, Your Honor, show that

23 that was sent on November 6, 1998.

24         THE COURT:  Well, I guess I need to be specific

25 then.  What is the state's contention as to why you are

1  objecting to it, at this timelines?  I know it has been

2  presented now.  But, --

3          MR. COTTRELL:  Well, Your Honor, --

4          THE COURT:   -- according to 15A-176, a Motion to

5  Suppress evidence can be made at any time, prior to trial,

6  except as in Sub-section D of 15A-976.

7          And, in that Sub-section, referring to 15A-975,

8  which deals with, [Reading.]

9          "The statements of the defendant or evidence

10  obtained by virtue of a search, without a search warrant, or

11  evidence obtained as a result of the search or a search

12  warrant, when the defendant is not present."

13          MR. COTTRELL:  Your Honor, I'll stand corrected.

14  According to my review of 15A-975(b), it would appear that

15  this evidence would not fall under that.  And therefore, this

16  motion could be made at any time.

17          So, I will WITHDRAW that motion.

18          THE COURT:  All right.  We'll proceed then.  I'll

19  need to hear some suggestions then from the parties as to how

20  we can proceed.

21          I would assume we can proceed with jury selection;

22  but, I assume, after jury selection, the state would want to

23  go into the testimony, at some point in time, probably

24  without much delay, the testimony of Samantha Wood.

25          And certainly, as part of Samantha Wood's

1  testimony, would be the identification of the defendant. Is

2  that correct?

3         MR. COTTRELL: That's correct, Your Honor.

4         THE COURT: All right. And, that the MOTION WILL

5  BE ALLOWED then. Then, the jury would have heard evidence

6  which the Court would be suppressing.

7         So, I see a problem then, in the absence of the

8  officer. What is the problem with the absence of the officer

9  not being here? I understand you just received the motion.

10 So, I'm not faulting the state for not having the officer

11 here now. I understand, not knowing this motion was coming.

12 So, you have a right not to have him be here. That's fine.

13 But, is there any way to getting the officer here?

14        MR. COTTRELL: Well Your Honor, the officer is in

15 Holden Beach at a family reunion.

16        THE COURT: Is where, sir?

17        MR. COTTRELL: In Holden Beach, North Carolina.

18        THE COURT: Okay.

19        MR. COTTRELL: For a family reunion. I was trying

20 to work with him. I left him a phone message this morning,

21 telling him I would expect him to be here tomorrow morning at

22 9:30 to testify.

23        And of course, I wasn't sure how the Motion to

24 Withdraw was going to go. So, I wasn't sure if this case

25 would even proceed.

1    Even if I got a message to him right now, Your

2 Honor, I'm not sure he could make it back before the end of

3 the day.

4        We certainly could present testimony from Ms. Wood;

5 but, I don't see how we can present testimony from that

6 officer until tomorrow morning.

7        THE COURT:   Well, you understand for me to rule on

8 the motion, I'm going to need to know about the

9 identification procedures?

10        MR. COTTRELL:   That's correct.

11        THE COURT:   I'm doubting that Ms. Wood, as a

12 civilian, who was not, I take it, a part of it; certainly not

13 a part of the selection of the photographs?

14        MR. COTTRELL:   That's correct.

15        THE COURT:   And, simply as to the array, I do not

16 believe she would be able to give the Court testimony as to

17 that information.  And, that's going to be the primary basis

18 of my ruling.

19        So, I'm going to need, if not the officer who did

20 the array; some officer who can testify as to that.

21        Does the state know of any other officer who might

22 work in a similar capacity with the officer that the state

23 feels like it needs, who can testify; if that officer might

24 be available?

25        MR. COTTRELL:   Yes, Your Honor.   There is an

1 officer, I believe, actually prepared the photographic line-

2 up. That officer was not the officer who showed it to the

3 victim. And, I can have that officer in here this morning.

4     THE COURT: How long do the parties estimate this

5 case will take?

6     MR. COTTRELL: Approximately two days, Your Honor.

7     THE COURT: Counsel approach the bench, if you

8 would, please.

9 {Conference at sidebar, outside the hearing of the this Court

10 Reporter, with all attorneys present.}

11 {Thereupon, the following proceedings take place in open

12 court.}

13     THE COURT: Ms. Thomas, have you discussed the

14 matter with your client?

15     MS. THOMAS: I have, Your Honor. And, we do not

16 oppose that.

17     THE COURT: All right. Let me just announce that,

18 for the record, I did call counsel to the bench and we

19 discussed the matter which we found ourselves, there being a

20 Motion to Suppress the identification made by Samantha Wood,

21 whom the state contends was the victim in the charges that

22 Ms. Massey faces.

23     The motion deals with the suppression of Ms. Wood's

24 identification of Mr. Massey; and, specifically challenges

25 the identification procedures utilized, alleging that they

1  were improper and unnecessarily suggestive and giving rise to

2  a substantial likelihood of irreparable mis-identification.

3       It would, obviously, be necessary for the Court to

4  hear from the officer or officers involved in the

5  identification process, as well as Ms. Wood.

6       The Court has been advised by the state that that

7  officer is not available and would not be available until

8  tomorrow morning.  The Court is not faulting the state; but,

9  with that officer's absence from this stage of the

10  proceeding, since the state was only served with this Motion

11  to Suppress the identification testimony; and, the state only

12  being made aware then that this officer was needed in court,

13  at an early stage of the trial, on this date.

14       The Court then faces itself with a predicament of

15  being unable to proceed, to any degree, in the trial, being

16  unable to rule on the motion.

17       The Court proposed to counsel at the bench and the

18  Court is advised now that counsel is willing to proceed in

19  this manner.  If we proceed with the jury selection process

20  and with the testimony of Ms. Samantha Wood, it will be

21  assumed that this would be done in a manner as if the Court

22  had ruled on the motion and had denied the motion.

23       The Court, however, will not have ruled on the

24  motion and will not rule on the motion until tomorrow

25  morning, at which time it can hear from the identifying

1 officer; the officer can identify the procedure used by the

2 officer and such other evidence as the state might wish to

3 present.

4 If [the state] grants the Motion to Suppress, the

5 state has advised the Court that this really the state's

6 case, Ms. Wood's identification of the defendant. And,

7 should the Court allow the Motion to Suppress, the state will

8 be forced to and the Court is advised that the state would

9 take a voluntary dismissal to the charges, having no evidence

10 of identification that the defendant is the perpetrator of

11 the offenses.

12 If the Court were to deny the defendant's motion,

13 then the case would proceed in the manner in which it had

14 already begun.

15 This is being done, being the use of time, to the

16 best manner possible. The motion will be heard then,

17 tomorrow morning, just in the same sense as if it had been

18 presented anew.

19 The defendant will not be prejudiced in any way by

20 the proceeding in this manner, since should the Court allow

21 the Motion to Suppress, the cases would end, by termination

22 with a voluntary dismissal by the state.

23 Since the Court can not make a ruling until it

24 hears from the officer; the officer is not available until

25 tomorrow morning, the only other alternative is not to do

1  anything until tomorrow morning, which would result in a

2  substantial loss of valuable court time.

3  Is the state prepared to proceed in that manner

4  then?

5  MR. COTTRELL:  We are, Your Honor.

6  THE COURT:  Is the defense prepared to proceed in

7  that manner?

8  MS. THOMAS:  We are.

9  THE COURT:  All right.  Recognizing that should

10  the Court allow the motion tomorrow morning, that would in

11  effect terminate the state's basis for the cases against Mr.

12  Massey.

13  Does the state understand and accept that?

14  MR. COTTRELL:  Yes.  That's correct, Your Honor.

15  THE COURT:  All right.  We'll put this motion

16  aside then.  I will rule on it, without any prejudice to the

17  defendant, if evidence has been presented today.

18  The only thing at all then is it might not be

19  necessary to present testimony for Ms. Wood tomorrow morning,

20  in opposition to the motion, since I will be hearing from Ms.

21  Wood, today.

22  I will likely then incorporate Ms. Wood's testimony

23  today, in my ruling tomorrow, without the necessity of the

24  state re-presenting evidence.

25  Is that clear to the parties?

1    MS. THOMAS:  It is.

2    MR. COTTRELL:  Yes, sir.

3    THE COURT:  All right.  Other than that, are there

4    any other matters to be resolved, before jury selection?

5    MR. COTTRELL:  No, Your Honor.

6    MS. THOMAS:  Your Honor, we would ask for a brief

7    recess so the defendant can change.

8    THE COURT:  Yes.  I'm sorry.  I was advised there

9    was a problem with obtaining street clothes; but, I did see

10   what looked like street clothes being brought in.  So, I take

11   it there are clothing available for the defendant?

12   MS. THOMAS:  There are.

13   THE COURT:  All right.  Thank you, Ms. Thomas for

14   bringing that to my attention.

15   Why don't we take a short recess then.  And, how

16   much time do you think you will need, Ms. Thomas, for Mr.

17   Massey to get ready?

18   MS. THOMAS:  About ten minutes.

19   THE COURT:  That would be fine.  And then, once we

20   begin with this jury selection process, we might try to

21   proceed through our jury selection, without taking a normal

22   break at 11 o'clock.

23   So, we'll go-ahead and take a morning recess a bit

24   early so that Mr. Massey can be attired in regular street

25   clothes, rather than prison uniform that he is wearing now.

1  And, when Mr. Massey is so attired, we'll resume in about 10

2  minutes. And, at that time if there is nothing further, we

3  would be prepared to proceed with jury selection process.

4       All right. We'll be in recess for about 10

5  minutes.

6  {Court stands in recess.}

7  {Court reconvenes.}

8  [JURY SELECTION BEGINS, at 10:32 a.m.]

9       THE COURT:  Ladies and gentlemen of the jury,

10 welcome to Superior Court for Mecklenburg County. My name is

11 Jim Baker. I'm a judge in Superior Court. I've been

12 assigned to hold court here in your county for the 6-month

13 period from July to December. I've had the occasion to serve

14 in your county a few times before. It's a pleasure to be

15 here.

16      Ladies and gentlemen of the jury, I want to address

17 myself to those of you who have been selected to serve as

18 potential jurors, at this session of the criminal Superior

19 Court.

20      Let me advise you that the state has called for

21 trial in this courtroom, the cases that are entitled, **State**

22 **of North Carolina Vs. Shawn Massey**. I'll advise you that the

23 defendant in these cases is Mr. Shawn Massey.

24      Mr. Massey, if you would please, raise your hand;

25 turn and face the jury so they can see you. Thank you, sir.

1    And, with Mr. Massey, at the same table, is his

2  attorney, Ms. Janet Thomas. Ms. Thomas is now standing and

3  facing you, as well.

4    Members of the jury, at the other table is the

5  Assistant District Attorney, Mr. Eric Cottrell. Mr. Cottrell

6  is turning and facing you, as well.

7    Ladies and gentlemen of the jury, in these cases,

8  the defendant has been charged with robbery with a dangerous

9  weapon, three counts of second-degree kidnapping, and a

10  charge of breaking and entering.

11    Ladies and gentlemen of the jury, the offenses are

12  alleged to have occurred on or about May 22, 1998; and, the

13  alleged victim of the offenses is Ms. Samantha Wood. I

14  believe Ms. Wood is in the courtroom. Ms. Wood, if you would

15  please -- yes; she is standing and facing you, as well. And

16  also, Brandon Wood and Leola Smith, who, as I understand it,

17  are minors.

18    Now, Ladies and gentlemen of the jury, the

19  defendant has entered pleas of "Not guilty," to these

20  charges. I have ordered that the charges be joined for one

21  trial.

22    Now, after we have selected a jury and after the

23  jury has been impaneled, you'll hear the evidence. The

24  evidence will be presented to you, according to certain rules

25  of law. It is my job, as judge, to enforce those rules and

1  to determine what evidence can be admitted.

2         After you've heard all of the evidence and after

3  the arguments of the attorneys have been presented to you,

4  then I will give you further instructions on the law that you

5  are to apply to the evidence in this case.

6         It will be your duty to apply the law as I give it

7  to you and not as you think the law is or as you might like

8  the law to be.

9         This is, of course, important because justice

10  requires that everyone who is tried for the same crime be

11  treated in the same way and have the same law applied in each

12  such case.

13         At this time, Ladies and gentlemen, you're not

14  expected to know the law and the attorneys won't question you

15  about the law, except perhaps to ask if you can accept and

16  follow it, as it is given to you by the Court.

17         Now, I want to tell you just a few things about the

18  law, in a criminal case, such as this.

19         As I have advised you, the defendant, Mr. Massey,

20  has tendered pleas of "Not guilty." Under our system of

21  justice, when a defendant pleads "Not guilty" he's not

22  required to prove his innocence, he is presumed to be

23  innocent.

24         This presumption remains with the defendant

25  throughout the trial, until the jury selected to hear the

1  case is convinced from the facts and from the law, beyond a

2  reasonable doubt, as to the guilt of the defendant.

3      The burden of proof is on the state to prove to

4  you that the defendant is guilty, beyond a reasonable doubt.

5  There is no burden or duty of any kind on the defendant.

6  And, the mere fact that the defendant has been charged of a

7  crime or crimes, is no evidence of his guilt.

8      A charge is merely the mechanical or administrative

9  way by which any person is brought to a trial.

10      Now, if the state does prove guilt, beyond a

11  reasonable doubt, then the function of the jury, by its

12  verdict, in that charge, is to say, "Guilty."

13      If the state fails to prove guilt or if you have a

14  reasonable doubt, then, of course, in that charge, you must

15  say, "Not guilty."

16      Now Ladies and gentlemen of the jury, this case is

17  a very important case, obviously to Mr. Massey; it's a very

18  important case to the state.  It is not expected to take very

19  long though.  The estimation of the parties is that the case

20  will be concluded in two days.  I take it then the case is

21  expected to end tomorrow.  That is an estimation.

22      Members of the jury, we're going to proceed now

23  with our jury selection process.  We will first call twelve

24  names.  When your name is called, please come forward; take a

25  seat that is pointed out to you.

1    Questions will be asked of the twelve jurors by the

2  Court first and then by the state and then by the defendant.

3  All of you should listen carefully to questions which are

4  asked, since the state and the defendant can excuse a limited

5  number of jurors, without giving any reason for doing so.

6    If the parties feel that it would be best that that

7  juror serve as a juror in another case or jurors can be

8  challenged for case, if there is some reason why that juror

9  could not serve in this case.

10    So Members of the jury, we'll proceed then.   Please

11  listen carefully to all the questions and we'll move to the

12  jury selection process.

13    Madame Clerk, if you would please, call twelve

14  names.

15  [TWELVE POTENTIAL JURORS ARE SEATED.]

16    THE COURT:   Ladies and gentlemen, those of you who

17  have been called as the first twelve, I want to begin by

18  asking you some basic questions; and then, the state will ask

19  questions; and then, the defense.

20    First of all, Ladies and gentlemen, do any of you

21  feel that you know the defendant in this case, Mr. Shawn

22  Massey?

23    If you would show, by raising your hand?

24    JURY:      [No verbal response.]

25    THE COURT:   Do any of you know Shawn Massey or

1    think you might know Mr. Massey?

2              JURY:        [No verbal response.]

3              THE COURT:    I believe I will expand that to

4    include members of family.  Do any of you feel you have any

5    knowledge of Mr. Shawn Massey?

6              JURY:        [No verbal response.]

7              THE COURT:    Do any of you feel you know Mr.

8    Massey's attorney, Ms. Janet Thomas?

9              If you would show by raising your hand?

10             JURY:        [No verbal response.]

11             THE COURT:    Do you think you know her or if she is

12   associated with any firm, any firm that she might be working

13   with?

14             JURY:        [No verbal response.]

15             THE COURT:    No hands being raised, Members of the

16   jury, do any of you know the Assistant District Attorney in

17   the case, Mr. Eric Cottrell?

18             JURY:        [No verbal response.]

19             THE COURT:    Any of you know Mr. Cottrell?  If you

20   would show by raising your hand?

21             JURY:        [No verbal response.]

22             THE COURT:    Seeing no hands being raised, Members

23   of the jury, I have told you that Mr. Massey is charged with

24   three counts of second-degree kidnapping, breaking and

25   entering and robbery with a dangerous weapon.  He has entered

1  pleas of [guilty] to those charges.  It is alleged that they

2  occurred on May 22, 1998.  It's further alleged by the state

3  that the victim is Samantha Wood and Brandon Wood and Leola

4  Smith.

5       Do any of you feel like you know any of the people

6  that I have named here at the end; or, that you might have

7  heard anything about these cases or read anything about these

8  cases?

9       JURY:       [No verbal response.]

10      THE COURT:    Seeing no hands being raised at all,

11  Members of the jury, thank you.  I'll let the jury selection

12  process be in the hands of the state.

13      MR. COTTRELL:   Thank you, Your Honor.

14  [JURY VOIR DIRE BY MR. COTTRELL AND MS. THOMAS, COMPLETE

15  RECORDATION NOT BEING REQUESTED.]

16  [JURY IMPANELED, at 12:20 p.m.]

17      THE COURT:    Members of the jury, you have now been

18  selected and impaneled to serve as jurors in the case of

19  State of North Carolina Vs. Shawn Massey.   At this time I

20  will give you some instructions and explain to you the manner

21  in which we'll proceed, as we attempt, together, to find the

22  truth in these cases.

23       First of all, Members of the jury, let me give you

24  some idea of the various time table that we will use.  It is

25  customary to break for lunch from 12:30 to 2 o'clock.  We

1  will be following that schedule.

2         Just to let you know about the later time periods,

3  we will take an afternoon recess, somewhere between 2:00 and

4  5 o'clock. It will be our practice to stop at 5 o'clock. I

5  won't cut someone off in mid-sentence; but, it will be around

6  5:00 or approximately 5:00 when we'll stop for the day.

7         We would like to begin tomorrow morning at 9:30;

8  take a mid-morning recess; and, follow the same afternoon

9  schedule as I have indicated.

10        Now, as we begin the presentation, the attorneys

11  first are going to have an opportunity to make opening

12  statements to you.

13        The purpose of an opening statement is narrow and

14  limited. It is merely an outline of what that attorney

15  believes is the competent and admissible evidence should be.

16  An opening statement is not evidence and must not be

17  considered by you as evidence.

18        The evidence will come in the form testimony of

19  witnesses, admissions or stipulations or physical exhibits

20  that might be offered by the parties.

21        And then, after the opening statements evidence

22  will be presented, at that time, witnesses will be placed

23  under oath and will be questioned by the attorneys.

24        It may also be that during the course of the trial,

25  documents or tangible exhibits might be offered and received

1  into evidence.  If some exhibit is given to you to examine,

2  then you should examine it carefully and individually and

3  without comment to your fellow jurors.

4          Now Members of the jury, as we proceed in this

5  hearing, it is the right of the attorneys to object when

6.  evidence or testimony is offered which that lawyer believes

7  is not admissible.

8          If the I sustain an objection to a question, you,

9  as jurors, must disregard the question and the answer, if one

10  was given, and draw no inference to the question or answer or

11  speculate what the witness might have said, if I had

12  permitted the witness to answer.

13          If I overrule an objection, to evidence, then you

14  must not give that evidence any more weight than if no

15  objection had been made at all.

16          The attorneys also have the right make a Motion to

17  Strike all or part of a witness' answer to a question.  If I

18  allow that Motion to Strike, then you are to disregard and

19  not consider the evidence that has been stricken.

20          Now, during the course of this trial, as often

21  happens, a questions of law arises that has to be considered

22  by the Court, out of the presence of the jury.

23          If and when that should happens, then I'll ask that

24  you go to the jury room for a few minutes; maybe we'll take a

25  recess.

1   Don't worry or speculate about what we're doing in

2   your absence.  We will merely be considering and resolving

3   those issues of law that do have to be heard outside the

4   presence of the jury.

5   All of the evidence though, will be presented to

6   you, while you're present in the courtroom.

7   And then, after the evidence has been presented,

8   the attorneys will have an opportunity to make final

9   arguments or closing arguments to you.

10  These final arguments of the attorneys are not

11  evidence; but, are given to assist you in evaluating evidence

12  which you've already heard.

13  Finally, just before you retire to begin

14  considering your verdict, I will give you further

15  instructions on the law which applies to each particular

16  charge.  At that time, I will declare and explain to you the

17  particular law arising from the evidence.

18  Then, you will be taken to the jury room to

19  deliberate upon your verdict.

20  Now Members of the jury, while you're serving as

21  jurors in this case, there are certain rules that you must

22  always keep in mind.

23  The first of all, you must not talk about the case

24  among your selves.  The only place that you can talk about

25  this case in the jury room.  But then, only after I tell you,

1  you may begin your deliberations.

2  　　　　Second, you must not talk about the case with

3  anyone else; which includes members of your own family. And,

4  you must not allow anyone else to talk with you about the

5  case or say anything in your presence about the case.

6  　　　　If anyone attempts to communicate with you or does

7  communicate with you about the case, you should bring that to

8  my attention, as soon as possible.

9  　　　　Third, while you're sitting as jurors in this case,

10  you must not form any opinions about the guilt or innocence

11  of the defendant.  Nor are you to express to anyone any

12  opinion about the case until I tell you to begin your

13  deliberations.

14  　　　　Fourth, you may not talk or communicate, in any

15  way, with any of the people who are involved in the case.

16  That includes the defendant, the witnesses, the attorneys,

17  anyone who has any interest at all in this case.

18  　　　　This rule applies inside, as well as outside the

19  courtroom.  And, prohibits all types of contact; whether it's

20  to talk about the case; whether it's to talk about the

21  hurricane heading our way, perhaps; or to talk about anything

22  else.  You're not to have contact with people at all who

23  were involved in this case.

24  　　　　If you have some concerns about your jury service,

25  then you may go to a bailiff.  You may ask the bailiff a

1  question; if necessary, the bailiff will bring it to my

2  attention.

3  Members of the jury, I don't know that this case

4  will receive any publicity or coverage by the media.  But, if

5  it does, you must not read about this case in any newspaper;

6  do not listen to it on any radio broadcast about it; or,

7  watch any television report about this trial.

8  Newspaper or radio or television accounts may be

9  inaccurate or it may contain references to matters that are

10  not proper for you to consider as jurors.  Your verdict has

11  to be based exclusively on what's presented to you, inside

12  this courtroom.

13  And finally, Members of the jury, you're not to

14  make any type of independent investigation

15  Again, your verdict has to be based exclusively

16  upon the evidence that has been presented to you.

17  Now Members of the jury, unless you follow all

18  those rules, there is no way that the state or the defendant

19  can have an absolutely fair and impartial trial.  You're

20  under a continuing obligation, while you serve as jurors,

21  which is to remain fair and impartial triers of the facts.

22  Now Ladies and gentlemen of the jury, it is about

23  time for our luncheon recess.  Rather than get into any

24  opening arguments, we'll stop for lunch here and I'll ask

25  that you return at 2 o'clock.

1    As you leave, the bailiff will give you some
2 instructions on the exact time you should return and where
3 you are to meet. I'll have you brought into the courtroom as
4 soon as you're present. Then, we'll proceed with the opening
5 arguments and then with the evidence.
6    Members of the jury, have a good lunch. Please
7 return at 2 o'clock.
8 {The following proceedings take place in open court, outside
9 the presence of the jury.}
10    THE COURT: In the absence of the jury, anything
11 from the state or the defense or any matters that need to be
12 brought to the Court's attention before we break for lunch?
13    What does the state say?
14    MR. COTTRELL: Nothing from the state.
15    THE COURT: What says the defendant?
16    MS. THOMAS: Nothing for the defendant.
17    THE COURT: All right. Thank you. We'll proceed
18 at 2 o'clock. Does the state plan to make an opening
19 statement?
20    MR. COTTRELL: Yes, sir.
21    THE COURT: All right. I take it the defense does
22 as well?
23    MS. THOMAS: Yes, Your Honor.
24    THE COURT: Very well. We'll proceed at 2 o'clock
25 with opening statements and the state's presentation of

1   evidence.

2   {Court stands in recess.}

3   {Court reconvenes.}

4           THE COURT:   All right.  In the absence of the

5   jury, anything for the state before the jury is brought in?

6           MR. COTTRELL:  No, Your Honor.

7           THE COURT:   Anything for the defense, before the

8   jury is brought in?

9           MS. THOMAS:  No, Your Honor.

10          THE COURT:   Sheriff, let's go-ahead and have our

11  jury come in.

12          While the jury is coming, I would request or ask

13  the defendant if the defense would like a continuing

14  objection to the testimony of Ms. Wood, concerning items of

15  identification?

16          MS. THOMAS:  We would, Your Honor.

17          THE COURT:   I'll let you go-ahead and do that,

18  since there is a proceeding in somewhat of an unusual manner,

19  in the interest of time.

20          I'll just note your objection.  You don't need to

21  make a continuing objection to that -- no need to make

22  objections to that.  If there are other objections during

23  presentation of that, you are certainly still free to object.

24          MS. THOMAS:  Thank you, Your Honor.

25          THE COURT:   All right.

1   {Thereupon, the following proceedings take place in open

2   court, in the presence of the jury.}

3          THE COURT:   The Court will note that all of our

4   jurors are present.  Ladies and gentlemen of the jury, I hope

5   you had a good lunch.  We're ready to proceed now with the

6   opening arguments.

7          Please remember what I told you about opening

8   arguments; that those opening statements are not evidence and

9   must not be considered by you as evidence; but, the evidence

10  will come in the form of testimony or other exhibits that

11  might be presented into evidence.

12         Does the state wish to make an opening argument?

13         MR. COTTRELL:  Yes, Your Honor.

14         THE COURT:   You  may proceed, sir.

15  [OPENING STATEMENT, BY MR. COTTRELL]

16  [OPENING STATEMENT, BY MS. THOMAS]

17         THE COURT:   All right.  Thank you, counsel.  The

18  statement may call it's first witness.

19         MR. COTTRELL:  Thank you, Your Honor.  We would

20  call Ms. Samantha Wood.

21  [WITNESS SWORN.]

22         THE COURT:   Please be seated, ma'am.  The witness

23  is with the state.

24         MR. COTTRELL:  Thank you, Your Honor.

25

SAMANTHA ROSE WOOD, BEING FIRST DULY SWORN, TESTIFIES AS
FOLLOWS DURING DIRECT EXAMINATION BY MR. COTTRELL:

Q.  Ms. Wood, would you please state your full name, for the
jury and spell your last name for our Court Reporter?

A.  Samantha Rose Wood; W-O-O-D.

THE COURT:  And Ms. Wood, if you would please keep
your voice up so we can all hear you.  Remember, we must all
hear you in the courtroom.

MS. WOOD:  Okay.

Q.  Ms. Wood, in May of 1998, where were you living, ma'am?

A.  5206 Cherry Crest Lane, Apartment B.

Q.  Okay.  And, Ms. Wood, I'm going to repeat what the judge
has just said.  I'm having a little problem hearing you;
probably some of the jurors may have a problem, too.  So,
just keep your voice up.  Thank you, ma'am.

Q.  Was that address in Mecklenburg County, ma'am?

A.  Yes.

Q.  And, who else was living with you there?

A.  My husband my two children.

Q.  What were the names of your two children, ma'am?

A.  Leola Smith and Brandon Wood.

Q.  And, do you recall how old they were at time of this
incident?

A.  They were six months; Brandon was; and, Leola was a year
and-a-half.

1   Q.   About how long had you lived at 5206 Cherry Crest Lane, on

2   May 22, 1998?

3   A.   We rented it the August before; but, I didn't move up from

4   Georgia until January of that year.

5   Q.   Do you recall how early you got up on May 22, 1998?

6   A.   Four o'clock in the morning because I had to take Richard

7   to work.

8   Q.   And, how did you go to take him to work?

9   A.   We went -- he was working for a Columbia Foods then; so,

10  we drove -- It was like three or four blocks down.

11  Q.   And, did you leave from your apartment?

12  A.   Yes.

13  Q.   Did you drive a car to your husband's work?

14  A.   Yes.

15  Q.   How many cars did your family own at that time?

16  A.   One.

17  Q.   Did you drive the car back?

18  A.   Yes.

19  Q.   Okay.  Where was the parking lot that your car was parked

20  in, in relation to your apartment?

21  A.   We had to go through a hallway to get to our apartment.

22  It was the last one.  Our apartment was the last one on the

23  left.

24  Q.   And, was this a ground-floor or upstairs apartment?

25  A.   Ground-floor.

1  Q. Did you go out any other times during the morning of May

2  22, 1998?

3  A. Yeah. I went out; it was 8:30; because, I picked up his

4  paycheck every week.

5  Q. What did you do with your children when you went to go get

6  his pay check?

7  A. I took them with me.

8  Q. After you got the paycheck, what did you do then?

9  A. I went to the bank and cashed the check and put most of it

10  in the bank. And, I went to the bakery which is right down

11  the road, on Old Pineville Road.

12  Q. What did you do there?

13  A. I got bread and cookies for the kids.

14  Q. Did you go any place else, after you went to that store?

15  A. No.

16  Q. Okay. Where did you go, after leaving the store?

17  A. I went to my apartment.

18  Q. Do you recall what time you arrived back at your

19  apartment?

20  A. It was around 10:00.

21  Q. Did you walk back from your car to your apartment?

22  A. Yes.

23  Q. Could you please describe to the jury how you were holding

24  your children?

25  A. I had Brandon in a baby carrier that straps around your

1  front of you. And then, Kyle -- I mean, Leola, she was

2  walking at the time. So, she was right beside me and I had

3  her in hand.

4  Q. What happened to you, as you were walking toward your

5  apartment? STRIKE THAT.

6          About how light was it outside, at this time? Do

7  you recall?

8  A. It was daylight.

9  Q. What happened, as you walked to your apartment?

10  A. I was at the door and everything and the man snatched

11  Leola away from me and he put a gun to her head and told me

12  to open up the door.

13  Q. All right. Could you -- was your door in a recess or was

14  it flush against the wall?

15  A. It was off about four inches indention.

16  Q. Now, were your doors -- I believe you testified earlier it

17  was a hallway; correct?

18  A. Yes.

19  Q. How big is this hallway?

20  A. About three, four foot.

21  Q. How close to the doorway were you when you were aware that

22  someone had picked up Leola?

23  A. I was at the door.

24  Q. Okay. Were you looking at her when she got picked up?

25  A. No.

1  Q.  How did you know she was picked up?

2  A.  Because she was pulled away from my hand.

3  Q.  What did you do when you felt her pull away?

4  A.  I looked toward her.

5  Q.  What did you see when you looked toward her?

6  A.  A man had her; was holding her and everything, with the

7  gun to her head.

8  Q.  About how close was this man to you at that time, when you

9  first saw him?

10  A.  About two foot.

11  Q.  Could you hold your arms out and show about how close that

12  is, to the jury?

13  A.  About that far.

14  Q.  Thank you.  Could you describe this person?

15  A.  Yes.

16  Q.  What did he look like?

17  A.  He had braids in his hair, with five hanging down.  He was

18  about five-eight; but, I'm short; so, I don't measure that

19  well.

20          THE COURT:  Ms. Wood, if you would, keep your

21  voice up.  I'm having trouble hearing you just this far away.

22  Remember, we all need to hear you, ma'am.  So, just yell, if

23  you have to.  Keep your voice up.  Thank you.

24          You can proceed, Mr. Prosecutor.

25          MR. COTTRELL:  Okay.  Thank you.

1 Q. Let me direct your attention to those braids, Ms. Wood.

2 Did the braids go all through his hair or were they just on

3 the back or just on the sides?

4      Where were the braids?

5 A. They went through.

6 Q. And, how tall was he, in your estimation?

7 A. It was about five-eight. I had to look up to him.

8 Q. Now, are you any kind of expert on estimating height or

9 anything like that?

10 A. No.

11 Q. What was he wearing?

12 A. He had a red shirt, which was like a jersey; and, it had

13 hurricane signs on it.

14      COURT REPORTER: I'm sorry, had what?

15 A. Had hurricane signs on it.

16      THE COURT: I'm sorry. I still couldn't

17 understand.

18 A. Hurricane signs like you're seeing on T.V. now; hurricane

19 signs.

20      THE COURT: Okay. Thank you.

21 Q. Do you remember thinking what kind of shirt it was?

22 A. No.

23 Q. Could you describe the gun that you saw, for the jury?

24 A. It was -- it had a revolving chamber in it; and, it was

25 silver.

1   Q.   How big was the gun, about?

2   A.   It was --

3   Q.   Did it appear to be a toy gun or did it appear to be a

4   real gun?

5   A.   It was a real gun.

6   Q.   When you saw this person, did that person speak to you?

7   A.   He just  motioned me into the house.

8   Q.   How did he do that?

9   A.   With his hands.

10  Q.   With both hands or just one hand?

11  A.   Just one hand.

12  Q.   Which hand was that?

13  A.   The one he had on Leola's shoulder.

14  Q.   At this point, where was the gun pointed?

15  A.   Still at Leola.

16  Q.   Did you open the door to your house?

17  A.   Yes.

18  Q.   What happened then?

19  A.   When we got into the foyer, we have a small foyer and I --

20  you go through to get to our den and living room and all.  He

21  pushed me down in between.

22  Q.   Where was your son, Brandon, at this time?

23  A.   He still was in his holster.

24  Q.   Okay.  What happened once you first got into the house?

25  A.   What do you mean?

1  Q.  After you were pushed down, as you just described, follow

2  me now?

3  A.  [No verbal response.]

4  Q.  What happened next?

5  A.  He told me -- he put Leola down because she was screaming.

6  He told me to quiet her down.  So, I tried to quiet her down;

7  but, she never quieted down; but, she's never around a lot of

8  people.

9  Q.  And, where were you, at this point, in your apartment?

10  A.  Still right there at the foyer.

11  Q.  Okay.  About how long did you try to quiet Leola down?

12  A.  A few minutes; not much.

13  Q.  And, where was the man, during this time?

14  A.  Right beside us.

15  Q.  What was he doing with the gun?

16  A.  He had it just pointing it; that's all.

17  Q.  Where was he pointing it?

18  A.  At us.

19  Q.  After you tried to quiet Leola down, what happened then?

20  A.  He let me get up and take the child off of me.  And, I put

21  both of them in their playpen, in front of the sliding-glass

22  window.

23  Q.  Was it your idea to put them in the playpen?

24  A.  Yes.

25  Q.  As all of this was occurring, about how close was the man

1  who was robbing you standing close to you?

2  A.  He was not far.

3  Q.  This person have any kind of a mask on?

4  A.  No.

5  Q.  Was he talking to you during all of this?

6  A.  He was talking, telling me I needed to keep real quiet

7  because Leola wouldn't quit crying.

8  Q.  While you were still by there in the playpen, did he say

9  anything else to you besides that?

10  A.  No.

11  Q.  Okay.  After you put the kids in the playpen, what

12  happened then?

13  A.  He motioned me into the back or to the right of our

14  apartment, which is our bedrooms.

15  Q.  Did he say anything when he did that?

16  A.  No.  He just kept on pushing until we got to where he

17  stopped.

18  Q.  And, when you say pushing, what exactly was he pushing?

19  A.  He was just kept on just pushing to go this way or that

20  way.

21  Q.  And, what did you do?

22  A.  I was trying to stay calm.

23  Q.  Were you scared?

24  A.  Yes.

25  Q.  Had he ever put the gun down at any point?

1  A.  No.

2  Q.  What happened when you got to the bathroom?

3  A.  He pushed me down on the bed.

4  Q.  Now, does this bathroom have a door?

5  A.  Yes.

6  Q.  Okay.  And, at the time he pushed you down on the bed, was

7  that door open or closed?

8  A.  At that time, he had closed the bathroom door.

9  Q.  What happened after he closed the bathroom door?

10 A.  He told me to stay hushed-up because those walls, saying

11 you could hear and everything.  The apartment is not sound-

12 proof.

13 Q.  Okay.  Could you hear your children?

14 A.  Yes.

15 Q.  What were they doing?

16 A.  They were still crying.

17 Q.  What happened after he told you to stay hushed up?

18 A.  Leola kept on getting out of her playpen, going to the

19 door; beating.  She was on the door, beating.

20 Q.  What happened then?

21 A.  Then he told me to lift my dress.

22 Q.  Did he tell you anything else besides "Lift your dress"?

23 A.  Yes.  He told me to give him some.

24 Q.  Were those his exact words?

25 A.  No.

1  Q.  What were his exact words?

2  A.  He said, "Give me some, bitch."

3  Q.  When he told you that, what did you do?

4  A.  I told him I couldn't.

5  Q.  And, why did you tell him that?

6  A.  Because I was on my monthly.

7      THE COURT:  Ms. Wood, you're going to have to

8  speak up, ma'am, so we can all hear you.  If you will, please

9  direct your voice to answer the questions as if the person

10  was asking you in the back of the courtroom or something.

11      It is necessary the [witnesses] hear all the

12  testimony of all the witnesses.  So, you must keep your voice

13  up, ma'am.  Thank you.

14      You can proceed, Mr. Prosecutor.

15      MR. COTTRELL:  Thank you, Your Honor.

16  Q.  When you told him that, what did he do?

17  A.  He told me to show him.

18  Q.  How close was he to you when all of this was going on?

19  A.  At the edge of the bed.

20  Q.  Did he still have the gun?

21  A.  Yes.

22  Q.  And, what was he doing with the gun, at that point?

23  A.  He was pointing to my head.

24  Q.  When he told you to do that, what did you do?

25  A.  I showed him.

1  Q.  When you do that, what did he do?

2  A.  He told me to get up.  So, I got up because Leola was

3  still knocking at the bottom of the door.

4  Q.  And, were you able to go to the door?

5  A.  Yes.

6  Q.  Okay.  And, what did you do next?

7  A.  He made me -- by that time, I picked up Leola because she

8  crawled out of her playpen.  He made me go through all the

9  house, open up all the cabinets, the doors and everything.

10  Q.  Was he telling you anything when he had you go and open up

11  all the cabinets?

12  A.  Yes.  He kept on telling me, "Open up this and everything

13  else."

14  Q.  Now, did he ever go over and open any of the cabinets up,

15  himself?

16  A.  No.

17  Q.  Where were your children during the time that you were

18  opening up all the cabinets?

19  A.  Kyle was still in the playpen and I was holding Leola.

20  Q.  You need just a second?

21  A.  [No verbal response.]

22  Q.  So, you were holding Leola during this time?

23  A.  Yes.

24  Q.  Did he say anything else to you, at this time?

25  A.  After we opened up all the cabinets and he asked me did I

1　have any money and I told him, "Just a little bit."

2　Q. And, where was that money kept?

3　A. It was in my purse.

4　Q. What did you do when he said, "Do you have money?"

5　A. I told him I had a little bit in my purse."

6　Q. Okay. Did you go to the purse?

7　A. He told me to get my purse, which was on the floor, with

8　all my groceries.

9　Q. When he told you that, what did you do?

10　A. I got it and opened it up and give it to him.

11　Q. What happened then?

12　A. When I gave it to him, he asked me was that all I had.

13　Q. What did you tell him?

14　A. "Yes."

15　Q. What happened then?

16　A. He told me everything he knew. My husband's schedule;

17　when he went to work and came home and said what times; 4

18　o'clock and at 9 o'clock.

19　Q. Had you left at 4 o'clock that day?

20　A. Yes.

21　Q. And, had you left at around 9 o'clock that day?

22　A. Nine o'clock was at nighttime.

23　Q. Okay. Was 9 o'clock a time that you and your husband were

24　generally left?

25　A. We usually -- I left around 8:30 to go and get Richard.

1   Q.  And, would you take your children when you left at 9

2   o'clock to go get your husband from work?

3   A.  Yes.

4   Q.  After he told you that he knew your schedule, did he tell

5   you anything else?

6   A.  He had told me if I called the cops and everything, he

7   would come back and kill us.

8   Q.  At that time, did you believe him?

9   A.  Yes.

10  Q.  After he told you that, what happened?

11  A.  he went out the door.  We have a window in our kitchen and

12  I saw him pass it.  So, I ran and locked the door.

13  Q.  All right.  From the time that you first saw this person

14  pick up your daughter to the time that he ran to your door

15  and locked it, about how much time went by?

16  A.  About 30 minutes.

17  Q.  Are you sure it was exactly that; or, is that just a

18  guess?

19  A.  That's just a guess.

20  Q.  During that time, were you in the robber's presence, the

21  entire time?

22  A.  Yes.

23  Q.  Okay.  Ms. Wood, do you wear any kind of corrective lenses

24  or anything like that?

25  A.  No.

1  Q.  During any time, did the robber ever have a mask over him

2  or anything like that?

3  A.  No.

4  Q.  And, about how many times did you estimate you would have

5  heard the robber speak to you, during the time that he was

6  with you?

7  A.  Only when he told me to drop Leola.  And then, when he

8  told me to open up the cabinets and to get on the bed.

9  Q.  Did he also say -- he told you to give him some; right?

10  A.  Yes.

11  Q.  Did he tell you to open up the cabinets?

12  A.  Yes.

13  Q.  And, did he tell you that he knew your schedule?

14  A.  Yes.

15  Q.  And, did he tell you to go get the purse?

16  A.  Yes.

17  Q.  Did he tell you to give you the money -- give him the

18  money that was in the purse?

19  A.  Yes.

20  Q.  Now, before then, had you ever seen this person before?

21  A.  No.

22  Q.  After you ran to your door and locked it, what's the next

23  thing that you did, Ms. Wood?

24  A.  I called the cops.

25  Q.  And, did police officers respond to that call?

1  A. Yes. They were there in a few minutes.

2  Q. Did you speak with the police officers then?

3  A. Yes.

4  Q. And, what did you tell them?

5  A. I told them everything that went on.

6  Q. About how long did you spend talking to the police

7  officers that day?

8  A. There was three of them. And, they brought in a person to

9  do the  fingerprints and but, he gave the description, of the

10 person over the radio, when I described him.

11 Q. Okay. Did you ever talk to the police officers, after

12 that day?

13 A. Yes.

14 Q. Okay. Do you recall which officer it was that you talked

15 to, after that day?

16 A. No.

17 Q. Okay. Do you remember sometime after the day that this

18 robbery occurred, do you remember officers coming to you and

19 showing you a series of pictures on a piece of white paper?

20 A. Yes. I went to the police station.

21       MR. COTTRELL: May I approach the witness, Your

22 Honor?

23 A. Yes, sir.

24 **[State's Exhibit No. 1 is marked for identification.]**

25 Q. Ma'am, I'm showing you what's been marked for

1  identification as State's Exhibit No. 1. If you would take

2  just a second and look at that. Do you recognize what that

3  is, ma'am?

4  A.  Yes.

5  Q.  Okay. And, what is that?

6  A.  It was one of the pieces of paper they gave me to look at.

7  Q.  And, when you looked at that piece of paper, -- STRIKE

8  THAT.

9      MR. COTTRELL: Your Honor, at this point, the state

10  would MOVE INTO EVIDENCE, State's Exhibit No. 1; being the

11  photo line-up that she looked at that day.

12      THE COURT: All right. State's Exhibit No. 1 WILL

13  BE ADMITTED.

14  Q.  How many officers were present when you looked at that

15  photo line-up, there?

16  A.  Two.

17  Q.  And, when you looked at that photo line-up, did you

18  recognize anyone in it?

19  A.  Yes.

20  Q.  How long did you look at the photo line-up before you

21  recognized the person?

22  A.  There was about seven or eight pages; and it was in

23  between.

24  Q.  Okay. Do you recall how long you looked at that

25  particular page, before you recognized anyone?

A.  A few minutes.

THE COURT:  Ms. Wood, I'm sorry, ma'am.  Maybe it's my hearing.  But, I am having trouble hearing you.  If you would please keep your voice up, ma'am.  It is absolutely essential that the jury hear all witnesses testifying and all their testimony, including yours.

So, please keep your voice up.  Remember, you're not just speaking to the attorney who is in front of you.  You're having to speak to the entire courtroom.

So please, if you will, ma'am, keep your voice up.  You may proceed, Mr. Prosecutor.

Q.  Ma'am, could you hold State's Exhibit No. 1 up and point to the person that you recognized in the photo line-up?

A.  The paper?

Q.  Yes.  Can you please hold it up and show the jury which person you pointed to?

A.  [No verbal response.]

Q.  Thank you.

MR. COTTRELL:  Your Honor, may the record reflect she has pointed out the person on the top row, in the upper-most right-hand corner.

THE COURT:  All right.  Let the record so reflect.

Q.  Ma'am, where did you recognize this person in that photo form?

A.  The robbery.

Q.  And, what did that person do from the robbery?

A.  He was the one that held the gun to Leola's head.

COURT REPORTER:     Excuse me.

THE COURT:   Ma'am, I can't hear you this far away.
I'm very sorry, Ms. Wood, you must keep your voice up, ma'am.

Ask the question again, if you would, Mr.
Prosecutor.  And Ms. Wood, please keep your voice up, ma'am.
Thank you.

Q.  Ms. Wood, what did the person in that photo do during the
robbery?

A.  He --

MS. THOMAS:  OBJECTION.

THE COURT:   SUSTAINED.  Asked and answered.

A.  He held a gun to Leola's head.

THE COURT:   Don't answer the question, ma'am, if I
sustain the objection.

You can ask your next question, Mr. Prosecutor.

MR. COTTRELL:  I beg your pardon, Your Honor.  I
thought you directed me to ask that question again.  I will
move on.

THE COURT:   There was an objection to it then,
sir.

MR. COTTRELL:  All right.

Q.  Okay.  Ms. Wood, looking at the picture that's in that
photo line-up, what features about that picture lead you to

1   recognize him as the person who robbed you?

2   A.  His facial.

3   Q.  Speak up, ma'am.

4   A.  His facial.

5   Q.  Now, can you see any braids in that picture?

6   A.  No.

7   Q.  There are no braids showing in that picture.  How were you

8   able to recognize him?

9   A.  By his face.

10  Q.  Now, when you identified that picture, were you in the

11  presence of the officer?

12  A.  Yes.

13  Q.  And, did you write something on the edge of that picture?

14  A.  Yes.

15  Q.  Could you please read what you wrote, to the jury?

16  A.  I said, "This looks like -- this looks like the" -- it's

17  smeared, -- "...except for the braids."  I can't read all of

18  it.

19  Q.  Okay.  Now, have you ever seen the person in that

20  photograph again?

21  A.  No.  Not until today.

22  Q.  Do you recognize anyone present in this courtroom as the

23  person who robbed you on May 22, 1998?

24  A.  Yes.

25  Q.  And, could you please point to that person and describe

1  what he's wearing?

2  A.  He's wearing a white, long-sleeved shirt.

3  Q.  And, where is this person located in the courtroom, ma'am?

4  A.  Sitting beside the lawyer.

5        MR. COTTRELL:  Your Honor, may the record reflect

6  the witness has identified the defendant?

7        THE COURT:  All right.  Let the record so reflect.

8  Q.  Ma'am, what if anything is different about the defendant

9  than on the day that he robbed you?

10  A.  His hair.

11  Q.  How is his hair different?

12  A.  It's shorter and the weight size.

13  Q.  Okay.  What's the last thing you said?  Speak up so --

14  A.  The weight.

15  Q.  -- we can hear you.

16  A.  The weight.

17  Q.  Now, when you're referring to weight, what exactly are you

18  referring to; the defendant's weight?

19  A.  Yes.

20  Q.  Did he appear to weigh more or less on May 22, 1998?

21  A.  More.

22  Q.  Is there anything else different about the defendant today

23  than back on May 22, 1998?

24  A.  No.

25  Q.  What if anything did you observe, looking at him right

1  now, is the same as back then?

2  A.  His facial and talk, height like.

3  Q.  What's the last thing you said?

4  A.  The height.

5  Q.  In an earlier hearing in this case, before the jury was

6  brought in, did you have an opportunity to hear the defendant

7  speak?

8  A.  Yes.

9  Q.  And, were you able to clearly hear him?

10  A.  Yes.

11  Q.  Was there anyone else speaking at the same time that he

12  was?

13  A.  No.

14  Q.  Did you recognize the defendant's voice from anywhere?

15  A.  Yes.

16  Q.  Where did you recognize his voice from?

17  A.  The day of the robbery.

18  Q.  And, approximately how long today have you had an

19  opportunity to observe the defendant?

20  A.  Which was this morning.

21  Q.  Thank you, ma'am.  Please answer any questions that Ms. --

22  the defense attorney may offer.

23          THE COURT:  All right. Cross-examination.

24  [CROSS EXAMINATION OF MS. WOOD, BY MS. THOMAS:]

25  Q.  Ms. Wood, was it your testimony that you wrote a notation

1  in the photographic line-up?

2  A.  I didn't write it.  The officer did.

3  Q.  Was it your earlier -- did you respond to a question Mr.

4  Cottrell asked about what you wrote on there?

5  A.  No.  The officer wrote it.  That's what I said.

6  Q.  Okay.  So, you in fact did not write anything on the line-

7  up?

8  A.  No.

9  Q.  Did you circle the photograph?

10  A.  No.

11  Q.  So, do you know who drew a circle around the photograph?

12  A.  The officer that was beside me.

13  Q.  And, can you once again read the notation on the

14  photograph?

15  A.  Said, "Looks like..." the rest of it is smeared.  And then,

16  "...without the braids."

17  Q.  Could it be that is says, "This looks most like him; but,

18  no braids"?

19  A.  Yes.

20  Q.  So, you did not positively identify Mr. Massey; did you?

21          MR. COTTRELL:  OBJECTION; form of that question.

22          THE COURT:  OVERRULED.  She may answer.

23  A.  I guess not.

24  Q.  You guess not.  Is that your answer?

25  A.  I guess not.  It's just that the picture did not have the

1  man's braids.

2  Q.  Could you repeat that?

3  A.  The pictures did not have the man's braids.

4  Q.  Okay.  But, you still could not positively identify this

5  man as the person who attacked you.  Is that correct?

6  A.  By the facial expression, it looked like the man that

7  robbed us.

8  Q.  But, did the notation -- was this your statement,

9  [Reading.]

10        "He looks most like him."

11  A.  Yes.

12  Q.  So, there was not a positive statement that this was the

13  man.  Is that correct?

14  A.  No.

15  Q.  And, as a matter of fact, you did not sign your name

16  anywhere on this line-up.  Is that correct?

17  A.  No.

18  Q.  Because, you were not positive this is the man; were you?

19  A.  They didn't ask me to sign.

20  Q.  Did you say that you were sure this was the man?

21  A.  No.

22  Q.  And, you're not positive today this is the man who

23  attacked you; are you?

24  A.  Yes.

25  Q.  You state the man who attacked you had braids woven into

1   his hair.  Is that correct?

2   A.  Yes.

3   Q.  Were braids hanging down.  Is that correct?

4   A.  Not that much; just on the very back where it wasn't

5   pulled together.

6   Q.  And, you stated you counted the braids in his hair.  Is

7   that correct?

8   A.  No.  I said there was a few braids.

9   Q.  Was it not your testimony that there were five braids in

10   his hair?

11   A.  No.

12   Q.  You described the man initially as being short.  Is that

13   correct?

14   A.  No.

15   Q.  You described the man as having a red T-shirt.  Is that

16   correct?

17   A.  Yes.

18   Q.  And, you described the man as having blue-jean shorts.  Is

19   that correct?

20   A.  Yes.

21   Q.  You stated that seven or eight pages were shown to you.

22   What did the other six or seven pages consist of?

23   A.  People.  Just one; one, I think this page.

24   Q.  So, you're not in fact shown just one photographic line-

25   up.  Is that correct?

1  A.  Right.

2  Q.  You were shown approximately how many pages of

3  photographic line-ups?

4  A.  I don't remember.  It was about seven.

5  Q.  And, you do not recall whether the circle was drawn on

6  this photograph at the time you viewed it?

7  A.  It was circled after.

8  Q.  Did you see the photograph being circled?

9  A.  After I told O'Janiit.

10  Q.  These photographs depict only faces.  Is that correct?

11  A.  Yes.

12  Q.  And, they do not depict any clothing or other features?

13  A.  No.

14  Q.  Was it your impression that the person the photograph was

15  circled had a beard?

16  A.  Yes.

17  Q.  And, did you make a statement that there was no beard on

18  the person who you identified?

19  A.  Yes.

20  Q.  And, you say that the only time -- the only time, prior to

21  today you were asked to make an identification was when the

22  photographic line-up took place.  Is that right?

23  A.  Yes.

24  Q.  Do you know approximately how many units are in the

25  apartment complex where you lived?

1  A.  No.

2  Q.  It's a big complex though.  Is that right?

3  A.  Yes.  I guess.  Whole Charlotte is big to me.

4  Q.  Okay.  Would you describe it as a rather large apartment

5  complex?

6  A.  I guess.

7  Q.  Can you estimate the number of buildings in the complex?

8  A.  I don't know.

9  Q.  How long did you reside at this residence?

10  A.  We had it in August; but, I didn't move up here until

11  January.

12  Q.  So, you had lived in your apartment approximately five

13  months when this occurred?

14  A.  Yes.

15  Q.  And, you were frightened when this happened; were you not?

16  A.  Yes.

17  Q.  And, what time of morning did this attack occur?

18  A.  It was around ten.

19  Q.  What lights were on in your apartment?

20  A.  The one at the foyer; but, it was light enough to see all

21  the way through.

22  Q.  The one in the foyer?

23  A.  The foyer.

24  Q.  Was that light on when you entered the apartment?

25  A.  Yes.

1  Q. Or, -- you testified that the gun was real. Is it

2  accurate to say the gun appeared real?

3  A. It was real.

4  Q. Was the gun ever fired?

5  A. No.

6  Q. So, would it not be accurate to say the gun appeared to be

7  real?

8  A. It was real. I had it pointed in between my eyes.

9  Q. Even though you had it pointed between your eyes, what

10 else, other than the appearance, lead you to believe the

11 weapon was real?

12 A. I know the difference because my mom's always carried one.

13 Q. So, it's your testimony that you can look at the gun,

14 without touching it, without hearing it, and determine, with

15 all certainty, whether it was real or not?

16 A. The way it looked, it was real.

17 Q. And, you say the person who attacked you was heavier than

18 the man sitting here. Is that correct?

19 A. A little bit.

20 Q. You've described the person who attacked you as being a

21 175 pounds, thereabout. Is that correct?

22 A. Yes.

23 Q. And, being approximately 5 foot 8. Is that correct?

24 A. Yes.

25 Q. And, when you made your statement, you didn't really

1  describe any other features about the person who attacked

2  you, other than his attire and the fact that he had braids.

3  Is that correct?

4  A.  Yes.

5  Q.  You didn't indicate whether he was light-skinned or dark-

6  skinned.  Is that correct?

7  A.  Yes.

8  Q.  You didn't indicate whether he had any facial hair.  Is

9  that correct?

10  A.  No.

11  Q.  You didn't indicate the color of his eyes.  Is that

12  correct?

13  A.  No.

14  Q.  So, it's fair to say that you gave no description of the

15  facial features.  Is that correct?

16  A.  Yes.

17  Q.  And, again, the notation said, "This looks most like him;

18  but, no braids."

19       Were those your words?

20  A.  Yes.

21  Q.  Thank you.

22       MS. THOMAS:  No further questions.

23       THE COURT:  Re-direct?

24  RE-DIRECT EXAMINATION OF MS. WOOD, BY MR. COTTRELL:

25  Q.  Ms. Wood, looking at the defendant right now, just looking

1   at him right now, do words spring to your mind about how to

2   describe the facial features?

3           MS. THOMAS:   OBJECTION.

4           THE COURT:   SUSTAINED, in that manner.   SUSTAINED.

5   Q.  The defense asked you questions about who circled the

6   person in that photo line-up; correct?

7   A.  Yes.

8   Q.  Now, is that picture the one that you, yourself pointed

9   to?

10  A.  Yes.

11  Q.  Okay.  And, did the officer circle that in your presence?

12  A.  Yes.

13  Q.  Okay.  Did he write those comments down there, in your

14  presence?

15  A.  Yes.  He wrote it in front of me.

16  Q.  Okay.  Now, earlier you testified that you recognized the

17  person in that picture as the robber because of his facial

18  features; correct?

19  A.  Yes.

20  Q.  Can you articulate exactly what it was about his facial

21  features that made you recognize him?

22          MS. THOMAS:   OBJECTION.

23          THE COURT:   OVERRULED.

24  A.  I have a picture in the back of my mind, the whole time.

25  Q.  Okay.

1  A.  I see it every night.

2  Q.  Is it difficult for you to exactly put those facial

3  features into words, though?

4  A.  Yes.

5  Q.  When those officers showed you all those other pictures,

6  you testified seven or eight different line-ups you looked

7  at, did you point any of those out as being the person who

8  robbed you?

9  A.  No.

10  Q.  Is that the only picture you pointed to?

11  A.  Yes.

12        MR. COTTRELL:  Thank you.  No further questions.

13        THE COURT:  Any re-cross?

14        MS. THOMAS:  Yes.

15  RE-CROSS EXAMINATION OF MS. WOODS, BY MS. THOMAS:

16  Q.  Ms. Wood, do you recall which one of the officers drew the

17  circle around the photograph?

18  A.  No.

19  Q.  Yet, you testified remembering the officer drawing the

20  circle?

21  A.  Yes.  Because, it was two officers.  I don't remember if

22  it was O'Janiit or the other one because both of them was

23  there.

24  Q.  Thank you.

25        THE COURT:  Anything further of this witness?

1          MR. COTTRELL:  Nothing further, Your Honor.

2          THE COURT:   Thank you, ma'am, you can step down.

3          The state may call it's next witness.

4          MR. COTTRELL:  Thank you, Your Honor.  The state

5   would call Ms. Theresa Savall.

6   [WITNESS SWORN.]

7   THERESA McCORMICK SAVALL, BEING FIRST DULY SWORN, TESTIFIES

8   AS FOLLOWS DURING DIRECT EXAMINATION BY MR. COTTRELL:

9   Q.  Ms. Savall, could you please state your full name, for the

10  jury; and, spell your last name for our Court Reporter.

11  A.  Theresa McCormick Savall; S-A-V-A-L-L.

12  Q.  And, back in May of 1998, ma'am, how were you employed?

13  A.  I was the Assistant Community Director for Emerald Bay

14  Apartments.

15  Q.  How long had you been at that position, at that time?

16  A.  Two and-a-half years.

17  Q.  And, were you living on site, at that time?

18  A.  Yes.

19  Q.  Okay.  And, do you remember working on the early-morning

20  of May 22, 1998?

21  A.  Yes.  I do.

22  Q.  And, What were you doing, say around 10 o'clock that

23  morning?

24  A.  I was walking the property to make sure there was no undue

25  amount of trash; making sure that -- I was inspecting some

1  apartments to make sure they were ready for move-ins.

2  Q.  Were those duties that you regularly conducted?

3  A.  Yes.

4  Q.  Okay.  Did anything out of the ordinary happen as you were

5  walking around?

6  A.  Yes.

7  Q.  What happened, exactly?

8  A.  As I was walking around the curve of the property, like a

9  sharp curve in the road to the property, a young man accosted

10  me, on the way to one of the apartments.

11  Q.  And, could you describe the way this young man looked, to

12  the jury, please?  What do you recall of him?

13  A.  I recall that he seemed very animated; almost agitated;

14  real high energy level.  He had a real high energy level;

15  kind of antsy, I would say.  If I was talking to my children

16  I would say they were antsy.

17  Q.  Okay.  Do you recall the way this person looked?

18  A.  Yes.

19  Q.  Could you please describe to the jury how this person

20  looked?

21  A.  The person was about my height; looked very young in the

22  face.

23  Q.  What is your height?

24  A.  Five, eight and-a-half.

25  Q.  Was -- did you have an estimate about how much this person

1  weighed?

2  A.  I would say about 150; 155.

3  　　　　MR. COTTRELL:  May I approach the witness, Your

4  Honor?

5  　　　　THE COURT:  All right.

6  **[State's Exhibit No. 2 is marked for identification.]**

7  Q.  Ma'am, I'm showing you a piece of paper that's been marked

8  for identification purposes as State's Exhibit No. 2.  Take

9  just a second to look over that.

10  　　　　Do you recognize that piece of paper, ma'am?

11  A.  Yes.

12  Q.  What is it, please?

13  A.  It was a statement I rendered to one of the police

14  officers who came to my office.

15  Q.  Do you remember giving that statement to the officer?

16  A.  Yes.  I do.

17  Q.  Okay.  Now, you didn't sign that statement.  It's printed

18  out on a computer; correct?

19  A.  Yes.

20  Q.  Okay.  Does the statement match up with your memory of

21  that day?

22  A.  Yes.  It does.

23  Q.  Okay.  And, at the time, how did you describe that person

24  you saw to the officers?

25  A.  The entire physical description?

Q. Yes, ma'am. Just the physical description, please.

A. He was about five-eleven, 155 to 170 pounds and I think he was wearing a hat.

THE COURT: Wait; slow down just a little bit, if you would please. Thank you.

A. He was also wearing a basketball jersey, which was orange and white, and pants, similar to jeans.

Q. Okay. Thank you. You -- can your recall specifics about the jersey or just that it was a jersey-type shirt?

A. Just that it was a jersey-type shirt.

Q. Okay. And, the pants similar to jeans, can you recall whether they were full-length pants or could it possible have been shorts?

MS. THOMAS: OBJECTION.

THE COURT: Well, OVERRULED. Don't lead the witness though. You may answer the question.

Q. What do you remember about that?

A. I remember the pants being long.

Q. Okay. Please describe to the jury what happened when you encountered this person?

A. When I saw him walking -- when he came walking towards me, he was, you know, he was acting kind of hyper and he approached me with, you know, comments. I didn't remember seeing his face before; but, you know, I didn't feel any kind of way about him approaching me.

1    He said, "Hello," or whatever, first.  I said, "Hi;

2  how are you doing?"  And then, he began to make comments

3  like, "Could we go out," or something like that; "Could we go

4  out together"; or, did I want to go out with him.

5    I told him, "Only if I could bring my husband and

6  four kids."  And I thought, you know, that would be the end

7  of that; but, he started saying some other stuff.  At which

8  point I got a lot less friendly.  I just said, you know,

9  "Take your young-self home."

10  Q.  What type of other things did he say to you, before you

11  told him to take his young-self home?

12  A.  May I refer to my statement?

13  Q.  You may.

14  A.  He was saying stuff like, "Baby, you look good."  Just

15  making comments about the way I walked.

16  Q.  Now, when he approached you, did you feel threatened by

17  him?

18  A.  Not at all.

19  Q.  Okay.  And, why was that, ma'am?

20  A.  I don't scare easily.

21  Q.  Okay.  How long -- had you been the apartment manager

22  there for two and-a-half years?

23  A.  That's correct.

24  Q.  Okay.  Where were you from, before that?

25  A.  The Bronx.

1  Q.  After you talked to this person, what did he do, when you

2  told him to take his young-self home?

3  A.  He didn't look rebuffed, like I wanted him to; but, he

4  didn't look particularly perturbed.  He just kind of, "Okay."

5  Went on his way.

6  Q.  And, where did you see him go?

7  A.  I saw him veer off to the right of me.  I was walking with

8  my back to the office.  So, the left would have been where

9  the bay is; and, the right would have been where the

10  buildings are; some more buildings are.

11  Q.  Okay.  Now, did he tell you that he was staying at any

12  particular type of apartment?

13  A.  I do remember saying, "Where do you live?"  Because, you

14  know, I hadn't seen  him around.  I basically knew everybody

15  there; that's not by name, by face.

16  Q.  Okay.  And, which -- did he tell you that he was living in

17  any apartment?

18  A.  He, if I remember correctly, gestured to the buildings

19  closer to the right.

20  Q.  Did you observe him, as he walked off?

21  A.  Well, I can't remember actually.  I remember him turning

22  off and going there; but, at that point, I was just trying,

23  you know, I was just trying to maintain eye contact; because,

24  I wasn't -- I really wasn't in the mood to play.  There were

25  some things I needed to do and I just kind of wanted to keep

1  eye contact; let him know I was serious.

2  Q.  Okay.  Did you tell the officers that you gave that

3  statement to that he was going in -- that he belonged to any

4  particular type of apartment?

5       Did you mention any particular apartment in your

6  statement?

7  A.  In my statement, where he walked from; not where he walked

8  to, after; but, where he walked from, after we spoke.  Where

9  he walked from.

10  Q.  And, which apartment was he walking from, when you first

11  saw him?

12  A.  5038; 5038 building; it was the back of a patio.

13  Q.  And, which apartment was that patio assigned to?

14  A.  5038-C.

15  Q.  Had you ever seen this person on the property before, that

16  you can recall?

17  A.  I couldn't recall having seen him.

18  Q.  Okay.  And, later on, did you talk with officers further

19  about this matter?

20  A.  Yes.  I did.

21  Q.  And, on a date of after you talked with them the first

22  time, were you presented with a series of pictures on a piece

23  of paper?

24  A.  Yes.

25       MR. COTTRELL:  May I approach the witness, Your

1    Honor?

2           THE COURT:  All right.

3    [State's Exhibit No. 3 is marked for identification.]

4    Q.  Now I'm showing you another piece of paper that I've

5    marked for identification purposes as State's Exhibit No. 3.

6    Can you take just a  moment to look over that?

7          Do you recognize that piece of paper, ma'am?

8    A.  Yes.  I do.

9    Q.  Where do you recognize that from?

10   A.  May office; the police had that piece of paper at my

11   office.

12   Q.  Okay.  All right.  Could you please hold that piece of

13   paper up and show the jury what's on it?

14   A.  [No verbal response.]

15   Q.  Did you talk with anybody about that piece of paper?

16   A.  Yes.  I did.

17   Q.  Did someone bring that piece of paper to you?

18   A.  Yes.

19   Q.  Okay.  And, do you recall who that was?

20   A.  It was one of the officers.  I don't recall his name.

21   Q.  Okay.  What did the officers tell you to do, in relation

22   to looking at that paper?

23   A.  They told me to see if I recognized any of the faces on

24   that paper; and I did.  And, they asked me to endorse the

25   picture of the person that I recognized.

1    Q. When you first looked at that piece of paper, how long did

2    it take you to recognize someone on it?

3    A. Not very long.

4    Q. Okay. About how long would you estimate?

5    A. I would say about a minute.

6    Q. Okay. And, which picture on that piece of paper did you

7    recognize?

8    A. [No verbal response.]

9    Q. Could you --

10   A. The one on my far-right, on the top.

11   Q. And, what did you do to that picture, after you recognized

12   it?

13   A. I endorsed over it.

14   Q. Where did you recognize, the person in that picture from?

15   A. From my work earlier, the day that -- I recognized him

16   from my walk the day that he had spoken to me, while on the

17   property.

18   Q. And, about what time, on your walk, did you see this

19   person?

20   A. About ten; it was about 10 o'clock in the morning.

21   Q. Do you recognize the person from your walk in the

22   courtroom?

23   A. Yes. I recognize the gentleman that's sitting at the

24   table.

25   Q. What if anything is different about him?

1  A. Even on the day that I saw the photo, it looked as if the

2  person that I had seen on the walk had lost a considerable

3  amount of weight; his face didn't look as full as it was on

4  the photo.

5  Q. Do you recall the person that you saw when you were taking

6  the walk, how their hair was done?

7  A. No. He had a hat on.

8        MR. COTTRELL: May I approach the witness, Your

9  Honor?

10       THE COURT: All right.

11  Q. Does the defendant have approximately the same type of

12  skin tone as the person you saw that day?

13  A. The person I saw that day; yes.

14  Q. Is the defendant, from what you can tell, approximately

15  the same height as the person you saw that day?

16  A. From what I can tell, yes.

17  Q. About how long, total, do you think you spent with the

18  person you saw on your walk that day?

19  A. Total amount of time, I would say about 3 to 4 minutes.

20  Q. Okay. When you talked with the officers and they showed

21  you the photo line-up, how sure were you that the person in

22  that picture was actually the person that you saw on your

23  walk that day?

24  A. I was fairly certain.

25       MR. COTTRELL: Thank you ma'am. No further

1  questions.

2      THE COURT:  Cross-examination.

3  [CROSS EXAMINATION OF MS. SAVALL, BY MS. THOMAS:]

4  Q.  Ms. Savall, first and foremost, when you were shown the

5  photographic line-up, were you asked to do anything?

6      DEPUTY SHERIFF:  Members of the audience, remain

7  quiet, please.

8  Q.  Were you asked to do anything, if you identified the

9  person you had seen?

10 A.  Yes.  I was asked to endorse the space above or along side

11 the picture of the person that I recognized.

12 Q.  And, you were specifically asked to sign your name.  Is

13 that correct?

14 A.  Yes.

15 Q.  And, that was because you made the identification.  Is

16 that correct?

17 A.  That's correct.

18 Q.  And, you did that as a result of being requested to sign

19 your name, if you were able to make an identification?

20 A.  Yes.

21 Q.  Is that correct?

22 A.  That's correct.

23 Q.  And, Ms. Savall, do you work at the Emerald Bay Community

24 approximately two and-a-half years.  Is that correct?

25 A.  When I just said two and-a-half years, I worked for the

1  company for two and-a-half years as an assistant community

2  director.  I had been at Emerald Bay about a year; about a

3  year, at that time.

4  Q.  And, approximately how many apartment residences are

5  there?

6  A.  There is exactly 250.

7  Q.  Two-hundred, fifty apartments.  How many buildings?

8  A.  Fifteen.

9  Q.  Do you have any idea of the approximate number of

10  residents at Emerald Bay, Complex?

11  A.  Counting children and all, I would say about 600.

12  Q.  About 600.  And, the residents are allowed to have company

13  and guests.

14  A.  Yes.

15  Q.  Is that correct?

16  A.  Yes.

17  Q.  And, residents are allowed to have people over night.  Is

18  that correct?

19  A.  Yes.

20  Q.  And, even though you're the property manager for the

21  complex, you don't personally know all the residents.  Is

22  that correct?

23  A.  I don't know every-single resident; but, I do know quite a

24  few of them.

25  Q.  The morning the young man approached you, he did not do

1  anything threatening or intimidating; did he?

2  A.  No.

3  Q.  And, it was in broad daylight.  Is that correct?

4  A.  Yes.

5  Q.  And, he was even complementary with  his comments.  Is

6  that correct?

7  A.  Yes.

8  Q.  He was not being derogatory?

9  A.  No.  No.

10  Q.  And, he was a young man.  Is that correct?

11  A.  [Affirmative response.]

12  Q.  And, you told him you were married and to take his young-

13  self home.  Is that correct?

14  A.  Yes.  That's correct.

15  Q.  And, did he in fact leave you alone, when you told him

16  that?

17  A.  Yes.  He did.

18  Q.  And, was he honest with you about why he was there; that

19  he knew someone there?

20  A.  Yes.

21  Q.  And, did he try to deny the fact -- did he try to be

22  dishonest or mislead you, in any way?

23  A.  No.  Not that I could tell.

24  Q.  Did he try to run away?

25  A.  No.

1  Q.  Did he in fact cooperate with you when you asked him what

2  he was doing there?

3  A.  Yes.

4  Q.  And, do you recall the person had on jean-pants.  Is that

5  correct?

6  A.  Yes.

7  Q.  And, do you recall the person had on an orange and white

8  jersey.  Is that correct?

9  A.  Yes.

10  Q.  And, you do not recall seeing the person's hair.  Is that

11  correct?

12  A.  No.  I don't.

13  Q.  And, you made no mention of any braids because you don't

14  recall seeing any?

15  A.  No.  I don't recall any braids.

16  Q.  And, you believed this was around 10 o'clock in the

17  morning.  Is that right?

18  A.  Yes.

19  Q.  And, this encounter with the young man, it was not

20  disturbing enough to you feel the need to report it or

21  anything?

22  A.  No.

23  Q.  And, in fact, it was days later when the police questioned

24  you about the incident that happened.  Is that correct?

25  A.  I'm not sure if that's correct.  I think the same day I

1  heard something of it. Something filtered back to the office

2  about it. And, I -- we have like a police officer who was

3  like our neighborhood liaison police officer; and, you know,

4  he spoke with me about it because I told him any time any

5  police activity went on at the property I wanted to know.

6  Q. Okay. And, when did you first hear about the incident

7  that happened? Was it sometime the same day?

8  A. I think it was either sometime that afternoon or the very

9  next day. It was fairly quickly.

10 Q. And, is there any doubt in your mind about your

11 description that you gave of the person?

12 A. If I were to give a description today, I couldn't be as

13 precise as I was on my statement. I don't remember it as

14 well as I remembered it then.

15 Q. But, it's the statement that Mr. Cottrell gave you, that

16 was not dated the day of the incident. Is that correct?

17 A. [No verbal response.]

18         MS. THOMAS: May I approach the witness, Your

19 Honor?

20         THE COURT: Yes, ma'am.

21 Q. Do you see a date on this supplement report?

22 A. Yes.

23 Q. And, what is the date of this supplement?

24 A. May 26.

25 Q. Thank you. Now Ms. Savall, the statement that you're

1  reading from is a statement that was actually written and

2  produced by the officer. Is that correct?

3  A.  I'm trying to remember it. It seems to me that he was

4  trying to write down that I was saying. It seems to me -- I

5  thought I wrote it myself, actually. I thought I wrote it

6  myself; because, I was becoming a little impatient; it was

7  taking too long, writing it down.

8  Q.  The -- even if you did write it, the copy you're looking

9  at has been transcribed --

10  A.  Yes.

11  Q.  -- by a police officer. Is that correct?

12  A.  That's correct.

13  Q.  And, the last line says, [Reading.]

14      "I signed my name and wrote the date beneath the

15  photograph."

16      Is that correct?

17  A.  That's what the statement says; yes.

18  Q.  But, it was actually over the photograph?

19  A.  That's correct.

20  Q.  And, you wrote your name because you were asked to write

21  it, if you were able to make an identification. Is that

22  correct?

23  A.  Yes.

24      MS. THOMAS:  Thank you, Ms. Savall. No further

25  questions.

1        THE COURT: Any re-direct?

2        MR. COTTRELL: No, Your Honor.

3        THE COURT: All right. Thank you, ma'am. You can

4 step down.

5        MS. THOMAS: Your Honor, I have one more question,

6 if I can.

7        THE COURT: All right. I'll let you ask the

8 question and then I'll ask the state if they have re-direct.

9 You can just complete the cross. Go-ahead.

10 Q. If I could call your attention to the -- do you still have

11 your paper there?

12 A. No. I don't.

13        MS. THOMAS: May I approach the witness, Your

14 Honor?

15        THE COURT: All right.

16 Q. If I could call your attention to the paragraph beginning,

17 "Investigator…" could you read that sentence, please?

18 A. Yes. [Reading.]

19        "Investigator Ledford asked me if I could recognize

20 anyone in the line-up and he told me that the person I saw on

21 the morning of 22 May 98, may or may not be in the photograph

22 and that I should not feel pressured to identify anyone."

23 Q. That is all. So, there are two different dates on here.

24 Is that correct?

25 A. Yes.

Q. What are the two dates?

A. Well, that says May 22; and then after that it says May 8th.

      MS. THOMAS: Thank you. No further questions.

      THE COURT: All right. Any re-direct?

      MR. COTTRELL: Yes, Your Honor, based on that last question.

      THE COURT: All right.

RE-DIRECT EXAMINATION OF MS. SAVALL, BY MR. COTTRELL:

Q. Ma'am, you remember talking to the police about the photo line-up on May 26. Is that correct?

A. That's correct.

Q. Now, you've already testified that you had talked to officers before that?

A. Yes.

Q. Is that correct?

A. That's correct.

Q. Now, was the day of -- did you talk to officers the same day you saw this person walking or the day after?

A. Seems it was the day after.

      MR. COTTRELL: Thank you. No further questions.

      THE COURT: Any re-cross?

RE-CROSS EXAMINATION OF MS. SAVALL, BY MS. THOMAS:

Q. You're not exactly positive about the timeframe. Is that correct?

1  A.   The timeframe that I took the walk or the timeframe that I

2  spoke to the officer?

3  Q.   The timeframe that you spoke with the officers?

4  A.   I'm not exactly positive.

5           MS. THOMAS:   Thank you.

6           THE COURT:   Anything further of the state for this

7  witness?

8           MR. COTTRELL:   No, Your Honor.   And, I would ask

9  that she be excused, if she wishes to.

10          THE COURT:   All right.   Does defense have further

11 need for this individual as a witness?

12          MS. THOMAS:   We do not, Your Honor.

13          THE COURT:   All right.   Thank you.   You're free to

14 go, if you wish, ma'am.

15          MS. SAVALL:   Thank you.

16          THE COURT:   And, Ladies and gentlemen of the jury,

17 it's time for our afternoon recess.   We'll take a 15-minute

18 recess.

19          Before you leave the courtroom, please remember the

20 instructions that I've given to you earlier.   Don't discuss

21 the case among yourselves; don't discuss it with anyone else;

22 don't allow anyone to discuss the case with you or in your

23 presence.

24          Members of the jury, don't form an opinion; keep

25 your minds open, in all respects.

1    In 15 minutes, please be in the jury room, pursuant

2  to the instructions I assume our bailiff will give you,

3  Members of the jury, you can leave the courtroom now.  Thank

4  you.

5  **{The following proceedings take place in open court, outside**

6  **the presence of the jury.}**

7    THE COURT:  Anything further from the state,

8  before the jury returns?

9    MR. COTTRELL:  Your Honor, the state MOVES INTO

10 EVIDENCE, State's Exhibit Nos. 2 and 3, at this time.

11    THE COURT:  All right.  Defendant have any

12 objection to admission of this statement and to the photo

13 array, as testified to by Ms. Savall?

14    MS. THOMAS:  No, Your Honor.

15    THE COURT:  All right.  Without objection, we'll

16 LET State's Exhibit Nos. 2 AND 3 BE ADMITTED.

17    Anything else for the state before we take our

18 recess?

19    MR. COTTRELL:  No, Your Honor.

20    THE COURT:  Anything for the defendant, before we

21 take our recess?

22    MS. THOMAS:  No, Your Honor.

23    THE COURT:  All right.  We'll be in recess 15

24 minutes.

25 {Court stands in recess.}

1    {Court reconvenes.}

2            THE COURT:   All parties are present.   Anything

3    from the state before the jury is brought in?

4            MR. COTTRELL:  No, Your Honor.

5            THE COURT:   Anything from the defendant?

6            MS. THOMAS:  No, Your Honor.

7            THE COURT:   Sheriff, if you will please have our

8    jury return.

9    {Thereupon, the following proceedings take place in open

10   court, in the presence of the jury.}

11           THE COURT:   All right.   The Court will note that

12   all of our jurors are present, having filed in, in an

13   extremely orderly fashion.   We'll proceed then with the next

14   witness.

15           The state may call it's next witness.

16           MR. COTTRELL:  Thank you, Your Honor.   We call

17   April Thompson, please.

18   [WITNESS SWORN.]

19           THE COURT:   Please be seated.   The witness is with

20   the state.

21           MR. COTTRELL:  Thank you, Your Honor.

22   APRIL PRIDE THOMPSON, BEING FIRST DULY SWORN, TESTIFIES AS

23   FOLLOWS DURING DIRECT EXAMINATION BY MR. COTTRELL:

24   Q.  Ms. Thompson, please state your full name to the jury and

25   be sure to spell your last name for the Court Reporter.

1  A.  April Pride Thompson; T-H-O-M-P-S-O-N.

2  Q.  Ms. Thompson, did you ever go by the name of Ms. April

3  Pride?

4  A.  Yes.

5  Q.  And Ma'am, where are you living now?

6  A.  At Emerald Bay Apartments.

7  Q.  And, what is your apartment number there?

8  A.  5038-C Cherrycrest Lane.

9  Q.  And, about how long had you lived in that apartment?

10  A.  Now, it's almost two years; two years, in November.

11  Q.  So, were you living there in May of last year?

12  A.  Yes.

13  Q.  Okay.  In May of last year, were you living there alone or

14  were you with someone else?

15  A.  Me and my daughter lived there; my husband lived there,

16  frequently; not as often.  He is not a resident, all the

17  time.

18  Q.  Okay.  What was the status of your marriage with your

19  husband in May of last year?

20  A.  We had just separated and I had got that apartment.  But,

21  he was trying to find him a place; so, he was staying there

22  until he could find him some place.

23  Q.  Ma'am, do you know the defendant in this case, Mr. Shawn

24  Massey?

25  A.  Yes.

1  Q.  Could you please point to where he's seated in the

2  courtroom?

3  A.  He's sitting right over there.

4          MR. COTTRELL:  May the record reflect the witness

5  has identified the defendant?

6          THE COURT:  Let the record so reflect.

7  Q.  How do you know Mr. Massey?

8  A.  I met him through my husband we met about ten years ago.

9  Q.  Have you know him all that time?

10  A.  Yes.

11  Q.  Okay.  Would Mr. Massey ever come over to the apartment

12  complex where you live?

13  A.  Yes.

14  Q.  About how many times, before May of 1998 would you imagine

15  he came over to your apartment?

16  A.  Well, I don't know.  Quite frequently.  I mean, because he

17  would come by to visit and sometimes just spent the night,

18  maybe; or, just to come by; just to have fun.  We consider

19  ourselves to be family.

20  Q.  Okay.  Now, when you say you considered yourself to be

21  family, were you talking about you consider yourself to be

22  part of Mr. Massey's family; correct?

23  A.  Yes.

24  Q.  Okay.  Were you working on May 22, 1998?

25  A.  Yes.

1  Q. Where were you working at that time?

2  A. At Data South Computer Corporation.

3  Q. And, about what time were you regularly leaving for work?

4  A. At that time, I probably left my house at least between

5  6:30 or 6:45 a.m.; because, I had to take my daughter to the

6  sitter. I had to go across town and then get back to work

7  and report at work at 8 o'clock.

8  Q. Okay. Do you remember leaving for work on May 22, 1998?

9  A. Yes. If it was a normal work day; yeah.

10  Q. All right. Do you remember with any specificity, what --

11  about what time you left for work on that date?

12  A. It had to be at least 6:45. I never left any later than

13  that.

14  Q. Before you left, did you see Mr. Massey?

15  A. It seems that he might have been there that day.

16  Q. What do you remember about that day, before you left?

17  A. That I left to go to work and my husband had been there

18  that day because he had worked -- he was working somewhere up

19  the street; and so, he needed to -- he would use my apartment

20  and he would walk to work.

21         So, he was there that morning with me, as well.

22  Q. Okay. About what time do you remember Mr. Massey being

23  there?

24  A. If he -- from what I can recall, he probably came the

25  night before.

Q. And, when you left, did Mr. Massey leave with you?

A. No.

Q. Who else was there at your apartment when you left, beside Mr. Massey?

A. My husband.

Q. The day after May 22, 1998, on Saturday, May 23, 1998, do you remember talking to some police officers at the complex?

A. I remember a police officer coming to my apartment. I don't remember if it was the day after or not.

Q. Okay.

A. When I talked to the police officer, it doesn't seem like it was a Saturday.

Q. Okay. Did they ask you questions about who might have been at your apartment?

A. Yes.

Q. Okay. And, who did you tell them was at your apartment that day?

A. I told him that my husband had been there and that Shawn had been there.

Q. Okay.

     MR. COTTRELL: May I approach the witness, Your Honor?

     THE COURT: All right.

Q. Ma'am, on this little table in front of you there is two sheets of paper that are marked for identification as State's

Exhibit No. 1 and State's Exhibit No. 3.

A.   [Affirmative response.]

Q.   What do those appear to be to you, ma'am?

A.   Pictures of I guess guys that have been maybe in a line-up.

Q.   Do you see the defendant's picture any where on those papers?

A.   Yes.

Q.   Could you please hold up State's Exhibit No. 1 and point to where you see Mr. Massey's picture?

A.   Right here.

Q.   Thank you.   Is there any writing beside that?

A.   Yes.

Q.   Thank you.

     MR. COTTRELL:   Your Honor, may the record reflect she's identified the picture of the defendant, with the writing next to it and circled?

     THE COURT:   Demonstrate the record should reflect she pointed out the upper-right-hand picture.

     MR. COTTRELL:   That's correct.

     THE COURT:   All right.

Q.   Ma'am, would you pick up State's Exhibit No. 3, which is the other photo line-up?

A.   [Affirmative response.]

Q.   And, do you see Mr. Massey's picture on that?

1    A.    Yes.

2    Q.    Would you please point out that picture to the jury?

3    A.    [Affirmative response.]

4    Q.    Okay.

5              MR. COTTRELL:    Your Honor, may the record reflect

6    that she has pointed out the same picture on State's Exhibit

7    No. 3?

8              THE COURT:    The record should reflect that she did

9    point out the top-right picture on State's Exhibit No. 3.

10             MR. COTTRELL:    Thank you, ma'am.    No further

11   questions.

12             THE COURT:    Cross-examination.

13   [CROSS EXAMINATION OF MS. THOMPSON, BY MS. THOMAS:]

14   Q.    Ms. Thompson, is there anything written on the

15   photographic line-up?

16   A.    Which picture?

17   Q.    On any of them?

18   A.    Either on; yes.

19   Q.    What is written on there?

20   A.    On the Exhibit No. 1 it said, "This looks most like him;

21   except, no braids"?

22   Q.    Okay.   But, you didn't write that; did you?

23   A.    No, ma'am.

24   Q.    And, you were never shown a photographic line-up by the

25   officers; were you?

A. No.

Q. You were not shown a photographic line-up?

A. [No verbal response.]

Q. And, today is the first time you viewed that photographic line-up?

A. Yes.

Q. And, how long have you known Shawn Massey?

A. Ten or eleven years.

Q. And, how frequently did you see Shawn Massey?

A. Wow; very frequently.

Q. Very frequently?

A. Yes.

Q. And, what do you recall about Shawn Massey's hairstyle?

A. From what I can recall of him, all the years I've known him, it's never been very long.

Q. And, when you say "never long" how short has his hair been?

A. He keeps it -- he keeps it low cut. He doesn't -- he usually has to brush it; he keeps it very low cut.

Q. As opposed to say combing it?

A. Right.

Q. Have you ever seen Shawn Massey wear braids?

A. No. Not that I can recall.

Q. Have you ever seen Shawn Massey with hair long enough to braid?

1　A.　It might have been; but, not long enough to where it could

2　really be hanging; hanging braids; no.

3　Q.　Do you recall Shawn Massey having braids the day he was

4　over at your house in May?

5　A.　No.

6　Q.　How do you recall his hair being styled on that date?

7　A.　A low haircut.

8　Q.　Is long hair required to braid hair?

9　A.　Yes.

10　Q.　And, you were not asked to make a written statement when

11　the officers came to your residence; were you?

12　A.　No.

13　Q.　So, you have not made a written statement of any kind?

14　A.　No.　I haven't written anything.

15　Q.　And, how long have you resided at the Emerald Bay

16　Apartments?

17　A.　It's coming on two years.

18　Q.　Are you acquainted with the property manager, Ms. Savall,

19　who previously testified?

20　A.　I've seen her.

21　Q.　And, how -- approximately how long a time period, prior to

22　May 22, had you seen her in the area?

23　A.　Probably only once.

24　Q.　And, how frequently did Shawn come to your residence?

25　A.　He came quite frequently.

1  Q. You've stayed at Emerald Bay Apartments sometime before

2  this incident. Is that right?

3  A. Yes. Well, I had lived there previously, before, also.

4  Q. And, what time period did you previously live there?

5  A. I lived there for two and-a-half years.

6  Q. And, you had only seen this property manager one time,

7  prior to May 22?

8  A. Yes.

9  Q. Is that your testimony?

10  A. Yes.

11  Q. And, you still live at Emerald Bay Apartments. Is that

12  correct?

13  A. Yes.

14  Q. And, you were working at Data South, at that time. Is

15  that correct?

16  A. Yes.

17  Q. And, are you still employed at Data South?

18  A. Yes.

19  Q. What do you do there?

20  A. Presently, I am shipping supervisor.

21          MS. THOMAS: Thank you. No further questions.

22          THE COURT: Re-direct.

23          MR. COTTRELL: Thank you, Your Honor.

24  RE-DIRECT EXAMINATION OF MS. THOMPSON, BY MR. COTTRELL:

25  Q. Ms. Wood, would you --

1    THE COURT:    Thompson.

2  Q.  Pardon me.  Ms. Thompson, when you spoke to the police

3  officer that came to  your apartment, do you remember giving

4  him any kind of description of Mr. Massey?

5  A.  No.  I can remember him asking me some questions about

6  him; but, I might have told him, maybe, how tall he was.

7  But, maybe about his build.  But, he asked me some general

8  questions.

9  Q.  But, you do remember talking to the officer; correct?

10 A.  Yes.  I remember him coming.

11 Q.  And, do you think you might have told the officer -- if

12 the officer had written down the name, "Shawn Giovanni

13 Massey" in notes that day, would that have come from

14 something you told him?

15 A.  Yes.  He had asked me who was there, other than my

16 husband.  And, I told him, "Another gentleman."  And, he

17 asked me his name.

18 Q.  And, did he ask you for a description and he wrote that he

19 was a Black male with a birth date of 3/23/73, that would

20 have come from you; correct?

21 A.  I probably wouldn't have told him his birth date because I

22 can hardly ever remember Shawn's birthday.  He usually has to

23 remind me.

24 Q.  In fact, you may have told him that his date of birth was

25 March 22 through 25 and he was about 25-years of age.  Would

1  that be --

2  A.  I could have told him about his age.  Yes, sir.

3  Q.  And you have told him that he resided with his

4  grandmother, the Reverend Annie Massey?

5  A.  Yes.

6  Q.  And, would you have told him that he lived on either 3216

7  or 3212 Graymont?

8  A.  Yes.

9  Q.  You would have told him that?

10  A.  Yes.  Because I know -- I know of a house on that street

11  of its exact address; and, I know she lives beside of it.  I

12  don't know which address.

13  Q.  If the officer had written in his notes that Mr. Massey --

14  that you told him Mr. Massey wears his hair pulled back with

15  four or five braids, would the officer have been making that

16  up?

17          MS. THOMAS:  OBJECTION.

18          THE COURT:  OVERRULED.  I'll let her answer.  You

19  may answer the question.

20  A.  I recall the officer asking me if Shawn wore braids.  I do

21  not recall telling him that he did.

22  Q.  So, you have no idea why the officer would have written

23  that down in notes of his conversation with you?

24  A.  That's right.

25  Q.  Okay.  Now, do you also remember coming to my office,

1  sometime probably about two weeks ago?

2  A.  Yes.

3  Q.  Okay.  And, do you remember me showing you pictures of the

4  defendant and asking if that was the Shawn Massey you knew?

5  A.  [No verbal response.]

6  Q.  Do you remember that?

7  A.  I can't remember you showing me any pictures.

8  Q.  Okay.  Okay.  Do you remember me asking you questions of

9  how the defendant looked on that date?

10  A.  Yes.  You asked me how he -- if I remember how he was --

11  what he was wearing.

12  Q.  And, do you remember telling me that he had braids, at

13  that time?

14  A.  No.

15  Q.  Okay.  So, your testimony would be that you would have

16  told me that he had a close haircut at that time, as well?

17  A.  I don't remember telling you what his hair looked like.

18  Q.  What you've testified to on the stand today, ma'am, is

19  that he had a close haircut;  but, you do remember him having

20  fairly long hair, at some point; but, in your opinion, not

21  long enough to braid.  Is that correct?

22  A.  That is correct.

23  Q.  And, you testified when I was asking you questions that

24  Mr. Massey is like family to you?

25  A.  Yes.

1           MR. COTTRELL: Nothing further.

2           THE COURT: Re-cross?

3           MS. THOMAS: Yes.

4  RE-CROSS EXAMINATION OF MS. THOMPSON, BY MS. THOMAS:

5  Q. Ms. Thompson, you have taken an oath to tell the truth;

6  have you not?

7  A. Yes. I have.

8  Q. Have you placed your hand on the Bible to take that oath?

9  A. Yes.

10  Q. Are you a spiritual person?

11  A. Yes.

12           MR. COTTRELL: OBJECTION.

13           THE COURT: Well, SUSTAINED.

14  Q. Would you be dishonest to protect anyone?

15           MR. COTTRELL: OBJECTION.

16  A. No.

17           MR. COTTRELL: The attorney is asking the witness

18  to comment on her own credibility.

19           THE COURT: SUSTAINED to the form of the question.

20  Q. Would the fact that Mr. Massey is related to you affect

21  the truthfulness of your testimony?

22  A. No.

23           MS. THOMAS: Thank you. No further questions.

24           THE COURT: Anything further of this witness, from

25  the state?

1    MR. COTTRELL:  Just one question.

2    RE-DIRECT EXAMINATION OF MS. THOMPSON, BY MR. COTTRELL:

3    Q.  How, exactly, is the defendant related to you, Ms.

4    Thompson?

5    A.  We're not related through blood.  It's just we've been so

6    close; we're like brother and sister.

7    Q.  All right.  Thank you.

8         THE COURT:  Anything further of this witness, from

9    the defendant?

10        MS. THOMAS:  No, Your Honor.

11        THE COURT:  All right.  Thank you, ma'am.  You may

12   step down.

13        MR. COTTRELL:  Your Honor, the state is fine with

14   this witness being excused.

15        THE COURT:  Does the defense have further need of

16   this witness as a witness?

17        MS. THOMAS:  No, Your Honor.

18        THE COURT:  All right.  Ms. Thompson is free to

19   go, if she chooses to leave.  The state may call its next

20   witness.

21        MR. COTTRELL:  Thank you, Your Honor.  The state

22   would call Officer Esposito.

23   [WITNESS SWORN.]

24        THE COURT:  The witness is with the state.

25        MR. COTTRELL:  Thank you, Your Honor.

1    GERALD ESPOSITO, BEING FIRST DULY SWORN, TESTIFIES AS FOLLOWS

2    DURING DIRECT EXAMINATION BY MR. COTTRELL:

3    Q.  Officer Esposito, please state your full name for the jury

4    and spell your last name for our Court Reporter.

5    A.  Gerald Esposito; E-S-P-O-S-I-T-O.

6    Q.  Sir, how are you employed?

7    A.  I'm currently assigned to the Adam 1 District of the

8    Charlotte-Mecklenburg Police Department, as a police officer.

9    Q.  And, how long have you been a police officer?

10   A.  In Charlotte, six years.

11   Q.  Have you been a police officer anywhere else, be side

12   Charlotte?

13   A.  Yes, sir.

14   Q.  And, where was that?

15   A.  City of Chicago.

16   Q.  And, how long were you a police officer in Chicago?

17   A.  Seventeen years, nine months and several days.

18   Q.  And, what's your current assignment in the Charlotte-

19   Mecklenburg Police Department?

20   A.  I'm a violent crimes investigator.

21   Q.  Sir, when did you first begin investigating the crimes

22   that happened on May 22, 1998, at 5206-B Cherrycrest Lane?

23   A.  I initially started on late-afternoon of that day; and

24   actually began the follow-up information on the following

25   day; the 23rd.

1  Q. What exactly did you do, as far as investigation was

2  concerned, on the first day, when you got there? Did you

3  respond to the scene?

4  A. Yes. I did.

5  Q. Okay. What did you do at the scene, sir?

6  A. I organized to see if anyone had canvassed the area for

7  any unreported witnesses; if canine had been called to see if

8  there was a direction of flight by the suspect; seeing about

9  the injuries of the victim and possible testimony of any

10  other victims or children. At that time, I didn't know how

11  old the children were. I knew that the one child was a year

12  and-a-half or two-years old.

13  Q. Did you go back to the scene, the following day?

14  A. Yes, sir.

15  Q. Okay. Did you go with any other officers, on that date?

16  A. Yes, sir.

17  Q. Who was that?

18  A. Officer O'Janiid; O-J-A-N-I-I-D.

19  Q. And, what did the two of you do at the scene, on May 23rd?

20  A. We began our canvass of the area for any possible

21  witnesses that may have been witness to the crimes or anyone

22  that may have information about who the suspect may have

23  been.

24  Q. Now, what do you mean by a "canvass of the area"?

25  A. Starting to go door-to-door; knock on doors to see if

1  anyone saw anything; heard anything; or, could provide any

2  information that would be useful during the investigation.

3  Q.  While canvassing the area, did you talk to Ms. Theresa

4  Savall?

5  A.  Yes.  I did.

6  Q.  And, how did you come into contact with Ms. Savall?

7  A.  I originally requested to speak with management to get the

8  maintenance men.  Generally, maintenance men know who belongs

9  and who doesn't.  They're on the property and they have a

10 good sense of who belongs and who doesn't, as well as they're

11 out and about.  And, things may have been visible to them

12 that may not have been visible to others.  So, I wanted to

13 speak with her maintenance man and herself.

14 Q.  And, when did Ms. Savall enter into that equation?

15 A.  She was on the pathway or sidewalk that leads from the

16 office, the complex office, across the street, passed the

17 5802, 5800 block of Cherrycrest Drive.  She was making her

18 rounds, walking the property.

19 Q.  Did you speak with her that day?

20 A.  Yes, sir.  I did.

21 Q.  And, what did she tell you on that day?

22 A.  She had some knowledge.  She was inquiring about why we

23 wanted to speak to the maintenance man.  What it was about.

24 She had heard there was an occurrence on the property.  And,

25 I told her that she was correct; there had been an occurrence

1  on the property; we weren't at liberty to discuss the

2  specifics of it; but that we were going to contact people

3  throughout the complex to see if anyone had seen anything.

4  Q.  And, did you ask here if she herself had seen anything?

5  A.  Yes.  I did.

6  Q.  And, what did she tell you?

7  A.  She told me that in the morning hours of the 22nd, that

8  she was on that specific pathway where I was speaking to her

9  at and that a man came from -- and, she pointed with her

10  right hand to a patio and sliding glass door and she said,

11  "Came from over there," and made certain statements to her

12  that she found somewhat offensive.

13  Q.  Did you record anywhere the physical description that she

14  gave to you?

15  A.  Yes.  I did.

16          MR. COTTRELL:  May I approach the witness, Your

17  Honor?

18          THE COURT:  Yes, you  may.

19          Members of the jury, the testimony of this witness

20  of the statements made to him by the previous witness,

21  Theresa Savall, is being offered for the purposes of

22  corroborating the testimony of that witness.  And, you may

23  consider it for the purpose of corroborating her testimony,

24  if indeed you find that it does corroborate her testimony.

25  You should only consider it for corroborating purposes.

1        You can proceed.

2        MR. COTTRELL:  Thank you, Your Honor.

3  [State's Exhibit No. 4 is marked for identification.]

4  Q.  Sir, presenting you with a sheet of paper I have marked

5  for identification purposes as State's Exhibit No. 4.  I will

6  direct you to the second paragraph of that sheet.

7        First of all, do you recognize that sheet, sir?

8  A.  Yes, sir.

9  Q.  Could you please describe what it is, to the jury?

10 A.  It's a supplemental report, in my handwriting; my case

11 notes and what was described to me at the time, step-by-step.

12 Q.  And, what is the date of the supplement?

13 A.  The date of the supplement is the 23rd of May, 1998.

14 Q.  Okay.  Directing your attention to the second paragraph,

15 does it contain your notes on what Ms. Savall told you the

16 physical description of the suspect was?

17 A.  Yes.  It does.

18 Q.  Please read that portion to the jury, sir?

19 A.  [Reading.]

20        "Ms. Savall stated that while walking in the area

21 of 5038 (rear), she was confronted."

22        We asked her to describe the individual.  She

23 stated that he was a male, Black, in his 20's, approximately

24 5 foot 11 inches tall, weighing 165-plus pounds.

25        He was wearing a "jersey-type shirt" and a ball

1   cap.

2          Do you wish me to continue?

3   Q. No, sir. Which apartment did Ms. Savall say this

4   individual was coming from when she saw him?

5   A. She directed me to 5038-C "as in Charles"; which is a

6   lower-level apartment, where the patio is.

7   Q. Now, on that date, did you also go to 5038-C, Cherrycrest?

8   A. Yes. I did.

9   Q. And, who, if anyone, did you speak to there?

10   A. I knew her as Ms. Pride; Ms. Thompson I believe is her

11   name now.

12   Q. Did you identify yourself as a police officer?

13   A. I changed into uniform. Yes, sir. I was in full uniform

14   at that time.

15   Q. Did you speak to Ms. Thompson or Ms. Pride?

16   A. Yes. I did.

17   Q. And, what did you tell her?

18   A. Actually, I told her that we had received the complaint

19   about someone from her apartment that he was possibly

20   intoxicated. And, I inquired as to who had been at her

21   apartment the previous day.

22   Q. Now, what was your reasoning about not telling her what

23   exactly you were investigating at that point?

24   A. I wanted her not to be reluctant in identifying who was on

25   her premises. I wanted her to be truthful. And so, I didn't

1 want to say that we were investigating any sort of attempt

2 rape or robbery or anything that would alarm her so that she

3 wouldn't protect anyone.

4 Q. And, during your conversation with her, did she tell you

5 if anyone was indeed on her premises the day before?

6 A. Yes, sir. She did.

7 Q. And, who did she name was the person?

8 A. She named him as Shawn Massey.

9 Q. In your supplement, sir, did you have a second page where

10 you documented your conversation with Ms. Pride?

11 A. Yes, sir. I do.

12       MR. COTTRELL: May I approach the witness, Your

13 Honor?

14       THE COURT: All right.

15 [State's Exhibit No. 4-A is marked for identification.]

16 Q. Sir, I'm showing you another sheet of paper. This one is

17 marked as State's Exhibit No. 4-A. Take a look at that.

18       Do you recognize that, sir?

19 A. Yes, sir. I do.

20 Q. And, what is it, please?

21. A. It's a supplemental report, in my handwriting; it's a

22 continuation from this page, marked "Page 2 of 2 pages."

23 Q. And, what is the date on that part of the supplement?

24 A. It's the 23rd of May.

25 Q. And, according to your recollection, did you fill it out

1  the same part as page 1; or, did you do them separately?

2  A.  I did them at the same time, sir.

3  Q.  And, does that page reflect what your conversation with

4  Ms. Pride was at that time?

5  A.  Yes, sir.  It does.

6  Q.  Would you please read -- first of all, would you please

7  read it to yourself?

8  A.  Certainly.  Yes, sir.

9  Q.  After reviewing that, sir, do those notes accurately

10 reflect what you remember about your conversation with Ms.

11 Pride that day?

12 A.  Absolutely; Yes, sir.

13 Q.  And, as a police officer, are you trained in the making of

14 reports?

15 A.  Yes, sir.

16 Q.  And, would you have entered anything on that report, under

17 the portion pertaining to your conversation with Ms. Pride,

18 that she didn't actually tell you?

19 A.  Absolutely not.

20 Q.  Could you please read to the jury, the portion of that

21 supplement, beginning with your casual conversation with Ms.

22 Pride?

23          THE COURT:  Members of the jury, you may consider

24 this account from Officer Esposito as to what was said to him

25 by April Pride Thompson, for the purpose of corroborating the

1  testimony of April Thompson, if indeed you do find that it

2  does corroborate her testimony.

3          Do not consider it for other purposes.

4          You can proceed.

5          OFFICER ESPOSITO:    Thank you, sir.

6  A.    [Reading.]

7          "During a casual conversation, Ms. Pride revealed

8  that on Friday, 5/22/98, she allowed a male friend, now known

9  to be Shawn G. Massey, male Black, 3/23/73.

10          Ms. Pride provided me with the following

11  information:   The subject at her residence was Shawn Giovanni

12  Massey.   His date of birth was March 22 to March 25 and that

13  he was 25 years of age.

14          That he resides with his grandmother, Reverend

15  Annie Massey, at about 3216 or 3212 Graymont.

16          That Mr. Massey wears his hair pulled back with

17  four to five braids."

18  Q.   Would you have written that last comment about how he wore

19  his hair if she had not told you that?

20  A.   No, sir.

21  Q.   About how long did you speak to Ms. Pride on that date?

22  A.   I was at her doorway probably about six to eight minutes.

23  Somewhere around there.

24  Q.   Did you take statements from any other people that day, in

25  relation to this case?

1   A. No, sir.

2   Q. What if anything else did you do, in relation to this

3   investigation?

4   A. I contacted Investigator Ledford. I directed Officer

5   O'Janiid, to prepare statements from Ms. Savall.

6           I reviewed this information with Officer O'Janiid.

7   Did a computer background check for the last name of Massey

8   and determined an exact date of birth.

9   Q. Thank you, sir.

10          MR. COTTRELL: No further questions, at this time.

11          THE COURT: All right. Cross-examination.

12          MS. THOMAS: Thank you.

13  [CROSS EXAMINATION OF OFFICER ESPOSITO, BY MS. THOMAS:]

14  Q. Officer Esposito, at what time, on May 23, 1998, did you

15  speak with Ms. April Pride Thompson?

16  A. I believe it was in the afternoon.

17  Q. You did not write this report contemporaneous with your

18  conversation; did you?

19  A. No, ma'am.

20  Q. And, approximately what time did you write this report?

21  A. Probably in the late-afternoon or very-early evening

22  hours.

23  Q. Where was the -- where did the conversation take place?

24  A. At her residence, 5038-C.

25  Q. Where did the -- where were you when you wrote up the

1  report, if you recall?

2  A.  Back at our police station.

3  Q.  So, you did write the report from your memory of the

4  conviction.  Is that correct?

5  A.  Yes, ma'am.  As well as my notes.

6  Q.  Did you participate in the photographic line-up of -- that

7  was displayed to Ms. Wood?

8  A.  No, ma'am.  I did not.

9  Q.  Were you present when the photographic line-up was shown

10  to her?

11  A.  No, ma'am.  I was not.

12  Q.  Have you had personal experiences in your duties as an

13  officer in preparing photographic line-ups?

14  A.  Yes, ma'am.  I have.

15  Q.  And, what is the procedure that is routinely followed in

16  someone showing photographic line-ups?

17  A.  To, through a database, Mecklenburg County Jail has a

18  database.  And, in that database, the computer matches

19  physical descriptions, physical characteristics, any

20  abnormalities there may be; and, they enter the date into the

21  computer; it requests certain information from you.

22          As you enter that date, the computer generates

23  numerous composite-type photographs that are similar in

24  characteristics, to the information that you have provided

25  and that the computer generates about your suspect.

1  Q.  How is the photographic line-up shown to the person who is

2  going to attempt to make an identification?

3  A.  Standard procedure is to prepare six, black and white --

4  let me rephrase that.  My procedure and most procedures are

5  six black and white photographs that are actually generated

6  from a -- from the computer.  And, these are copies of the

7  photographs that are originally fed for information into the

8  computer from photographs taken at the time of arrests.

9       So, some photographs are -- if someone's last

10  arrest was 1996, and this is 1999, that photograph may be

11  three years old, if that's the most recent photograph.

12  Q.  When you display the photographic line-up to the person

13  you're hoping will make an identification, what words do you

14  say to them?

15  A.  A standard operational procedure would be to go-ahead and

16  not allow the individual to see the photo line up; when you

17  discuss it with them, prior to showing it to them, you advise

18  them that there is a possibility that the suspect in this

19  case may or may not be included in this line-up.

20       They don't want you to feel under any pressure to

21  identify anyone.  I do request that if you find someone in

22  that photograph that you recognize or that you know; and, it

23  is or is not the suspect, please advise me of that.

24       I suggest that you take your time; there is no

25  rush.  I would like you to view each and every photograph.

1    And, if you are positive about the identification of the

2    suspect, I want you to inform me of that by pointing to that

3    specific picture.

4              That's standard procedure for preparing the show;

5    the photo line-up. You generally leave it face-down and you

6    advise them whenever you're comfortable, whenever you're

7    ready, you agree to turn it over and view the photograph.

8    Q. And, if someone indicates by a positive identification,

9    you ask them to sign it. Is that correct?

10   A. Yes, ma'am. I do.

11   Q. Thank you. Have you ever participated in a line-up where

12   six or seven pages of photos, photographs, were shown?

13   A. No, ma'am. Personally, I have not.

14              MS. THOMAS: Thank you, Officer Esposito.

15              THE COURT: Any re-direct?

16              MR. COTTRELL: No, Your Honor.

17              THE COURT: Thank you, sir. You may step down.

18              OFFICER ESPOSITO: Thank you.

19              MR. COTTRELL: Thank you, office.

20              THE COURT: The state may call it's next witness.

21              MR. COTTRELL: Your Honor, we would call

22   Investigator Tom Ledford to the stand.

23   [WITNESS SWORN.]

24              THE COURT: The witness is with the state.

25              MR. COTTRELL: Thank you, Your Honor.

THOMAS GLYNN LEDFORD, BEING FIRST DULY SWORN, TESTIFIES AS FOLLOWS DURING DIRECT EXAMINATION BY MR. COTTRELL:

Q. Investigator Ledford, once again, please say your full name for the jury and spell your last name for our Court Reporter.

A. Yes, sir. Thomas Glynn Ledford; L-E-D-F-O-R-D.

Q. And, how long have you been employed as a police officer, sir?

A. Been a police officer for 15 years, nine months and 10 days.

Q. Has that all been in Charlotte?

A. Yes, sir. It has.

Q. And, what's your current assignment?

A. My current assignment is as a robbery investigator, Felony Investigations Bureau.

Q. Sir, in this case, did you show a photo line-up to Ms. Theresa Savall?

A. I did.

Q. Sir, approximately how many photo line-ups have you shown, in your work as a police officer?

THE COURT: Would counsel approach the bench just a minute, please?

{Conference at sidebar, outside the hearing of the jury, with all attorneys present.}

{Thereupon, the following proceedings take place in open

1  court, within the hearing of the jury.}

2  Q.  Sir, I think I was asking you the -- approximately how

3  many photo line-ups you think you've shown, since you've been

4  a Charlotte Police Officer?

5  A.  It would be a rough guess; it would be literally hundreds.

6  Q.  And, could I direct your attention to State's Exhibit Nos.

7  1 and 3, which are the two photo line-ups on the table there

8  in front of you?

9  A.  Yes, sir.

10  Q.  Now, have you ever seen those photo line-ups like that

11  before?

12  A.  I have.

13  Q.  And, where has that been, sir?

14  A.  Well, this is pretty much our standard form of the line-

15  up.  The computer generates criteria, based upon the criteria

16  of the person who was to be the focus.

17            You use a photographic line-up to either focus in

18  on someone or eliminate them as a suspect.

19            You enter the person's name; the database already

20  has certain criteria that it automatically, for us, plugs

21  into the system.  You then match up subjects with similar

22  characteristics.  And, this is what you get when you print it

23  out.

24  Q.  So, does the line-up start with a single photo?

25  A.  Yes, sir; it does.

1  Q.  And, who would that photo be of, in this case?

2  A.  Well, in this case it would have been the defendant or the

3  suspect, at that point.

4  Q.  And, then --

5  A.  And, that gives you certain criteria; usually things like

6  date of birth, hair length, hairstyle; just a whole

7  assortment of criteria.

8         And then, you select the criteria.  And, if you

9  plug them into the system, you might get 900 or 9,500 names.

10  You continue paring it down; it continues to pair the field

11  of candidates down, as you continue to narrow it down with

12  criteria.

13  Q.  So, after a typical suspect's photo is entered into the

14  system, how many different photographs would the system spit

15  out?

16  A.  It depends on the criteria.  I mean, I've seen it spit out

17  fewer than ten; I've seen it spit out 100,000.

18  Q.  And, how then are those photographs narrowed to six that

19  are eventually presented to someone?

20  A.  Well, you select the candidates that you feel are fair to

21  the defendant or the suspect, as well as fair to the state.

22  Again, the purpose of the photographic line-up being to focus

23  in on someone as a suspect or tell you that you need to

24  continue looking for someone else.

25         So, your goal, in a photographic line-up is to make

1  the line-up fair to both the state and fair to the potential

2  suspect.

3  Q.  After the officer selects six different photographs, what

4  does he do to get that sheet of paper?

5  A.  You print it off.

6  Q.  Were you trained in the preparation of photo line-ups in

7  your duties as police officer?

8  A.  There is some training in it.

9  Q.  How much training is it, Officer?

10  A.  Well, there is some training in the police academy; there

11  is some training in investigations, in various courses that

12  you take.  And, primarily what we use is FARB, which is one

13  of the leading experts in Raleigh, North Carolina.

14  Q.  Now, directing your attention to State's Exhibit No. 3,

15  Officer?

16  A.  Yes, sir.

17  Q.  Have you seen that particular line-up before?

18  A.  Yes, sir. I have.

19  Q.  Okay.  Now, is that the same photo line-up as in Exhibit

20  No. 1?

21  A.  It is.

22  Q.  Okay.  Did you personally show that to someone?

23  A.  I did.  I showed it to Ms. Savall.

24  Q.  And, what was the date that you showed her that line-up?

25  A.  I met with her, Officer Esposito was with me as well.

1   And, that would have been on the 26th of May, 1998.

2   Q.   And, did you have a line-up with you when you went there?

3   A.   Yes.   I did.

4   Q.   Could you please explain to the jury the manner in which

5   you gave this line-up to Ms. Savall?

6   A.   Certainly.   The line-up is concealed from the subject who

7   is going to be reviewing it, initially.   I explained to her

8   that I was going to show her a set of six black-and-white

9   photographs of young, Black males.   That the person involved

10  in this incident may or may not be in the line-up; and, that

11  she was certainly under no obligation to make an

12  identification.

13          I asked her to pay attention to things that don't

14  change like eyes, nose, mouth; things that we use to identify

15  people with.   And, to see if she recognized anybody; but

16  certainly, again, don't feel any pressure.

17  Q.   Do you ever tell persons to focus on the hair of a

18  subject?

19  A.   Well, what I tell people about hair is, hair can change.

20  I could have hair down to my collar, you know; two weeks, I

21  could be bald, with a shiny head, tomorrow.   So, to pay more

22  attention to those things that can not change, such as your

23  eyes and   your nose and mouth.

24  Q.   On the photo line-ups that you have there, is it possible

25  to view the back of any of these subject's head, in that

1  photo line-up?

2  A. No, sir. It's not.

3  Q. What did you tell Ms. Savall, as you presented this line-

4  up to here?

5  A. Well, after I explained to her the portion of not feeling

6  compelled to identify somebody, I just hand her the line-up

7  and let her look at the line-up.

8  Q. Did you observe her while she looked at the line-up?

9  A. I did.

10  Q. What did you observe?

11  A. She focused on the top photograph, on the right-hand side,

12  which was the photograph of the defendant.

13  Q. About how long did it take her to focus on the defendant's

14  picture?

15  A. She focused on it fairly quickly; very quickly. The exact

16  time, I couldn't say.

17  Q. And, what did she say to you when she pointed out the

18  defendant's picture?

19  A. She told me that it looked like the person that she

20  believed that it was the subject who she saw that morning.

21  Q. After she identified the subject, identified the

22  defendant, what did you have her to do to the picture?

23  A. I asked her to sign her name and across the top and above

24  the photograph of the subject that she had pointed to and to

25  write the date; which she did.

1   Q. And, what's the date that's circled?

2   A. The date is 5/26/98.

3   Q. Did you have any further conversation with Ms. Savall at

4   that point?

5   A. No, sir.

6   Q. After presenting that photo line-up to Ms. Savall, did you

7   have any more involvement in the investigation of this case?

8   A. My involvement was to complete the paperwork; present it

9   to the Mecklenburg County District Attorney's Office to

10   determine if charges would be authorized.

11   Q. Did you do anything besides that, sir?

12   A. No, sir. No, sir. Well, actually, I did -- I called the

13   victim. I did not participate in the photographic line-up

14   with the victim. So, prior to going to the District

15   Attorney's Office I kind of wanted to have a feel for what

16   she had told the officer who did show the line-up.

17         I contacted her. She told me that she believed the

18   person she identified was the person who robbed her. That

19   she would be certain if she saw him in person.

20         MR. COTTRELL: Thank you, sir. No further

21   questions.

22         THE COURT: All right. Cross-examination.

23   [CROSS EXAMINATION OF INVESTIGATOR LEDFORD, BY MS. THOMAS:]

24   Q. Officer Ledford, for your last sentence, do you have notes

25   referring to that last sentence you appear to be reading?

1  A. Well, it's in my supplement. Yes, ma'am. I don't have

2  notes; but, it's in my supplement.

3          MS. THOMAS: May I approach the witness?

4          THE COURT: Yes, ma'am.

5  A. Right here, ma'am.

6  Q. Officer Ledford, was that something, that supplement,

7  turned over to the District Attorney's Office?

8  A. Yes, ma'am. It was.

9  Q. And, do you know when the supplement was turned over to

10 them?

11 A. I would have to look at my file, back here, to see when it

12 was papered. It was papered with Assistant District Attorney

13 Leslie Tucker. She had the whole case file.

14 Q. And, you did not personally participate in the photo line-

15 up shown to Ms. Wood. Is that correct?

16 A. I'm sorry. Yes. I did not.

17 Q. You did not participate in that?

18 A. That's correct. I did not.

19 Q. And, you only did the photographic line-up which was shown

20 to Ms. Savall, the property manager. Is that correct?

21 A. That is correct.

22 Q. And, what did you tell Ms. Savall to do, if she made a

23 positive identification?

24 A. I asked her to sign her name above the photograph and

25 write the date. She told me that she believed this was the

1  subject.  That was not a positive identification, in my

2  opinion; but, it was an identification.

3  Q.  And, your procedure is to have the person doing the line-

4  up sign, if they do make an identification.  Is that correct?

5  A.  That is correct.

6  Q.  Have you ever participated in a line-up where six pages of

7  photo arrays were shown to one person?

8  A.  We don't do that.  I have participated in line-ups, if you

9  will, where we use the mug-shot system, which is what we get

10  the photographs off of.

11        That's the computer system; we refer to it as the

12  mug-shot system, which is the database that pulls up the

13  candidates.

14        I usually do that with the subject those the person

15  knows, the person who is alleged to have committed the

16  offense.  But, six pages of photos, no, ma'am.

17  Q.  And, in this particular type of photographic array, it is

18  not customary to show the person viewing it more than one

19  page of photographs.  Is that correct?

20  A.  I don't understand.  Are you talking about the line-up of

21  Ms. Savall?

22  Q.  In a photographic line-up of this type, it's not customary

23  to show the person viewing the line-up a number of pages.  Is

24  that correct?

25  A.  I wouldn't say -- to say that it's "customary" -- you

1    could certainly show a subject -- a person, more than one

2    page of photographs. I'm not really sure what you're --

3    Q.   How many pages of photographs did you prepare?

4    A.   Did I prepare?

5    Q.   Yes.

6    A.   I didn't prepare any photos.

7    Q.   Are you aware of the existence of six or seven additional

8    pages of photos?

9    A.   Are you talking about of this same line-up; or, several

10   separate line-ups with separate candidates? Are you asking

11   me is there more copies of this or are you asking me are

12   there more photographic line-ups with potential candidates in

13   it, concerning this case?

14   Q.   I'm asking you if there are any other photo line-ups with

15   other candidates in it?

16   A.   Not to my knowledge. There may be; but, I'm not aware of

17   them.

18   Q.   Have you had the opportunity to view this photographic

19   line-up, at length?

20   A.   This line-up here?

21   Q.   Yes.

22   A.   Yes, ma'am.

23   Q.   Officer Ledford, isn't it true that the four photographs

24   on the left-hand side are almost entirely black?

25   A.   Well, they're certainly darker.

1  Q.  Isn't it true that the lower right-hand corner of the

2  photograph shows only the person's eyes and nothing else?

3  A.  Not what I'm looking at.

4           MS. THOMAS:  May I approach the witness?

5           THE COURT:  Yes, ma'am.  I can see every person in

6  here, counselor.

7  A.  What you're probably looking at is in preparing papering

8  material, we make copies on the copy machine.  And, that

9  tends to be darker than the photographic line-up that was

10  actually shown.

11  Q.  Okay.  On the copy that I have, isn't it a fact --

12  A.  It's very dark.  Yes, ma'am.

13  Q.  The two photos on the left-hand side are entirely black,

14  except for the eyes?

15  A.  Not entirely black; but, certainly blacker than the one we

16  showed the subject to view the line-up.

17  Q.  Isn't it a fact that it would be impossible to recognize

18  any characteristics, other than the eyes of these two people,

19  from these photos?

20  A.  I would tend to agree with that.  But again, that's not

21  the photographic line-up that was shown to either party.

22  Q.  Isn't it a fact that the two center photos show a little

23  more than the eyes and this shows the teeth?

24  A.  On your copy.  Yes, ma'am.  On the copies that were shown

25  to the subjects viewing the line-ups, that is not correct.

1  Q.  Officer Ledford, do you have the original photo that was

2  shown to Ms. Savall and Ms. Wood?

3  A.  I believe I probably do.  Probably, that's in my original

4  file.  May I get that, Your Honor?

5        THE COURT:  Yes, sir.

6  A.  I do have those, counselor.

7        MS. THOMAS:  May I approach the witness?

8        THE COURT:  Yes, ma'am.

9  Q.  Thank you.  Now, were you present when the photograph was

10  shown to Ms. Savall?

11  A.  That is correct.

12  Q.  So, you could say with certainty which photograph was

13  shown to her.  Is that correct?

14  A.  That is correct.

15  Q.  But, you were not present when the photographic line-up

16  was shown to Ms. Wood.  Is that right?

17  A.  That's correct.  I was not.

18  Q.  Thank you, Officer Ledford.

19        THE COURT:  Any re-direct?

20  RE-DIRECT EXAMINATION OF INVESTIGATOR LEDFORD, BY MR.

21  COTTRELL:

22  Q.  Just one point of clarification, Officer Ledford.

23        MR. COTTRELL:  Your Honor, may I approach?

24        THE COURT:  All right.

25  Q.  These two copies that defense attorney showed you, these

1 are copies of the original photos?

2 A.  They are copies.  That is correct.

3 Q.  That is not what was shown to either witness.  Is that

4 correct?

5 A.  That is correct.

6         MR. COTTRELL:  No further questions.

7         THE COURT:  Re-cross?

8         MS. THOMAS:  No, Your Honor.

9         THE COURT:  All right. Thank you, sir.  You may

10 step down.  Mr. Prosecutor, since it's about five-'til, I

11 would suggest that we stop for today, rather than getting no

12 more than the name out of the next witness.

13         MR. COTTRELL:  I agree, Your Honor.

14         THE COURT:  All right.  Ladies and gentlemen of

15 the jury, we'll stop here for the day.  And, I think I may

16 need to give you some additional instructions.  If you will,

17 just sit tight for a minute.  Let me ask counsel a question,

18 at the bench, please.

19 {Conference at sidebar, outside the hearing of the jury, with

20 all attorneys present.}

21 {Thereupon, the following proceedings take place in open

22 court, within the hearing of the jury.}

23         THE COURT:  Members of the jury, as I told you

24 earlier, it is customary that we start court at 9:30.  We

25 will be starting court tomorrow at 9:30.  But, there is a

1  matter that needs to be done which is a legal issue that
2  needs to be resolved and will not require your presence.
3         Rather than have you come at 9:30 and just sit in
4  the jury room for about half an hour, while we resolve that
5  matter, I'm going to direct you to return then at 10 o'clock.
6         We'll be working before you get here; so, don't
7  think that we're just wasting our time. But Members of the
8  jury, there will be no need for you to come early when your
9  presence would not be needed for about half an hour.
10        So, Members of the jury, when you jury members
11 return at 10 o'clock tomorrow morning; and, report as the
12 bailiff may instruct you to the jury room. And, when I'm
13 advised that you are all present, I'll have you brought back
14 into the courtroom.
15        Members of the jury, as you are away from court
16 this evening, please remember the instructions that I've
17 given you. Don't discuss the case among yourselves; don't
18 let anyone else, including members of your own family; don't
19 allow anyone else to discuss it with you or in your presence.
20 If anyone does so, be sure and bring that to my attention, as
21 soon as possible.
22        Remember also, Members of the jury, you are also
23 not to have any contact with any person who is involved in
24 this case; that means any type of contact, whatsoever;
25 whether it's to talk about the case or anything else.

1    Don't form any opinion; keep your minds open.

2    Members of the jury, should this trial be receiving

3  any type of media coverage, don't read or watch or listen to

4  any reports.

5    And remember also not to make any type of

6  independent investigation.  Remember, your verdict does have

7  to be based exclusively on what's presented to you in the

8  courtroom.

9    Members of the jury, have a good evening and you'll

10  need to return then at 10 o'clock.  You Members of the jury

11  can leave.

12  {The following proceedings take place in open court, outside

13  the presence of the jury.}

14    THE COURT:  All right.  Before we take our evening

15  recess, anything from the state?

16    MR. COTTRELL:  Not from the state.

17    THE COURT:  Anything from the defense?

18    MS. THOMAS:  No, Your Honor.

19    THE COURT:  All right.  We will resume then

20  tomorrow morning at 9:30.  And, at 9:30, we'll have the

21  hearing on the Motion to Suppress, which I deferred ruling

22  on, due to the unavailability of a necessary witness.  That

23  is, for the record, why I had the jury report tomorrow

24  morning or going to have the jury report at 10 o'clock,

1    So, we'll take our evening recess until 9:30. And,

2    we will conduct the suppression hearing, in the absence of

3    the jury, tomorrow morning, beginning at 9:30.

4    Sheriff, if you will, please recess court until

5    9:30.

6    {Court stands in recess.}

7    {Court reconvenes September 15, 1999, at 9:30 a.m.}

8    **{The following proceedings take place in open court, outside**

9    **the presence of the jury.}**

10    THE COURT: Okay. The Court will go-ahead and

11    note that counsel for the defendant is here and the defendant

12    is here, counsel for the state is here, the jury is not here.

13    We had set aside this morning for a hearing on the

14    motion which was filed, pre-trial; a Motion to Suppress the

15    identification testimony. It need not be repeated, for the

16    record for any in any great detail; but, I had, as you will

17    recall, agreed to hear the motion this morning and proceeded

18    with trial, yesterday, rather than delay everything.

19    I'll not require the state to re-introduce evidence

20    that it would have introduced in opposition to the

21    defendant's motion, if the state will just advise me of the

22    testimony of named witnesses it would like to have

23    considered, in opposition to the testimony, I'll -- I mean

24    the opposition to the motion, I'll do that.

But, I will not require you to -- I think it will

1  be unnecessarily repetitive to call the same witnesses to say

2  the same thing. So, if you'll just tell me what witnesses

3  you would like me to consider.

4  MR. COTTRELL: Yes, Your Honor. The state will

5  offer testimony from Officer O. J. O'Janiid. And, I believe

6  that is the only witness that the Court has not already heard

7  from.

8  THE COURT: All right. You would like me to

9  consider, I take it, evidence that has already been presented

10  in this case?

11  MR. COTTRELL: Yes, Your Honor.

12  THE COURT: From the case in chief?

13  MR. COTTRELL: Yes, Your Honor. The testimony of

14  Samantha Wood and also the testimony of Investigator Tom

15  Ledford, concerning how photo line-ups, such as the one

16  previously identified as the one that the witness in question

17  picked out; and, how the defendant's pictures are created.

18  THE COURT: All right. Thank you. Do you wish to

19  call additional witnesses then?

20  MR. COTTRELL: Yes, Your Honor. Officer O'Janiid.

21  THE COURT: Okay.

22  [WITNESS SWORN.]

23  VOIR DIRE EXAMINATION OF OFFICER O. J. O'JANIIT, BY MR.

24  COTTRELL:

25  Q. Officer, could you please state your name, for the record;

1  and, spell your last name for our Court Reporter?

2  A.  My name is Officer J. J. O'Janiit; O-J-A-N-I-I-T.

3  Q.  How are you employed?

4  A.  With the Charlotte-Mecklenburg Police Department.

5  Q.  And, how long have you been a police officer?

6  A.  Eight years.

7  Q.  As -- what type of training have you gone through, since

8  you've been a police officer?

9  A.  I've gone through considerable training in my eight years.

10  On-the-job training, numerous classes, repetitive training

11  we're required to take yearly.

12  Q.  At the police academy, did you receive any type of

13  training regarding the presentation of photo line-ups?

14  A.  I don't know there is a specific block for photo line-up.

15  It is part of the training covered in our curriculum at the

16  police academy.

17  Q.  Okay.  In your duties as a police officer, did you

18  investigate a break-in and armed robbery that happened at

19  5206-B Cherrycrest Lane, on May 22, 1998?

20  A.  Yes, sir.  I did.  I was the primary unit assigned to the

21  call.

22  Q.  Okay.  At some time during that investigation, did you

23  show a photo line-up to the victim in that case?

24  A.  Yes, sir.  I did.

25  Q.  What was the name of the victim in that case, sir?

1  A.  Samantha Wood.

2  Q.  Do you recall which day that you showed the line-up to Ms.

3  Wood?

4  A.  I would have to look at the statement to give you an exact

5  date.

6           MR. COTTRELL:  May I approach the witness, Your

7  Honor?

8  [State's Exhibit No. 5 is marked for identification.]

9           THE COURT:  Yes, sir.

10  Q.  I'm handing you a sheet of paper that I've marked for

11  purpose of identification as State's Exhibit No. 5.  Take

12  just a second to look over that, sir.

13           Do you recognize that statement, sir?

14  A.  Yes, sir.  I do.

15  Q.  And, what is it, please?

16  A.  The statement I took from the victim, Ms. Wood, on the day

17  that I showed her a photo line-up.

18  Q.  And, are all these entries on that statement still true

19  and accurate, to the best of your knowledge?

20  A.  Yes, sir.  They are.

21           MR. COTTRELL:  The state would MOVE INTO EVIDENCE,

22  State's Exhibit No. 5?

23           THE COURT:  This was the statement of Samantha

24  Wood?

25           MR. COTTRELL:  That's correct.

1    THE COURT:  Does the defense wish to be heard on

2  the admission of State's Exhibit No. 5, for the purpose of

3  this hearing, only?

4    MS. THOMAS:  No, Your Honor.

5    THE COURT:  All right.  It's ADMITTED THEN, FOR

6  THIS HEARING, ONLY.  As to this Motion to Suppress.

7  Q.  Is there a date?  What type of report is that, sir?

8  A.  It's what we call a follow-up statement; supplemental

9  report.

10  Q.  And, who prepared that report?

11  A.  I did.

12  Q.  Does it indicate whether or not you showed a photo line-up

13  to the victim?

14  A.  Yes, sir.  It does.

15  Q.  And, does it also contain which day that photographic

16  line-up was shown to her?

17  A.  Yes, sir.  It does.

18  Q.  Which day was that?

19  A.  The 23rd of May, 1998.

20  Q.  Was that the day following the initial call for this

21  incident?

22  A.  Yes, sir.  It was.

23  Q.  And, when did you write that report, sir?

24  A.  On the 23rd of May.

25    MR. COTTRELL:  May I approach the witness once

1  again, Your Honor?

2  [State's Exhibit No. 6 is marked for identification.]

3  THE COURT:  Yes, sir.

4  Q.  Sir, handing you another sheet of paper which is State's

5  Exhibit No. 6.  Take just one moment to look at that.

6  Do you recognize that, sir?

7  A.  Yes, sir.  I do.

8  Q.  And, what is that document?

9  A.  This is the document that I showed the victim from my

10  photo line-up.

11  Q.  Now, is that a copy of the document or is that the

12  original?

13  A.  No, sir.  This is the original.

14  Q.  Does it -- is it changed in any manner, shape or form than

15  when you presented it to the victim?

16  A.  No, sir.

17  Q.  Can you explain to the Court exactly what you said to the

18  victim when you presented that photo line-up?

19  A.  When I presented this document to the victim, I explained

20  to her that I was going to show her a series of photos; and,

21  that the suspect may or may not be in that photo.  If she

22  would just take her time and look at and advise me.

23  Q.  Now, is this the only photo line-up you showed to the

24  victim?

25  A.  Yes, sir.  It is.

1  Q.  Did you show her seven or eight other pages of photos?

2  A.  No, sir.  I did not.

3  Q.  Did you have any other pieces of paper with you when you

4  showed her this particular line-up?

5  A.  I don't know; I may have had several other pieces of paper

6  in my hand.  However, they would not have been anything other

7  than information; either duplicates of this page that you've

8  admitted; or, information as to the identification of the

9  persons within these photos.

10  Q.  And, at any other time, while in your presence, did the

11  victim look at any other photos?

12  A.  No, sir.  She did not.

13  Q.  Did, at any other time, did she ever look at any other

14  photos of the defendant, other than on May 23rd, when you

15  presented her that photo line-up?

16  A.  Not that I'm aware of.

17  Q.  Are you aware of -- do you have any personal knowledge of

18  the victim viewing photos with other officers?

19  A.  None that I'm aware of.

20  Q.  Directing your attention to State's Exhibit No. 6, sir,

21  where were you when you presented that photo line-up to the

22  victim?

23  A.  We were at our team office on 7901 England Street.

24  Q.  And, did you explain what you've already told the Court

25  about the presentation of the photo line-up?  Did you do that

1 before or while you were showing her the photo line-up?

2 A. I did that prior to showing her any photos.

3 Q. Okay. Were you in a position to observe the victim when

4 you handed her the photo line-up?

5 A. Yes. I was.

6 Q. And, what did you observe when you handed her the photo

7 line-up?

8 A. I gave her the photo line-up. She studied it for just a

9 few seconds and then picked the photo in the upper-right-hand

10 corner.

11 Q. And, whose picture is it? Whose picture was the one that

12 she picked out?

13 A. The defendant's picture.

14 Q. Did she say anything to you when she picked out the

15 defendant's picture?

16 A. She picked the defendant's picture and advised that she

17 believed that --- "That it looked like the defendant," except

18 in this picture that I had shown her, he did not have braids

19 in his hair and she believed he did not have a beard.

20 Q. Can you see the back of the suspect's head in the picture

21 on that photo line-up?

22 A. No. You can not.

23 Q. While in your presence, did the victim say anything else

24 about the picture?

1  Q. Did you direct her or did someone write anything on the

2  photo line-up?

3  A. I did.

4  Q. Okay. And, what did you write on the photo line-up, sir?

5  A. What she had stated to me. I wrote, said, [Reading.]

6         "This looks most like him; except for no beard and

7  has braids in his hair."

8  Q. Are there any other markings on that photo line-up?

9  A. No, sir. There is not.

10 Q. And, is that photo line-up changed in any manner, shape or

11 form, than when you gave it to the victim?

12 A. No. It is not.

13        MR. COTTRELL: Your Honor, at this point, the state

14 would submit State's Exhibit No. 6.

15        THE COURT: Does the defense wish to be heard on

16 the admission of State's Exhibit No. 6, for purposes of this

17 suppression hearing?

18        MS. THOMAS: No, Your Honor.

19        THE COURT: All right. ADMITTED then, for

20 purposes of this suppression hearing.

21 Q. Sir, did you prepare that particular photo line-up?

22 A. No, sir. I did not.

23 Q. How did you go about getting that photo line-up?

24 A. I contacted the investigator with our robbery division,

1   Q. Are you sure you contacted Mr. Ledford?

2   A. I'm pretty sure that it was him. I don't know anyone else

3   up in that division. So, he would have been my primary

4   contact.

5   Q. Okay. After you contacted the investigator, how did you

6   receive that particular line-up?

7   A. I responded down to the main Law Enforcement Center and

8   picked it up.

9   Q. And, are you familiar with exactly how these line-ups are

10   prepared?

11   A. I've got a general knowledge of how they're done.

12   Q. Did you ever show the victim any line-ups after May 23rd?

13   A. No, sir. I did not.

14   Q. Did you ever show her any other pictures of the defendant,

15   other than on the line-up, on the 23rd?

16   A. No. I did not.

17   Q. Did you ever have any further conversations with the

18   victim about that particular line-up, after May 23rd?

19   A. No. I did not.

20   MR. COTTRELL: Thank you, sir. No further

21   questions, at this time.

22   VOIR DIRE EXAMINATION OF OFFICER O'JANIIT, BY MS. THOMAS:

23   Q. Officer O'Janiit, Ms. Wood testified that she saw six or

24   seven other pages of photos. Did you say that you may have

1  A.  From what I recollect, I probably had three copies of this

2  particular photo line-up with me, in my hand.

3  Q.  Do you have the other copies in your possession?

4  A.  No.  I do not.

5  Q.  And, when you show a witness a photographic line-up, do

6  you not ask them to sign their name and date it, if they're

7  able to recognize -- make an identification?

8  A.  I personally do not.  I've done very few line-ups.

9  Q.  Would you be surprised if Officer Esposito testified that

10  his procedure was to ask the witness to sign and date the

11  photo line-up?

12          MR. COTTRELL:  OBJECTION as to relevance, Your

13  Honor.

14          THE COURT:  OVERRULED.  He may answer, for the

15  purpose of this hearing.

16  A.  I don't know what other officers' procedures are for doing

17  photo line-ups.

18  Q.  Would you be surprised that Officer Ledford stated that

19  his procedure is to have the witness sign and date the photo

20  line-up?

21  A.  Again, I don't know what Officer Ledford's procedures are

22  either.

23  Q.  Did you receive any training on what to ask of a witness

24  who is viewing a photo line-up?

25  A.  Other than training in the academy,

1  Q. What was the extent of that training?

2  A. It's part of the information covered in our curriculum.

3  Q. Do you have an estimate of how many photo line-ups you've

4  conducted in the past?

5  A. Yes, ma'am.

6  Q. How many would that be?

7  A. One.

8  Q. This is the only one you conducted?

9  A. Yes, ma'am.

10  Q. And, isn't it true that Ms. Wood did not make a positive

11  identification?

12  A. She advised me that she believed that this person in this

13  photo looks most like the suspect.

14  Q. And, would you consider that a positive identification?

15  A. I would consider it an identification.

16  Q. Did she say, "…most, out of the people on this page"?

17  A. Again, I don't know if she used those words. From my

18  recollection, she advised, you know, "That looks like him."

19  Q. And, weren't her exact words, "This looks most like the

20  suspect"?

21  A. No, ma'am. Not from my recollection.

22        MS. THOMAS: May I approach, Your Honor?

23        THE COURT: Yes, ma'am.

24  Q. Could you read the -- is that your handwriting?

25  A. Yes, ma'am. It is.

1  Q.  What was the extent of that training?

2  A.  It's part of the information covered in our curriculum.

3  Q.  Do you have an estimate of how many photo line-ups you've

4  conducted in the past?

5  A.  Yes, ma'am.

6  Q.  How many would that be?

7  A.  One.

8  Q.  This is the only one you conducted?

9  A.  Yes, ma'am.

10  Q.  And, isn't it true that Ms. Wood did not make a positive

11  identification?

12  A.  She advised me that she believed that this person in this

13  photo looks most like the suspect.

14  Q.  And, would you consider that a positive identification?

15  A.  I would consider it an identification.

16  Q.  Did she say, "..most, out of the people on this page"?

17  A.  Again, I don't know if she used those words.  From my

18  recollection, she advised, you know, "That looks like him."

19  Q.  And, weren't her exact words, "This looks most like the

20  suspect"?

21  A.  No, ma'am.  Not from my recollection.

22          MS. THOMAS:  May I approach, Your Honor?

23          THE COURT:  Yes, ma'am.

24  Q.  Could you read the -- is that your handwriting?

25  A.  Yes, ma'am.  It is.

1  Q. And, could you read the notation on there?

2  A. Says, [Reading.]

3          "This looks most like him except no beard and had

4  braids."

5  Q. And, no where on there does her name appear. Is that

6  correct?

7  A. Her name does not appear on mine.

8  Q. And, nowhere on there does the date appear. Is that

9  correct?

10  A. That's correct.

11  Q. And, Ms. Wood did not, in fact, mark anything on this

12  page. Is that correct?

13  A. That's correct.

14  Q. And, the markings, including the circle, are your

15  markings. Is that correct?

16  A. Yes, ma'am. They are.

17  Q. And, nowhere on here does it positively identify Mr.

18  Massey as the suspect. Is that correct?

19  A. I'm not understanding. Are you asking if she's marked on

20  here?

21  Q. Is there any notation that says, "This is the suspect"?

22  A. No, ma'am.

23          MS. THOMAS: Thank you, Officer O'Janiit. No

24  further questions.

25          THE COURT: Any re-direct.

1    MR. COTTRELL: Not from the state, Your Honor.

2    THE COURT: All right. Thank you, sir. You can

3 step down.

4    MR. COTTRELL: Your Honor, that is the extent of

5 the further evidence the state would produce at this time.

6 We do have Officer Ledford here, if the Court wishes to hear

7 further testimony from him.

8    I do not plan to put him up though, Your Honor.

9    THE COURT: Do you wish -- I apologize, I'm not

10 sure if you wish the Court to consider Officer Ledford's

11 testimony or not.

12    MR. COTTRELL: I did, Your Honor. I did indicate

13 that I do wish you to consider his testimony on how this type

14 of photo line-up is prepared.

15    THE COURT: All right. Thank you. All right.

16 Anything else for the state, then, in opposition to the

17 defendant's suppression motion?

18    MR. COTTRELL: No, Your Honor.

19    THE COURT: Thank you. I'll hear from the defense

20 then, in support of this Motion to Suppress .

21    MS. THOMAS: Your Honor, I would ask that the

22 testimony of Officer Esposito, from yesterday, be introduced

23 into evidence about the method the photo line-ups are

24 conducted.

25    I also have witnesses to call, if the Court

1  pleases.

2         THE COURT:   That will be fine.  You  may present

3  such evidence as you see fit.  I will receive the testimony

4  of Officer Esposito.

5         If the parties wish, I will consider all the

6  testimony that has been presented.

7         MR. COTTRELL:  I have no objection to Officer

8  Esposito's testimony being considered; his testimony from

9  yesterday.  No objection at all.

10         THE COURT:   All right.  You can proceed then, Ms.

11  Thomas.

12         MS. THOMAS:  I would call Mr. Brady Dorsey.

13  [WITNESS SWORN.]

14  VOIR DIRE EXAMINATION OF BRADY DORSEY, BY MS. THOMAS:

15  Q.  State your name, please.

16  A.  Brady Dorsey.

17  Q.  Mr. Dorsey, how are you employed?

18  A.  I'm with the Dorsey Concrete Finishing Company.

19  Q.  What is your position with them?

20  A.  I'm bookkeeper, worker; I got three titles there.

21  Q.  Do you know Mr. Shawn Massey?

22  A.  Yes, ma'am.

23  Q.  How do you know Shawn Massey?

24  A.  From one of our employees.

       And how long have you known Shawn Massey?

1    A.  Since he was, I guess about 12-years old.

2    Q.  Are you any relation to Mr. Massey?

3    A.  No.  I'm not.

4    Q.  And, Mr. Dorsey, how frequently did you see Mr. Massey?

5    A.  Quite frequently.  Something like maybe three or four

6    times a week; sometimes.

7    Q.  And, how did you know Mr. Massey during that time period?

8    A.  From some jobs that we were undertaking, with McDevitt and

9    Street, and Carolina Flooring.

10   Q.  And, what is Mr. Massey's position with Dorsey Concrete?

11   A.  He was laborer.

12   Q.  And, do you have either records or recollection that he

13   was employed at Dorsey Concrete on the week of May 15th

14   through May 22nd of 1998?

15   A.  Yes, ma'am.

16   Q.  And, from your recollection, do you recall seeing Shawn

17   Massey during that time?

18   A.  Yes, ma'am.

19   Q.  Do you recall noticing his hair?

20   A.  Yes, ma'am.

21   Q.  What do you recall noticing about his hair?

22   A.  Well, since I've been knowing him, he was wearing it like

23   he's got now.

24   Q.  Have you known him to have any longer hair?

1   Q.  Have you ever seen Shawn Massey wear braids?

2   A.  No.

3           MS. THOMAS:  Thank you, Mr. Dorsey.  No further

4   questions.

5           THE COURT:  Cross-examination.

6   <u>VOIR DIRE EXAMINATION OF BRADY DORSEY, BY MR. COTTRELL:</u>

7   Q.  Mr. Dorsey, you testified that you have some records

8   showing that the defendant worked for you during the 15th

9   through the 20th I believe is your testimony?

10  A.  Yes, sir.

11  Q.  All right.  Do you have any records of him working for you

12  any time besides those?

13  A.  I -- no; because of the type of work we do.

14  Q.  And, that was from the 15th through the 20th; right?

15  A.  The 22nd.

16  Q.  Okay.  Did he stop working for you on the 22nd?

17  A.  Well, you know, concrete work is just kind of temporary

18  thing.

19  Q.  Yes, sir.  I understand that.

20  A.  So, you know how that works.

21  Q.  And, do those records reflect exactly how long he worked

22  each day?

23  A.  Yes, sir.  It does.

24  Q.  Okay.  Now, you have personal knowledge as to where he was

25  on the 15th of May, 1998?

1   A.   No.   I do not.

2   Q.   How about the 16th?

3   A.   No.   I do not.   All I do is make sure most of them get to

4   the job and go back to the office.

5   Q.   So, you have no independent recollection as to where he

6   was in particular, 10 o'clock, on May 22nd?

7   A.   May 22nd, yes; I know that because of the jobs that we

8   were doing that particular day.   I transported some employees

9   to the location.

10   Q.   And, what time did you do that, sir?

11   A.   At 7 o'clock.

12   Q.   And,   what --

13   A.   A.M.

14   Q.   Right.   And, what did you do after you transported them?

15   A.   Back to the office.

16   Q.   Okay.   Did you ever return to the job site?

17   A.   No.

18   Q.   And, was Mr. Massey among the employees that you

19   transported there?

20   A.   Yes.

21   Q.   Okay.   Where was Mr. Massey when you picked him up?

22   A.   They show up at the location 3132 Graymont.

23   Q.   Okay.   And, how are you able to recall specifically that

24   Mr. Massey was among the people that you picked up, sir?

25   A.   I have documentations as to who I picked up.   I picked up

1  mostly -- I was handling the labor and my brother handled the

2  finishers; the journeymen.

3  Q.  All right.  And, do you have that documentation with you,

4  sir?

5  A.  Yes.  I do have it.

6  Q.  Could I see that, please?

7  A.  Yes.

8              MS. THOMAS:  Do you have it at the bench with you,

9  Mr. Dorsey?

10             MR. DORSEY:  No, ma'am.

11             MS. THOMAS:  May I approach the witness?

12             THE COURT:  Yes.

13             MR. DORSEY:  Thank you.

14  Q.  Do you have that with you now, sir?

15  A.  Yes.

16             MR. COTTRELL:  May I approach the witness, Your

17  Honor?

18             THE COURT:  Yes, sir.

19  Q.  Okay.  Mr. Dorsey, could you show me which documentation

20  you're referring to, sir?

21  A.  This is as of 15th through 22nd; "Shawn Massey, 16 hours."

22             COURT REPORTER:    Excuse me, I can not hear what

23  you're saying.  "Shawn Massey" is the last word I heard,

24  clearly.

             MR. DORSEY:  Yes.

1  A.  This is the journal that we keep.  It says, "Shawn Massey

2  worked for 16 hours; worked on Wednesday and Friday; $120.00

3  for 16 hours."

4  Our vouchers that he filled out on Friday, on the

5  22nd, that we paid him.

6  Q.  Might I turn this around so I can look at it?

7  A.  Sure.

8  Q.  Thank you.  Which of these days was the 22nd, sir?

9  A.  Friday.

10 Q.  Okay, sir.  Thank you very much.

11  MS. THOMAS:  Your Honor, are you finished?  May I

12  approach the witness, Your Honor?

13  THE COURT:  Yes, ma'am.  You had completed your

14  cross-examination?

15  MR. COTTRELL:  I have one further question.

16  THE COURT:  Yes, sir.

17 Q.  Where was the location that you transported Mr. Massey to

18  that day?

19 A.  It was a little street off Graham.  There was Carolina

20  Flooring is the name of the company he worked for.  And, that

21  particular job is on Liddell Street, at Graham.

22 Q.  So, it was at the intersection of Liddell and Graham?

23 A.  It's not exactly at the intersection; it's really on

24  Dalton Avenue; but, you have to get to it through Liddell

25  Street.

1  Q.  Okay.  About how long does it take to get there from where

2  your business is located on Graymont, sir?

3  A.  About 15 minutes.

4  Q.  Fifteen minutes.  Which direction do you have to go to get

5  there?

6  A.  We would come -- we would come 77 North to Brookshire.

7  Q.  Okay.

8  A.  From Brookshire to North Tryon; North Tryon to Graham.

9  Q.  And, how many other people did you transport to that

10  location that day?

11  A.  About four.

12  MR. COTTRELL:  Thank you, sir.  No further

13  questions.

14  VOIR DIRE EXAMINATION OF MR. DORSEY, BY MS. THOMAS:

15  Q.  Mr. Dorsey, you're here today at the request of Rudy

16  Dorsey.  Is that correct?

17  A.  Yes.

18  Q.  And, what is Mr. Dorsey's position?

19  A.  He's the owner of Dorsey Concrete Finishing.

20  Q.  And, did he request that you come to bring documents that

21  were subpoenaed from him?

22  A.  Yes, ma'am.  Sent me because of today, the weather outside

23  and had concrete scheduled.  He couldn't leave that.

24  Q.  And, were the documents subpoenaed the records from the

25  15th of May to the 22nd of 1998?

1   A.  Yes, ma'am.

2   Q.  And, are those the records you brought?

3   A.  Yes, ma'am.

4   Q.  And, Mr. Dorsey, did you keep regular logs of employees'

5   time during that week?

6   A.  Yes, ma'am.

7   Q.  Do you have them with you?

8   A.  Yes, ma'am.  It's all here.

9   Q.  Okay.

10          MS. THOMAS:  May I approach the witness, Your

11  Honor?

12          THE COURT:  Yes, ma'am.

13  A.  This is this whole week.

14  [Defendant's Exhibit No. 1 is marked for identification.]

15          MS. THOMAS:  Your Honor, I have this marked as

16  Exhibit No. 1.

17  Q.  Is this the journal that you kept for the week of December

18  15th through -- May 15th through May 22nd, 1998?

19  A.  Yes, ma'am.

20  Q.  And, this is the journal that you kept?

21  A.  Yes, ma'am.

22          MS. THOMAS:  Your Honor, I MOVE THIS INTO EVIDENCE.

23          THE COURT:  All right.  Does the state wish to be

24  heard for the admission of Defendant's Exhibit No. 1, for the

25  purposes of this suppressing hearing?

1    MR. COTTRELL:  Not for purposes of this hearing,

2  Your Honor.

3    THE COURT:  All right.  ADMITTED.

4  Q.  Mr. Dorsey, are there any other records that you keep?  Do

5  you keep any record of paying employees who work?

6  A.  Yes, ma'am.

7  Q.  And, what type of pay records do you keep?

8  A.  This is on a voucher, petty cash basis, for our accountant

9  that we have the employees that we know exactly what we paid

10  them.

11  Q.  And, do the employees sign or indicate in any way when

12  they receive their pay for the day?

13  A.  Well, sometimes they -- most of them sign; sometimes they

14  be moving too fast to sign to get the money.  They get the

15  money and run; sometimes they forget; but, the majority.

16  Q.  Do you have any documents on your pay vouchers for that

17  week showing Shawn Massey's name?

18  A.  Yes.

19  Q.  And, what dates do you have vouchers relating to Shawn

20  Massey?

21  A.  Just I have one on 5/22/98 for the 16 hours, at $7.50 an

22  hour.

23    MS. THOMAS:  May I approach the witness, Your

24  Honor?

25    THE COURT:  Yes, ma'am.

1  [Defendant's Exhibit No. 2 is marked for identification.]

2  Q.  I'm showing you what has been marked for identification as

3  Defendant's Exhibit No. 2.  Could you describe that exhibit,

4  please?

5  A.  Yes.  It's a payroll voucher, petty cash slip that we have

6  each employee sign.  And, documents as to what hours he

7  worked and how much he was paid, per hour, the total amount

8  entered.

9  Q.  And, whose name is on there?

10  A.  Shawn Massey.

11  Q.  And, did you produce that document back in May of '98?

12  A.  Yes, ma'am.

13      MS. THOMAS:  Thank you, Mr. Dorsey.  No further

14  questions.

15      THE COURT:  Re-cross.

16      MR. COTTRELL:  Yes, sir.  May I approach the

17  witness to look at the exhibit which has just been marked,

18  Your Honor?

19      THE COURT:  Yes, sir.

20  VOIR DIRE EXAMINATION OF MR. DORSEY, BY MR. COTTRELL:

21  Q.  Mr. Dorsey, may I see the pay vouchers, please?

22  A.  Yes, sir.

23  Q.  Sir, Shawn Massey's name is on the document.  Is that

24  correct?

1  Q.  Shawn Massey's name is on the document.  Is that correct?

2  A.  Yes, sir.

3  Q.  And, did he sign that voucher?

4  A.  No.  He didn't sign that one.

5  Q.  That's something that you signed in order to keep your

6  records that you pay somebody, sir?

7  A.  No, no.  He didn't sign it, as far as his signature on it.

8  I put his name on it.

9  Q.  I understand that, sir.  And, you do that so that you can

10  keep your records straight?

11  A.  Yes, sir.

12  Q.  Is that correct?

13  A.  Yes, sir.

14  Q.  What time did you pay your employees, sir?

15  A.  Usually about 5:30, 5:30, Friday afternoon.  But, that all

16  depends on when we finish.

17  Q.  Sure.  So, some days it might be earlier; some days it

18  might be later.

19  A.  It won't be any earlier; it might be a little later.

20  Q.  Okay.  And, there is no time noted on that voucher.  It's

21  just the date; correct?

22  A.  Yes.

23  Q.  All right.  Nothing further.

24           MS. THOMAS:  Your Honor, I would ask that the Court

25  ins....... that Mr. Dorsey remain here so that he can be called

again during the defense testimony.

THE COURT: Okay. Mr. Dorsey, you'll be needed as a witness. Then, you'll need to remain.

Let me ask a question though about what has been identified as Defendant's Exhibit No. 2. Now Mr. Dorsey, that's a payroll voucher, indicating that Mr. Massey was paid?

MR. DORSEY: Yes, sir.

THE COURT: On what date, sir?

MR. DORSEY: On the 22nd of May.

THE COURT: All right. That is not a record of hours that he worked on May 22nd; just an indication that he was paid on May 22nd?

MR. DORSEY: It just indicates the hours he was there.

THE COURT: And, that was identified as Defendant's Exhibit No. 1. Is that correct?

MR. DORSEY: Yes, sir.

THE COURT: All right. And, does it show Mr. Massey working for you on May 22nd?

MR. DORSEY: Yes, sir.

THE COURT: And, what time did he work on May 22nd?

MR. DORSEY: Well, if I recollect, he started 7 o'clock; the concrete truck was there at 7 o'clock. And, it takes four hours to get it down. So, we give

1  them employment, eight hours; so, probably through about

2  4:30.

3       THE COURT:   All right.   Is it your contention your

4  records then show that he worked for you on what hours, on

5  May 22nd?

6       MR. DORSEY:   Just have eight hours; just have a

7  total of eight hours he worked.

8       THE COURT:   And, when you say "seven"; you're

9  talking about 7:00 a.m.   Is that what you're talking about;

10  7:00 a.m.?

11       MR. DORSEY:   Yes, sir.

12       THE COURT:   So, you believe your records show that

13  he was employed by you; worked on May 22, 1998; worked from

14  7:00 a.m., eight hours?

15       MR. DORSEY:   Yes, sir.

16       THE COURT:   Is that right?

17       MR. DORSEY:   Yes, sir.

18       THE COURT:   All right.   And then, he was then paid

19  on May 22, 1998, which was a Friday.   Is that correct?

20       MR. DORSEY:   Yes, sir.

21       THE COURT:   All right.   I'll just ask if the

22  parties have further questions.   Anything further of this

23  witness, from the defense?

24       MS. THOMAS:   No, Your Honor.

25       THE COURT:   Anything further from the state?

MR. COTTRELL: Yes, sir.

THE COURT: All right.

VOIR DIRE EXAMINATION OF MR. DORSEY, BY MR. COTTRELL:

Q. Sir, you testified that you were waiting for a concrete truck to get --

A. To the site.

Q. -- to the site?

A. [Affirmative response.]

Q. You said that Mr. Massey was employed as a laborer; correct?

A. Yes.

Q. Was he ever assigned to drive vehicles or anything like that?

A. Well, he used to drive, you know, brother's vehicles, you know, cleaning them up and drive them, cut grass and things like that, you know. But, he wasn't assigned to drive a vehicle.

Q. But, it's pretty typical in construction jobs that you need people to run out and get some things for the rest of the crew?

A. No. He wouldn't be the one to do it. He had sons out there with him, too.

Q. Whose son?

A. Rudy Dorsey's sons.

Q. I'm talking about Mr. Massey. Would Mr. Massey ever be

1   assigned to like go to the store for a part for a particular

2   machine?

3   A. No.

4   Q. Go get people lunch or anything like that?

5   A. No. No.

6   Q. That would never happen?

7   A. Not with -- no, it hadn't happened, with the son being on

8   the job; the son being on the job the same day. So, he be

9   the one running errands like that.

10   Q. How old is Rudy Dorsey's son?

11   A. Twenty-five, twenty-six, something like that.

12   Q. About the same age as Mr. Massey?

13   A. Yes. Yes, sir.

14   Q. All right. Thank you sir.

15   VOIR DIRE EXAMINATION OF MR. DORSEY, BY MS. THOMAS:

16   Q. Mr. Dorsey, to your knowledge, from the time you dropped

17   off Shawn Massey until you picked him up that afternoon,

18   would he have any reason to leave the construction site?

19   A. No. No, ma'am.

20   Q. Would he have any transportation to leave?

21   A. No.

22   Q. Thank you, Mr. Dorsey.

23       THE COURT: All right. Other evidence for the

24   defense on the Motion to Suppress?

25       MS. THOMAS: Your Honor, I would call Ms.

1  Annie Massey.

2       THE COURT:    Come around, please ma'am.

3  [WITNESS SWORN.]

4  VOIR DIRE EXAMINATION OF ANNIE MAY MASSEY, BY MS. THOMAS:

5  Q.  State your name, please.

6  A.  Annie May Massey.

7  Q.  And, Ms. Massey, do you know Shawn Massey?

8  A.  Yes, ma'am.

9  Q.  How do you know him?

10 A.  He's my grandson.

11 Q.  Okay.  And, does Mr. Massey live with you?

12 A.  Yes, ma'am.

13 Q.  And, does Mr. Massey stay at your house during May of

14 1998?

15 A.  Yes, ma'am.

16 Q.  And, did he sometimes spend the nights away from your

17 house?

18 A.  Yes, ma'am.

19 Q.  But, for the most part, that would have been his home,

20 during May of 1998?

21 A.  Yes, ma'am.

22 Q.  And, did you see Mr. Massey on a daily basis?

23 A.  Yes, ma'am.

24 Q.  And, how do you recall Mr. Massey's hair having been

25 during that time period?

1   A. He never had long hair; never.

2   Q. Have you ever seen Mr. Massey with braids?

3   A. No, ma'am.

4   Q. Have you ever, for an instance, in his life, seen him wear

5   braids?

6   A. No, ma'am.

7   Q. Have you ever seen him wear his hair long enough to wear

8   braids?

9   A. No, ma'am.

10  Q. Do you recall seeing him the week of May 15th through the

11  22nd of 1998?

12  A. Yes, ma'am.

13  Q. Do you recall how his hair was styled during that time

14  period?

15  A. About like it is now.

16  Q. Do you recall Shawn's routine, as far as leaving for work

17  in the mornings?

18  A. Yes, ma'am.

19  Q. And, what time would he normally leave for work?

20  A. About seven.

21  Q. And, would he drive to work; walk to work?

22  A. No, ma'am.  Mr. Dorsey picked him up.

23          MS. THOMAS:  Thank you.  No further questions.

24          MR. COTTRELL:  No questions.

25          THE COURT:  Thank you, ma'am.  You can step down.

1       All right.  Further evidence, on the part of the

2   defense?

3           MS. THOMAS:  I would call Mr. Bobby Ross.

4   [WITNESS SWORN.]

5   VOIR DIRE EXAMINATION OF BOBBY ROSS, BY MS. THOMAS:

6   Q.  State your name, please?

7   A.  Bobby Ross.

8   Q.  Do you know Shawn Massey?

9   A.  Yes.  I do.

10  Q.  How long have you known Shawn Massey?

11  A.  About three years.

12  Q.  And, how close are you to Shawn Massey?

13  A.  We're pretty good friends.

14  Q.  And, how often have you seen Shawn Massey during the past

15  three years?

16  A.  A good bit.

17  Q.  And, during the period of including May of 1998, did you

18  see Shawn Massey during that period?

19  A.  Not during that period.

20  Q.  Did you see him any time during early 1998?

21  A.  Yeah.

22  Q.  And, do you recall which months that you saw Shawn Massey?

23  A.  Well, it would have been all the first --- the early part

24  of the months.

25  Q.  Meaning?

1 A. January through May.

2 Q. Do you recall noticing how Mr. Massey wore his hair

3 during that time?

4 A. Like he's wearing it now.

5 Q. During the period you've known him, have you known him to

6 ever wear braids in his hair?

7 A. Never.

8 Q. Have you known him to have hair long enough to wear

9 braids?

10 A. Never.

11     MS. THOMAS: Thank you. No further questions.

12     THE COURT: Just for the record, when the witness

13 is testifying, "He wears his hair like it is now," would you

14 mind asking the witness how the hair is now, so that there

15 won't be any confusion on the record.

16     MS. THOMAS: Yes, Your Honor.

17 Q. Mr. Ross, could you describe the style of Mr. Massey's

18 hair, at this time?

19 A. It's a low hair cut; very short.

20 Q. How short is it?

21 A. Very short; not long enough to braid or do anything with,

22 other than brush.

23 Q. Is it long enough to comb?

24 A. No.

    Q. And is this the way you recall his hair being styled in

1  early 1998, including May of 1998?

2  A.  Yes.

3           MS. THOMAS:  Thank you, Mr. Ross.  No further

4  questions.

5           THE COURT:  All right.  Thank you.  Cross-

6  examination?

7           MR. COTTRELL:  Nothing.

8           THE COURT:  Thank you, sir.  You can step down.

9  All right, Ms. Thomas.

10          MS. THOMAS:  We would call Ms. Roberta Massey.

11  [WITNESS SWORN.]

12  VOIR DIRE EXAMINATION OF ROBERTA MASSEY, BY MS. THOMAS:

13  Q.  State your name, please.

14  A.  Roberta Massey.

15  Q.  And, Ms. Massey, how do you know Shawn Massey?

16  A.  He's my brother.

17  Q.  And, how long have you known him?

18  A.  All my life.

19  Q.  And, how often do you see Mr. Massey?

20  A.  On a daily basis.

21  Q.  Back in May of 1998, how often did you see Shawn Massey?

22  A.  A lot; because, he came to my son's birthday party.

23  Q.  How was Shawn's hair styled in May of '98?

24  A.  He wore waves all the time; never had long hair.

         THE COURT:  I'm having a little trouble hearing

1    you, ma'am.  If you'll speak up just a little bit.  Thank

2    you.

3    A.  He had waves.  He never had long hair; ever.

4    Q.  He's never in his life had long hair?

5    A.  Never.

6    Q.  Has he ever, in his life, had hair long enough to braid?

7    A.  [Negative response.]

8    Q.  Do you recall that he's ever had hair long enough to comb?

9    A.  No.

10              MS. THOMAS:  Thank you.  No further questions.

11              THE COURT:  Cross?

12              MR. COTTRELL:  Yes, Your Honor.

13   [State's Exhibit No. 7 is marked for identification.]

14   VOIR DIRE EXAMINATION OF ROBERTA MASSEY, BY MR. COTTRELL:

15   Q.  Ma'am, I'm showing you this photograph which has been

16   identified as State's Exhibit No. 7.  Do you recognize the

17   person in that?

18   A.  [Affirmative response.]

19   Q.  Who is in that photograph, ma'am?

20   A.  My brother.

21   Q.  And, could you describe the length of his hair there?

22   A.  It was short.

23   Q.  Do you think you can comb that?

24   A.  You can comb it; but, you couldn't braid it.

     Q.  Can you see the back of his head there?

1  A.  [Affirmative response.]

2  Q.  You can see the back of his hair?

3  A.  No.  You can't.  You can see his facial.

4  Q.  Okay.  So, you can't tell how long the back of his hair

5  is; correct?

6  A.  It was short.

7  Q.  Just from that picture?

8  A.  Not in this picture.

9  Q.  Right.  But, you would agree that that hair is long enough

10  to comb?

11  A.  Sort of; but, you would have to use a real small comb.

12  Q.  Okay.  Fair enough.  Thank you.

13  VOIR DIRE EXAMINATION OF MS. MASSEY, BY MS. THOMAS:

14  Q.  Ms. Massey, you don't know when that picture was taken; do

15  you?

16  A.  When he was in jail.

17  Q.  So, you don't know if he had seen a barber lately; do you?

18  A.  Because I cut his hair.

19  Q.  Okay.  And, when you cut it, how do you cut it?

20  A.  I cut it bald.

21  Q.  And, in your opinion, is that hair long enough to braid?

22  A.  No.  You can not braid it.

23  Q.  And, in that picture, you have no idea how long he had

24  been in jail; do you?

MS. THOMAS:  Thank you.  No further questions.

THE COURT:  Re-cross?

MR. COTTRELL:  No further questions, Your Honor.

THE COURT:  Thank you.  Step down.

MS. THOMAS:  Your Honor, I would like to re-call Ms. Annie Dorsey.

THE COURT:  All right.

MS. THOMAS:  Annie Massey.  I'm sorry.

THE COURT:  Ms. Annie Massey, come around, please.

VOIR DIRE EXAMINATION OF ANNIE MAY MASSEY, BY MS. THOMAS:

Q.  Ms. Massey, I'm recalling you.  You're Shawn Massey's grandmother.  Is that correct?

A.  Yes, ma'am.

Q.  And, did Shawn go to high school in Charlotte?

A.  Yes, ma'am.

Q.  Where did he attend high school?

A.  Kennedy.

Q.  Okay.  And, was that Kennedy Middle School?

A.  [Affirmative response.]

Q.  And, do you recall about how old Shawn was when he was in middle school?

MR. COTTRELL:  OBJECTION, as to relevance, Your Honor.

THE COURT:  I'll assume we'll get there.  OVERRULED.

1  Q.  Did you bring some photographs of Shawn?

2  A.  Yes, ma'am.

3          MS. THOMAS:  May I approach the witness, Your

4  Honor?

5          THE COURT:  All right.

6          MR. COTTRELL:  Your Honor, I'm going to OBJECT to

7  the photograph, to a photograph of the defendant in middle

8  school.  I hardly see how that's relevant to this case.

9          THE COURT:  I'll see.  You can proceed, ma'am.

10  [Defendant's Exhibit No. 3 is marked for identification.]

11  Q.  I am showing you what is marked for identification as

12  Defendant's Exhibit No. 3.  Can you describe that photograph?

13  A.  [Affirmative response.]  This is Shawn when he was at

14  Kennedy; he was on the basketball team.

15  Q.  And, can you describe his hair?

16  A.  It's cut short.

17  Q.  And, is that the way Shawn has always worn his hair?

18  A.  Yes, ma'am.  When he was a baby, his mother never plait

19  his hair; she would always comb it.

20          MS. THOMAS:  May I approach the witness again, Your

21  Honor?

22          THE COURT:  All right.

23  [Defendant's Exhibit No. 4 is marked for identification.]

24  Q.  And, I'm showing you what's been marked incorrectly, as

   Defendant's Exhibit No. 3; it should be Defendant's Exhibit

1  No. 4. Can you describe that photograph?

2  A. Yes. It's a picture of Shawn and his girlfriend and his

3  baby.

4  Q. And, do you have any knowledge of when that was taken?

5  A. That was taken in -- wait; I'm not sure; but, it was taken

6  in the '90's.

7  Q. Can you describe the haircut?

8  A. Low; just like it is on here.

9  Q. Is it almost bald?

10  A. Yes, ma'am.

11  Q. Is it the same way Shawn's hair is styled at this time?

12  A. Yes, ma'am.

13  [Defendant's Exhibit No. 5 is marked for identification.]

14  Q. And, can you look at Defendant's Exhibit No. 5?

15  A. Yes, ma'am.

16  Q. And, can you describe that photograph?

17  A. Yes, ma'am. His hair is cut short.

18  Q. And, can you tell by the photograph approximately when

19  that was taken?

20  A. This was taken at prom night.

21  Q. And, how many years ago would that have been?

22  A. Oh, God; I mean, been through so much, I can't hardly

23  think.

.24  Q. Are you aware of the year Shawn graduated from high

25  school?

1 A. Lord, I can't even think.

2 Q. But, he was in high school, at that time?

3 A. [Affirmative response.]

4 Q. And, why did you bring these photographs to court today?

5 A. Because, I've heard so much testimony that he wore long

6 hair and had a beard. And, I want to bring these photographs

7 so you could see from his early up until the '90's that he

8 didn't wear a beard nor long braids.

9 Q. And, during your time of having known Shawn, which is his

10 lifetime, have you ever seen Shawn Massey with braids?

11 A. No, ma'am.

12 MS. THOMAS: Thank you, Ms. Massey.

13 MS. MASSEY: Could I say something? I haven't seen

14 his hair this long.

15 Q. And, does it appear he was in jail when that was taken?

16 A. He must have been.

17 Q. And, you have no idea how long he had been in jail,

18 without a haircut. Is that correct?

19 A. No, ma'am.

20 MS. THOMAS: Thank you, Ms. Massey.

21 THE COURT: All right. Cross-examination?

22 MR. COTTRELL: No questions.

23 THE COURT: Thank you, ma'am. You may step down.

24 MS. THOMAS: That would be the evidence for the

preliminary hearing, for Mr. Massey.

1    THE COURT:    All right.  Do you wish to offer then

2  Defendant's Exhibit Nos. 3, 4 and 5, the photographs?

3    MS. THOMAS:    I do, for purposes of the hearing.

4  And, if I haven't already, I would offer Defendant's Exhibit

5  Nos. 1 and 2.

6    THE COURT:    You have offered those; not 3, 4, 5.

7    Does the state wish to be heard further on the

8  admission of Defendant's Exhibit Nos. 3, 4, and 5, for the

9  suppression hearing?

10    MR. COTTRELL:    No, Your Honor.

11    THE COURT:    Okay.    I'll LET THEM BE ADMITTED

12  then, for the purposes of this suppression hearing.  Also, I

13  would like to see them, at some point.  Also, I would like to

14  see, at some point in time, the state's exhibits, as well.

15  The line-up, particularly; State's Exhibit No. 6.

16    Anything else from the defendant?  Anything else

17  from the state on the suppression hearing?

18    MR. COTTRELL:  Not from the state, Your Honor.

19    MS. THOMAS:  No, Your Honor.

20    THE COURT:    Anything further from the state?

21    MR. COTTRELL:  Not from the state.

22    THE COURT:    All right.  I'll hear the parties then

23  as to arguments they wish to make on the matter of the

24  defendant's Motion to Suppress.  I'll hear from the state

25  first; let the defendant sum up.

1    MR. COTTRELL:  Your Honor, the issue before the

2  Court that has been brought before the defendant's motion is

3  whether or not an improper line-up was shown to the victim,

4  which lead to an improper identification.  That is the --

5  that would be the grounds to suppress this photo line-up,

6  Your Honor.

7    You heard testimony from Officer Ledford and

8  Officer Esposito as to how that line-up -- how line-ups like

9  that are made, in Charlotte-Mecklenburg Police Department.

10    You haven't heard testimony from exactly who made

11  the line-up; there is some uncertainty as to exactly who did

12  that.  But, you do know how the line-up was made.

13    Your Honor has also heard from the officer, exactly

14  how the line-up was presented to the victim.  You've heard

15  testimony about her opportunity to observe it; her actions in

16  making her identification and the comments that were recorded

17  on the original photo identification right there.

18    Your Honor, while it is not an I.D. that I would

19  term a "positive identification"; it is a strong

20  identification.  She picked the defendant out, almost

21  immediately, according to the officer, Officer O'Janiit's

22  testimony.  And, she said, "This looks most like him, except

23  his beard is different and he has no braids."

24    Your Honor can see, you can't see whether or not

25  any of those suspects have the braids that she described in

1   her testimony, which were four or five short braids, barely

2   hanging down the back of the head.  We're not talking about a

3   suspect with dreadlocks.  We're talking about very short

4   braids.

5          Your Honor, that is the issue before the Court.  I

6   would argue to the Court there has been no improper

7   procedures in this case.  Certainly no improper

8   suggestiveness inherent to that photo line-up.

9          Most of the evidence that the defendant has offered

10  was just that the defendant did not have braids at that time.

11         Well, that has been contradicted, Your Honor, by

12  the victim's testimony and her identification of the

13  defendant.  And also, in the testimony of by Officer

14  Esposito, as to what Ms. April Price told him, the day after

15  the incident occurred.

16         And, due to that light, Your Honor, we would urge

17  the Court to deny the motion.

18         THE COURT:  I'll hear from the defense.

19         MS. THOMAS:  Your Honor, this was not an

20  identification, to start with.  In all the photo line-ups

21  that I've seen presented to the Court, there was a signature;

22  the witness' signature on or near the correct photo, with the

23  date.

24         There was no marking, whatsoever, made by this

25  witness anywhere on the photo line-up.  If there had been an

1    identification, she would have made a mark of some kind on

2    that photo.  The only marking on the photo is a circle,

3    probably drawn by Officer O'Janiit; and, his notation, "This

4    looks most like the suspect; but, doesn't have braids."

5            There is no signature, I contend, this is not a

6    positive I.D.  Officer Esposito, a highly experienced

7    officer, who has done numerous photo I.D.s, testified that if

8    he states that there is a positive I.D., sign and date it.

9    And, that's what he did with the identification he made.

10           Officer Ledford also testified that he requests

11   that the positive identification is signed and dated.

12           Officer O'Janiit stated this is his first and only

13   photo I.D.  We contend this is not a proper I.D.; it's not a

14   positive I.D.  And, we contend that even had all the

15   procedures been followed, which we take issue with, we don't

16   even know who composed this photo I.D.

17           We contend that no I.D. was made.  And, if no I.D.

18   was made, we would contend that the courtroom identification

19   should be suppressed, based on the case of *United States V.*

20   *Simmons*, and the language in *U.S.  V. Simmons* is regardless

21   of how the initial misidentification and we contend this is a

22   non-identification, comes about, the witness thereafter is

23   apt to retain in his memory the image of the photograph

24   rather than the person who actually --

25           So, we would ask that the in-Court identification

1  also be excluded.

2  Most critical, we have shown a number of witnesses

3  who knew Shawn Massey all of his life, especially during that

4  time period, and can testify that he never had braids; he

5  never had hair long enough to braid or probably to even comb.

6  And, the person who committed this attack had braids

7  throughout his hair, which would take pretty long hair to

8  sort of -- I think that would be a what you call a "corn-row"

9  type braids, with braids hanging down.  The evidence shows

10  that this is not Mr. Massey.

11  Further, we have very convincing evidence from Mr.

12  Brady Dorsey that Shawn was working on that date; that Mr.

13  Dorsey actually took him to the job site at 7:00 in the

14  morning; that he picked him up in the late-afternoon; paid

15  him; and, that he has no knowledge that Shawn ever left the

16  job site.

17  We have testimony that he didn't even have

18  transportation; that he was transported to and from work by

19  one of the Dorsey people.

20  We would ask that the out-of-court identification

21  be suppressed, as well as the in-court identification.

22  THE COURT:  Okay.  Thank you.  All right.  Take

23  this, if you will, Madame Court Reporter.  It may be a little

24  lengthy and I will try to be coherent in dictating this, as I

25  can.

# O R D E R

1
2   NOW COMES THE UNDERSIGNED JUDGE PRESIDING AT THE

3 TRIAL OF THE CASE INVOLVING SHAWN MASSEY, defendant, in

4 Mecklenburg County, File Nos. 98 CRS 33738, 33739, 33740,

5 33741 and 98 CRS 141972.

6     Prior to the beginning of the trial of these cases,

7 the defendant filed a Motion to Suppress identification

8 testimony. This motion was filed on the morning of the

9 trial, which was September 14, 1999.

10     The state first objected to the motion, contending

11 it was untimely filed; but, withdrew its objection. Having

12 no advanced notice of the motion, however, a necessary

13 witness for the state was not available until Wednesday,

14 September 15, 1999.

15     After consultation with counsel, with the consent

16 of counsel, the Court determined that rather than lose a day

17 of court time, by waiting to begin the trial after the Motion

18 to Suppress could be heard on September 15th, the case could

19 proceed on September 14th, with the motion to be heard on

20 September 15th.

21     The state advised the Court that should the Motion

22 to Suppress the identification testimony of Samantha Wood be

23 allowed, the state would take a voluntary dismissal, as the

24 identification of the defendant as the perpetrator of the

25 offenses charged by victim, Samantha Wood, was essential to

1   the state's case.

2        The Court could also, upon motion of defense,

3   dismiss the cases, at the close of state's evidence, should

4   the state not voluntary dismiss.

5        The Court therefore concluded no prejudice would

6   exist toward the defendant by proceeding with jury selection

7   and trial on September 14th and hearing the suppression motion

8   on September 15th, since, if the Court ruled in favor of the

9   defendant, the case would terminate on September 15th. Should

10   the Court rule in favor of the state, the case could proceed

11   with an ultimate jury determination.

12        Present at all times during the suppression hearing

13   was the defendant, Shawn Massey; his attorney, Janet Thomas;

14   Assistant District Attorney, Eric Cottrell.

15        Both the state and defense were allowed to present

16   evidence and make argument. The Court did not require the

17   state recall witnesses Samantha Wood and Officers Esposito

18   and Ledford, whose testimony was heard on [October 14th]; but

19   allowed the testimony of those witnesses and cross-

20   examination of those witnesses be considered in the

21   suppression hearing.

22        The state did call as an additional witness,

23   Officer O'Janiit; O-J-A-N-I-I-T, who was cross-examined by

24   the defense.

25        The defense did call witnesses, as well, who

1   testified at the suppression hearing. Among those, Mr.

2   Dorsey, Annie Massey, Bobby Ross, Roberta Massey and re-

3   calling Annie Massey.

4          The Court has considered the testimony of all

5   witnesses in this suppression hearing and has not required,

6   as I've indicated, the parties to recall any witness who has

7   already testified.

8          From the evidence presented, the Court makes the

9   following:

### FINDINGS OF FACT:

10

11         1)  That the above-referred to charges against the

12  defendant resulted from events occurring on May 22, 1998, at

13  the apartment of Samantha Wood.

14         On that date and in that place, a person forced

15  Samantha Wood into her apartment with her two young children,

16  at gunpoint; and, ultimately robbed her of an amount of cash;

17  and, fled.

18         2)  That these offenses occurred at approximately

19  10:00 a.m., in broad daylight.

20         Samantha Wood personally saw her assailant outside

21  her apartment, about two feet from her and was forced to

22  spend almost half an hour with her assailant, inside her

23  apartment, as the robbery and other events took place.

24         The foyer light was on; but, even without the

25  light, this occurring at 10:00 a.m., lighting conditions in

1    her apartment enabled her to clearly see the individual.

2        3)   Samantha Wood does not wear corrective lenses.

3        4)   That the assailant was not wearing any type of

4    mask or disguise.

5        5)   That Samantha Wood was in her assailant's

6    presence during the entire course of the robbery, always at a

7    close distance.

8        6)   That frequently, and on numerous occasions,

9    Samantha Wood heard her assailant speak, as he ordered her to

10   open her door; quiet her young children; give him money; open

11   drawers, doors and cabinets; and even submit to sexual

12   assaults, which was however, not carried out; as he

13   threatened her with death and as he threatened her with

14   death, should she report the robbery to police; advising her

15   he knew her schedules of departure and arrival from her home.

16        7)   That upon the individual's departure, Samantha

17   Wood immediately called the police and the police responded,

18   within minutes.

19        She was asked, by the police, to provide and did

20   provide the police with a description of the individual.

21        8)   That Samantha Wood described the individual as

22   being a Black male with braids in his hair; about 5 feet 8

23   inches tall, wearing a red jersey shirt and blue-jean shorts

24        9)   In the course of their investigation of the

25   robbery, the police obtained either the name of the defendant

1. or another description of the person in the area at the time

2. of Ms. Wood's robbery, roughly fitting the description given

3. by Samantha Wood, from two independent sources; Theresa

4. Savall and April Pride Thompson.

5.     10) That from the description given by Samantha

6. Wood and Theresa Savall and the name of the defendant

7. obtained from April Thompson, a photographic line-up was

8. composed of six black and white photographs.

9.     11) The photographic line-up was composed by

10. officers of the Charlotte-Mecklenburg Police Department. Out

11. of the procedure in composing a photographic array, by said

12. officers, was testified to as follows:

13.     A photo of an individual is selected and specific

14. information about that individual, such as sex, race, height,

15. weight, hair color, eye color, facial hair or other

16. distinguishing characteristics, is entered into the computer,

17. which searches the database for individual similar features.

18. The database has in excess of 100,000 photos, as testified by

19. Officer Ledford.

20.     The officer then narrows the photos generated by

21. the computer from the database, until the manageable number,

22. such as six, is reached.

23.     It is unclear, from the evidence presented, exactly

24. who at the Charlotte-Mecklenburg Police Department prepared

25. the photographic line-up used in this case, by Samantha Wood.

1    The Court did examine the photographic line-up and

2 does find that the six individuals do have common physical

3 characteristics.

4    The Court incorporates State's Exhibit No. 6, for

5 reference.

6    12)  That Officer Ledford showed the photo line-up

7 to Theresa Savall on May 26, 1998, telling her the suspect's

8 photo, (the man which she had seen in the area, on May 22,

9 1998) may or may not be included in the six.

10    That she should examine the photos carefully; she

11 was not under any pressure; not compelled to identify anyone

12 in the line-up.  And that, after a brief examination of the

13 photos, Ms. Savall identified the upper-right-hand

14 photograph, which was in fact the photograph of the

15 defendant, Shawn Massey.

16    13.  That Officer J. J. O'Janiit showed the photo

17 line-up to Samantha Wood, on May 23, 1998.  He advised

18 Samantha Wood the suspect may or may not be enclosed in the

19 photo line-up.  He did not show her other photographic line-

20 ups but might have had copies of the same photographic line-

21 up in his possession.

22    Officer J. J. O'Janiit, by his own testimony,

23 admitted this was the only photo line-up he had conducted.

24 Officer O'Janiit did not show her other photo line-ups or

25 other photos of the defendant then or at any other time.

He observed Samantha Wood study the line-up for "a few seconds" and picked the upper-right-hand photo, which is a photo of the defendant; Ms. Wood stating that that photo looked like her assailant; but, her assailant had braids and no beard, different from the photographic line-up.

Officer O'Janiit wrote Samantha Wood's comments on the line-up page. Samantha Wood indicated the photo that she had selected looks most like her assailant. Her identification was not unequivocal or positive. Officer O'Janiit did not ask her to sign or date the photo line-up. He testified in the suppression hearing he had no other conversation with Samantha Wood regarding her identification of the defendant.

14. That only four days elapsed from the date Theresa Savall saw a person in the apartment complex until the time she identified the defendant's photograph in the photo line-up; and, only one day elapsed from the date Samantha Wood was robbed in her apartment until she identified the defendant's photograph in a photo line-up, as looking most like him, except without braids in his hair.

Let me state that again.

14. That only four days elapsed from the date Theresa Savall saw a person in the apartment complex until the time she identified the defendant's photograph in the photo line-up; and, only one day elapsed from the date

1   Samantha Wood was robbed in her apartment until she

2   identified the defendant's photograph in a photo line-up, as

3   looking most like him, except without braids in his hair or

4   with facial hair, as was depicted in the photograph.

5       15.   That Samantha Wood has not made any prior mis-

6   identification of another person or refused to identify

7   another person during pre-trial identification proceedings.

8       16.   That no suggestive statements were made by the

9   police to Samantha Wood about the accused, before, during or

10  after the identification procedure.

11      17.   That no suggestive statements were made by any

12  other persons to Samantha Wood about the accused, before,

13  during or after the identification procedure.

14      18.   That six photographs were used in the photo

15  line-up and reviewed by Samantha Wood, that, independently

16  was with different officers; but, Samantha Wood and Theresa

17  Savall identified the defendant as being at the apartment

18  complex on May 22, 1998; and, that all six photos were of

19  Black males, in the same age category with what appears to be

20  the same basic weight and facial characteristics.

21      19.   That no efforts were made by the police to

22  single out the defendant or otherwise suggest the photo of

23  the defendant to Samantha Wood, as a photo of the person she

24  should select.

25      20.   That in court, on September 14, 1999, the

victim, Samantha Wood, identified the defendant as the person who robbed her on May 22, 1998, having observed him during court procedures, during the morning of September 14, 1999, pointing out some differences in his courtroom appearance from the May 22nd date; such as a loss in weight.

And further, she had heard the defendant speaking on September 14, 1999, and testified that she recognized his voice as the voice of her May 22, 1998 assailant.

21. That the in-court identification of the accused by the witness is based solely on recollection of the witness at the time of the crime and is not influenced by pre-trial identification procedures.

BASED UPON THE FOREGOING FINDINGS OF FACT, THE COURT CONCLUDES AS A MATTER LAW THAT:

1. The identification of the defendant by the witness, Samantha Wood, is not inherently incredible, given all the circumstances of the witness' ability to view her assailant at the time of the crime. Credibility of the identification evidence is for the jury to weigh.

2. The pre-trial identification procedure involving the defendant was not so impermissibly suggestive as to violate the defendant's right to due process of law.

3. That the pre-trial identification procedure involving the defendant, even if impermissibly suggestive, was reliable and not productive of a substantial likelihood

of mis-identification, given the totality of circumstances surrounding the pre-trial identification procedures, in that:

a) The witness' opportunity to view the accused and observe the physical characteristics of the accused was ample and sufficient to gain a reliable impression of the accused at the time of the crime.

b) The witness' degree of attention was strongly and focused on the accused during the time the witness viewed the accused at the scene of the crime, as required by her in following the various demands made upon her by her assailant.

c) The witness' description of the accused given the police, shortly after crime, was accurate and basically matches the known physical characteristics of the accused, the Court taking into account the description of hair which conflicts with various other witnesses' testimony presented by the defense, cannot be overlooked.

However, the two other witnesses, totally independent from each other, identified the defendant as being at the apartment complex on the morning of May 22, 1998, one of them a close acquaintance of the defendant, who had known the defendant for years and with whom she testified the defendant had stayed the night before.

It also cannot be overlooked that the defendant has presented a witness indicating the defendant was employed and had worked on May 22, 1998.

1   This conflicting evidence, however, is more
2 relevant for a jury determination on the issue of identity
3 and does not weigh as much on the pre-trial identification
4 procedures used.

5   d)  That Samantha Wood's level of certainty in
6 her in-court identification that the accused was the same
7 person Samantha Wood observed at the scene of the crime, was
8 firm and unequivocal.

9   e)  That the time lapse between the crime and
10 pre-trial identification procedure was not so long as to
11 significantly diminish Samantha Wood's ability to make a
12 strong and reliable identification of the perpetrator and all
13 other circumstances and events surrounding the crime and the
14 pre-trial identification procedure supports the conclusion
15 that the identification testimony by the witness possesses
16 sufficient aspects of reliability.

17   4.  That the defendant did not have a Sixth
18 Amendment right to counsel, as contended in the defendant's
19 Motion to Suppress, as this was attempted by a witness to
20 identify her assailant and photographs, in a photo line-up.
21 Nor did the defendant have a right to be present, since a
22 photo line-up is not a critical stage of a prosecution when
23 the assistance of counsel is constitutional or necessary.

24   5.  Based on clear and convincing evidence, the in-
25 court identification of the accused is of independent origin,

1    based solely upon what the witness saw at the time of the

2    robbery, on May 22, 1998; and, is not tainted by any pre-

3    trial identification procedure, so impermissibly suggestive

4    and conducive to irreparably mistaken identification, as to

5    constitute a denial of due-process of law, in that the

6    witness had ample opportunity to view the accused at the time

7    of the crime; witness had a high degree of concentration to

8    focus attention on the accused at the time of the crime; the

9    witness' prior description of the accused, shortly after the

10   crime is a reasonably accurate description of the accused;

11   the degree of certainty in the witness' identification in

12   court is high and the pre-trial identification procedure did

13   not taint the ability of a witness to testify as to an in-

14   court identification of independent origin.

15          IT IS, THEREFORE, ORDERED that the defendant's

16   Motion to Suppress the in-court identification by Samantha

17   Wood of the defendant, Shawn Massey as the person who robbed

18   her on May 22, 1998, and to suppress testimony by Samantha

19   Wood or any law enforcement officer concerning Samantha

20   Wood's pre-trial identification of defendant, Shawn Massey as

21   the perpetrator, is denied; and, such testimony and evidence

22   shall be received and heard by the jury.

23          This, the 15th day of September, 1999.

                    James L. Baker

24                  Judge presiding.

25