Exhibit 8 (cont.)

187

1       All right.  Other matters, before we resume our

2  jury selection -- our case presentation?  I would suggest we

3  take a short recess; but, I'll hear if there are other

4  matters that need to be presented, before we bring the jury

5  in.

6       MR. COTTRELL:  I have one brief matter, Your Honor.

7       THE COURT:  All right.

8       MR. COTTRELL:  That is, yesterday, during the

9  defendant's cross examination of Investigator Ledford, he

10  identified this photo line-up, which I propose to mark as

11  State's Exhibit No. 8, as the original line-up he had shown

12  to Ms. Theresa Savall.  I would move to admit that into

13  evidence, since he's already identified that as the line-up,

14  on the stand, under examination of the defense.

15       THE COURT:  What was State's Exhibit No. 3?

16       MR. COTTRELL:  State's Exhibit No. 3 was a copy,

17  shown to Ms. Savall, of the line-up.  The officer testified

18  that this photo line-up is the original.

19       THE COURT:  All right.  What says the defendant on

20  the admission of State's Exhibit No. 8, without asking the

21  defense to abandon the contention of the photo line-up,

22  again?

23       MS. THOMAS:  I OBJECT to it.  The evidence has

24  already been closed; a ruling has been made; and, I would

25  oppose the admittance of that, at this time.

1    THE COURT:  Was that the actual item which was

2  identified by the officer, while he was testifying on the

3  stand, as the original photo array shown to Theresa Savall?

4    MR. COTTRELL:  Yes, Your Honor.  It was.

5    THE COURT:  Well, that's sufficient to, I think,

6  to allow its admissibility into evidence and may be presented

7  to the Court for admission, even after the witness

8  identifying it has testified.  So, I'll allow it to be

9  admitted then.

10    Do you wish to offer it, in the presence of the

11  jury?  I will be inclined to allow it.

12    MR. COTTRELL:  Thank you, Your Honor.  I will

13  identify it as State's Exhibit No. 8.

14    THE COURT:  All right.  Okay.  Anything else?

15  Anything else from the state?

16    MR. COTTRELL:  No, Your Honor.

17    THE COURT:  Anything else from the defendant?

18    MS. THOMAS:  No, Your Honor.

19    THE COURT:  We'll take a recess until 11:00 --

20  let's see, I guess our jury has been cooped up since 10:00.

21  Sheriff, I will advise you please to tell the jury they can

22  have a 10-minute recess.  We have finished matters that

23  needed to be conducted out of their presence and we'll be

24  ready to resume, after the recess, at 11:00.  You can gather

25  them back up at 11:00 and take them to the jury room.

1    We'll be in recess until 11:00.

2   {Court stands in recess.}

3   {Court reconvenes.}

4    THE COURT:   All right.   All parties are present.

5   Anything for the state, before the jury is brought in?

6    MR. COTTRELL:   No, Your Honor.

7    THE COURT:   Anything for the defendant?

8    MS. THOMAS:   No, Your Honor.

9    THE COURT:   Sheriff, let's have the jury, please.

10   {Thereupon, the following proceedings take place in open

11   court, in the presence of the jury, at 11:08 a.m.}

12    THE COURT:   All of our jurors are present.

13   Members of the jury, I'm sorry that I kept you in the jury

14   room so long.  My estimation of the time it would take to

15   complete the matter that we were working on was incorrect, I

16   would say, mildly.  I apologize for that.  I'll assure you

17   that we started on time and were working diligently.  And so,

18   I'm sorry that we had to keep you waiting.

19    We're not ready to proceed though, Members of the

20   jury.  And, as I recall, the state had completed its

21   presentation of witness, Officer Ledford.  And, the state may

22   then call its next witness.

23   [State's Exhibit No. 8 is marked for identification.]

24    MR. COTTRELL:   Before we do, we would MOVE INTO

25   EVIDENCE, the original copy of the photo line-up presented to

1 Ms. Theresa Savall, that has been identified as State's

2 Exhibit No. 8.

3 THE COURT: All right. Who was it that identified

4 this, sir?

5 MR. COTTRELL: Investigator Ledford, the last

6 witness.

7 THE COURT: All right. I'll note an OBJECTION for

8 the defense. Do you wish to be heard further, Ms. Thomas?

9 MS. THOMAS: No, Your Honor.

10 THE COURT: All right. Over objection of the

11 defendant, State's Exhibit No. 8 WILL BE ADMITTED.

12 MR. COTTRELL: Your Honor, the state's next witness

13 is Officer J. J. O'Janiit.

14 THE COURT: All right. If you would, come around.

15 [WITNESS SWORN.]

16 OFFICER J. J. O'JANIIT, BEING FIRST DULY SWORN, TESTIFIES AS

17 FOLLOWS DURING DIRECT EXAMINATION BY MR. COTTRELL:

18 Q. Officer O'Janiit, please state your name, for the Court?

19 A. My name is Officer J. J. O'Janiit.

20 Q. Officer O'Janiit, how long have you been a police officer,

21 sir?

22 A. For eight years.

23 Q. And, were you so employed and on duty on May 22, 1998?

24 A. Yes, sir. I was.

25 Q. And, on that date, did you respond to a robbery call at

1    5206-B Cherrycrest Lane?

2    A. Yes, sir. I did.

3    Q. And, about what time of day did you respond to that

4    address?

5    A. I believe it's in the morning. I would have to look at

6    the actual complaint numbers to give you an exact time and

7    what time I was dispatched.

8    Q. Okay.

9         MR. COTTRELL: May I approach the witness, Your

10   Honor?

11        THE COURT: All right.

12   Q. Sir, I'm showing you what's been marked for identification

13   purposes as State's Exhibit No. 5. Do you recognize that

14   document, sir?

15   A. Yes. I do.

16   Q. And, what is that, please?

17   A. A supplemental report, prepared by me; my investigation.

18   Q. And, is that in relation to this case?

19   A. Yes, sir. It is.

20   Q. Does it have the complaint number for this case on it?

21   A. Yes. It does.

22   Q. Could you please explain to the jury what a complaint

23   number is and how it's generated?

24   A. Each time a person calls the police, the police department

25   computer-generates a number as to what time we received the

1    call. The complaint number would be the year, first; your

2    month; and then, your date of occurrence; then, your time the

3    call is received; and then, which number call it was at that

4    particular hour. We had two calls 10:28, you would have "01"

5    or "02" at the end of the call.

6    Q. And, what's the complaint number associated with this

7    case?

8    A. The complaint number is 980522102800.

9    Q. And, based on your understanding of complaint numbers,

10   what does that tell you?

11   A. That the call was received at 1028 hours, on the 22nd day

12   of May 1998.

13   Q. And, how soon after receiving the call did you respond to

14   the scene; approximately?

15   A. Immediately upon receiving the call, I responded; you

16   know, within maybe five, ten minutes after the call had come

17   in.

18   Q. Did you speak to anyone at that address?

19   A. Yes. I did.

20   Q. And, who did you speak to?

21   A. The victim, Samantha Wood.

22   Q. Is she in the courtroom now?

23   A. I believe she's in the back of the courtroom.

24   Q. Okay. Officer O'Janiit, do you remember what Ms. Wood's

25   general demeanor was when you arrived at the scene?

1  A.  From what I recollect, upon my arrival, she was visibly

2  shaken; very upset.

3  Q.  And, did you have a conversation with Ms. Wood about what

4  had happened?

5  A.  I did.

6  Q.  Okay.  And, did you take a statement from her on that day?

7  A.  Yes, sir.  I did.

8          MR. COTTRELL:  May I approach, Your Honor?

9          THE COURT:  All right.

10  [State's Exhibit No. 9 is marked for identification.]

11          MR. COTTRELL:  May I approach the witness, Your

12  Honor?

13          THE COURT:  Yes, sir.

14  Q.  All right.  Sir, I'm giving you two sheets of paper.  They

15  are marked collectively as State's Exhibit No. 9.  What is

16  that, sir?

17  A.  This is a statement I took from the victim.

18  Q.  And, whose handwriting is that statement, sir?

19  A.  It's my handwriting.

20  Q.  Do you recall when you took that statement?

21  A.  Yes.  It was on the date the incident occurred.

22  Q.  Was the victim with you when you were writing it down or

23  was this --

24  A.  This was after the incident; just after -- upon my

25  arrival.

1  Q. My question is, sir, was the victim with you when you were

2  preparing this; or, was this afterwards?

3  A. No. She was with me.

4  Q. Have you had a chance to read that statement, prior to

5  this court date?

6  A. Yes, sir.

7  Q. Okay. And, upon your review of it, are all the instances

8  contained in that statement true and accurate to the best of

9  your knowledge?

10  A. Yes, sir. They are.

11  Q. Has this statement been changed in any way, shape or form,

12  since you took it that day?

13  A. No, sir. It has not.

14        MR. COTTRELL: All right. At this point, the state

15  would MOVE INTO EVIDENCE, State's Exhibit No. 9.

16        THE COURT: Does the defense wish to be heard?

17        MS. THOMAS: No, Your Honor. No objection.

18        THE COURT: LET State's Exhibit No. 9 BE ADMITTED.

19  Q. Officer, would you read that statement to the jury,

20  please?

21  A. [Reading.]

22        "This statement is being written for me by J. J.

23  O'Janiit, whom I understand is an officer with C.M.P.D. This

24  statement is true and accurate, to the best of my

25  recollection.

1    On 22 May '98, I was walking up to my apartment and

2 a Black male approached me from behind; grabbed my baby and

3 put a gun to her head.

4    The suspect then told me to get inside the

5 apartment.  I went inside the apartment and put my baby down

6 and the Black male --

7    I went inside the apartment and put my baby and the

8 Black male put the other baby down because she was crying.

9 He then told me to make the baby stop crying.  I picked the

10 baby up but she would not stop crying.

11    The Black male then told me to get up and go into

12 the bedroom.  When I did he threw me on the bad and said,

13 'Give me some, bitch.'  I told him I couldn't because I was

14 having my period.  He made me pull up my dress and show him.

15    The suspect then got off the bed and walked into..."

16    We're missing part of it from this copy you have

17 here; it's missing the rest of my statement.  You're missing

18 probably the last words on the right-side of the page.

19 That's why we're missing some words on this.

20 Q.  Okay.

21 A.  I can read you most of it.

22    MR. COTTRELL:  May I approach the witness, Your

23 Honor?

24    THE COURT:  All right.

25 A.  There should be more.

1 [State's Exhibit No. 10 is marked for identification.]

2 Q. Officer O'Janiit, let's try again. I'm handing you

3 another two pieces of paper. These are marked as State's

4 Exhibit No. 10.

5         What do those appear to be?

6 A. This is the actual statement or a copy of the actual

7 statement.

8 Q. And, once again, officer, is that the same statement that

9 Exhibit No. 9 was?

10 A. Yes. It is.

11 Q. And, are all the entries in State's Exhibit No. 10 true

12 and correct to the best of your knowledge?

13 A. Yes. They are.

14         MR. COTTRELL: Your Honor, state would MOVE TO

15 ADMIT, State's Exhibit No. 10.

16         THE COURT: State's Exhibit No. 10 is the same as

17 9, except 10 is complete, where as 9 cuts off some words. Is

18 that correct?

19         MR. COTTRELL: That is correct.

20         THE COURT: All right. Defense wish to be heard

21 on the admission of 10?

22         MS. THOMAS: NO OBJECTION.

23         THE COURT: LET State's Exhibit No. 10 BE

24 ADMITTED.

25 Q. What is the condition of the copy in State's Exhibit No.

1   10?

2   A.   Its condition, it looks like it's got most of the rest of

3   what was missing from this page.

4   Q.   All right.   Could you go back to where you left off and

5   continue to read from there?

6   A.   [Reading.]

7           "I told him I couldn't because I was having my

8   period.   He made me pull up my dress and show him.   The

9   suspect then got off the bed and walked over to my jewelry

10  box and asked, 'Where is your money?' I told him I didn't

11  have any and asked where my purse was.

12          The suspect removed $60.00 from my purse and made

13  me open the closets so he could look through them.

14  Afterwards, he brought me back into the living room, pushed

15  me on to the floor and said if I called the police he would

16  be outside watching and he could come back to kill me.

17          He then stated he knew my schedule and that he knew

18  when I left at 4 o'clock in the morning.   I did leave this

19  morning at 4 o'clock and returned at 4:30 a.m.

20          The suspect was a Black male, approximately five-

21  nine, 180 pounds, with his hair pulled back from his face and

22  four small braids on the back of his head.   He was wearing a

23  red shirt and blue-jean shorts."

24  Q.   Is there anything else to that statement?

25  A.   [No verbal response.]

1  Q.  Any other writing on that statement?

2  A.  Just a line drawn diagonally across the page, with the

3  victim's signature and the dates that the statement was

4  taken.

5  Q.  And, what was the date that the statement was taken?

6  A.  May 22, 1998.

7  Q.  While you were still there at the scene that day, what

8  else did you do, sir?

9  A.  While at the scene, we took her statement; we called for a

10  crime scene officer to respond and attempt to process the

11  scene for any evidence.  And then, a few other officers came

12  out in the area and canvassed for possible witnesses or

13  suspects.

14  Q.  All right.  When is the next time that you saw Ms. Wood?

15  A.  On the 23rd of May.

16  Q.  And, where did you see Ms. Wood that day?

17  A.  She came to our team office.

18  Q.  Why did she do that?

19  A.  I had contacted her to come to the office to view a photo

20  line-up.

21  Q.  Officer, is this photo line-up -- is the photo line-up

22  you're referring to one you had personally prepared?

23  A.  No, sir.  It is not.

24  Q.  Okay.  How did you go about getting this photo line-up?

25  A.  I contacted an investigator at the main Law Enforcement

1 Center down here, who generated a photo line-up on the

2 computer system and prepare it for me.

3 Q.  And, where did you go to pick up the photo line-up?

4 A.  I responded to the Law Enforcement Center and retrieved

5 the line-up.

6         MR. COTTRELL:  May I approach the witness, Your

7 Honor?

8         THE COURT:  Yes, sir.

9 Q.  Let me s how you what has been identified as State's

10 Exhibit No. 6.  Do you recognize that document, sir?

11 A.  Yes, sir.  I do.

12 Q.  What is it, please?

13 A.  It's the photo line-up I showed to the victim.

14 Q.  Is that the original photo line-up or is that a copy?

15 A.  That is my original.

16 Q.  Has there been any changes made to that photo line-up

17 since it last left your possession?

18 A.  No, sir.  It is not.

19 Q.  Are there any -- all the entries on it, true and accurate

20 to the best of your recollection?

21 A.  Yes, sir.  They are.

22         MR. COTTRELL:  Your Honor, the state would MOVE TO

23 ADMIT, State's Exhibit No. 6.

24         THE COURT:  Defense wish to be heard?

25         MS. THOMAS:  No objection.

1  THE COURT:  All right.  LET State's Exhibit No. 6

2  BE ADMITTED.

3  Q.  Officer, could you explain to the jury how you went about

4  showing this particular photo line-up to Ms. Wood?

5  A.  When I received the photo line-up I asked the victim to

6  come into the office.  When she arrived, we went into the

7  conference room.  I advised her that I was going to show her

8  a series of photos that may or may not be including a picture

9  of a suspect.

10  Q.  And, where was the photo line-up when you were explaining

11  this to her?

12  A.  I was holding the photo line-up.  And, after I explained

13  it to her, I gave it to her.

14  Q.  Officer, were you aware which picture was the defendant's

15  picture in that line-up?

16  A.  Yes, sir.  I was.

17  Q.  Which picture is that, please?

18  A.  The picture in the upper-right-hand corner of the photo

19  line-up.

20  Q.  Were you in a position where you could observe Ms. Wood as

21  she looked at the photo line-up?

22  A.  Yes.  I was.

23  Q.  And, what did you observe when she did so?

24  A.  When I gave her the line-up she looked at it for several

25  seconds.  And then, identified the individual in the top

1   portion, top-right-hand portion of my photo line-up, as the

2   suspect.

3   Q.  And, whose picture did she identify?

4   A.  The defendant.

5   Q.  How long did she spend looking at the photo line-up,

6   total, do you think, before she focused on the defendant's

7   picture?

8   A.  Maybe five seconds, ten seconds.

9   Q.  Did she make any comments to you about that photo?

10  A.  She did.

11  Q.  What were those comments, sir?

12  A.  She stated that she believed that was the suspect; looked

13  most like him; except, in the photo, he has a beard and at

14  the time of the occurrence, he did not have a beard; and that

15  at the time of the occurrence, he had braids in his hair;

16  and, in this particular photo, he did not have braids.

17  Q.  Can you see the back of any of those subjects' heads in

18  the photo line-up?

19  A.  No.  You can not.

20  Q.  Did you make any notations on the photo line-up?

21  A.  Yes, sir.  I did.

22  Q.  Okay.  And, what note on the photo line-up itself did you

23  make?

24  A.  I circled the picture which the victim had pointed out.

25  And, next to the circling, I wrote my comments she said.

1 "This looks most like him; except for no beard and has

2 braids"?

3 Q. Did the victim, Ms. Wood, write anything on the photo

4 line-up?

5 A. No. She did not.

6 Q. Did you bring any other photo line-ups to show to the

7 victim that day?

8 A. No. I did not.

9 Q. Okay. Did you bring anything else with you, when you

10 showed the victim this line-up?

11 A. I may have had other papers in my hand. This was the only

12 line-up she would have saw. However, I did have papers in my

13 hand that would have been duplicates of this line-up and

14 biographical information on the other individuals.

15 Q. While in your presence, did you ever show Ms. Wood another

16 line-up containing the defendant's picture?

17 A. No. I did not.

18 Q. Did you ever show her any other line-up, besides that one

19 in front of you?

20 A. No. I did not.

21 Q. Do you have any personal knowledge of other officers

22 showing Ms. Wood photo line-ups?

23 A. No, sir.

24 Q. And sir, did you complete a supplemental report about when

25 you showed Ms. Wood that line-up?

A. Yes. I did.

Q. And, could you hold that supplemental report up and say for the record what it's been marked as?

A. It is marked as State's Exhibit No. 5.

Q. Can you take just a moment to look over that document, sir?

Does that also contain what the victim said to you about the photo line-up?

A. Yes. It does.

Q. And, when did you prepare that supplemental report, in relation to when you showed the photo line-up?

A. I prepared it the same time, that day.

Q. What did you record that the victim said in that exhibit?

A. Do you want me to read the entire --

Q. Just the portion relating to what she said when shown the line-up?

A. [Reading.]

"Officer O'Janiit told me there were a series of photos for me to look at to see if any of the subjects was the suspect that robbed me.

I looked at the photos and told the officer that one of the subjects looked like the suspect, except that the suspect had longer hair, with braids and he did not have a beard."

Q. Have you shown Ms. Wood any other photo line-ups since May

1  23rd?

2  A.  No, sir.  I have not.

3  Q.  Have you had any contact with Ms. Wood since May 23rd?

4  A.  No, sir.

5      MR. COTTRELL:  May I have just a moment, Your

6  Honor?

7      THE COURT:  All right.

8      MR. COTTRELL:  No further questions.

9      THE COURT:  Cross examination.

10     MS. THOMAS:  Thank you, Your Honor.

11  [CROSS EXAMINATION OF OFFICER O'JANIIT, BY MS. THOMAS:]

12  Q.  Officer O'Janiit, I call your attention to State's Exhibit

13  No. 8, the statement signed by Ms. Samantha Wood.

14  A.  I've got 9 and 10.

15     THE COURT:  No. 9 I believe is the statement you

16  may be referring to.

17     MS. THOMAS:  That is correct.

18  Q.  On State's Exhibit No. 9, could you read the last sentence

19  on the second page, beginning with, "The suspect…"

20  A.  [Reading.]

21     "The suspect was a Black male, five-nine, 180

22  pounds with his hair pulled back from his face and four small

23  braids on the back of his head.  He was wearing a red shirt

24  and blue-jean shorts."

25  Q.  Now, this is the victim, Ms. Wood's only statement?

1  A.  I'm sorry.

2  Q.  This is the victim's statement?

3  A.  Yes, ma'am.

4  Q.  And, she said his hair was pulled back from his face.  Is

5  that correct?

6  A.  Yes, ma'am.

7  Q.  And, four, small braids?

8  A.  Yes.

9  Q.  And, she did count the number of braids?

10  A.  She stated to me, "…four, small braids."

11  Q.  And, "four" appears on your statement?

12  A.  Yes, ma'am.

13  Q.  And, she said his hair was pulled back from his face.  Is

14  that correct?

15  A.  That's correct.

16  Q.  Would that indicate that this person had long hair?

17         MR. COTTRELL:  OBJECTION.

18         THE COURT:  Well, I'll SUSTAIN that form of the

19  question.  SUSTAINED.

20  Q.  Going back to the fourth --- the first page of Exhibit No.

21  9, the ninth line, up, isn't it a fact that the statement

22  says, [Reading.]

23       "The suspect looked into my jewelry box."

24  A.  Yes, ma'am.

25  Q.  And, isn't it a fact that it says, "The suspect removed

1  $60.00 from my purse"?

2  A. Yes, ma'am.

3  Q. And, did Ms. Wood tell you that the suspect was in her

4  apartment for approximately 30 minutes?

5  A. I don't really recollect her advising me of a particular

6  timeframe.

7  Q. But, based on her statements, the suspect was in there for

8  a period of time. Is that correct?

9  A. Yes, ma'am.

10  Q. And, the suspect was not wearing gloves. Is that correct?

11  A. She did not advise me of that.

12  Q. The suspect was not wearing a disguise or a mask of any

13  kind. Is that correct?

14  A. Didn't advise that either.

15  Q. And, crime scene was called to the apartment; were they

16  not?

17  A. Yes, ma'am.

18  Q. And, crime scene is obtaining or attempting to obtain

19  fingerprints. Is that correct?

20  A. Yes, ma'am.

21  Q. And, to your knowledge, no fingerprints came back matching

22  those of Shawn Massey. Is that correct?

23  A. Not to my knowledge.

24  Q. And, to your knowledge, no physical evidence exists that

25  shows Shawn Massey was ever present in that apartment. Is

1  that correct?

2  A.  I'm not aware of him collecting any evidence, if that's

3  what you're asking me.

4  Q.  To your knowledge, no physical evidence exists which links

5  Shawn Massey to that apartment.  Is that correct?

6  A.  That's correct.

7  Q.  And, Officer O'Janiit, is it not true that Ms. Wood

8  described this person as wearing a red shirt.  Is that

9  correct?

10  A.  Yes, ma'am.

11  Q.  And, blue-jean shorts.  Is that correct?

12  A.  Yes, ma'am.

13  Q.  And, going back to the photographic line-up, you're not

14  sure of the origin of that photographic line-up; are you

15  A.  State's Exhibit No. 6?

16  Q.  Yes.

17  A.  Is that what you're referring to?

18  Q.  Yes.

19  A.  Yes, ma'am.  I received it from the robbery division of

20  Law Enforcement Center.

21  Q.  Do you know which officer composed the line-up?

22  A.  No, ma'am.

23  Q.  And, isn't it a fact that when a positive I.D. is made,

24  the witness is asked to sign and date the photograph that is

25  I.D'd?

1  A.  I don't believe that's a policy of our department.  I can

2  tell you what I did; but, I can't give you information as to

3  other officers' policies.

4  Q.  This is your one and only photo line-up that you've ever

5  conducted?

6  A.  Yes, ma'am.

7  Q.  Is that not true?

8  A.  Yes, ma'am.

9  Q.  And, isn't it a fact that Ms. Wood's words were, "This one

10 looks the most like the person, except he did not have

11 braids"?

12 A.  [No verbal response.]

13 Q.  "...except, with braids."

14 A.  [No verbal response.]

15 Q.  Do you have the exhibit in front of you?

16 A.  Yes, ma'am.

17 Q.  Is that your circle?

18 A.  Yes, ma'am.  It is.

19 Q.  Is that Ms. Wood's writing on markings on there anywhere?

20 A.  No.

21 Q.  Does it?

22 A.  It does not.

23 Q.  The only markings on there are your markings?

24 A.  Yes, ma'am.

25 Q.  And, read the notation beside the photograph?

1  A.  The photograph is circled and my notation says, "Said this

2  looks most like him except for no beard and braids."

3  Q.  So, she did not identify him.  Is that correct?

4  A.  She identified this subject to me, stating she believed

5  that was him, except he has no braids -- he has braids and

6  does not have a beard.

7  Q.  But, looking the most like someone is not a positive I.D.;

8  is it?

9  A.  Ma'am, that's a question you have to ask her.

10  Q.  I'm just asking you, as an officer.

11  A.  As an officer, her statement to me she believed that was

12  the suspect, except in this particular photo, he has no

13  braids and that he does not have a beard at this time.

14  Q.  The words "believe he is the suspect," does not appear on

15  any of your supplement reports.  Is that correct?

16  A.  [No verbal response.]

17  Q.  The only thing I'm seeing is, "He looks like the suspect."

18  A.  That's correct.

19  Q.  And one, "He looks the most like the suspect."

20  A.  That's correct.

21  Q.  Except, the suspect had longer hair, with braids?

22  A.  That's correct.

23  Q.  And, how early were you present?

24  A.  I was the initial officer, responding to the call.

25  Q.  And, did you follow the investigation, through the follow

1  up?

2  A.  No.  Well, what do you mean by the follow-up?

3  Q.  Are you familiar with the interviews conducted by Officer

4  Esposito?

5  A.  No, ma'am.

6  Q.  You're not aware of any other evidence, any other

7  eyewitness evidence, putting Shawn Massey in that apartment;

8  are you?

9  A.  Not in the apartment; no, ma'am.

10  Q.  Thank you.

11         MS. THOMAS:  No further questions.

12         THE COURT:  Re-direct?

13         MR. COTTRELL:  No further questions, Officer.

14         THE COURT:  Thank you, sir.  You can step down.

15  The state may call it's next witness.

16         MR. COTTRELL:  Your Honor, the state will call

17  Officer Mark Wilson.

18         MS. THOMAS:  Your Honor, may we approach?

19         THE COURT:  Yes.

20  {Conference at sidebar, outside the hearing of the jury, with

21  all attorneys present.}

22  {Thereupon, the following proceedings take place in open

23  court, in the presence of the jury.}

24         THE COURT:  All right.  Are you ready to proceed?

25         MR. COTTRELL:  The state calls Officer Wilson.

1   [WITNESS SWORN.]

2   MARK WILSON, BEING FIRST DULY SWORN, TESTIFIES AS FOLLOWS

3   DURING DIRECT EXAMINATION BY MR. COTTRELL:

4   Q.  Officer Wilson, please state your name for court and spell

5   your last name for the Court Reporter.

6   A.  It's Mark Wilson, W-I-L-S-O-N.

7   Q.  And sir, how are you employed?

8   A.  I am a Crime Scene Search Technician with the Charlotte-

9   Mecklenburg Police Department.

10  Q.  And, how long have you been a Crime Scene Search

11  Technician?

12  A.  Thirteen years.

13  Q.  And, on May 22, 1998, did you respond to a call for

14  service at 5206 Cherrycrest Lane?

15  A.  Yes, sir.

16  Q.  And, who called you there, sir?

17  A.  I was dispatched by a police dispatcher.

18  Q.  Okay.  And, what did you find on the scene when you

19  arrived there?

20  A.  When I arrived at the scene, I found Officer O'Janiit at

21  the scene and also the victim, Samantha Wood.

22  Q.  Could you please describe to the jury, sir, what you did

23  when you got there to the scene?

24  A.  When I arrived, I observed a 2-story apartment building;

25  Unit B was at the rear of the building; it was a 1-story

1  unit, labeled "B." I made an examination of the front door

2  for any signs of forced entry. I did not see any signs of

3  forced entry.

4  I did a general walk-through of the overall scene.

5  I photographed the front door and the over-all scene. I also

6  processed the front door of Unit B and the rear bedroom door

7  for latent prints. And, I did not collect any prints.

8  Q. So, after testing both the front door and the door to the

9  bedroom, you were unable to raise any prints at all?

10  A. Yes, sir. That's correct.

11  Q. And, looking over the scene, did you see any other items

12  that could be seized as evidence in this case?

13  A. No, sir.

14  Q. And, did you seize any other items, sir?

15  A. No, sir.

16  Q. In your 13 years, sir, as a Crime Scene Search Technician,

17  about how many breaking and entering scenes do you think

18  you've processed for prints?

19  A. Probably in excess of 750.

20  Q. And, in your experience, would you characterize it as

21  abnormal to respond to a scene and find no prints at all?

22  A. No, sir.

23  MS. THOMAS: OBJECTION.

24  THE COURT: OVERRULED.

25  A. No, sir.

1  Q. Why is that, sir?

2  A. A latent print is very fragile; a lot of environmental

3  factors; surface that it's on. There are a lot of things

4  that can interrupt a latent print being laid on a surface.

5  And, my collection is limited to fingerprint powders.

6  Q. About how long did you spend at the scene that day, sir?

7  A. Approximately 30 minutes.

8  Q. And, did you do anything else regarding the investigation

9  of this case, after you left the scene, sir?

10  A. I completed my photo jacket for the evidence I took and

11  also completed a supplement form.

12  Q. All right. Thank you, sir.

13      MR. COTTRELL: No further questions.

14      THE COURT: Cross-examination.

15      MS. THOMAS: Thank you, Your Honor.

16  [CROSS EXAMINATION OF OFFICER WILSON, BY MS. THOMAS:]

17  Q. Officer Wilson, isn't it a fact that nothing you found in

18  this apartment linked Shawn Massey to that apartment?

19  A. I did not collect any physical evidence from the scene.

20  Q. Do you know of any evidence that associates Shawn Massey

21  with that apartment?

22  A. No, ma'am.

23  Q. Were any fingerprints of Shawn Massey obtained from that

24  apartment?

25  A. I did not collect any latent fingerprints from Apartment

1   B.

2   Q.  Did anyone else, to your knowledge, attempt or collect

3   fingerprints?

4   A.  No, ma'am.

5   Q.  So, there are no fingerprints associating Shawn Massey to

6   that apartment.  Is that correct?

7   A.  I do not know of any.

8            MS. THOMAS:  Thank you, Officer Wilson.

9            THE COURT:   Re-direct?

10           MR. COTTRELL:  Nothing further.

11           THE COURT:   Does the state have any further need

12  of this officer as a witness?

13           MR. COTTRELL:  No, Your Honor.  We would ask that

14  he be excused.  I would also ask that Officer O'Janiit be

15  excused.

16           THE COURT:   Any objection?

17           MS. THOMAS:  No, Your Honor.

18           THE COURT:   All right.  Officer O'Janiit may also

19  be excused.

20           MR. COTTRELL:  That's the evidence for the state.

21  [STATE RESTS, at 11:40 a.m.]

22           THE COURT:   Counsel approach the bench, just a

23  second.

24  {Conference at sidebar, outside the hearing of the jury, with

25  all attorneys present.}

{Thereupon, the following proceedings take place in open court, within the hearing of the jury.}

THE COURT:   You may proceed, the state having rested.

MS. THOMAS:   Your Honor, Mr. Massey's first witness we would call is Mr. Brady Dorsey.

THE COURT:   All right.

[WITNESS SWORN.]

THE COURT:   The witness is with the defense.

BRADY DORSEY, BEING FIRST DULY SWORN, TESTIFIES AS FOLLOWS DURING DIRECT EXAMINATION BY MS. THOMAS:

Q.   State your name, please.

A.   Brady Dorsey.

Q.   Where do you live, Mr. Dorsey?

A.   3132 Graymont Drive.

Q.   What is your occupation?

A.   I am the bookkeeper for Dorsey Concrete.

Q.   And, are you here today at the request of Mr. Rudy Dorsey?

A.   Yes, ma'am.

Q.   Is he the owner of Dorsey?

A.   Yes, ma'am.

Q.   And, what did Mr. Dorsey request that you bring, pursuant to his subpoena?

A.   The payroll journal and the documents in which the petty cash vouchers.

Q. For what week?

A. From May 15th through the 22nd.

Q. What year?

A. '98.

Q. And, do you know Mr. Shawn Massey?

A. Yes.

Q. Has Mr. Massey been employed by Dorsey Concrete Company?

A. Yes.

Q. In what capacity is he employed there?

A. He was employed as a laborer.

Q. What type of work did he do?

A. That consisting of grading concrete and placing paper barrier and wire mask.

Q. And, about what size is -- what size company is Dorsey Concrete Company?

A. It's small; it's a small business.

Q. On the average, how many employees does the company employ on a daily basis?

A. Well, since it's a sub-contractor, we employ -- it various from five to fifteen.

Q. And, where is the company located?

A. 3132 Graymont Drive.

Q. In the course of being a bookkeeper, for Dorsey Concrete Company, did you come to know Mr. Shawn Massey?

A. Well, no. I knew him before that, as a small kid on that

1 block.

2 Q. And, did Shawn Massey work frequently for the company?

3 A. Yes; frequently.

4 Q. And, do your records indicate that Shawn Massey worked

5 there the week of May 15th through May 22, 1998?

6 A. Yes.

7 Q. And, did you bring those records to court with you?

8 A. Yes.

9 MS. THOMAS: May I approach, Your Honor?

10 THE COURT: Yes, ma'am.

11 Q. Mr. Dorsey, I'm going to show you what's been marked as

12 Defendant's Exhibit No. 1. Can you describe this document?

13 A. Yes. This is a weekly payroll journal that's kept on a

14 daily basis as to the employees that we employ. And, it

15 varies from one week to the next, according to the type of

16 job we're doing.

17 This particular one, I think Exhibit No. 1, from

18 the 15th of May '98, through 5/22/98, Shawn Massey had worked

19 16 --

20 MR. COTTRELL: OBJECTION, Your Honor, as to the

21 notations.

22 THE COURT: SUSTAINED, at this point. You need a

23 couple questions.

24 Q. Mr. Dorsey, do you keep this journal in the regular course

25 of your business?

1  A.  Yes.

2  Q.  And, how long have you been keeping journals for Dorsey

3  Concrete Company?

4  A.  Five and-a-half years.

5  Q.  And, where are those journals kept?

6  A.  In the file cabinet.

7  Q.  Now, did you make these notations in the journal?

8  A.  Yes.  I did.

9  Q.  And, has the journal been in your possession?

10  A.  Yes.

11  Q.  And, are there entries in your journal for the date of May

12  22, 1998?

13  A.  Yes.

14  Q.  What entries relating to Shawn Massey are in the journal?

15  A.  On the Wednesday; Wednesday and Friday; those were the 8

16  hours per day.

17  Q.  And, do you know the approximately or exact hours Mr.

18  Massey worked on that Wednesday and on that Friday?

19  A.  Yes; eight hours.

20  Q.  And, approximately what would those hours have been?

21  A.  Seven to say 4 o'clock, something like that.  It's

22  according to -- we show up at the job at 7 o'clock.

23  Q.  How are employees at Dorsey Concrete Company paid?

24  A.  Weekly.

25  Q.  And, are they paid in cash or by check?

1  A.  Cash.

2  Q.  And, what if anything do you do to note that the employees

3  have received their paycheck?

4  A.  I write their name, date and the hours worked and the

5  amount per hour, on petty cash voucher, which is to show, you

6  know, to correspond with the ledger.

7  Q.  Do you require a signature on those vouchers?

8  A.  Yes.

9  Q.  And, sometimes do people receive their money without

10  signing?

11  A.  Yes.  Sometimes they do.

12  Q.  And, why is that?

13  A.  sometimes they, you know, might be in a hurry or be

14  wanting to get paid, you know.  Friday, trying to get away.

15  Sometimes they forget, you know; it's a mental thing.

16  Q.  Okay.  Now, do you -- do your records indicate that Shawn

17  Massey received payments on Friday, May 22, 1998?

18  A.  Yes.

19  Q.  And, did you bring those records with you?

20  A.  Yes.

21         MS. THOMAS:  May I approach the witness, Your

22  Honor?

23         THE COURT:  Yes, ma'am.

24  Q.  Mr. Dorsey, can you describe the documents I just handed

25  to you?

1  A.  Yes.  This is a petty cash voucher that we use to

2  correspond with our payroll ledger, indicating that we have

3  paid the employees on that Friday.

4            THE COURT:  For the record, what number is that?

5            MR. DORSEY:  That's Exhibit No. 2.

6            THE COURT:  All right.  Thank you.

7  Q.  And, is there a voucher in there for Shawn Massey?

8  A.  Yes, ma'am.  It is.

9  Q.  How much does it indicate that Shawn Massey was paid on

10  that day?

11  A.  For sixteen hours, $7.50 per hour, $120.00.

12  Q.  Does his signature appear on this voucher?

13  A.  Not on this one; no.

14  Q.  On the vouchers you have for the week of May 15th through

15  the 22nd, do some signatures appear on the vouchers?

16  A.  Yes, ma'am.  I have all -- I have all but two.  I have all

17  but two, three; sorry.

18  Q.  Now, do you have any personal recollection of a project

19  Dorsey Concrete Company was working on during that week?

20  A.  Yes, ma'am.  We were working on that -- on that Wednesday,

21  we worked with McDevitt and Street Bogess, on Yorkmont Road.

22  And, on that Friday, we were working for Carolina Floors.

23  That was on Eleventh and Graham Street, over off of Dalton

24  Avenue.

25  Q.  Was Shawn Massey working at that location?

1  questions.

2  THE COURT: Cross-examination.

3  [CROSS EXAMINATION OF MR. DORSEY, BY MR. COTTRELL:]

4  Q. Okay. Mr. Dorsey, your records, according to your

5  records, you show that Shawn Massey worked for your company

6  on May 22, 1998; correct?

7  A. That's correct.

8  Q. Okay. And, your records -- where in your records does it

9  show, sir, that you picked him up at 7 o'clock?

10 A. That's not shown on the records that I picked him up.

11 Q. Okay. And, Shawn worked two days that week; correct?

12 A. Correct.

13 Q. According to what the records show?

14 A. [Affirmative response.]

15 Q. Did anyone else on that job only work two days?

16 A. No. They vary. I have some that work four days that

17 week, that month -- that week.

18 Q. Isn't it true that everybody else beside Shawn worked four

19 days or did several work --

20 A. No; they varies.

21 Q. From what?

22 A. From 37 -- from 40 hours down to 8 hours.

23 Q. Okay. So, you had quite a few people coming and going

24 then; not everybody was on the job the same day?

25 A. No. That's not what I'm saying.

1  Q.  Okay.  What are you saying, sir?

2  A.  I'm saying there is days when we need more help than

3  others.

4  Q.  Right.  So, you don't have the same amount of people

5  working on the job everyday?

6  A.  That's correct.

7  Q.  Okay.  Now, according to your testimony, you're sure that

8  you  picked up Shawn Massey on 5/22 -- May 22, 1998; correct?

9  A.  I transported Shawn; I transported him to the work site on

10 that day, from the location we go from; Graymont Drive.

11 Q.  And, where in your records, sir, does it show that you

12 actually transported the help to the work site?

13 A.  Well, it's not on the records; we don't keep that on the

14 books.

15 Q.  And, what time do you remember picking him up?

16 A.  We left the location about 6:40; 6:55, something like

17 that, to get to the work site.  The concrete company was

18 scheduled between 7:00 and 7:30, I recollect.

19 Q.  You're able to remember that from over a year ago?

20 A.  Yeah.  We do it every day.

21 Q.  All right.

22 A.  Usually, that's when concrete is scheduled, early in the

23 morning.

24 Q.  Okay.  Is it always 7 o'clock or just most of the time 7

25 o'clock?

1. A. What do you mean?

2. Q. Do you always arrive at a work site at 7 o'clock, sir; or,

3. is it just mostly at 7 o'clock?

4. A. Sometimes.

5. Q. Sometimes?

6. A. Sometimes. According to when the concrete can get there.

7. Q. How are you so sure that it was 7 o'clock on May 22nd, if

8. your records don't show, sir?

9. A. Because of the amount of concrete we were pouring that

10. day.

11. Q. And, the records that you have there, does it show how

12. much concrete was poured, sir?

13. A. No; but, I know who we were pouring for; and, I know where

14. it was poured at.

15.             MR. COTTRELL: May I approach the witness, Your

16. Honor?

17.             THE COURT: Yes, sir.

18. Q. Sir, I'm pointing right now to your record book, which is

19. Defendant's Exhibit No. 1; correct?

20. A. Yes, sir.

21. Q. Okay. If I may step around, there is a row of names at

22. the beginning of a ledger. And the name I'm pointing to

23. right now is Shawn Massey; correct?

24. A. That's correct.

25. Q. Okay. And, all of these entries are made in black pen;

1  correct?

2  A.  I'm color-blind; if you say so.

3  Q.  All right.

4  A.  Looks black to me.

5  Q.  Are there some swiggles in different colors of ink?

6  A.  Yes.

7  Q.  Right on Shawn Massey's eight on Friday, May 22nd?

8  A.  No.  It's not.  The only different thing is that red line.

9  Q.  You don't see some blue swiggles right there?

10  A.  I see swiggles right there; little swiggles right there;

11  little swiggles right there.

12  Q.  But, you don't see them where I'm pointing to?

13  A.  Yes.  I see them right there that you indicate.  Just a

14  mark.

15         THE COURT:  Slide over a little bit so the jury

16  can see both of you.

17  A.  You can see some marks.

18         THE COURT:  Mr. Dorsey, if you would please keep

19  your voice up so everybody --

20         MR. DORSEY:  Yes.

21         THE COURT:  -- can hear you.  Thank you.

22         MR. DORSEY:  He's indicating a mark; marks three or

23  four places on here.

24  Q.  Okay.

25  A.  Sometimes we have to change hours being by how many hours

1  they work, below here.  You can see others like that.

2  Q.  So, sometimes these records are changed; correct?

3  A.  No.  No.  Sometimes the hours are changed.

4  Q.  Well, does it look like to you, sir, that Shawn Massey's

5  hours --

6  A.  No.

7  Q.  -- have been changed --

8  A.  No.

9  Q.  -- on that day?

10  A.  No.

11  Q.  There is nothing different about that entry than any of

12  the rest --

13  A.  No.

14  Q.  -- on that ledger sheet?

15  A.  No.  Eight-and-eight is sixteen; no matter how you look at

16  it.

17  Q.  Okay.  And, according to your testimony he was paid for 16

18  hours of work?

19  A.  Absolutely.

20  Q.  Okay.  And, that was at the rate of $7.50 an hour?

21  A.  Absolutely.

22  Q.  Okay.  And, according to my math, I'm a lawyer, I really

23  don't do math very well, but 16 times $7.50 is $120.00;

24  correct?

25  A.  [No verbal response.]

1  Q.  If he was paid exactly the amount of cash that he got was

2  what --

3  A.  Yes.

4  Q.  Sixteen times the $7.50; correct?

5  A.  Yes.

6  Q.  Okay.  And, do you rely on your employees to report income

7  for tax purposes?

8  A.  No.  Pay their own taxes, usually; because they're exempt;

9  we're sub-contractors.

10 Q.  Okay.  And sir, according to  your testimony, Shawn Massey

11 never had long hair?

12 A.  [No verbal response.]

13 Q.  What do you consider to be long hair, sir?

14 A.  Some that you could call "Afro."

15 Q.  Okay.  Okay.  Has Shawn ever worn very much facial hair,

16 that you're aware of?

17 A.  Not aware of any.  I haven't seen him with any.

18 Q.  Okay.  And, it's your testimony that you see Shawn quite a

19 lot; or, at least you used to; correct?

20 A.  I used to;  yes.

21 Q.  All right.

22      MR. COTTRELL:  May I approach the witness, Your

23 Honor?

24      THE COURT:   All right.

25 Q.  Sir, I'm showing you a photograph that's been marked as

State's Exhibit No. 7.  Take a look at that, please.

Do you recognize who the person is in that photograph, sir?

A.  Yes.  I recognize this person.

Q.  Who is that?

A.  Shawn Massey.

Q.  And, how would you describe the length of his hair in that photograph, sir?

A.  It's moderate, sir.  It's moderate.  It's not what I would say long hair.

Q.  Okay.  It's longer than his hair is right now?

A.  Yes.  Oh, yes.

Q.  Does he appear to have some facial hair in that photograph?

A.  Yes.  On here, yes.

Q.  Okay.  Thank you, sir.  One further question, you dropped -- it's your testimony that you dropped the defendant off at about 7 o'clock; 6:55?

A.  Yes.

Q.  As far as you know.

A.  Yes.

Q.  What did you do, after you dropped the defendant and the other people who were working that day, off?

A.  I returned; went to the office.

Q.  Okay.  Thank you, sir.

1    MR. COTTRELL:  No further questions.

2    <u>RE-DIRECT EXAMINATION OF MR. DORSEY,  BY MS. THOMAS:</u>

3    Q.  Mr. Dorsey, on May -- the week of May 15th to May 22nd, of

4    1998, do you recall seeing Shawn Massey's hair?

5    A.  Yes.

6    Q.  How was Shawn Massey's hair styled on that -- at that

7    time?

8    A.  Like it is now.

9    Q.  How would you describe Shawn Massey's hair at this time?

10   A.  Short; that's short; shorter than that.

11   Q.  Is this hair long enough to braid?

12   A.  No.

13   Q.  Is it long enough to comb?

14   A.  No.

15   Q.  Have you ever seen Shawn Massey's hair longer than this?

16   A.  I haven't.

17   Q.  Do you know when this photograph was taken?

18   A.  This?

19   Q.  Yes.

20   A.  No.  I don't know.

21      THE COURT:   Is that the photograph that's referred

22   to by the state as State's Exhibit No. 7?

23      MS. THOMAS:  Yes, sir.

24      THE COURT:   Okay.  Thank you.

25   Q.  And, in that photograph, in your opinion, is that hair

1  long enough to braid?

2  A.  No.

3  Q.  Thank you, Mr. Dorsey.

4          MS. THOMAS:  No further questions.

5          THE COURT:  Any re-cross examination?

6          MR. COTTRELL:  Nothing further, Your Honor.

7          THE COURT:  All right.  Thank you, sir.  You can

8  step down.  The defense can call it's next witness.

9          MS. THOMAS:  I would call Ms. Annie Massey.

10          THE COURT:  All right.  Come around please, Ms.

11  Massey.

12  [WITNESS SWORN.]

13  ANNIE MAY MASSEY, BEING FIRST DULY SWORN, TESTIFIES AS

14  FOLLOWS DURING DIRECT EXAMINATION BY MS. THOMAS:

15          THE COURT:  Ms. Thomas, did you wish to have Mr.

16  Dorsey released?

17          MS. THOMAS:  Yes; we do, Your Honor.

18          THE COURT:  Does the state have further need for

19  Mr. Massey?

20          MR. COTTRELL:  No, Your Honor.

21          THE COURT:  Mr. Dorsey is free to go, if he needs

22  to go; but, the records, I think are still part of the case.

23  So, the records would be with the state.  Mr. Dorsey can

24  leave though.

25          The witness is with the defense.

1  Q.  State your name, please ma'am.

2  A.  Annie May Massey.

3  Q.  How do you know Shawn Massey?

4  A.  He's my grandson.

5  Q.  How many years have you known him?

6  A.  All of his life.

7  Q.  And, how old is he?

8  A.  Twenty-seven.

9  Q.  And, has Shawn Massey stayed with you frequently or lived

10  with you?

11  A.  Yes, ma'am.

12  Q.  Was he living with you during the month of May, 1998?

13  A.  Yes, ma'am.

14  Q.  And, do you recall him working during that month?

15  A.  Yes, ma'am.

16  Q.  And, where do you recall Shawn working?

17  A.  For Mr. Dorsey.

18  Q.  And, what time would Shawn go to work?

19  A.  Around seven.

20  Q.  And, when he worked, is that the time he would always go

21  in?

22  A.  Yes, ma'am; as far as I can relate.

23  Q.  And, what time would Shawn usually finish work?

24  A.  Late in the evening.

25  Q.  And, did Shawn own a car at that time?

1   A.   No, ma'am.

2   Q.   How did Shawn get to and from work?

3   A.   Mr. Dorsey would pick him up.

4   Q.   Now, was Mr. Brady Dorsey always the one who picked   him

5   up or were there other employees or --

6   A.   Mr. Dorsey.

7   Q.   Okay.  Now, have you ever seen your grandson with long

8   hair?

9   A.   No, ma'am.

10  Q.   How would you describe your grandson's hair at this point?

11  A.   Now?

12  Q.   Yes.

13  A.   Short.

14  Q.   Would you say that his hair is long enough to comb?

15  A.   No, ma'am.

16  Q.   Is his hair long enough to braid?

17  A.   No, ma'am.

18  Q.   And, do you have any recollection of Shawn ever having had

19  longer hair?

20  A.   No, ma'am.

21  Q.   Was his hair styled this way in May of 1998?

22  A.   Yes.  It was.

23  Q.   Has Shawn gained -- I'm sorry.  Has Shawn lost a lot of

24  weight since that time?

25  A.   No, ma'am.

1  Q.  Does his weight appear to be the same?

2  A.  Yes, ma'am.  He always been thin.

3  Q.  Have you ever seen Shawn wear red clothing?

4  A.  No, ma'am.

5  Q.  Have you ever known Shawn to own or possess or carry a

6  weapon?

7  A.  No, ma'am.

8  Q.  Have you ever known Shawn to wear hats?

9  A.  A hat?

10  Q.  [Affirmative response.]

11  A.  Yes.  A cap.

12  Q.  Okay.  Now, did you bring some photographs of Shawn with

13  you today?

14  A.  Yes.  I did.

15         MS. THOMAS:  May I approach Ms. Massey, Your Honor?

16         THE COURT:  Yes, ma'am.

17         MR. COTTRELL:  Your Honor, the state WILL OBJECT to

18  these exhibits, on the grounds of relevance.  These are

19  Defendant's Exhibit Nos. 3, 4, 5.

20         THE COURT:  Okay.  OBJECTION NOTED.  I'll rule on

21  the objections when and if they're identified.

22  Q.  Calling your attention first to the photograph marked

23  Defendant's Exhibit No. 3.  Can you describe that photograph?

24  A.  Yes.  This is Shawn when he was at Kennedy, playing

25  basketball.

1   Q.  Is that junior high school?

2   A.  Yes, ma'am.

3   Q.  And, how is Shawn's hair styled on the photograph?

4   A.  Low cut.

5            MR. COTTRELL:  OBJECTION.

6            THE COURT:   OVERRULED.

7   A.  Well, you can see it.

8   Q.  And, what --

9            THE COURT:  Don't hold it up yet, ma'am.  It's not

10  introduced into evidence. She was asking about his hair.  You

11  can answer that question.

12   A.  It's cut low.

13   Q.  Compared to the way Shawn's hair is today, how would you

14  compare that?

15   A.  Cut low.

16   Q.  Would you say it's absolutely identical?

17   A.  Yes, ma'am.

18   Q.  Have you known Shawn to have any difficulty getting his

19  hair long or growing his hair?

20   A.  No.  He just don't never grow his hair out.

21   Q.  Okay.  And, you've never seen  him with braids?

22   A.  No, ma'am.

23   Q.  Calling your attention to Exhibit No. 4, what does that

24  photograph show?

25   A.  The night of his prom.

1  Q.  And, would he have been in high school, at that time?

2  A.  Yes, ma'am.

3  Q.  How was Shawn's hair styled?

4  A.  It's low; cut low.

5  Q.  Would you describe it as being the identical cut that he

6  has today?

7  A.  Yes, ma'am.  It is.

8  Q.  Calling your attention to Exhibit No. 5, what does that

9  photograph depict?

10 A.  This is one that he made for me; and, this is of Shawn and

11 his girlfriend and his baby.

12 Q.  And, approximately how long ago was that made?

13 A.  It was in '90.

14 Q.  And, is Shawn's hair style in that photograph identical to

15 the way it is right now?

16 A.  Identical.

17 Q.  Have you ever known Shawn with hair long enough to pull

18 back from his face?

19 A.  No, ma'am.

20 Q.  Thank you, Ms. Massey.

21        MS. THOMAS:  No further questions.

22        THE COURT:  Cross-examination.

23 [CROSS EXAMINATION OF MS. MASSEY, BY MR. COTTRELL:]

24 Q.  Ms. Massey, it's your testimony you've never known your

25 son to wear red?

1  A.  No.  Never known him to wear red.

2  Q.  All right.  Ma'am, was Shawn's hair cut like it was say,

3  in March of 1998?

4  A.  Yes.  He always wore low cut hair.

5  Q.  Was it cut that way approximately March of 1997?

6  A.  Yes.

7  Q.  Okay.

8  A.  As you can see.

9  Q.  Well, that picture you're holding up, ma'am, that was

10 actually taken when he was in junior high school; wasn't it?

11 A.  [Affirmative response.]  But, as you can see, this is the

12 same thing.

13 Q.  And, that's a high school photograph; isn't it?

14 A.  Yes.  But, this right here was in '90.

15       THE COURT:  Okay.  Just a minute.  If we're going

16 to be displaying pictures and holding them up, does the

17 defense wish to offer the photographs?

18       MS. MASSEY:  I'm sorry.

19       THE COURT:  That's okay.  Does the defense wish to

20 offer these exhibits, Exhibit Nos.  3, 4 and 5, if we're

21 going to be showing them around, I think they will need to be

22 ruled on whether they're admissible or not.

23       MS. THOMAS:  Yes.  We do wish to offer them.

24       THE COURT:  I realize we're doing this a little

25 bit out of order.  But, I think it's a necessity to make a

1  ruling on its admissibility. I believe the state objects to

2  their admissibility. Do you wish to question her about the

3  photographs and not object to their admissibility?

4       MR. COTTRELL: I would still object to them, Your

5  Honor.

6       THE COURT: All right. I'm going to ALLOW them as

7  being admissible, under 404-A(1) and as being offered for the

8  purpose of showing a personal trait of the accused and

9  determine that under 403 that they are relevant and let them

10  be admitted and will admit them, Defendant's Exhibit Nos. 3,

11  4 and 5.

12       You may go-ahead now and have any questioning.

13  Now, people may refer to the photographs, as they feel

14  necessary.

15       MR. COTTRELL: Thank you, Your Honor.

16  Q.  Ms. Massey, how old is your son now?

17  A.  Twenty-seven.

18  Q.  He's 27. And, he was born on March 23, 1973; correct?

19  A.  Oh, Lord; I can't -- I was there when he was born; but, I

20  can't tell you; I can't remember. I can't even remember some

21  of my own children.

22  Q.  Would you agree that that's around the time he was born?

23  A.  It was around the time; because, he's 27.

24  Q.  Okay. Now, that first picture is of Shawn in the junior

25  high basketball uniform, that was taken in junior high

1  school; right?

2  A.  [Affirmative response.]

3  Q.  Right.  And, the next one, the prom picture, that was

4  taken in high school; high school prom?

5  A.  [Affirmative response.]

6  Q.  Okay.  And, I believe you testified that Shawn's

7  girlfriend and baby was in '90?

8  A.  No.  It was in '90; I didn't say in '90-what; but, I know

9  it was in the '90's because his mother died in '94.  So, it

10  was after his mother died.

11  Q.  It was after 1994?

12  A.  [Affirmative response.]

13  Q.  But, to return to my earlier line of questioning, ma'am,

14  you don't know how Shawn's hair looked say in March of 1995?

15  A.  [Affirmative response.]

16  Q.  Okay.  How did it look then?

17  A.  He wore a low haircut.

18  Q.  Okay.  Is it like it is now?

19  A.  [Affirmative response.]

20          MR. COTTRELL:  May I approach the witness, Your

21  Honor?

22          THE COURT:  Yes, sir.

23  Q.  Ma'am, I'm going to ask you to look at this photo, which

24  is State's Exhibit No. 7.

25  A.  [Affirmative response.]

1  Q.  Do you know the young man in that photograph?

2  A.  Shawn Massey.

3  Q.  What's his hair look like there, to you, in that picture?

4  A.  It's longer than it is now.

5  Q.  Is that a close-cut to you?

6  A.  No. It looks like he needs a haircut.

7  Q.  Okay. Would it surprise you, ma'am, to learn that picture

8  was taken in March of 1995?

9  A.  Well, it had to be when he was in jail; because, my

10  husband was real sick and I didn't get a chance to see him

11  every day.

12  But, before this picture was taken, in '95, he did

13  have a low haircut. I do remember that.

14  Q.  Okay. Did you ever remember having him -- him having a

15  lot of facial hair?

16  A.  No.

17  Q.  Okay.

18  A.  I've never seen Shawn with a beard.

19  Q.  Well, let me show you another photograph, ma'am. This is

20  State's Exhibit No. 8.

21  MR. COTTRELL:  May I approach the witness, Your

22  Honor?

23  THE COURT:  Yes, sir.

24  Q.  Ma'am, I'm showing you a copy of the photo line-up in this

25  case. I direct your attention to the picture, the upper-

1  right-hand corner.

2  A.  [Affirmative response.]

3  THE COURT:  Just for clarity, that is State's

4  Exhibit No. 8?

5  MR. COTTRELL:  That's correct, Your Honor.

6  THE COURT:  I think that was introduced as an

7  original.  Is that the original or is that a copy?

8  MR. COTTRELL:  That's the original.

9  THE COURT:  Okay.  Go-ahead.

10  Q.  Ma'am.  I'll direct your attention to the picture, in the

11  upper-right-hand corner of that line-up.

12  A.  Yes.

13  Q.  Do you recognize the young man in that picture?

14  A.  Yes.  Shawn Massey.

15  Q.  Okay.  And, doesn't it appear in that line-up that he's

16  got some hair down around under his chin?

17  A.  Yeah.  Look like he needs to shave.

18  Q.  Okay.  Does he also look like he's got a mustache?

19  A.  Yes.  He look like he got a mustache.

20  Q.  Do you recall ever seeing him with hair like that?

21  A.  [Negative response.]

22  Q.  How tall is Shawn Massey?

23  A.  About five -- I'm about six, I believe.  I don't know

24  exactly; but, I think he about my height.

25  Q.  So, do you think he's six-feet tall?

1  A. He's five-feet, eleven or six feet.

2  Q. So, would it surprise you that on March 16th of 1995 he's

3  actually listed as five-eight?

4  A. It sure would surprise me; because, we all tall.

5  Q. Okay.

6  A. Just about all of us.

7  Q. Thank you, ma'am.

8      MR. COTTRELL: No further questions.

9      THE COURT: Any re-direct?

10     MS. THOMAS: Yes.

11  RE-DIRECT EXAMINATION OF MS. MASSEY, BY MS. THOMAS:

12  Q. Ms. Massey, how many grandchildren do you have?

13  A. I have 14 grandchildren and 14 great-grands.

14  Q. So, 14 grandchildren and 14 great-grandchildren. And, you

15  raised some of these children; did you not?

16  A. Yes, ma'am.

17  Q. How many of these children and grandchildren and great-

18  grandchildren did you raise?

19  A. I raised Shawn, Roberta, Billy and Tony.

20  Q. And, you don't know all of your grandchildren and great-

21  grandchildren's birthdays, by heart; do you?

22  A. No, ma'am.

23  Q. The photograph shown to you by Mr. Cottrell, you don't

24  know when that photograph was taken; do you?

25  A. No, ma'am. I don't.

1 Q. Did you say it appears he was in jail, at that time?

2 A. He must have been.

3 Q. And, he just needed a haircut?

4 A. He needed a haircut.

5 Q. But, you've never known Shawn to intentionally when he had

6 gown his hair even that long; have you?

7 A. No, ma'am.

8      MS. THOMAS: Thank you, Ms. Massey.

9      THE COURT: Any re-cross?

10      MR. COTTRELL: No, Your Honor.

11      THE COURT: Ma'am, you can step down. The defense

12 may call it's next witness.

13      MS. THOMAS: Call Mr. Bobby Ross.

14      THE COURT: Come around please, Mr. Ross.

15 [WITNESS SWORN.]

16 BOBBY ROSS, BEING FIRST DULY SWORN, TESTIFIES AS FOLLOWS

17 DURING DIRECT EXAMINATION BY MS. THOMAS:

18      THE COURT: The witness is with the defendant.

19 Q. State your name.

20 A. Bobby Ross.

21 Q. Do you know Shawn Massey?

22 A. Yes. I do.

23 Q. How do you know Shawn Massey?

24 A. Through a friend.

25 Q. How well do you know Shawn Massey?

1   A.  Pretty well.

2   Q.  And, how long have you known him?

3   A.  About three years.

4   Q.  Did you know Shawn Massey during the month of May, 1998?

5   A.  Yes.

6   Q.  And, how would you describe Shawn Massey's hair during

7   that time period?

8   A.  Short.

9   Q.  How would you describe Shawn Massey's hair at this time?

10   A.  Short.

11   Q.  How would you compare Shawn Massey's hair during that time

12   period and at this time?

13   A.  Short.

14   Q.  Would you say it's the same or different?

15   A.  The same; probably shorter then. It was shorter than what

16   it is now.

17   Q.  During May of '98, did you ever see Shawn Massey with hair

18   long enough to put in braids?

19   A.  Never.

20   Q.  Did you see him with braids that were braided into his

21   hair and then long in the back?

22   A.  Never.

23   Q.  Did you ever see Shawn Massey's hair long enough to comb?

24   A.  No.

25   Q.  Did you know Shawn Massey in April of '98?

1   A.  Yes.

2   Q.  In March of '98?

3   A.  Yes.

4   Q.  In February of '98?

5   A.  Yes.

6   Q.  And, was his hair ever any different than it is now?

7   A.  No.

8   Q.  Did Shawn look the same, as far as being heavier or

9   thinner, in May of '98?

10   A.  He's always been thin.

11   Q.  You've never known him to weigh any more than he weighs

12   now?

13   A.  No.

14   Q.  Have you ever known Shawn Massey to possess, own or carry

15   a gun or weapon of any kind?

16   A.  No.

17   Q.  Do you feel that you're a close friend of Shawn Massey?

18   A.  Yes.

19          MS. THOMAS:  Thank you, Mr. Ross.

20          THE COURT:  Cross examination.

21   [CROSS EXAMINATION OF MR. ROSS, BY MR. COTTRELL:]

22   Q.  About how much time, sir, on an average, would you

23   estimate you spend with Shawn Massey, say in the course of a

24   month?  How many times did the two of you get together?

25   A.  I would say two, three times; maybe, within a month.

1   Q.  And, you never have known him to have any kind of long

2   hair, at all?

3   A.  Never.

4   Q.  Did you know him in 1995?

5   A.  No.

6   Q.  You did not know him then?

7   A.  In '90?  I've only known him about three years.

8   Q.  Okay.  So, that dates back to 1996; correct?

9   A.  Right.

10  Q.  Have you ever known Mr. Massey to wear the kind of

11  artificial braids that you can attach to the back of the

12  head?

13  A.  No.  And, he wouldn't be able to because his hair has

14  never been long enough.  You have to have hair long enough in

15  order to attach those braids.

16  Q.  But, you are familiar with that practice?

17  A.  Yes.

18          MR. COTTRELL:  Nothing further.

19          THE COURT:  Re-direct?

20          MS. THOMAS:  Yes.

21  RE-DIRECT EXAMINATION OF MR. ROSS, BY MS. THOMAS:

22  Q.  Mr. Ross, you were present yesterday during the testimony

23  of Ms. Wood.  Is that correct?

24  A.  That is.

25  Q.  And, how did you hear her describe the hair?

1      MR. COTTRELL:  OBJECTION.

2      THE COURT:  SUSTAINED as to what he might have

3  heard another witness to say.

4      MS. THOMAS:  No further questions.

5      THE COURT:  Any re-cross?

6      MR. COTTRELL:  None, Your Honor.

7      THE COURT:  Okay.  Thank you, sir.  You can stand

8  down.  The defense may call its next witness.

9      MS. THOMAS:  Next we'll call Reverend Linda Brown.

10  [WITNESS SWORN.]

11  REVEREND LINDA BROWN, BEING FIRST DULY SWORN, TESTIFIES AS

12  FOLLOWS DURING DIRECT EXAMINATION BY MS. THOMAS:

13      THE COURT:  The witness is with the defense.

14  Q.  State your name, please?

15  A.  Linda Brown.

16  Q.  And, how are you employed?

17  A.  I'm a Minister.

18  Q.  And, what church are you a Minister of?

19  A.  Greenville Memorial A.M.E. Zion Church, here in Charlotte.

20  Q.  How long have you been employed as a minister at

21  Greenville Memorial A.M.E. Zion Church?

22  A.  Eight years in all.

23  Q.  Do you know Shawn Massey?

24  A.  Yes, I do.

25  Q.  How do you know Shawn Massey?

1    A.   Well, I was at his Christening.   I am his Godmother.

2    Q.   Do you see Shawn Massey frequently?

3    A.   Yes.   I do

4    Q.   Did you see Shawn Massey, frequently, during the early

5    part of 1998?

6    A.   '98; I'm sure I did.

7    Q.   Did you see Shawn on a regular basis?

8    A.   Well, as often as I can.   We were traveling a lot; but, if

9    I'm not seeing him, I'm talking.   He calls; he calls every

10   time he can get a chance; at night; late at night; in the

11   mornings.   All the time, letting me know that he's okay.

12   Q.   Have you had the opportunity to observe Shawn's hair?

13   A.   Oh yes.   I always observed him because of the way his

14   head is shaped.   And, I remember always observed it, for that

15   reason.

16   Q.   And, how have you observed his hair to be?

17   A.   Always short.   Like that; because of the way  his head is

18   shaped.   And, he was like that when he was a baby.

19   Q.   Have you ever known him to have hair any longer than this?

20   A.   No, no, no.

21   Q.   Have you ever known Shawn to have braids?

22   A.   No, no, no.

23   Q.   Have you ever known Shawn to have hair long enough to

24   braid?

25   A.   No; not at all.

Q. And, is it true that every time you've ever seen Shawn, he's had hair like that?

A. Shorter than that; shorter than that; because he would have little waves in it; shorter than that.

Q. Thank you Reverend Brown.

A. You're welcome.

      THE COURT: Cross examination?

      MR. COTTRELL: No, Your Honor.

      THE COURT: Thank you, ma'am, you can step down.

      REVEREND BROWN: Okay.

      THE COURT: Let's go-ahead and call the next witness?

      MS. THOMAS: Call Ms. Roberta Massey.

[WITNESS SWORN.]

ROBERTA MASSEY, BEING FIRST DULY SWORN, TESTIFIES AS FOLLOWS DURING DIRECT EXAMINATION BY MS. THOMAS:

      THE COURT: The witness will be with the defendant.

Q. State your name?

A. Roberta Massey.

Q. Ms. Massey, how do you know Shawn Massey?

A. My brother.

Q. How long have you known him?

A. all my life.

Q. And, have you been close to Shawn Massey, all --

1  A. Yes.

2  Q. -- of his life?

3  A. Yes.

4  Q. And, you -- have you seen the photographs that your

5  grandmother, Annie Massey, brought to court?

6  A. Yes, ma'am.

7  Q. Is that the way Shawn has always worn his hair?

8  A. Yes, ma'am.

9  Q. Have you ever known Shawn to wear braids?

10  A. No, ma'am.

11  Q. And, who generally cut Shawn's hair?

12  A. Me.

13  Q. And, how does he like his hair cut?

14  A. Bald; real short.

15  Q. Has he ever shown any interest in growing his hair long?

16  A. No.

17  Q. Did you see the photograph offered by Mr. Cottrell,

18  earlier?

19  A. Yes.

20  Q. And, do you have an observation about that photograph?

21  A. I have a problem with that photograph.

22  Q. What -- where do you believe the photograph was taken?

23  A. When he was in -- when he was incarcerated; he was

24  downtown for a while and they shipped him to Spector. And,

25  that's when they took that picture; when they shipped him to

1  Spector Drive.

2  Q.  And, --

3      THE COURT:  For the record, again, the photograph

4  you're referring to is -- has been identified as State's

5  Exhibit No. 7.  Is that correct?

6  A.  Yes.

7  Q.  And, is it your opinion he was incarcerated when that was

8  taken?

9  A.  [Affirmative response.]

10  Q.  And, could not get to a barber?

11  A.  I don't think they have barbers downtown there.  I'm not

12  for sure.

13  Q.  Okay.  And, have you ever known Shawn to grow his hair,

14  even that length, intentionally?

15  A.  No.  He never had hair growing in.

16  Q.  In your opinion, is the hair in that photograph long

17  enough to braid?

18  A.  No.

19  Q.  Is that -- is the hair in that photograph long enough to

20  braid closely to the head?

21  A.  No.  I have girls.  I know.

22  Q.  Thank you.

23      MS. THOMAS:  No further questions.

24      THE COURT:  Cross examination.

25      MR. COTTRELL:  Thank you, Your Honor.

[CROSS EXAMINATION OF MS. MASSEY, BY MR. COTTRELL:]

Q. Ma'am, how do you know, of any personal knowledge, whatsoever, when State's Exhibit No. 7 was taken?

A. Because I know someone that works for the Sheriff's Department.

Q. And, have you talked with them about that specific picture, as to when it was taken?

A. I talked to her; I talked to this person, on occasions; and, she, the pictures that y'all had, I know, on his little badge, when he was with this picture, they have a picture; they have their face on their badge.

Q. Are you sure that's the same photograph that was on his little badge?

A. This is not the photograph.

Q. There was another photograph on the badge?

A. It was like two things. It was like taken one when he was at the Mecklenburg County Jailhouse. And then, that was when he was at Spector.

Q. The truth is, ma'am, you have no idea exactly when that picture was taken?

A. It was taken when he was locked up; I know. When you was physically shipped.

Q. Do you know the exact date that --

A. No.

Q. -- particular mug shot was taken?

1  A.  Not the exact date.  But, I can find out for you.

2          MR. COTTRELL:  No further questions.

3          THE COURT:  Any re-direct?

4          MS. THOMAS:  [No verbal response.]

5          THE COURT:  Thank you, ma'am.  Step down.  We'll

6  stop for lunch, at this point.  Members of the jury, we're

7  going to take our luncheon recess.  We'll take our normal

8  luncheon recess hours and I'll ask you to return at 2:00.

9          Members of the jury, beware of the weather; don't

10  be blown away.  Looks like it's blowing out there pretty

11  much.

12          So, remember the instructions that I've given you

13  about not discussing the case among yourselves or discussing

14  it with anyone else.  Don't allow anyone to discuss it with

15  you or in your presence.

16          Keep your minds open.  Don't form any opinions.

17  Don't have any contact at all with anyone who has any

18  involvement in this case.

19          Don't read or watch or listen to any accounts of

20  this hearing.

21          Members of the jury, please be back in place at 2

22  o'clock, while following the directions of the bailiff.

23  We'll resume at 2:00.  You may leave the courtroom now.

24  Thank you.

25  [The following proceedings take place in open court, outside

1   the presence of the jury.}

2         THE COURT: Is there anything for the state,

3   before we break for lunch?

4         MR. COTTRELL: No, Your Honor.

5         THE COURT: Anything from the defense?

6         MS. THOMAS: No, Your Honor.

7         THE COURT: All right. We'll recess for lunch

8   until 2 o'clock.

9   {Court stands in recess.}

10   {Court reconvenes.}

11         THE COURT: All right. The Court will note all of

12   our parties are present. Anything from the state before the

13   jury is brought back in?

14         MR. COTTRELL: No, Your Honor; nothing from the

15   state.

16         THE COURT: Anything from the defendant, before

17   the jury is brought back in?

18         MS. THOMAS: No, Your Honor.

19         THE COURT: Okay. Out of curiosity, to help us

20   with planning the time remaining today, can the defense give

21   me some idea of how many additional witnesses there are?

22         MS. THOMAS: Your Honor, I have one additional

23   witness who should be here any moment. Just one more

24   witness.

25         THE COURT: All right. We would be waiting on

1  that witness then.

2          MS. THOMAS:   If we could just wait a few minutes.

3          THE COURT:   I would rather do that and bring the

4  jury in and let us all sit here and look at ourselves.

5          I can put on the record that there was a brief

6  conference at the bench, at the conclusion of the state's

7  evidence, at which time, and please correct me if I'm stating

8  anything different from your recollection, Ms. Thomas, at the

9  bench.

10         Ms. Thomas indicated that they did make motions and

11  wished the record to reflect that they made motions to

12  dismiss, at the close of the state's evidence, of all

13  charges.  Did not wish to argue the motions out of the

14  presence of the jury.

15         The Court, therefore, DENIED THE Motion to Dismiss,

16  at the close of the state's evidence.

17         Is that your recollection, Ms. Thomas?

18  A.   That is my recollection.

19         THE COURT:   Okay.  Mr. Cottrell?

20         MR. COTTRELL:   That is correct, Your Honor.

21         THE COURT:   All right.

22         DEPUTY SHERIFF:    May I approach, Your Honor?

23         THE COURT:   Yes.

24  {Conference at sidebar, outside the hearing of the jury,

25  without the attorneys present.}

1           THE COURT:   One other thing that needs to be
2    placed on the record.   At the -- just as we broke for lunch,
3    one of the jurors started to approach me and wished to speak
4    about some item.   I believe it was Juror No. 8, Mr. Williams;
5    front row; second from the end.

6           Sheriff, is that the juror that you remember?
7           DEPUTY SHERIFF:    That sounds right, Your Honor.
8           THE COURT:   I can confirm that.   But, in any way,
9    it was a juror who wished to just advise me.   I referred it
10   to the bailiff.   I did speak to the bailiff and the bailiff
11   will bring it to me.

12          The juror did speak to me and then to the bailiff.
13   The bailiff advises me that that jury indicated that he
14   recognized Reverend Linda Brown as someone he had thought he
15   had gone to school with.   Is that correct, sheriff?

16          DEPUTY SHERIFF:    That's correct, Your Honor
17          THE COURT:   Nothing more than that; but, that he
18   felt it necessary to bring it to my attention.   I'll make
19   inquiry.   If either party wishes to make some inquiry about
20   the matter, apparently, as I understand it, just this juror
21   recognized this individual as someone he had known sometime
22   ago in school.

23          MR. COTTRELL:   Does the state wish further inquiry
24   be made?

25          MR. COTTRELL:   No, Your Honor.

1      THE COURT:   Does the defense wish for an inquiry

2  to be made?

3      MS. THOMAS:  No, Your Honor.

4      THE COURT:   And, to be sure that I'm not leaving

5  out anything, did he say anything else, Sheriff, concerning

6  his knowledge of that witness or anything else?

7      DEPUTY SHERIFF:   That was all, Your Honor.

8      THE COURT:   That was it.

9      MR. COTTRELL:  Which one was that; Linda Brown?

10     THE COURT:   Linda Brown; Reverend Linda Brown.

11     MR. COTTRELL:  And, since we do have some time, I

12  would like the Court to make an inquiry of Mr. Williams.

13     THE COURT:   All right.  That's fine.  Well

14  Sheriff, go-ahead and ask that juror, I believe it was Mr.

15  Williams.  You'll recognize the juror when you see him, will

16  you not?

17     DEPUTY SHERIFF:   Yes, Your Honor.

18     THE COURT:   Okay.  Ask that juror to step in the

19  courtroom.

20  {Thereupon, the following proceedings take place in open

21  court, in the presence of Juror, Mr. Williams.}

22     THE COURT:   Okay.  Mr. Williams, thank you for

23  coming in the courtroom.  Sir, I have been advised that as we

24  began our luncheon recess, you felt it necessary to go to the

25  bailiff and bring the bailiff's attention to something.

1    I'll ask you to go-ahead and relay that to us, if

2    you would please.

3    MR. WILLIAMS:  Just that I knew -- know one of the

4    witnesses in the case.

5    THE COURT:  Who was it that you know, sir?

6    MR. WILLIAMS:  A schoolmate of mine, Linda; I can't

7    recall her last name; but, I know --

8    THE COURT:  Linda Brown?

9    MR. WILLIAMS:  Yes.

10    THE COURT:  Ms. Brown, would you stand just a

11    moment, please.  Is that the individual, sir?

12    MR. WILLIAMS:  Yes; it is.

13    THE COURT:  All right.  And, -- you can be seated.

14    And, how is it that you know Ms. Brown, sir; or,

15    Reverend Brown?

16    MR. WILLIAMS:  We was in school together; high

17    school together.

18    THE COURT:  Okay.  I'm making no comment about

19    your age; that was more than a year or two ago, I take it.

20    Is that correct?

21    MR. WILLIAMS:  Yes.

22    THE COURT:  About how long ago was that, sir?

23    MR. WILLIAMS:  Pretty close -- I've been out of

24    high school 39 years; so, it's around 40 years.

25    THE COURT:  All right.  Mr. Williams, have you had

1   any close contact with Reverend Brown since that high school?

2          MR. WILLIAMS:  No; I haven't.

3          THE COURT:   All right.  Have you even seen

4   Reverend Brown to any degree, since you all were in school

5   together?

6          MR. WILLIAMS:   I can't recall.  I may have, 40

7   years ago.

8          THE COURT:   Recently?

9          MR. WILLIAMS:  No, no, no.

10         THE COURT:   No close relationship.

11         MR. WILLIAMS:  No.

12         THE COURT:   Nothing like visiting in each others

13  homes or frequent communications or anything like that.  Is

14  that correct?

15         MR. WILLIAMS:  No.

16         THE COURT:   All right.  Sir, does the fact that

17  she's appeared as a witness for the defense, influence your

18  decision in this case, in any way?

19         MR. WILLIAMS:  No; it wouldn't.

20         THE COURT:   All right.  Sir, does it make any

21  difference at all, sir, that you knew a witness who has

22  testified for one side or the other, some 39 years ago or so,

23  would hinder your ability to serve impartially to the state

24  and to the defense, as a juror?

25         MR. WILLIAMS:  No.

1       THE COURT:   Does it make any difference at all to

2   you, sir?

3       MR. WILLIAMS:   No, it doesn't make any difference.

4       THE COURT:   All right.  As I understand it then,

5   Mr. Williams, you, after seeing the witness, recognized her

6   as someone that you went to high school with, some 39 years

7   ago; you've had no real contact with her at all, since that

8   period of time.  That it really does not affect you in any

9   way as a juror; but, you felt it your duty as a juror to

10  bring it to our attention.  Is that correct?

11      MR. WILLIAMS:   Yes.   I didn't want to -- for

12  something to come up later saying that, you know.

13      THE COURT:   All right.  And, you acted entirely

14  proper.  So Mr. Williams, is there anything else that you

15  need to tell us about that?

16      MR. WILLIAMS:   No; that's it.   I recognized her as

17  -- when she took the stand; and, I just thought it was my

18  duty to report that or let someone know.

19      THE COURT:   Yes.   Thank you very much, sir.   If

20  you'll just sit there for just a moment.  Counsel approach

21  the bench, please.

22  {Conference at sidebar, outside the hearing of the juror,

23  with all attorneys present.}

24  {Thereupon, the following proceedings take place in open

25  court, within the hearing of the juror.}

1    THE COURT: Mr. Williams, if you would, just let

2    the prosecutor ask you some questions. We appreciate it very

3    much.

4    **VOIR DIRE EXAMINATION OF MR. WILLIAMS, BY MR. COTTRELL:**

5    Q. Mr. Williams, thank you for bring it to our attention.

6    Were you and Ms. Brown friends in high school?

7    A. We were just friends. I knew her.

8    Q. Okay.

9    A. She knew me.

10   Q. But, you all never went out on dates or anything like

11   that?

12   A. No. If I could remember, she dated another fellow who

13   played football.

14   Q. All right. Sir, because of the fact that you know Ms.

15   Brown and you were acquainted with her, in high school, do

16   you think that you might be more inclined to believe she's

17   telling the truth than say any other witness that got up on

18   the stand?

19   A. No. I would just keep that neutral, you know.

20   Q. All right. Thank you, sir.

21   THE COURT: State wish to ask any further

22   questions?

23   MR. COTTRELL: No, Your Honor.

24   THE COURT: Does the defense wish to ask the

25   juror any questions?

1    MS. THOMAS:    No, Your Honor.

2    THE COURT:    All right.  Mr. Williams, you can

3    return to the jury room.  Again sir, appreciate your bringing

4    this to our attention.  If you will, just don't discuss it

5    among the other jurors.  And, you did entirely the right

6    thing.  Thank you very much, Mr. Williams.

7    THE COURT:    All right.

8    {The following proceedings take place in open court, outside

9    the presence of the jury.}

10    THE COURT:    All right.  State wish to be heard

11    concerning Juror No. 8, Mr. Williams?

12    MR. COTTRELL:  Yes, Your Honor.  I mean, I believe

13    Mr. Williams is being completely honest with the Court.  And,

14    the state appreciates his candor.

15    However, since the -- since the witness -- since

16    the juror does know a witness, in this case, who has

17    identified herself as the Godmother of the defendant and has

18    given testimony as to the defendant's appearance, out of an

19    abundance of caution, the state would make a motion to

20    dismiss Mr. Williams from the jury panel.

21    THE COURT:    All right. Thank you, sir.  Defense

22    wish to be heard?

23    MS. THOMAS:    Yes, Your Honor.  We strongly object

24    to the dismissal of Mr. Williams.  He's obviously a very

25    truthful person to bring this to our attention.  He stated

1    that he knew her 40 years ago.  He has had no contact with

2    her since then.  And, at that time they have no relationship,

3    other than knowing each other.

4         We have a storm on the way; we may need our

5    alternate juror for something more serious.

6         We do oppose the dismissal of Mr. Williams.

7         THE COURT:    All right.  For the record, the

8    Court will note that the juror, Juror No. 8, Mr. Tommy

9    Williams, did attempt to relay a message to the Court, during

10   the beginning of the luncheon recess.  The Court felt it not

11   appropriate to discuss any matter with the juror; referred

12   the juror to the bailiff.

13        I had earlier instructed jurors if they have some

14   matter that they should go to the bailiff.

15        The bailiff then advised me that Juror No. 8, Mr.

16   Williams, felt like that he recognized and knew one of the

17   witnesses who had testified.

18        The Court advised the bailiff I would bring that to

19   counsel's attention.  The Court does appreciate the bailiff

20   reminding me of that.

21        The Court would further direct the record to

22   reflect that the parties first indicated they did not wish

23   any further inquiry made; but, the state, upon reflection,

24   then asked Juror No. 8, Mr. Williams, be brought into the

25   courtroom for inquiry to be made.  The Court determined that

1  inquiry should be made by bringing the juror into the

2  courtroom.

3       The juror was brought in the courtroom; the juror

4  did indicate that he did in fact recognize a witness who

5  testified for the defense, Reverend Linda Brown, that he had

6  going to high school with her, as he recalled, some 39 years

7  ago.

8       That he had not had contact with Ms. Brown since

9  their high school days; that his relationship with Ms. Brown

10 was not that of a social relationship of dating or that sort

11 of thing; but, that he did remember her as a friend of his,

12 although nothing to indicate in the juror's testimony that

13 they were close friends, having dated or that sort of thing.

14       The juror was thanked for bringing the matter to

15 the Court's attention and instructed not to discuss it with

16 other jurors and returned to the jury room.

17       Upon inquiry by the Court, the state has moved this

18 juror be dismissed, due to his knowledge of a witness who has

19 testified for the defense.

20       The defense has indicated their opposition to the

21 juror being dismissed.

22       The Court will conclude that nothing Mr. Williams,

23 Juror No. 8, said would interfere with his ability to serve

24 as a fair and impartial juror.

25       That Mr. Williams' knowledge of the juror and the

1   passage of almost four decades is sufficient time period,

2   even should they know each other in the manner in which he

3   referred, during this time period, would not call for Mr.

4   Williams' dismissal, unless the juror found himself unable to

5   be fair and impartial.

6          Upon inquiry, the Court will note that the juror

7   himself indicated he would not be more inclined to give that

8   witness' testimony greater weight or more truth than any

9   other witness who might testify.

10         The Court does not feel it necessary then to

11  dismiss the juror, seating the alternate.

12         The Motion to Dismiss the juror is denied.

13         Has your witness appeared yet, Ms. Thomas?

14         MS. THOMAS:    May I walk out into the hallway?

15         THE COURT:    Yes.  We're going to need to

16  proceed, ma'am.

17         MS. THOMAS:    I understand.

18         THE COURT:    Ms. Thomas, the bench conference had

19  nothing to do with this case.  Totally unrelated.  Has your

20  witness appeared, ma'am.

21         MS. THOMAS:    She has not.

22         THE COURT:    Okay.  Do you -- it's 20 minutes

23  after 2:00; maybe the clock may be a little fast; it may be

24  16 or 17 minutes after 2:00.

25         I'm more than willing to wait a reasonable amount

1  of time.  But, do you know what might be keeping your witness

2  from arriving?

3       MS. THOMAS:    Your Honor, I do not.  She was here

4  this morning; court was adjourned and she was instructed to

5  be back at a little before 2:00.

6       THE COURT:    All right.  Will this be your last

7  witness, ma'am?

8       MS. THOMAS:    Yes, it will, Your Honor.

9       THE COURT:    Will the state have rebuttal

10  evidence?

11       MR. COTTRELL:  No, Your Honor.

12       THE COURT:    Well, I tell you what we can do, Ms.

13  Thomas, it's possible for you do so, without revealing your

14  trial strategy or something, do you expect from this witness

15  any type of information or evidence which would be of a

16  totally different nature than has been presented to this

17  point?

18       And, what I'm getting at, if this is going to be

19  your last witness and the witness is merely going to -- and,

20  I say "merely" without any attempt to minimize the importance

21  of any witness' testimony.  But, if the witness is going to

22  testify as to matters which have already been presented to

23  the jury, it could well be that we could move ahead then with

24  motions or even some other matters, while we wait.

25       But, if you feel this witness would -- should be

1  heard before any that we move on then, that's fine and I'll

2  wait just a few more minutes.

3          MS. THOMAS:    Your Honor, this was a witness who

4  contacted me who has previously testified, who contacted me,

5  requesting to testify again and clarify the earlier

6  testimony.

7          THE COURT:    Okay.

8          MR. COTTRELL:  And Your Honor, just to clarify

9  something, the Court asked earlier if there is going to be

10  rebuttal evidence.  The state would intend to introduce the

11  photograph of the defendant, State's Exhibit No. 7; and, it

12  having been identified by several witnesses.

13          But, I suppose that would be considered rebuttal

14  evidence.

15          THE COURT:    I have a note here, "The state needs

16  to introduce State's Exhibit No. 7."

17          MR. COTTRELL:  Thank you, Your Honor.

18          THE COURT:    Ms. Thomas, do you wish this witness

19  to testify before say -- before I heard any motions that you

20  wish to make, at the close of all the evidence?

21          MS. THOMAS:    Your Honor, I think we can go-ahead

22  with the motions.

23          THE COURT:    Okay.  Let's just do that.  We'll

24  proceed in a bit of legal diction; as if the witness has

25  testified; and as if all sides have rested; as if State's

1  Exhibit No. 7 has been offered; and as if the Court had

2  allowed the submission; as if then all parties had rested.

3         And, I'll hear the parties then, if there are

4  motions to be made, at the close of all the evidence.  By

5  moving ahead in this matter, thought, the Court is not

6  precluding parties from introducing evidence.  I'm just

7  making an effort to use time, as best we can.

8         So, proceeding then, in the -- just as if everyone

9  had rested, what says the parties, at the close of all

10 evidence?

11        Does the state have anything they wish to present,

12 at the close of all the evidence?

13        MR. COTTRELL:  No, Your Honor.

14        THE COURT:    All right.  I'll hear from the

15 defense then.  What says the defense, at the close of all the

16 evidence?

17        MS. THOMAS:   Your Honor, I did not introduce or

18 introduce my exhibits into evidence.  And, I would like to

19 reserve the right to introduce Exhibit Nos. 1 through 5 into

20 evidence and publish them to the jury.

21        THE COURT:    All right.  I'll let you do that.

22 And, I -- 3, 4 and 5 have been introduced; 1 and 2 have not.

23 I will accept 1 and 2 as business records and have now been

24 properly and sufficiently identified by Mr. Brady Dorsey.

25 And, I will allow those to be admitted.  And, I will allow

1   you to publish them to the jury.

2          MS. THOMAS:   And, at the end of all the evidence, I

3   would make a Motion to Dismiss all the charges against Mr.

4   Shawn Massey; the breaking and entering, the three counts of

5   kidnapping, and the robbery with a dangerous weapon charge.

6          I would contend that after all the evidence has

7   been entered, there is not enough evidence to support a

8   conviction and we would request that the cases against Mr.

9   Massey be dismissed, for that reason.

10          THE COURT:   All right.   At the close of all

11  evidence, the Motion to Dismiss the charges will be denied.

12  The Court is of the opinion sufficient evidence does exist

13  for the cases to proceed to the jury.

14          We can move on ahead a little bit further then.

15  I'll hear from the parties, as to first the charges that you

16  feel should go to the jury and the possible arrangement then

17  of verdict sheets.

18          On the charge of robbery with a dangerous weapon,

19  what's the contention of the state to that charge going to

20  the jury?

21          MR. COTTRELL:   Is the defendant guilty or not

22  guilty of robbery with a dangerous weapon?

23          THE COURT:   Okay.   What says the defendant?

24          MS. THOMAS:   We would ask for a charge and

25  instruction on common-law robbery, guilty or not guilty.

1    MR. COTTRELL:  Your Honor, the state would OBJECT

2  to that.

3    THE COURT:   I'll hear you, if you wish to be

4  heard, Ms. Thomas, on that.  The evidence has not been

5  presented -- not been refuted, as I recall, that the

6  intruder, whoever that might have been, did have and the

7  victim's appearance of a firearm.

8    I think the law is though that the person actually

9  had a firearm or that it reasonably appeared to the victim

10  that a firearm was being used.

11    And, it would be my recollection of the evidence

12  that there would be evidence to satisfy that prong.  I'll

13  hear you then as to your theory of why common-law robbery

14  should be presented, if you wish to argue it.

15    MS. THOMAS:  I do not wish to make an argument.

16    THE COURT:  Okay.  That request is denied, for the

17  lesser charge.  And, the verdict then would be guilty or not

18  guilty of robbery with a dangerous weapon.

19    As to the counts of kidnapping, what says the

20  state.

21    MR. COTTRELL:  In each of the three counts, Your

22  Honor, guilty or not guilty of second-degree kidnapping.

23    THE COURT:  Okay.  I'll hear from the defense on

24  the different theory.

25    MS. THOMAS:  We have NO OBJECTION as to those

1  charges.

2  THE COURT: Okay. As to each of those charges

3  then, the verdict sheet should be, "Guilty of second-degree

4  kidnapping"; or, "Not guilty."

5  And, as to the charge of felonious breaking and

6  entering, I'll hear from the state. What says the state?

7  MR. COTTRELL: Your Honor, I think the evidence is

8  clear that there is enough to support a charge of felonious

9  breaking and entering. However, Your Honor, I believe the

10  case law --

11  THE COURT: Stand up, if you would please.

12  MR. COTTRELL: Thank you, Your Honor. I believe

13  the case law would also require the Court to instruct on the

14  lesser-included charge of misdemeanor breaking and entering.

15  THE COURT: All right. What says the defense?

16  MS. THOMAS: We would request the instruction on

17  misdemeanor breaking and entering.

18  THE COURT: All right. The Court will instruct

19  the jury and the verdict sheet should so reflect the possible

20  verdict of "Guilty of felonious breaking and entering,"

21  "Guilty of non-felonious breaking and entering"; or, "Not

22  guilty."

23  And, those will be the verdict sheets.

24  We can move ahead a little bit further then with

25  possible jury instructions, if the parties are ready to

1   proceed with that. Are the parties ready to proceed with

2   that?

3         MR. COTTRELL: The state is ready, Your Honor.

4         THE COURT: All right. Let me just advise you

5   some instructions, that I have in mind; then I will allow the

6   state and the defense to be heard on instructions they would

7   like the Court to include or objections to any instructions

8   that I've indicated.

9         On the underlying offenses, I'll instruction

10   patterned jury instructions, robbery with a firearm, at

11   217.20; second-degree kidnapping, I'll instruction on 210.35;

12   in the charge of kidnapping concerning Samantha Wood, the

13   instruction would include as a third element that the

14   defendant confined or restrained the person for the purpose

15   of facilitating a felony; and, the felony being -- well, what

16   felony does the state contend?

17         MR. COTTRELL: Your Honor, we would contend for the

18   purpose of felony of robbery with a dangerous weapon.

19         THE COURT: I'm sorry.

20         MR. COTTRELL: Robbery with a dangerous weapon.

21         THE COURT: Okay. And, what says the defense as

22   to the instruction of kidnapping, concerning Samantha Wood?

23         MS. THOMAS: No objection.

24         THE COURT: Okay. As to the kidnapping charges

25   concerning Brandon Wood and Leola Smith, would be a slight

difference then, in that the evidence does indicate that the person had not yet reached their 16th birthday and the parent did not consent to their confinement or restraint.

So, there would be a slight difference in those, otherwise, the instruction would be the same, as in the previous one.

Is that the state's contention?

MR. COTTRELL: Yes, Your Honor.

THE COURT: And, what says the defense then, as to that instruction?

MS. THOMAS: No objection.

THE COURT: Okay. Those will be the instructions then on the other two kidnapping charges.

And, the breaking and entering charge will also be from the patterned jury instructions on the charge of felonious breaking and entering and misdemeanor breaking and entering. I think it's 214.30, in the patterned jury instructions.

And, I don't have, at the moment, the misdemeanor breaking and entering instruction in front of me. But, I would intend to instruct from the patterned jury instructions on that, as well.

What says the state then, as to those instructions?

MR. COTTRELL: Your Honor, the state is satisfied with the patterned jury instructions for each of those

1  offenses.

2        THE COURT:  What says the defense?

3        MS. THOMAS:  We're satisfied.

4        THE COURT:  Okay.  Now, on the preliminary

5  instructions, I would start with 101.05, function of the

6  jury; 101.10, burden of proof and reasonable doubt; 101.15,

7  credibility of witnesses; 101.20, weight of the evidence.

8        The defendant, in giving their forecast of the last

9  presentation of evidence, does not include the defendant's

10  testimony.  So, does the defense desire an instruction from

11  the patterned jury instructions at 101.30, affect of the

12  defendant's decision not to testify?

13        MS. THOMAS:  We do.

14        THE COURT:  That will be included.  Does the state

15  request instruction on circumstantial evidence?

16        MR. COTTRELL:  We do, Your Honor.

17        THE COURT:  Okay.  The Court has heard evidence

18  which would, in the Court's opinion, support an instruction

19  on circumstantial evidence, such as the testimony of Theresa

20  Savall, of the defendant being present in the location, at

21  the same time that the robbery was said to have been

22  committed or a person she identified as the defendant.

23        I'll include circumstantial evidence, unless the

24  defense can talk me out of it.  Does the defense wish to be

25  heard on circumstantial evidence?

1    MS. THOMAS: Your Honor, we would oppose the

2    instruction on circumstantial evidence because the

3    circumstantial evidence offered by Ms. Savall would make him

4    merely present in the area; nothing more than that. And, her

5    testimony of the person she saw was dressed entirely

6    differently. And, she could not really pinpoint the exact

7    time that she saw this person in the area.

8        THE COURT: Okay. I'm going to include

9    circumstantial evidence so the jury can, I think, needs to be

10   instructed on what circumstantial evidence is. And so, I

11   will include that instruction.

12       Note the defense objection to that instruction.

13       I will include 104.20, testimony of interested

14   witnesses.

15       I will include 104.90, identification of the

16   defendant as the perpetrator of the crime.

17       And, I will include 105.20, impeachment or

18   corroboration by prior statements.

19       Those are some instructions I had in mind. I'll

20   hear from the state and then from the defense as to any other

21   instructions they would like the Court to consider.

22       What says the state?

23       MR. COTTRELL: Your Honor, the state is satisfied

24   with the list that the Court has provided.

25       THE COURT: What says defense, without asking me

1 | to waive any objections you've made?

2 |         MS. THOMAS:  We would request an instruction on

3 | alibi.

4 |         THE COURT:  Okay.  I believe I have that one

5 | pulled.  Let me look.  No; I don't.  But, I can find it.

6 | Okay; 301.10, I believe is the instruction on alibi.  It's a

7 | short, 3-paragraph instruction.

8 |         Does the state wish to be heard on giving the

9 | instruction on alibi?

10 |         MR. COTTRELL:  No, Your Honor; we don't.

11 |         THE COURT:  I'll include that then; 301.10

12 | instruction on alibi.

13 |         Okay.  Anything else from the defense then as to

14 | the instructions to be given to the jury?

15 |         MS. THOMAS:  No, Your Honor.

16 |         THE COURT:  All right.  Well, we have had our

17 | charge conference.  I'll conclude, by the way, with the

18 | patterned jury instructions of those instructions so aptly

19 | entitled, "Concluding instructions," at 101.35.  And, those

20 | would be the instructions.

21 |         Anything else concerning the charges to be

22 | submitted to the jury; the possible verdicts then or the

23 | instructions to be given to the jury, from the state?

24 |         MR. COTTRELL:  No, Your Honor.

25 |         THE COURT:  Anything from the defense?

MS. THOMAS: No, Your Honor.

THE COURT: All right. The clerk, ever-efficient, has already prepared our verdict sheets which read:

[Reading.]

"Guilty of robbery with a dangerous weapon"; or, "Not guilty."

"Guilty of second-degree kidnapping"; and, there are three charges; or, "Not guilty."

And, "Guilty of felonious breaking or entering"; or, "Guilty of non-felonious breaking or entering"; or, "Not guilty"; the final charge.

Do the parties wish to inspect them? They are here.

Okay. What says the state about the verdict sheets?

MR. COTTRELL: The state is satisfied, Your Honor.

THE COURT: And, what says the defense?

MS. THOMAS: We're satisfied.

THE COURT: Okay. That, I believe, is every issue that I can think of we would need to do, before actually bringing the jury back in. Is your witness present, yet?

MS. THOMAS: She is.

THE COURT: Okay. We'll bring the jury back in, in just a moment then. And, when we do, the defendant may call it's next witness. After that, or at any time you wish

1  to, in your final presentation of evidence you wish to move

2  the admission of the items you've indicated; if you wish to

3  have them published to the jury, I would likely allow that;

4  and, you may do that.

5        The state has indicated that it would, on rebuttal,

6  be offering what has been referred to at various times as

7  State's Exhibit No. 7, a photograph of the defendant.

8        I would be inclined to allow that photograph.  And,

9  we'll move from there.

10        Now, once all that is done though, would the

11  parties then be ready to proceed right into the closing

12  arguments?

13        MS. THOMAS:  Yes; we will, Your Honor.

14        MR. COTTRELL:  The state will be.

15        THE COURT:  The defense has offered evidence.  So,

16  the state would be entitled to an opening and a closing

17  argument.

18        Does the state with to make an opening argument?

19        MR. COTTRELL:  No, Your Honor; we do not.

20        THE COURT:  All right.  When we do closing

21  arguments then, the jury will be with the defense.

22        All right.  Sheriff, bring our jury in.

23  {Thereupon, the following proceedings take place in open

24  court, in the presence of the jury.}

25        THE COURT:  The Court will note that all of our

1  jurors are present.  Members of the jury, sorry for the

2  delay.  We did have another matter or two we needed to

3  discuss that did have to be resolved out of your presence.

4  We have resolved those matters and we are ready to proceed.

5          The defense can call it's next witness.

6          MS. THOMAS:  Mr. Massey would next call Ms. April

7  Pride Thompson.

8          THE COURT:  All right.  Ms. Thompson, would you

9  come around to the witness stand.

10         THE COURT:  Ms. Thompson was earlier called as a

11 state's witness and is still under oath.  So, she can just

12 take the witness stand then.

13         You are still under oath, Ms. Thompson.  The

14 witness is with the defendant.

15 APRIL PRIDE THOMPSON, BEING FIRST DULY SWORN, TESTIFIES AS

16 FOLLOWS DURING DIRECT EXAMINATION BY MS. THOMAS:

17 Q.  State your name, please.

18 A.  April Pride Thompson.

19 Q.  And, Ms. Thompson, you testified yesterday for the state.

20 Is that correct?

21 A.  Yes.

22 Q.  And, you have now been called to testify as a defense

23 witness.  Is that correct?

24 A.  Yes.

25 Q.  And, going back to your testimony yesterday, about  your

1  conversation with Officer Esposito, where did that

2  conversation take place?

3  A.  It took place on the outside of our apartment.  We were on

4  the sidewalk, close to the parking lot.

5  Q.  Close to the parking lot?

6  A.  Yes.

7  Q.  And, do you recall what time of day that occurred?

8  A.  It was in the evening; probably about 5:30 or 6:00.

9  Q.  Would you characterize this as Officer Esposito did as a

10  casual conversation?

11  A.  Yes.

12  Q.  How was Officer Esposito dressed?

13  A.  He did have on his officer's uniform.

14  Q.  Did Officer Esposito take any notes as he talked with you?

15  A.  No.  I do not recall him writing anything.

16  Q.  Did you see him with any pad or notebook or any writing

17  instruments?

18  A.  No.

19  Q.  And, did you recall what day of the week this was on?

20  A.  I believe it was a weekday; possibly a Friday.

21  Q.  Why do you believe it was a Friday?

22  A.  Because, I had just got home from work and I had talked

23  with my husband the next day about an officer coming to see

24  me.  And, I talked with him on a Saturday.

25  Q.  Are you talking to a different officer the next day?

1  A.  No.  I talked with my husband the next day, telling him

2  someone had come to see me the day before.

3  Q.  Why do you believe the conversation with your husband

4  occurred on Saturday?

5  A.  Because he did not come to my house on Friday night; he

6  came on a Saturday.

7  Q.  And, do you know what night Shawn Massey spent the night

8  with you?

9  A.  That was probably that Thursday night.

10  Q.  And, can you say with certainty, what time Shawn Massey

11  left that morning?

12          MR. COTTRELL:  OBJECTION, Your Honor.  This has

13  already been covered in prior testimony.

14          THE COURT:  I couldn't hear you.

15          MR. COTTRELL:  OBJECTION; asked and answered, Your

16  Honor.

17          THE COURT:  OVERRULED.  She can answer the

18  question.

19  A.  He was still there when I left.

20  Q.  What time did you leave?

21  A.  I left approximately 6:45.

22  Q.  Did Shawn Massey have braids in his hair?

23  A.  No.

24  Q.  Are you positive?

25  A.  Yes.

1  Q.  Did you say anything to Officer Esposito about Shawn

2  Massey having braids?

3  A.  No.

4  Q.  You didn't make a written statement to Officer Esposito;

5  did you?

6  A.  No.

7  Q.  You didn't sign your name to any statement that he wrote;

8  did you?

9  A.  No.

10  Q.  And, you said Officer Esposito was not taking notes, as he

11  spoke with you.  Is that correct?

12  A.  That is correct.

13  Q.  Did Shawn Massey frequently come to your house?

14  A.  Yes.

15  Q.  How often did he come to  your house?

16          MR. COTTRELL:  OBJECTION, once again, Your Honor.

17  Asked and answered in earlier testimony.

18          THE COURT:  OVERRULED.  I'll let her answer.

19  A.  He came quite frequently.

20  Q.  And, you stated that you had lived at that address how

21  long?

22  A.  At that time, it had been almost a year.  I'm still living

23  there now; so, it's almost two years.

24  Q.  Had Shawn Massey visited your home frequently, during the

25  year you lived there?

1  A. Yes.

2  Q. And, when you previously lived there, did Shawn Massey

3  visit you frequently?

4  A. Yes.

5  Q. And, did he participate in the recreational activity,

6  sponsored by the complex?

7  A. Yes. If I did, he participated.

8  Q. Did he go fishing in the lake?

9  A. Yes.

10 Q. And, did he frequent the swimming pool and the

11 recreational area?

12 A. Yes.

13 Q. Now, when Shawn Massey was at your residence, did you

14 ever know him to carry a weapon?

15 A. No.

16 Q. Did you ever see him with a weapon?

17 A. No.

18 Q. Did you ever hear Shawn Massey discuss having a weapon?

19 A. No.

20 Q. Do you ever -- do you recall him ever wearing red, at or

21 near that or any other time he was at your house?

22 A. No.

23        MS. THOMAS: Thank you Ms. Thompson. No further

24 questions.

25        THE COURT: Cross examination.

1    [CROSS EXAMINATION OF MS. THOMPSON, BY MR. COTTRELL:]

2    Q.   Ms. Thompson, your testimony is you have never seen the

3    defendant wear red?

4    A.   To my recollection, I can never recall seeing him with

5    anything red.

6    Q.   And, ma'am, did you ever take any written notes of your

7    conversation with Officer Esposito, the day that you spoke

8    with him outside your apartment?

9    A.   Did I?

10   Q.   Yes, ma'am.

11   A.   No.

12   Q.   You didn't take any notes?

13   A.   No.

14   Q.   You never memorialized that conversation in any kind of

15   way; no notes; no tapes or anything like that?

16   A.   No.

17          MR. COTTRELL:   Thank you.

18          MS. THOMAS:   Just one other question.

19   RE-DIRECT EXAMINATION OF MS. THOMPSON, BY MS. THOMAS:

20   Q.   Has Shawn Massey lost a lot of weight or --

21          MR. COTTRELL:   OBJECTION, Your Honor; outside the

22   scope.

23          THE COURT:   Well, it is outside the scope of

24   cross-examination.   OBJECTION SUSTAINED.

25          MS. THOMAS:   No further questions.

1    THE COURT:  Any further questions -- well, no

2    questions were actually asked.  You can step down, ma'am.

3    All right.  Any further evidence for the defense?

4    MS. THOMAS:  At this time, I would move that

5    Defendant's Exhibit Nos. 1 through 5 be INTRODUCED INTO

6    EVIDENCE AND ALSO PUBLISHED TO THE JURY.

7    THE COURT:  All right.  The Court has received 3,

8    4 and 5; Defendant's Exhibit Nos. 1 and 2 WILL BE ADMITTED.

9    And Sheriff, if you would please, assist in the

10   publication of Defendant's Exhibit Nos. 1, 2, 3, 4 and 5 to

11   the jury.

12   Members of the jury, these are being passed to you

13   at their request.  Please examine them carefully,

14   individually and without comment to your fellow jurors.

15   [Defendant's Exhibit Nos. 1 through 5 are passed to the

16   jury.]

17   THE COURT:  Counsel approach the bench for just a

18   second, please.

19   {Conference at sidebar, outside the hearing of the jury, with

20   all attorneys present.}

21   {Thereupon, the following proceedings take place in open

22   court, within the hearing of the jury.}

23   THE COURT:  All right.  Members of the jury, is

24   there anyone who hasn't had a chance to review Defendant's

25   Exhibit Nos. 1 through 5?

1  JURY:          [No verbal response.]

2  THE COURT:    Seeing no hands being raised.  All

3  right.  Anything else for the defense?

4  MS. THOMAS:  No, Your Honor.

5  THE COURT:    Any rebuttal evidence for the state?

6  MR. COTTRELL:  Yes, Your Honor.  The state would

7  MOVE TO ADMIT, State's Exhibit No. 7; and, we would also like

8  that to be published to the jury.

9  THE COURT:    All right.  State's Exhibit No. 7 then

10  WILL BE ADMITTED.  That is identified as a photograph of the

11  defendant.

12  Sheriff, if you will please, take State's Exhibit

13  No. 7 and publish it to the jury.

14  Members of the jury, as stated before, examine the

15  item carefully, individually and without comment to your

16  fellow jurors.

17  [State's Exhibit No. 7 is passed to the jury.]

18  THE COURT:    Members of the jury, is there any

19  member of the jury who has not had an opportunity to examine

20  State's Exhibit No. 7?

21  JURY:          [No verbal response.]

22  THE COURT:    Seeing no hands being raised, anything

23  else from the state?

24  MR. COTTRELL:  No, Your Honor.

25  THE COURT:    Anything else from the defense?

1       MS. THOMAS:  No, Your Honor.

2       THE COURT:  Members of the jury, all of the

3  evidence then has been presented to you.  And, it is now time

4  for the final arguments of the attorneys.

5       At the conclusion of their final arguments, I'll

6  instruct you on the law in this case; and then, you will be

7  taken to the jury room to begin your deliberations.

8       Now, Members of the jury the final arguments of the

9  attorneys are not evidence but are given to assist you in

10  evaluating the evidence that you heard.

11       The lawyers are permitted in their final arguments

12  to argue, to characterize the evidence and to attempt to

13  persuade you to a particular verdict.

14       Now, it is of course improper in a final argument

15  for an attorney to become abusive or to inject personal

16  experiences or to express personal beliefs as to the guilt or

17  innocence of a defendant; or, to make argument on the basis

18  of matters outside the record.

19       A lawyer may however, on basis of that lawyer's

20  analysis of the evidence, argue any positions or any

21  conclusion with respect to a matters in issue.

22       If however, in the course of making a final

23  argument, an attorney attempts to restate a portion of the

24  evidence to you, and your recollection of the evidence

25  differs from what the attorney said, then you are to be

1  exclusively by your own recollection of the evidence.

2              The jury will be with the defendant.

3  [CLOSING ARGUMENT, BY MS. THOMAS]

4  [CLOSING ARGUMENT, BY MR. COTTRELL]

5  [JURY CHARGE, BY JUDGE JAMES L. BAKER, at 3:55 p.m.]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# JURY CHARGE

**JAMES L. BAKER:** Ladies and gentlemen of the jury, all of the evidence has been presented to you. It is now your duty to decide from this evidence what the facts are. You must then apply the law which I am about to give you to those facts.

Now, it is absolutely necessary that you understand and apply the law, as I give it to you, not as you think the law is or as you might like it to be. This, of course, is important because justice requires that everyone who is tried for the same crime be treated in the same way and have the same law applied to him.

Members of the jury, in this case, as you know, the defendant, Mr. Massey, has entered a plea of "Not guilty."

The fact that he has been charge is no evidence of his guilt. Under our system of justice, when a defendant pleads "Not guilty" he is not required to prove his innocence. But, he is presumed to be innocent. The state must prove to you that the defendant is guilty, beyond a reasonable doubt.

A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented or the lack or insufficiency of the evidence, as the case may be.

Proof beyond a reasonable doubt is proof that fully

1 satisfies or entirely convinces you of the defendant's guilt.

2 Members of the jury, you are the sole judges of the

3 credibility of each witness. You must decide for yourselves

4 whether to believe the testimony of any witness. You may

5 believe all or any part or none of what a witness has said on

6 the stand.

7 In determining whether to believe any witness, you

8 should apply the same tests of truthfulness which you apply

9 in your own everyday lives.

10 As applied to this trial, those tests may include:

11 The opportunity of the witness to see, or hear, or

12 know or remember the facts or occurrences about which the

13 witness testified;

14 The manner and the appearance of the witness;

15 Any interest, or bias or prejudice that witness

16 might have;

17 The apparent understand and fairness of the

18 witness;

19 Whether the witness' testimony is reasonable; and,

20 Whether the witness' testimony is consistent with

21 other believable evidence in this case.

22 You are the sole judges of the weight to be given

23 any evidence. And, by this I mean if you decide that certain

24 evidence is believable, you must then determine the

25 importance of that evidence, in light of all the other

1  believable evidence in this case.

2  Now, Members of the jury, in this case, the

3  defendant has not testified. The law of North Carolina gives

4  him this privilege. The same law also assures him that his

5  decision not to testify creates no presumption against him.

6  Therefore, his silence is not to influence your decision in

7  any way.

8  Members of the jury, there are two types of

9  evidence from which you may find the truth as to the facts of

10  a case. Direct evidence and circumstantial evidence.

11  Direct evidence is the testimony of one who asserts

12  actual knowledge of a fact, such as an eyewitness.

13  Circumstantial evidence is proof of a chain or

14  group of facts and circumstances indicating the guilt or

15  innocence of the defendant.

16  The law makes no distinction between the weight to

17  be given to either direct or circumstantial evidence. Nor is

18  a greater degree of certainty required of circumstantial

19  evidence than of direct evidence.

20  You should weigh all of the evidence in the case.

21  And, after weighing all of the evidence, if you're not

22  convinced of the guilt of the defendant, beyond a reasonable

23  doubt, you must find him "Not guilty."

24  Members of the jury, you may find that a witness

25  who has testified is interested in the outcome of this

1    hearing.

2         In deciding whether or not to believe such a

3    witness, you may take his or her interest into account.

4         If, after doing so, you believe the testimony of

5    the witness, in whole or in part, you should treat what you

6    believe, the same as any other believable evidence.

7         Members of the jury, I instruct you that the state

8    has the burden of proving the identity of the defendant as

9    the perpetrator of the crimes charged, beyond a reasonable

10   doubt.

11        This means that you, the jury, must be satisfied,

12   beyond a reasonable doubt, that the defendant, was a

13   perpetrator of the crimes charged before you may return a

14   verdict of guilty.

15        Members of the jury, when evidence has been

16   received tending to show, that an earlier time, a witness

17   made a statement which may be consistent with or may conflict

18   with his or her testimony at this trial, you must not

19   consider such earlier statement as evidence of the truth of

20   what was said at that earlier time, because it was not made

21   under oath at this trial.

22        If you believe such earlier statement was made and

23   that it is consistent with or does conflict with the

24   testimony of the witness, at this trial, then you may

25   consider this, together with all other facts and

1  circumstances bearing upon the witness' truthfulness, in

2  deciding whether you will believe or disbelieve that witness'

3  testimony, at this trial.

4  Now Members of the jury, the defendant contends

5  that he was at some other place at the time the offenses are

6  said to have taken place.  This is known as an alibi.  The

7  word "alibi" simply means, "somewhere else."

8  The burden of proving an alibi does not rest upon

9  the defendant.  To establish the defendant's guilt, the state

10  must prove, beyond a reasonable doubt, that the defendant was

11  present at and participated in the crimes charged.

12  The defendant's contention that he was not present

13  and did not participate is simply a denial of facts essential

14  to the state's case.

15  Therefore, I charge that if, upon considering all

16  of the evidence in this case, including the evidence with

17  respect to alibi, you have a reasonable doubt as to the

18  defendant's presence at or participation in the crimes

19  charged, you must find him not guilty.

20  Members of the jury, the defendant has been accused

21  of five separate charges.  I'm going to discuss each of those

22  with you, one at a time, beginning with the charge of robbery

23  with a firearm.

24  Members of the jury, the defendant has been accused

25  of ROBBERY WITH A DANGEROUS WEAPON, A FIREARM, which is the

taking and carrying away the personal property of another, from that person or in his presence, without his or her consent, by endangering or threatening a person's life with a firearm, the taker knowing that he was not entitled to take the property and intending to deprive another of its use, permanently.

Now, I charge that for you to find the defendant "Guilty of robbery with a firearm," the state must prove seven things, beyond a reasonable doubt.

First, that the defendant took property from the person of another or in her presence.

Second, that the defendant carried away this property.

Third, that the [defendant] did not voluntarily consent to the taking and carrying away of the property.

Fourth, that the defendant knew he was not entitled to take the property.

Fifth, that at the time of the taking, the defendant intended to deprive that person of its use, permanently.

Sixth, that the defendant had a firearm in his possession at the time he obtained the property or that it reasonably appeared to the victim that a firearm was being used.

In which case, you may infer that said instrument

1  was what the defendant's conduct represented it to be.

2        And seventh, that the defendant obtained the

3  property by endangering or threatening the life of that

4  person or another person with a firearm.

5        So, I charge that if you find, from the evidence,

6  beyond a reasonable doubt, that on or about the alleged date,

7  May 22, 1998, the defendant had in his possession a firearm;

8  and, took and carried away property from the person or

9  presence of the person; without her voluntary consent; by

10  endangering her or another person's life with the use or

11  threatened use of a firearm; the defendant knowing that he

12  was not entitled to take the property; and, intending to

13  deprive that person of its use permanently; it would be your

14  duty to return a verdict of "Guilty of robbery with a

15  firearm."

16        However, if you do not so find or a reasonable

17  doubt as to one or more of these things, it would be your

18  duty to return a verdict of "Not guilty."

19        The defendant has also been accused of the **SECOND-**

20  **DEGREE KIDNAPPING** of Samantha Wood. Now, I charge that for

21  you to find the defendant "Guilty of second-degree

22  kidnapping," the state must prove four things, beyond a

23  reasonable doubt.

24        First, that the defendant unlawfully confined

25  Samantha Wood, that is, imprisoned her, within a given area;

or, restrained Samantha Wood. That is, restricted her freedom of movement.

Second, that the Samantha Wood did not consent.

Third, that the defendant confined or restrained Samantha Wood for the purpose of facilitating his commission of a felony, robbery with a dangerous weapon.

Remember my instructions to you on what constitutes robbery with a dangerous weapon.

And fourth, that this confinement or restraint was a separate, complete act, independent of and apart from the robbery with a dangerous weapon.

So, Members of the jury, I charge that if you find, from the evidence, beyond a reasonable doubt, that on or about the alleged date, the defendant unlawfully confined or restrained Samantha Wood; and, that the person did not consent; and, that this was done for the purpose of facilitating the defendant's commission of a felony, robbery with a dangerous weapon; and, that this confinement or restraint was a separate, complete act, independent of and apart from the robbery with a dangerous weapon, it would be your duty to return a verdict of "second-degree kidnapping of Samantha Wood."

However, if you do not so find or if you have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of "Not guilty."

Now Members of the jury, the defendant has also been accused of **TWO ADDITIONAL COUNTS OF SECOND-DEGREE KIDNAPPING**; the second-degree kidnapping of Samantha Wood's two children; Brandon Wood and Leola Smith.

My instructions on these two charges will be the same, except for the names. I'm not going to repeat these instructions to you again, two separate times. But, I'll direct you to apply these instructions in each case.

Now Members of the jury, I charge that for you to find the defendant "Guilty of second-degree kidnapping," of either of Samantha Wood's two children, the state must prove four things, beyond a reasonable doubt.

First, that the defendant unlawfully confined that child, that is, imprisoned him or her, within a given area; or, restrained that child. That is, restricted his or her freedom of movement.

Second, that the child had not reached his or her 16th birthday; and that his or her parent did not consent to the confinement or restraint.

Third, that the defendant confined or restrained the child for the purpose of facilitating his commission of a felony, robbery with a dangerous weapon.

Remember again my instructions to you on robbery with a dangerous weapon.

And fourth, that this confinement or restraint was

1 a separate, complete act, independent of and apart from the

2 felony of robbery with a dangerous weapon.

3 So, Members of the jury, I charge that if you find,

4 from the evidence, beyond a reasonable doubt, that on or

5 about the alleged date, the defendant unlawfully confined or

6 restrained that child; that that child had not reached his or

7 her 16th birthday; and, his or her parent did not consent to

8 this confinement or restraint; and, that this was done for

9 the purpose of facilitating the defendant's commission of a

10 felony, robbery with a dangerous weapon; and, that this

11 confinement or restraint was a separate, complete act,

12 independent of and apart from the felony of robbery with a

13 dangerous weapon, it would be your duty to return a verdict

14 of "second-degree kidnapping."

15 However, if you do not so find or if you have a

16 reasonable doubt as to one or more of these things, it would

17 be your duty to return a verdict of "Not guilty."

18 Now Members of the jury, the last charge that the

19 defendant has been accused of is **FELONIOUS BREAKING AND**

20 **ENTERING** into another's building, without her consent, with

21 the intent to commit a felony.

22 Now, I charge that for you to find the defendant

23 guilty of felonious breaking or entering, the state must

24 prove four things, beyond a reasonable doubt.

25 First, that there was either a breaking or an entry

1  by the defendant.  Gaining access to an apartment with the
2  threat of violence to the residence would be an entry.

3  Second, that the state must prove that it was a
4  building that was broken into or entered.

5  And third, that the owner did not consent to this
6  breaking or entering.

7  And fourth, at the time of the breaking or entering
8  the defendant intended to commit a felony.  In this case,
9  larceny.

10  Larceny is the taking and carrying away of the
11  personal property of another; without her consent; and with
12  the intent to deprive her of possession permanently.

13  So I charge, Members of the jury, if you find from
14  the evidence, beyond a reasonable doubt, that on or about the
15  alleged date, May 22, 1998, the defendant, Shawn Massey,
16  broke into or entered a building; without the consent of the
17  owner; intending at the time to commit a felony, larceny; it
18  would be your duty to return a verdict of "Guilty to
19  felonious breaking or entering."

20  However, if you do not so find or if you have a
21  reasonable doubt as to one or more of these things, you will
22  not return a verdict of "Guilty of felonious breaking or
23  entering."

24  If you do not find the defendant "Guilty of
25  felonious breaking or entering" you must determine whether he

1  is guilty of non-felonious breaking or entering.

2  Non-felonious breaking or entering, differs from

3  felonious breaking or entering in that it need not be done

4  with the intent to commit a felony, so long as the breaking

5  or entering was wrongful; that is, without any claim of

6  right.

7  So I charge, Members of the jury, if you find from

8  the evidence, beyond a reasonable doubt, that on or about the

9  alleged date, May 22, 1998, the defendant, Shawn Massey,

10  wrongfully broke into or entered another person's building;

11  without her consent; but, do not find, beyond a reasonable

12  doubt, that he intended to commit a felony, larceny; it would

13  be your duty to return a verdict of "Guilty to non-felonious

14  breaking or entering."

15  However, if you do not so find or if you have a

16  reasonable doubt as to one or more of these things, it would

17  be your duty to return a verdict of "Not guilty."

18  Now Members of the jury, you have heard the

19  evidence; you have heard the arguments of counsel for the

20  state and for the defendant.

21  I have not summarized the evidence in the case;

22  but, it's your duty to remember the evidence whether it's

23  been called to your attention or not.

24  And, as I have advised you, if your recollection of

25  the evidence differs from that of the District Attorney or of

1 the defense attorney, you are to rely solely upon your own
2 recollection of the evidence in your deliberations.
3       I have also not reviewed the contentions of the
4 state or of the defendant. But, it's your duty not only to
5 consider all the evidence but also to consider all the
6 arguments, the contentions and positions urged by the state's
7 attorney and the defendant's attorney in their speeches to
8 you; and, any other contention that arises from the evidence;
9 and, to weigh them all, in the light of your common sense and
10 as best as you can, to determine the truth of this matter.
11       Now, the law, as indeed it should, requires the
12 presiding Judge to be impartial. You are not to draw any
13 inference from any ruling I have made or any inflection in my
14 voice or any expression on my face or any question I might
15 have asked a witness or anything that I have said or done
16 during this trial to insinuate to you that I have an opinion
17 or as to whether any fact has or has not been proved; whether
18 any of the evidence should be believed or disbelieved; or, as
19 to what your findings ought to be.
20       It is your exclusive province to find the true
21 facts of the case and to render a verdict reflecting the
22 truth, as you find the truth to be.
23       I instruct you that a verdict is not a verdict
24 until all twelve jurors agree unanimously as to what your
25 decision shall be.

1    You may not render a verdict by a majority vote.

2    Now Members of the jury, when you have reached a

3 unanimous verdict, have your foreperson mark the appropriate

4 place on the verdict form, which I'll send in to you in a few

5 minutes, after you go into the jury room.

6    There will be a separate verdict sheet for each

7 charge.

8    Now Members of the jury, it does appear at this

9 time that we will not need the services of our alternate.

10 Mr. Frank, thank you very much, sir. You are free to go or

11 stay, as you see fit. You do need to step down now from the

12 jury box.

13    Members of the jury, as you retire to the jury

14 room, your first duty will be to select a member of the jury

15 to serve as your jury foreperson. It will be the duty of

16 this person to lead you in your deliberations.

17    Do not begin though, your deliberations on the

18 verdict until you have received the written verdict forms

19 from the bailiff.

20    Proceed immediately with the selection of your

21 foreperson. And, after receiving the written verdict form,

22 proceed with your verdict deliberations. And, when you have

23 reached a unanimous verdict as to each charge and are ready

24 to pronounce them; and, your foreman has marked the verdict

25 on the form, have your foreperson sign and date the verdict

1  sheets; notify the bailiff, by knocking on the door to the

2  jury room; and, you'll be returned to the courtroom to

3  pronounce your verdict.

4  Members of the jury, you may retire to select your

5  foreperson.

6  {The following proceedings take place in open court, outside

7  the presence of the jury.}

8  THE COURT:  In the absence of the jury, I'll hear

9  from the state and from the defense your requests for

10  corrections or additions to the charge.

11  What says the state?

12  MR. COTTRELL:  There are no such requests from the

13  state, Your Honor.

14  THE COURT:  What says the defense?  I will not ask

15  the defense to waiver their objections and exceptions.

16  MS. THOMAS:  We're satisfied with the charge.

17  THE COURT:  Sheriff, if you will, take the verdict

18  sheets.  There is a blank notepad that the jury will also be

19  given to use during their deliberations.

20  And Sheriff, you may give the verdict sheets to the

21  jury.  Thank you, sir.  I've got the jury going out then at

22  about 4:10.

23  The parties can be at ease then while the jury

24  deliberates.  I'll ask counsel not to go far, in case the

25  jury has a question or does reach a verdict.

1    Does the state have anything else it needs to do

2  before leaving Court?

3    MR. COTTRELL:  I don't believe so, at this time.

4    THE COURT:  All right.  We'll be in recess then.

5  And, let me know if you need me in court for anything.

6  [JURY DELIBERATIONS BEGIN, at 4:10 p.m.]

7  [QUESTION BY THE JURY, at 4:55 p.m.]

8    THE COURT:  The Court will note that everyone is

9  present.  We have received a question, actually, two

10  questions from the jury, which reads as follows:  [Reading.]

11    "When did the victim hear the defendant in court --

12  the defendant's voice, in court?  The jury would like to

13  know."

14    "2.  How far from scene of crime to defendant's

15  job?"

16    The second question I will tell the jury that it is

17  their evidence -- or rather, their duty to determine the

18  outcome of the case from the evidence that's been presented

19  to them.

20    And, the first, I will hear from the state and the

21  defense as to how they would like the Court to deal with the

22  first question.  [Reading.]

23    "When did the victim hear the defendant in court?"

24    MR. COTTRELL:  Your Honor, the evidence in this

case was that she heard the defendant's voice in a hearing

1  prior to the jury coming in. That's when that evidence came
2  out.
3       THE COURT: Well, you say that's the evidence.
4  How did the jury hear that?
5       MR. COTTRELL: The jury heard that. I asked her
6  the question, "Did you hear the defendant's voice in a
7  hearing in this matter, outside the presence of the jury?"
8  She said she did.
9       THE COURT: All right. What says the defense?
10      MS. THOMAS: I would just ask that the jury be
11  instructed to rely on their recollection.
12      THE COURT: I think that would be the best course
13  of action, rather than the Court starting to attempt to
14  repeat --
15      MR. COTTRELL: I would agree, Your Honor.
16      THE COURT: -- evidence to them. That would be my
17  instruction to them.
18      I will also send the jury home for the day and will
19  instruction them that they are to return tomorrow morning at
20  9:30.
21      I will also advise the jury of a memorandum which
22  has been distributed to court personnel which reads, in
23  effect, [Reading.]
24      "If Hurricane Floyd creates hazardous weather, the
25  Trial Court Administrator will place an independent

1   announcement on both the radio and television stations, only

2   if court has been canceled. If no independent announcement

3   has been made, all courts will operate on a normal schedule."

4         So, I will advise them of that. But, it is time to

5   call it day, I believe. I'll call the jury in and I'll

6   answer the question to the jury in that it is the jury's duty

7   to recall the evidence that was submitted to them and

8   determine the facts of the case, based on that evidence.

9         Sheriff, if you will please, bring the jury in.

10   {Thereupon, the following proceedings take place in open

11   court, in the presence of the jury.}

12         THE COURT: All right. Mr. Jackson, I'm assuming

13   from the message that I received that you are the jury

14   foreperson. Is that correct, sir?

15         MR. JACKSON: That's correct.

16         THE COURT: All right. If you'll stand please and

17   let me just ask you a simple question and you'll answer it

18   yes or no. Stand up, sir, for just a moment.

19         Mr. Jackson, as foreperson of the jury, has the

20   jury reached a unanimous verdict?

21         MR. JACKSON: No, sir.

22         THE COURT: You haven't. You can be seated.

23   Members of the jury, I asked you that question because it is

24   time for us to call an end to the day's activities and for me

25   to send you home, in just a few moments and direct you to

1   return tomorrow morning, at 9:30.

2           In case, Members of the jury, you have questions of

3   the weather and what affect that might have on our court

4   schedule, I'll just read to you a paragraph from a memorandum

5   that has been circulated to the various courts in Mecklenburg

6   County.

7           "If Hurricane Floyd creates hazardous weather, the

8   Trial Court Administrator will place an independent

9   announcement on the local radio and television stations, only

10  if court has been canceled. If no independent announcement

11  has been made, all courts will operate on a normal schedule."

12          Members of the jury, in a few minutes then, I'll

13  need to send you home for the evening and direct that you

14  return tomorrow morning at 9:30.

15          If you do not, before coming to court, see or hear

16  an independent announcement on radio or television, then you

17  may assume all courts are operating on the normal schedule.

18          Members of the jury, in answer to questions that

19  you reduced to writing and delivered to the bailiff, which

20  was delivered to me, [Reading.]

21          "When did the victim hear the defendant's voice in

22  court"; and, how far from the scene of the crime is the

23  defendant's job?"

24          Members of the jury, I must answer your question by

25  advising you that all of the evidence has been presented to

1   you. · It would be your duty to reflect on the evidence that

2   has been presented to you to find the answers to questions

3   that you might have concerning evidentiary matters.

4   Members of the jury, as you leave, please remember

5   the instructions that I have given you in the past.   Not to

6   discuss the case with anyone, even members of your own

7   family; don't allow anyone to discuss the case with you or in

8   your presence.

9   Members of the jury, don't have any contact at all

10  with people who are involved in this case; don't read or

11  watch or listen to any accounts of this case in the media,

12  should there be any coverage of it.

13  Members of the jury, keep your minds open, when

14  you're away from court.   You should not reflect on the case.

15  Just try to put it out of your mind.

16  Please return tomorrow morning at 9:30 and not

17  resume your deliberations until you receive the verdict

18  sheets.

19  Where are the verdict sheets, ma'am?   Thank you.

20  Sheriff, if you would please take the verdict sheets and

21  place them in this brown envelope and then give them to the

22  clerk for safekeeping.

23  DEPUTY SHERIFF:    Yes, sir.

24  THE COURT:    Members of the jury, you may consider

25  the return of the verdict sheets to you tomorrow morning as

1   your signal that you can resume your deliberations. Do not

2   resume your deliberations until then.

3       Members of the jury, I hope you have a good

4   evening. Be careful going home and listen to the weather

5   announcements, particularly as it might affect our court

6   schedule.

7       Remember again, if you do not hear any announcement

8   concerning court, court is operating on a normal schedule.

9   Members of the jury, please follow the bailiff's instructions

10  about when you should return to the jury room tomorrow

11  morning.

12      You can leave the courtroom now. Thank you.

13  **{The following proceedings take place in open court, outside**

14  **the presence of the jury.}**

15      THE COURT: In the absence of the jury, I will

16  hear if the state wishes to add anything to the record, also

17  including the Court's instructions to the jury.

18      What says the state?

19      MR. COTTRELL: No, Your Honor.

20      THE COURT: What says the defense?

21      MS. THOMAS: No, Your Honor.

22      THE COURT: All right. We'll be in recess then,

23  please sheriff, until 9:30 tomorrow morning.

24  {Court stands in recess.}

25  {Court reconvenes on September 17, 1999.}

1    THE COURT:    The Court will note that all parties

2  are present in the trial that we were conducting on Wednesday

3  afternoon.   As the parties know and the record should

4  reflect, court was canceled on Thursday due to what was

5  expected to be inclement weather.

6         I'm advised by the bailiff that all of our jurors

7  are present and I can have the jurors brought in, if the

8  parties would like to see them.

9         Does the state wish for the jury to be brought in?

10        MR. COTTRELL:   No, Your Honor.

11        THE COURT:   Does defendant wish the jury to be

12  brought in?

13        MS. THOMAS:   No, Your Honor.

14        THE COURT:   Sheriff, did any of the jurors

15  indicate any desire or anything that would need to be brought

16  by any juror to the Court's attention?

17        DEPUTY SHERIFF:    No, Your Honor.

18        THE COURT:   All right.   The jurors are all present

19  in the jury room then; and, neither side wishes the jurors to

20  be paraded in; so, we will just deliver the verdict sheets

21  please to the jury, Sheriff.   And, advise the jury we

22  appreciate their reporting and that they may resume their

23  deliberations.

24        DEPUTY SHERIFF:    Yes, Your Honor.

25        THE COURT:   I have the jury out at about 9:30

1  then.  The parties in the Massey case may be at ease then.

2  Mr. Massey is in custody.  Ms. Thomas, if you will, don't

3  stray too far, in case the jury does have a question.

4  [JURY DELIBERATIONS CONTINUE, at 9:35 a.m.]

5            THE COURT:    We have set things up so that we may

6  continue the hearing we arranged in our other matter we began

7  on Monday.

8  [VERDICT OF THE JURY, at 11:15 a.m.]

9            THE COURT:    All right.  For the record, all

10  parties are present.  So, I have been advised the jury has

11  reached a verdict.

12            Anything from the state before the jury is brought

13  in?

14            MR. COTTRELL:  No, Your Honor.

15            THE COURT:    Anything from the defense?

16            MS. THOMAS:  No, Your Honor.

17            THE COURT:    Sheriff, please let us have our jury.

18  {Thereupon, the following proceedings take place in open

19  court, in the presence of the jury.}

20            THE COURT:    All right.  The Court will note that

21  all our jurors are present.  Members of the jury, I would ask

22  the foreman of the jury, please stand.

23            And, Mr. Jackson, again, please sir, for the

24  record, would you state your name?

25            MR. JACKSON: Louis Jackson.

1       THE COURT:   I'll be asking perhaps two questions

2  and I will ask you to answer them just yes or no.

3       Mr. Jackson, has the jury reached unanimous

4  verdict?

5       MR. JACKSON: Yes, sir.

6       THE COURT:  Has the jury reached a unanimous

7  verdict in each charge submitted to the jury for its

8  consideration?

9       MR. JACKSON: Yes, sir.

10      THE COURT:  Mr. Jackson, if you will please sir,

11  give the verdict sheets to the bailiff and remain standing;

12  and, I'll ask the bailiff to bring them to me.

13      Mr. Jackson, you have returned a unanimous verdict

14  of the jury, in File No. 98-33739, **State of North Carolina**

15  **Vs. Shawn Massey**, that the jury finds the defendant, "Guilty

16  of second-degree kidnapping of Samantha Wood."

17      Mr. Jackson, was that the unanimous verdict of the

18  jury?

19      MR. JACKSON: It is, sir.

20      THE COURT:  Mr. Jackson, you have returned as the

21  unanimous verdict of the jury in 98 CRS 33741, **State of North**

22  **Carolina Vs. Shawn Massey**, that the jury returns as its

23  unanimous verdict, that the defendant is "Guilty of second-

24  degree kidnapping of Leola Smith."

25      Sir, is that the unanimous verdict of the jury?

1   MR. JACKSON: It is, sir.

2   THE COURT:   In 98 CRS 33740, the offense in **State**

3   **of North Carolina Vs. Shawn Massey**, Mr. Jackson, you have

4   returned as the unanimous verdict of the jury that the

5   defendant is "Guilty of second-degree kidnapping of Brandon

6   Wood."

7   Mr. Jackson, is that the unanimous verdict of the

8   jury?

9   MR. JACKSON: It is, sir.

10  THE COURT:   And, in 98 CRS 141972, **State of North**

11  **Carolina Vs. Shawn Massey**, you have returned a unanimous

12  verdict of the jury that the defendant is "Guilty of

13  felonious breaking or entering."

14  Is that the unanimous verdict of the jury?

15  MR. JACKSON: It is, sir.

16  THE COURT:   And, in 98 CRS 33738, **State of North**

17  **Carolina Vs. Shawn Massey**, you have returned as your

18  unanimous verdict of the jury that the defendant is "Guilty

19  of robbery with a dangerous weapon."

20  Is that the unanimous verdict of the jury?

21  MR. JACKSON: It is, Your Honor.

22  THE COURT:   Members of the jury, would you all

23  please stand. Members of the jury, I will be asking you

24  essentially if you agree with the verdict as having been

25  returned as the unanimous verdict of the jury.

1    If you choose to answer, please answer out loud.

2    Members of the jury, your foreman has returned as

3 unanimous verdict of the jury in each case, that the

4 defendant is guilty. Those cases being, "Guilty of second-

5 degree kidnapping of Samantha Wood"; "Guilty of second-degree

6 kidnapping of Leola Smith"; "Guilty of second-degree

7 kidnapping of Brandon Wood"; "Guilty of felonious breaking

8 or entering"; and, "Guilty of robbery with a dangerous

9 weapon."

10    Members of the jury, if that is the unanimous

11 verdict of the jury, would you please answer by saying,

12 "Yes"?

13    JURY:    Yes.

14    THE COURT:  Members of the jury, would you please

15 be seated.  And, one last time, Members of the jury, if this

16 is your unanimous verdict -- if these are the unanimous

17 verdicts of the jury,  would you so indicate by raising your

18 right hand.  Leave your hand up just a minute.

19    Seeing twelve hands being raised, thank you.  You

20 can put your hands down.

21    Anything further of this jury, from the state?

22    MR. COTTRELL:  Your Honor, the state would like to

23 thank the jury for their service.

24    THE COURT:  Anything further for this jury, from

25 the defense?

1    MS. THOMAS:  No, Your Honor.

2    THE COURT:    All right.  Members of the jury, this

3 will conclude your service in this case and will conclude

4 your service as jurors.

5    I do thank you, on behalf of the State of North

6 Carolina; not the state that was represented by the

7 prosecutor; but, just as a representative of the state

8 judicial system, for your service as a juror.

9    It's improper for a judge to comment on the verdict

10 of the jury.  By my thanking you, I am making no comment on

11 your verdict.

12    Members of the jury, I apologize for the length of

13 time the case took, as compared to our original estimate.  I

14 hope that the interruption yesterday did not create too much

15 of a problem for you.  Maybe you were able to make use of the

16 time.

17    As I said, this does complete your jury service.  I

18 have given you various instructions about your conduct as

19 jurors.  You will be released from all of those instructions.

20 You can discuss now the case with whomever you might want.

21 You do not have to discuss the case with anyone; but, you may

22 discuss the case with anyone, if you wish.

23    Members of the jury, again, thank you very much for

24 your service.  What will follow now is a sentencing hearing.

25    Members of the jury, if you would so request, it

1  probably can be arranged that you be allowed to remain for

2  that. If you do not wish to, your service would be completed

3  and you will be able to check out and you will be allowed to

4  go.

5      Members of the jury, if you wish, you may now

6  leave the courtroom. Thank you.

7      THE COURT: All right. Is the defense ready to

8  proceed with sentencing?

9      MS. THOMAS: We are.

10      S E N T E N C I N G   H E A R I N G

11      THE COURT: All right. I will hear from the state

12  then. I have, of course, heard the evidence presented as to

13  the charges. And, I'll need to know a little bit about Mr.

14  Massey as to any prior record he might have or any other

15  factors that the state wishes the Court to consider.

16      MR. COTTRELL: Your Honor, the state does realize

17  the Court has heard the evidence in this case and we leave

18  sentencing in the Court's discretion.

19      I would inform the Court that the Prior Record

20  Level is three. If I may approach with the structured

21  sentencing work sheet.

22      THE COURT: Ms. Thomas, the prosecutor has just

23  advised me those written in red on the sheet do not count and

24  should not be regarded by the Court. And, that is what that

25  conversation was about.

1    MS. THOMAS:  Yes, sir.

2    THE COURT:  The state has computed the points.

3    Let's see, that's seven; 1 Class G felony, for which he would

4    receive four points; and, that was for sell and deliver of

5    cocaine charge.

6    And then, 3 Class 1 misdemeanors, for which he

7    would get one point each.  The total of it being seven.

8    What says the defense as to the state's computation

9    of points?

10    MR. COTTRELL:  May we approach, Your Honor?

11    THE COURT:  Yes.

12    {Conference at sidebar, outside the hearing of this Court

13    Reporter, with all attorneys present.}

14    MR. MASSEY:  I did that time already.

15    **{Thereupon, the following proceedings take place in open**

16    **court, within the hearing of this Court Reporter.}**

17    THE COURT:  All right.  The bench conference was a

18    discussion of the prior offense attributed to the defendant

19    of sell and deliver of cocaine.  The concern by the state, a

20    reasonable concern, is whether that should be considered, for

21    sentencing purposes, as a Class H or Class G felony.

22    The Court would note that it would be then either

23    four points, if a Class G and two points, if Class H.  Either

24    way, when added to the misdemeanors he would be within the

25    level of five to eight points.

1  However it is counted then, the Prior Record Level

2  would be a Level 3. I don't know then that it will really

3  make any sentencing difference.

4  I appreciate it being brought to the Court's

5  attention. I'm referring to, at the bench conference, I am

6  referring to 90-95, Subsection B-1, which reads, "A

7  controlled substance classified in Schedule 1 and 2 shall be

8  punished as a Class H felony, except for sale of controlled

9  substance, classified as Schedule 1 and 2 shall be punished

10 as a Class G felony. Cocaine comes under a Schedule 2."

11 I'll allow the defense to be heard, if the defense

12 wishes to be heard. And, as I said, I don't know if that's

13 going to make any difference in sentencing.

14 MS. THOMAS: Your Honor, I don't have my book with

15 me. I haven't looked carefully. I agree with the Court that

16 it would not make any difference. But, I still believe,

17 under the law existing in 1995, it would have been Class H.

18 But again, I do not believe it would affect the

19 sentencing.

20 THE COURT: Okay. Thank you. Anything else from

21 the state then?

22 MR. COTTRELL: No, Your Honor.

23 THE COURT: Is there restitution? Any other

24 factors for sentencing that the state needs to bring in of

25 any kind?

1    MR. COTTRELL: Your Honor, the restitution should
2  be due is $60.00 taken in the robbery. That's the only
3  monetary restitution due.

4    THE COURT: All right. I'll hear from the defense
5  then. Anything the defense wish to say for sentencing
6  purposes first.

7    MS. THOMAS: Yes, Your Honor. I would like to
8  begin by having Mr. Massey speak.

9    THE COURT: That's fine.

10    MS. THOMAS: And then, his aunt would like to be
11  heard also.

12    THE COURT: That's fine. And, you can present the
13  witnesses in any manner you wish. They can be sworn or I'll
14  hear them in presentation form or sworn; as you wish.

15    MS. THOMAS: We would present un-sworn testimony,
16  Your Honor.

17    THE COURT: That's fine.

18    MR. MASSEY: I have never seen this lady in my
19  life. I hate that she was victimized like this. And, I
20  don't understand how -- I'm kind of in shambles right now
21  because I have never possessed a gun; I never owed a gun; I
22  never held one in my hand.

23    I love kids. I'm not the kind of person that will
24  pull a gun on a person and take somebody's goods. I work
25  hard. I do work.

1        This lady, to me, in my heart, I feel that she

2  falsely accused me of a crime I did not commit. I feel that

3  the State of North Carolina has put these charges on me

4  because of the simple fact that I'm a Black male and I'm

5  young, in North Carolina.

6        And, I feel this way because I was locked up, came

7  to jail, before this even transpired; and, I was in jail on a

8  possession of a stolen vehicle charge. I made bond. And,

9  after that, two months later, I got hit with these charges,

10  which is armed robbery and breaking and entering and

11  kidnapping of this woman and her kids, which I never seen her

12  in my life. I never even behold her to the other day, when I

13  seen her.

14        I got these charges. The judge first told me that

15  the charges were in Memphis, Tennessee. Then they said I was

16  on state-wide in Mississippi; say the charges was in

17  Mississippi say that I was on state-wide warrant for my

18  arrest; state-wide.

19        I never even had a chance to even -- I haven't

20  never seen the lady in order to rob her.

21        Now, I have a friend and a godmother that lives

22  down there. And, in these same apartment complex that have

23  lived there, previous, before this. Then, after they moved

24  out to a condominium, they moved back. And, I had just got

25  out of prison.

And therefore, like I say, I hadn't never seen the lady, yet still, I'm convicted, about to get sentenced with half my life for $60.00.

And, I don't understand. If that was the case, if I would have did it to this lady or whatever, I think I would rather tried reconcile it on the street or say, "Ms. Lady, I rather just pay you."

But, I came to trial thinking I would get judged fairly on the charges. And, I don't think that I was judged fairly on the charges. There is a lot of things why I feel this way because, you know, a lot of reasons. And yet-and-still, I haven't never seen this lady. This lady said this person was totally different description from me and yet-and-still, I have been found guilty of these charges, which I can't understand in my mind.

I can't get it to reconcile in my heart to where I'm considered to go to prison for somebody's negligence behind somebody that I never seen in my life. And, I don't take people's goods. I have never taken nothing from nobody. I ain't never have to.

THE COURT: All right, sir. Thank you very much. I'll hear other evidence from the defense, for sentencing.

MS. THOMAS: Your Honor, I think that Ms. Linda Brown would also like to be heard, if she can.

THE COURT: All right.

1     MS. BROWN:   I'm standing here, Your Honor.

2     COURT REPORTER:    Excuse me.  If she is not

3 going to speak up, she'll have to come up to the witness

4 stand.

5     MS. BROWN:   My name is Linda Brown.  And, I'm

6 standing here, Your Honor, to say that I have two older sons;

7 one is not a very good boy; but, Shawn, he's been a good boy.

8 And, what I mean is his mother died of cancer; and, cancer is

9 a terrible disease.

10    She suffered so long and Shawn was just a boy, you

11 know, in junior high school and maybe a couple years; I think

12 maybe 9th grade.  And, they had it real bad.  And, not only

13 that she was -- she had a problem, as far as the

14 understanding things.

15    And, his father was here in Charlotte; but, his

16 father didn't help him, you know, him and his mother.  And,

17 you know, the grandmother's husband had terrible disease and,

18 you know, he had about 15 operations; so, she was lot

19 involved in that.

20    Shawn was placed in a foster home and sent back and

21 forth too, with kids.  And, they went through a lot, you

22 know, just two of them.  And, the mother didn't have good

23 understanding how to work through the system and I was

24 crippled all up, you know.

25    And, I know that can affect kids when they get

about 13 or 14 because I'm raising a 17-year old now that's starting to acting up. But, you know, that happens; they fed him and clothed him and stuff and made him go to church. But, I, myself, I'm just, Your Honor, learned -- listened to all of this here. I will keep up with things because I'm a minister; I've been a minister 33 years; and, I keep up with things.

And, I'm not criticizing, you know, people doing jobs when they had proof that -- that it wasn't proved that he was in the house. And this boy getting ready to get sentenced the rest of his life.

I would just like you to take into consideration his life style as a child. A young Black boy, going to Charlotte-Mecklenburg Schools and he wanted to play football and he had a hard time getting his cleats.

And then, he wanted to drive and he had a hard time passing his license thing. And, it wasn't because he was mentally retarded or anything; just when he was with the mother that's real sick, like his mother was; not able to help him.

And, we tried to help him, you know. And, at that time, he was '80's, you know, I have the mother that you seen with Alzheimer's. I've had 37 years who couldn't give him all that we can give him.

I feel like we failed him, too; because, we have

1    not been able to give him what he needs.

2        And, would you please just maybe -- I don't know

3    how you -- I do know that you have to do your job; everybody

4    does.  But, he had it pretty bad; he's been here a year and-

5    a-half, going on two years, in the jails.

6        And, I go to the jails and I have -- they give me

7    authority to go to the jail and I go to the prison and things

8    like that myself.  And, I know I've seen him like just skin

9    and bones and just suffering all the time.

10        I feel like this might be the worst turning point

11    in his life, as far as being a human being.  If he have to go

12    now, it's probably his life's going to be over.

13        But, he has a father now that, you know, and, you

14    know how they do when they get in trouble.  One of my sons

15    didn't; one of my sons I came and asked the judge to put him

16    in jail.

17        I'm not asking you because I wanted -- see, I had

18    to take my son and put him down there, Your Honor.  But,

19    Shawn has suffered so, since he was about -- I think his

20    mother started getting sick when he was about seven, you

21    know, years old; with my mother, couldn't do very much;

22    granddaddy's leg and everything cut off; and, all this kind

23    of stuff.  Me, I was in a wheelchair.

24        And so, he feels like maybe he didn't get enough,

25    you know, of our love and dying.  You know, you can't do too

1   much when you're living with your mother. Every since she

2   died, he's been a different person, as far as his

3   personality.

4           I mean, he never disrespected me; but, I know I

5   noticed, just like I never seen him talk out. I know he's

6   very afraid of what's getting ready to happen to him. And, I

7   don't want to see his life just destroyed.

8           I know what she said. And, I have two daughters;

9   one a teacher and one that's a lawyer. I don't want to see

10  that happen to my daughters. But, I do think people should

11  have a little bit of proof when they say things about

12  people.

13          As I said, I never seen him with --

14          MR. MASSEY: I ain't never seen her.

15          MS. BROWN: I feel like maybe I should have done

16  more by his mother; she's a young girl; she died at 37, 36

17  years old. And, he never had a father. Just difficult for

18  kids in school. He couldn't get a lot of things, you know.

19  My kids couldn't either.

20          And, I know that's no excuse for anything that he

21  didn't have a piece of candy; but maybe he can get some kind

22  of counseling, as well as something where he might could get

23  a chance in this country and in this city, state, just one

24  more time. Something that finds out what's going on inside.

25          I saw a broken little boy, about ten years ago.

1  He's just 26; that's when he was 16, you know, going through

2  the teenage years.

3  And so, I just wanted to say that. I just don't

4  understand. It wasn't right. Just wanted to say that if you

5  could Judge, just -- if you could just -- if you put him away

6  in prison, with the system, his life is destroyed and I know

7  he can't do nothing with these big guys.

8  And, since that they didn't prove he was in the

9  house, I don't know how he could just get sent away like

10 this. I have never been to court in years, you know. But, I

11 know he was having a real bad -- you know, teenagers, you

12 know, and won't listen to his grandmother when he's there,

13 having to go to church.

14 She's got grandchildren there now; granddaddy just

15 died, the one he cooked for, he just died, while Shawn was in

16 the prison -- I mean, the jail here. And, he's been in  jail

17 almost two years; no period; no nothing; just the terrible

18 thing I ever seen.

19 Please, if you can give him some mercy on him, it

20 probably would help him; give him another chance; because,

21 going to prison today, it will never -- he will never leave.

22 I don't think it will ever, ever get any help.

23 THE COURT: Thank you very much, ma'am. I'm glad

24 you're here. And, I'm sure Mr. Massey and his family

25 appreciate your being here, very much.

1    I would just advise you actually, my sentencing

2  options are pretty limited as to what I would be able to do

3  in this case.

4    I'll hear from the defense counsel now, anything

5  you would like to add, Ms. Thomas.

6    MS. THOMAS:  Your Honor, I understand that we're

7  taking some time with this; but, Mr. Bobby Ross has just

8  indicated that he would like to be briefly heard, if the

9  Court would please.

10    THE COURT:  That's all right.  Mr. Ross, just

11  stand where you are, sir.  I will be happy to hear you.

12    MR. ROSS:  First of all, I will be as brief as

13  possible.  I would like to say, you know, my heart goes out

14  to the victim here.  You know, what happened to her was a

15  horrible thing.  And, Shawn is a personal friend of mine.

16  I've known him for about three years.

17    I wouldn't be here if I really believed that he had

18  done this crime.  And, I've never, before now, had to come to

19  court for any reason, other than traffic tickets, and sat in

20  on any trial of any sort.

21    However, after sitting in on this trial, you know,

22  I'm almost motivated to become a trial attorney because the

23  prosecution, they put on a great case and in spite of them

24  having a very weak case against him.

25    And, you know, it is my belief, as much as I like

1    Janet, there wasn't enough time preparing for these cases.

2    This case was a winnable case.

3           I, and his grandmother, we will, after this, you

4    know, get together and we will get Calvin Murphy to appeal

5    this and to overturn it because what has happened here today

6    or over the course of the last couple days, shouldn't have

7    happened.

8           There were things that went on. I'm a lay person;

9    I'm not an attorney. But, you know, having a uniformed

10   officer get up there and say to the jury about his experience

11   as far as the fingerprinting and what not, that shouldn't

12   have happened.

13          There were several things that I saw, as a lay

14   person, that shouldn't have happened. And, you know --

15          THE COURT: Mr. Ross, I'll be happy to hear

16   anything you want to say on behalf of Mr. Massey. The manner

17   in which I conducted the trial is -- Mr. Massey has a right

18   to appeal that and more power to him. But, that's not going

19   to change how I sentence Mr. Massey.

20          If you want to say things about Mr. Massey, which

21   would help me sentence him, I would be happy to hear anything

22   you want to say about Mr. Massey.

23          MR. ROSS: Well, you know, he does have a

24   troubled past; that is clear. And, you know, there is no

25   excuse for breaking the law at any time, as far as I'm

1  concerned.

2      However, in this incident, you know, it is my

3  belief that he didn't do this.  The reason I am here is

4  because in his support, because, I don't believe that he did

5  it.  And, you know, I just think it's a tragedy what's

6  happened here, over the last couple of days.

7      THE COURT:  All right.  Thank you, sir.  Anything

8  else from the defense?

9      MS. THOMAS:  If Mr. Massey could briefly be heard

10  again, Your Honor.

11      THE COURT:  All right.  And then, I'll allow

12  counsel to be heard.  Go-ahead, Mr. Massey.

13      MR. MASSEY:  Like in my motion, right, you know, I

14  was wondering, you know, it was a lot of things that was

15  blank in my motion.

16      And, as far as the hair, I have like, you know, my

17  people was saying, I never had long hair.  Now, I had it to

18  where the picture that they showed me, little longer hair, I

19  was going -- my mom had passed then and I was mentally burned

20  out.  I was really  mentally [restormed.]

21      I mean, like I stated, three or four months,

22  rebuilding, mentally on -- I, really, I was sitting on my

23  grandma's porch, wondering when my mom was going to come back

24  through the door.

25      But, you know, I don't want no sympathy because of

1  the point that I didn't do it.  Lord knows I didn't do it.

2  And, that's what I'm going on right there.  So, any way you

3  look at it, and you sentence me, the Lord's going to overturn

4  it and it's going to turn out for me, any way.

5      Maybe this is a blessing from God, in disguise.

6  Really, which I think it is; because, when I had the attorney

7  come in again, it won't be her; and, it won't be nobody in

8  this courtroom.  It will be this one.  He's going to come and

9  talk to me.

10      So,  however it go, it don't matter now.  But, I do

11  wish you would have some leniency on me.  Like I said, I feel

12  sorry for this woman.  I ain't never seen her.

13      Ms. Lady, if you accused, I'm sorry that it

14  happened to you like it did and your kids.  I love kids.

15  And, to your husband there, I would never -- One thing I

16  would never do, I'll never take a women and try to mess with

17  her, sexually.  But, I would never do nothing to any kids, at

18  that.

19      But, I feel sorry for you and I feel when I see you

20  in heaven again, I hope to be sitting there where I can see

21  you, if you make it there, so I can tell God, "That's the

22  woman who falsely accused me and I'm fixing to be rich, after

23  this is over with."

24      THE COURT:    All right.  Thank you, Mr. Massey.

25  Ms. Thomas, I'll hear you, on behalf of Mr. Massey.

1    MS. THOMAS:  Your Honor, Mr. Massey is 27 years

2    old.

3         MR. MASSEY:  Twenty-six.

4         MS. THOMAS:  He has a very supportive family and

5    have been here most of the week for him.  His grandmother,

6    his godmother, his aunt and a family friend and many other

7    family members have been here to show their faith and believe

8    in Mr. Massey.

9         He has a seven year old son and I understand from

10   the family that he is rather involved in his son's life and

11   does his best to provide for the son.

12        For those two reasons, we would ask the Court to

13   find mitigating factors.  We would also ask that because this

14   was one occurrence that happened at the same -- during the

15   same course of events, that the Court consolidate these cases

16   for sentencing, under the robbery with a dangerous weapon.

17        And, fortunately, Ms. Wood was released, unharmed,

18   when she was going to be, there was some talk about sexually

19   taking her.  She said, "No; I can't," and she was not

20   attacked or touched in any way.

21        So, Your Honor, we do ask for consolidation of the

22   sentences and we do ask the Court to find two mitigating

23   factors.

24        THE COURT:  Thank you.  Mr. Massey, stand up,

25   please, sir.  All right.  Madame Clerk, if you will take this

1  as the judgment.  There will be two judgments.

2          Mr. Massey, I'm going to sentence you under the

3  provisions of law; the Court is not determining whether or

4  not a person is guilty or innocent of the crime.  That is a

5  factual determination for the jury.

6          The state selected the jury and the jury has

7  spoken.  You are, therefore, under the law, guilty of these

8  charges.

9          I suppose the only thing that I really disagree

10  with that you said, Mr. Massey, without making any comment on

11  your protesting your innocence is about your counsel.  I

12  think your attorney has done an excellent job representing

13  you, sir.

14          I think  you had, in your proceeding the state's

15  strong point was the identification of you by the victim.

16  And,  your attorney made an effort to suppress that

17  identification.  That was a matter of law which I ruled on.

18          The matter in your behalf was differing accounts of

19  descriptions, as far as your hair.  Your counsel certainly

20  made the most of that and presented quite a bit of evidence

21  on that.

22          That was not sufficient though, sir, for the jury

23  not to be able to be convinced.  A jury of 12 people who were

24  not there, that you were in fact guilty of these charges,

25  beyond a reasonable doubt.

1    As I think everyone has admitted, what happened to

2  Samantha Wood and her family were terrible things. And, the

3  law has provided in sentencing to fall within pretty much a

4  narrow range of options for a presiding judge.

5    As your attorney has argued, the Court has the

6  ability to run all the charges consecutively or combined them

7  or to make some variations of that.

8    As far as an active sentence or not, that is not in

9  the Court's discretion.

10    I will sentence then, according to the sentencing

11  provisions and this will be the sentence. Beginning first

12  with the charge in File No. 98 CRS 33738, the charge of

13  robbery with a dangerous weapon.

14    The Court will note that in this case the defendant

15  has been present throughout the hearing; is represented by

16  counsel and has been found guilty, by a jury, of the charge

17  of robbery with a dangerous weapon.

18    The date of the offense was May 22, 1998; the

19  offense is a violation of 14-87. It is a Class B felony.

20  The Court has determined that there are seven points for

21  sentencing purposes, which would put this Prior Record Level

22  3. There is some condition that instead of seven points, it

23  should be computed as five. Either way, it still falls

24  within a Prior Record Level 3.

25    The Court has examined aggravating factors and

1   mitigating factors. However, the Court chooses to sentence

2   within the presumptive range of sentences and will make no

3   findings of aggravation or mitigation.

4          Having considered the evidence, arguments of

5   counsel and statements of the defendant, the Court does ORDER

6   that the defendant be IMPRISONED FOR A MINIMUM TERM OF ONE-

7   HUNDRED, THREE (103) MONTHS AND A MAXIMUM OF ONE-HUNDRED,

8   THIRTY-THREE (133) MONTHS in the custody of the Department

9   of Corrections.

10         The defendant shall be given credit for all the

11   time he has spent in custody, prior to this date, as a result

12   of these charges -- or, result of this charge.

13         Madame Clerk, in the second judgment, this will be

14   in the kidnapping charges and the breaking and entering

15   charge.

16         In these charges, the Court will note the defendant

17   has been present throughout the proceedings, represented by

18   counsel and having been found guilty, by a jury, to a charge

19   of second-degree kidnapping, in File No. 98 CRS 33739;

20   another charge of second-degree kidnapping, and a third

21   charge of second-degree kidnapping, in File Nos. 98 CRS 33740

22   and 33741.

23         All of these are Class E felonies, punishable under

24   General Statute 14-39; also occurring on May 22, 1998.

25         The defendant has also been found guilty, by a

1    jury, of a charge of breaking and entering. This is Case No.

2    98 CRS 141972, a violation of 14-54A, a Class H felony.

3       The Court determines that there are seven points

4    for sentencing in these charges and will sentence in the

5    Prior Record Level 3.

6       The Court will make the same notations that it has

7    been contended that the points should be five. However, that

8    would still place it in a Prior Record Level 3 and the Court

9    will sentence accordingly.

10       The Court has examined the aggravating and

11    mitigating factors and feels that the presumptive sentence is

12    appropriate and will then sentence within the presumptive

13    range of sentencing, without finding aggravating or

14    mitigating factors.

15       Having considered the evidence, the arguments of

16    counsel, the statements of the defendant, the Court will

17    ORDER that THE FOUR CHARGES BE CONSOLIDATED AND ORDER THE

18    DEFENDANT BE IMPRISONED FOR A MINIMUM TERM OF THIRTY-FOUR

19    (34) MONTHS AND A MAXIMUM OF FIFTY (50) MONTHS in the custody

20    of the North Carolina Department of Corrections.

21       No credit is given in these charges, as all the

22    credit for time in custody is being applied in the preceding

23    case.

24       THIS SENTENCE SHALL BEGIN AT THE EXPIRATION OF THE

25    SENTENCE WHICH IS IMPOSED IN File No. 98 CRS 33738, AND SHALL

1  NOT RUN CONCURRENTLY THEREWITH.

2  The sentencing is concluded then, unless there are

3  any questions concerning the sentence.

4  Anything from the state?

5  MR. COTTRELL: No, Your Honor.

6  THE COURT: Anything from the defendant?

7  MS. THOMAS: No, Your Honor.

8  THE COURT: All right. Mr. Massey, good luck to

9  you, sir. The defendant is in your custody.

10  MS. THOMAS: Your Honor, may I be heard?

11  THE COURT: Yes.

12  MS. THOMAS: Your Honor, Mr. Massey has requested

13  that NOTICE OF APPEAL BE ENTERED. I would make a motion to

14  withdraw as counsel and that the Public Defender's Office be

15  appointed.

16  THE COURT: All right. Does the state wish to be

17  heard, in any way, on the Notice of Appeal or any procedure

18  thereto?

19  MR. COTTRELL: No, Your Honor.

20  THE COURT: All right. The Court is vested

21  jurisdiction by giving Notice of Appeal. The record should

22  reflect that the defendant has, in open court, given oral

23  Notice of Appeal.

24  Counsel in this case, Ms. Janet Thomas, is allowed

25  to withdraw and shall not be appointed as appellant. The

1  Court will appoint the Public Defender's Office.

2           Did you mean the Public Defender's Office here or

3  the Appellate Defender's Office?  It may be that the

4  Appellate Defender's Office does not automatically accept

5  these cases.  I know they are limited in what they do.  Or,

6  were you make a specific request beyond that?

7           MS. THOMAS:  I intended to request the Public

8  Defender's Office.

9           THE COURT:  I'll put that down and then put as

10  secondary counsel, if there is some reason the Public

11  Defender's Office could not do it, the Appellate Defender

12  could.

13           THE CLERK:  Usually the Public Defender's Office

14  has someone who handles appeals.  If they can not handle it,

15  they farm it out, if you just appoint the Public Defender's

16  Office.

17           THE COURT:  All right.  I'll do that then.  I'll

18  just appoint the Public Defender's Office to handle the

19  appeal.

20           And, the Court DECLINES TO MAKE ANY RECOMMENDATION

21  FOR RELEASE AND WILL NOT SET ANY RELEASE CONDITIONS, PENDING

22  APPEAL.

23           The defendant is in your custody.  Good luck, Mr.

24  Massey.

25           MS. THOMAS:  Thank you, Your Honor.

1    THE COURT:    Sheriff, go-ahead and recess <u>sine die</u>.

2    Wait, just recess until Monday morning.   I guess,

3    technically, we're still in a long-term proceeding for the

4    capital case.   Just recess court until then.

5    {Court stands in recess.}

6    [END OF PROCEEDINGS.]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
98 CRS 33738, 39,40,41,
98 CRS 141972

STATE OF NORTH CAROLINA )
)
VS. )
)
SHAWN GIOVANNI MASSEY )
)
                    Defendant. )

CERTIFICATE

    I, the undersigned Commissioner, **DO HEREBY CERTIFY** that the foregoing **Three-hundred, Thirty-eight (338)** pages constitutes a true and accurate transcript of the proceedings, as taken stenographically and transcribed by me.

    **I FURTHER CERTIFY**, that I am not of counsel for any of the parties to this action; that I am not related by blood or marriage to any of the parties; nor am I interested, either directly or indirectly, in the results of this action.

    **I CERTIFY** this is a **TRUE COPY** of the original transcript herein, and that same is **VALID ONLY IF IT BEARS MY RAISED SEAL**, followed by my printed name.

    WITNESS BY HAND AND SEAL, this **31**st day of **December,** 1999.

_____
Josephine Garrett-Coley
Official Court Reporter

My Commission Expires, July 31, 2000.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
98 CRS 33738, 39,40,41,
98 CRS 141972

STATE OF NORTH CAROLINA )
)
VS. )
) **CERTIFICATE OF DELIVERY**
)
SHAWN GIOVANNI MASSEY )
)
Defendant. )

 

      **THIS IS TO CERTIFY** that the transcript in the above-entitled case was requested of **Josephine Garrett-Coley,** Official Court Reporter for the 26th Judicial District, on or about **September 21, 1999** and was delivered and/or mailed to the persons indicated below, on January 3, 2000.

      **WITNESS BY HAND AND SEAL,** this 31st day of **December,** **1999.**

                         _____
                         Josephine Garrett-Coley
                         Official Court Reporter

My Commission Expires, July 31, 2000.

**Eric Cottrell**
Assistant District Attorney

**Office of the Public Defender**