UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No.: 3:11-CV-477

| | | |
|---|---|---|
| SHAWN MASSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLOTTE-MECKLENBURG POLICE | ) | |
| OFFICER J.J. OJANIIT; CHARLOTTE- | ) | **DEFENDANT OFFICER GERALD J.** |
| MECKLENBURG POLICE OFFICER | ) | **ESPOSITO'S MEMORANDUM IN** |
| GERALD J. ESPOSITO; CHARLOTTE- | ) | **SUPPORT OF MOTION FOR** |
| MECKLENBURG POLICE OFFICER TOM | ) | **JUDGMENT ON THE PLEADINGS** |
| LEDFORD; AND CHARLOTTE- | ) | |
| MEKCLENBURG POLICE OFFICERS JOHN | ) | |
| AND JANE DOES ##1-10, IN THEIR | ) | |
| INDIVIDUAL CAPACITIES, | ) | |
| | ) | |
| Defendants. | ) | |

## Nature of Proceeding

This case arises out of the trial and conviction of the Plaintiff for kidnapping and other crimes in September 1999, and the decision of the Office of the District Attorney in Mecklenburg County in May 2010, to agree to vacate his convictions and dismiss those charges. As a result of the dismissal, the Plaintiff has sued three police officers, individually, for various constitutional and state torts based on his claim that they "fabricated" evidence against him and otherwise pursued a baseless prosecution (and conviction). The Defendants have filed Answers and Motions for Judgment on the Pleadings. The Defendants do so because, as was made clear in the District Attorney's Motion and the trial transcript, there was and still remains ample probable cause against the Plaintiff for these crimes. The victim in this case has repeatedly, and as recently as 2010, identified the Plaintiff as her attacker; one of the Plaintiff's own witnesses

not only places him at the scene of the attack a few hours before it occurred, but in so doing disproved his alibi defense. Moreover, the fabrication claim made by the Plaintiff was not the basis for the vacation of the Plaintiff's convictions, nor was it the basis for the District Attorney's decision to dismiss these charges. Put simply, excluding any evidence that the Plaintiff claims was fabricated, as a matter of law the evidence that remains both establishes the existence of probable cause and demonstrates that any allegedly fabricated evidence was not the legal cause of the Plaintiff's conviction.

## **Factual Background**

### *The Robbery and Kidnapping of Samantha Wood*

The events of this case revolve around the robbery and kidnapping of Samantha Wood and her children on May 22, 1998. At that time, Mrs. Wood, her husband and her children, lived at 5206 Cherry Crest Lane in Apartment B of the Emerald Bay Apartments. At about 10:00 am, Mrs. Wood was returning from errands with her children, one of whom was a baby; as she approached her door a man grabbed her and put a gun to her baby's head. **Complaint ¶11; Exhibit 9 pp. 38-39.** Forcing her inside her apartment, the assailant attempted to rape her and, when unsuccessful, robbed her, eventually fleeing after 30 minutes. **Complaint ¶¶13-14; Exhibit 9 p. 49.** The assailant did not wear a mask. **Exhibit 9 p. 50.** While in the apartment, the assailant told Mrs. Woods to be quiet because the walls of the Emerald Bay Apartment were not soundproof, **Exhibit 9 p. 45**; he also told her that he knew her schedule and her husband's schedule and warned her not to call police as "he would be outside watching" and would come back and kill her. **Exhibit 9 p. 48; Exhibit 3 p. 1.**

After being released, Mrs. Woods called the police. She described her attacker as a young black male who was approximately 5'9" tall and was wearing a red jersey with a

2

"Hurricanes" symbol and blue jean shorts. **Complaint ¶¶15-16; Exhibit 3 p. 2; Exhibit 9 p. 41.** She also told police that her attacker had "(4) small braids on the back of his head." **Complaint ¶16; Exhibit 3 p. 2.**

<em>The Police Investigation</em>

The next day, May 23, 1998, Officer Esposito was assigned to the Emerald Bay Apartments to conduct "canvas" interviews. **Exhibit 9 p. 103.** Officer Esposito was a violent crimes investigator with Adam One and had been an officer with the Charlotte-Mecklenburg Police Department for six years; for nearly 18 years before that he had been in law enforcement in the Chicago area. **Complaint ¶17; Exhibit 9 p. 102.** During the canvas process, Officer Esposito spoke with Theresa Savall, the Assistant Community Director for the Emerald Bay Apartments. **Complaint ¶17; Exhibit 9 p. 67.** Ms. Savall had been at work on May 22, 1998, and was doing her "rounds" of the buildings when she was "accosted" by a young black male, approximately 5'11" tall, wearing a jersey type shirt and a hat. Ms. Savall indicated that the man was "acting kind of hyper," approached her, said "Baby, you look good," and asked her to "go out" with him. **Complaint ¶17; Exhibit 9 pp. 70-71.** Ms. Savall told the man to leave her alone and he left, walking back towards the apartment buildings. **Exhibit 9 p. 72.** Ms. Savall told Officer Esposito that the man had come from the patio of the apartment at 5038 Cherry Crest Lane, Apartment C. **Complaint ¶17; Exhibit 9 p. 73.**

Based upon this information, Officer Esposito went to 5038 Cherry Crest Lane, Apartment C, and spoke with the woman who lived at that apartment, April Pride. **Complaint ¶18.** In order not to jeopardize any potential leads, Officer Esposito told Ms. Pride that he was investigating a noise complaint about a young black male the prior morning. **Exhibit 9 p. 107** ("I wanted her not to be reluctant in identifying who was on her premises. I wanted her to be

3

truthful. And so, I didn't want to say that we were investigating any sort of attempt[ed] rape or robbery or anything that would alarm her so that she wouldn't protect anyone.") Ms. Pride told Officer Esposito that Shawn Massey had spent the night at her apartment; she described Shawn Massey as about 25 years old, and told Officer Esposito that he lived with his grandmother at either 3212 or 3216 Graymont Road. **Complaint ¶18; Exhibit 4 p. 2.** Officer Esposito further wrote in his report that Ms. Pride said that "Mr. MASSEY wears his hair pulled back with 4 or 5 braids." **Exhibit 4 p. 2.** Ms. Pride also confirmed that Mr. Massey was at her apartment on the morning of May 22, 1998, when she left for work at 6:45 am. **Exhibit 9 pp. 91, 281; Complaint ¶18.**

With this information, Officer Esposito conducted a record search into Mr. Massey and discovered that he had previously been arrested and that a processing photograph ("mug shot") existed for him. Officer Massey provided this information to Investigator J.J. Ojaniit, who was leading the investigation.

Investigator Ojaniit took Officer Esposito's information and, along with Investigator Tom Ledford, created a photo array that included Shawn Massey's mug shot. **Exhibit 5.** On May 26, 1998, the photo array was shown by Investigator Ledford to Ms. Savall. Ms. Savall was told that the person who accosted her on the morning of May 22 "may or may not be" in the array and that she "should not feel pressured to identify anyone." **Exhibit 9 p. 83.** After approximately one minute, she identified Shawn Massey's photograph as the man who approached her that morning. **Complaint ¶22; Exhibit 9 pp. 74-75.** The same version of the photo array, along with other photographs, had been shown to Mrs. Woods on May 23 by Officer Ojaniit. Mrs. Woods also identified Shawn Massey, telling investigators that his mug shot "looks most like the suspect except the suspect had longer hair with braids and he did not have a beard." **Complaint**

**¶20; Tri Exhibit 9 pp. 58, 64; Exhibit 3.** It is undisputed that Shawn Massey's mugshot showed no braids and did not show the back of his head.[1]

*The Prosecution of Shawn Massey*

On July 7, 1998, felony warrants for Shawn Massey's arrest on three counts of kidnapping, one count of armed robbery, and one count of breaking and entering with a dangerous weapon were issued to Investigator Ledford. **Exhibit 7.** These warrants were not served until August 26, 1998, when Shawn Massey was arrested on other charges. Shawn Massey was indicted by a grand jury for these felonies on September 8, 1998. **Exhibit 8.** Officer Esposito did not appear before the grand jury, nor was he listed as a witness for the grand jury hearing.

Shawn Massey's case was scheduled for trial on September 13, 1999. Before court opened that morning, Mrs. Wood spoke with the Assistant District Attorney, telling him that she had doubts about her identification, stating: "I don't know if that's him or not." **Exhibit 2 ¶6.** Because a hearing was about to begin, the Assistant District Attorney told her that he would not be able to discuss this with her at that time. **Exhibit 2 ¶6.** Mrs. Wood then watched as a preliminary hearing over whether Mr. Massey's attorney should be allowed to withdraw was conducted. **Exhibit 9 pp. 3-8.** During the course of that hearing, Shawn Massey answered questions about his satisfaction with and confidence in his attorney. Following that hearing, Mrs. Wood informed the Assistant District Attorney that "she was satisfied Massey was the one who victimized her based on seeing his face and hearing his voice." **Exhibit 2 ¶6.** The State did not reveal these conversations to Shawn Massey's attorney.

---

[1] The mug shot showed Mr. Massey with a light beard, which he did not have in May 1998.

5

Shawn Massey's trial began on September 14, 1999. His attorney filed a Motion to Suppress Mrs. Woods' identification of him, and to bar her from identifying him in court. The trial court held a hearing on the Motion, and took testimony from a number of witnesses, all but one of whom were called by defense counsel.[2] The thrust of the testimony offered by defense counsel was that Shawn Massey never wore braids in his hair, that his hair was never long enough to wear braids, and that he was at work at the time the crime occurred on May 22, 1998. Consequently, counsel argued that the out of court identification conducted by Investigator Ojaniit had been constitutionally defective and that any identification of Shawn Massey by Mrs. Wood was inherently unreliable. The trial court denied the Motion and entered extensive findings of fact and conclusions of law permitting the State to introduce Mrs. Wood's out of court identification of Shawn Massey and to allow her to identify him in court during her testimony. **Exhibit 9 pp. 175-86.** Officer Esposito did not testify at the Suppression hearing.

The State's case against Shawn Massey was based on his identification by Mrs. Wood as being her attacker, and his identification by Theresa Savall as being the man who accosted her thus placing him within the apartment complex at the time of the crime. **Complaint ¶¶24-25.** The State also called April Pride. Ms. Pride testified that Shawn Massey was the person that both Mrs. Woods and Theresa Savall had chosen in the photographic array, and identified Shawn Massey herself. **Exhibit 9 pp. 88-89, 94.** She testified that he spent the night at her apartment and that he was still at her apartment in the complex at 6:45am on the morning of the attack, when she went to work. **Exhibit 9 p. 91.** Ms. Pride and Shawn Massey had been friends for more than a decade, and Ms. Pride testified that he came by her apartment frequently. **Complaint ¶27; Exhibit 9 pp. 89, 94.** Since, based on the attacker's statements to Mrs. Wood,

---

[2] Due to the unavailability of witnesses, the Motion to Suppress was heard in the middle of the State's case, with the consent of both the State and the Defendant.

the attacker was familiar with the apartment complex (including the fact that the walls were not soundproof) and was in the complex frequently enough to know that Mrs. Woods had a husband and what their schedules were, Ms. Pride's testimony not only placed Shawn Massey at the complex that morning but also established his knowledge of the apartments.

During cross-examination, however, Ms. Pride testified that Shawn Massey never wore his hair long, that he did not have braids when he spent the night of May 21st at her apartment, and that she had never seen him with braids. **Complaint ¶27; Exhibit 9 pp. 94-95.** When confronted with the report made by Officer Esposito, Ms. Pride testified that she told Officer Esposito everything in his report except that she did "not recall telling him" that Shawn Massey had 4 to 5 braids in his hair:

> Q.[By the ADA]     If the officer had written in his notes that Mr. Massey, that you told him Mr. Massey wears his hair pulled back with four or five braids, would the officer have been making that up?
>
> MS. THOMAS: OBJECTION.
>
> THE COURT: OVERRULED. I'll let her answer. You may answer the question.
>
> A.     I recall the officer asking me if Shawn wore braids. I do not recall telling him that he did.
>
> Q.     So, you have no idea why the officer would have written that down in notes of his conversation with you?
>
> A.     That's right.
>
> Q.     Okay.  Now, do you also remember coming to my office, sometime probably about two weeks ago?
>
> A.     Yes.
>
> Q.     Okay.  And do you remember me showing you pictures of the defendant and asking you if that was the Shawn Massey you knew?
>
> A.     [No verbal response]

Q.    Do you remember that?

A.    I can't remember you showing me any pictures.

Q.    Okay, do you remember telling me that he had braids at that time?

A.    No.

Q.    Okay. So your testimony would be that you would have told me that he had a close haircut at that time, as well?

A.    I don't remember telling you what his hair looked like.

**Exhibit 9 pp. 98-99.** Ms. Pride then testified that Shawn Massey was "like family" to her and that they were "so close" they were "like brother and sister." **Exhibit 9 pp. 100-01.**

The State called Officer Esposito to introduce his notes of his conversation with Ms. Savall (and her identification of Shawn Massey) and Ms. Pride into evidence. In so doing, the trial court specifically instructed the Jury that it was to consider the notes of his conversation with Ms. Pride "for the purpose of corroborating the testimony of April Thompson [Pride], if indeed you find that it does corroborate her testimony. Do not consider it for any other purpose." **Exhibit 9 pp. 109-10.**[3] Officer Esposito's notes were thus never introduced as substantive evidence, and were limited solely to corroborating Ms. Pride. The relevant notes occupy approximately one-third of one page of the transcript out of a total transcript of 338 pages. Aside from reading this single paragraph in his notes (in which Ms. Pride disputed only a single sentence), Officer Massey was asked only one question about this portion of his notes: "Would you have written that last comment about how he wore his hair if she had not told you that?" His answer was: "No, sir." **Exhibit 9 p. 110.**

---

[3] Ms. Pride had apparently separated from her husband after these events and before trial and changed her name to "Thompson."

The State also called Investigator Ledford as well as the crime scene investigator. Specifically, the State called the crime scene investigator to meet the claim that there was no "physical evidence" linking Shawn Massey to the crime scene. The crime scene investigator testified that there was no physical evidence linking anyone to the crime scene because he had been unable to lift any fingerprints from the crime scene. **Exhibit 9 pp. 212-13.** He further testified that in his experience it was not "abnormal" to respond to a crime scene and be unable to lift latent prints. Because there were no fingerprints, he collected no physical evidence from the crime scene.

Shawn Massey called six witnesses in his defense, including recalling April Pride. **Complaint ¶¶ 29-30.** One of those witnesses, Brady Dorsey, testified that on May 23, 1998, Shawn Massey was at work as a day laborer several miles away from the apartments. He testified that he picked Shawn Massey up at between 6:45am and 7:00am at his home on Graymont Road and drove him to the worksite, where he stayed the day and then was paid in cash.[4] **Exhibit 9 pp. 221, 224.** While the laborers are supposed to sign their cash vouchers, the cash voucher for Shawn Massey was not signed for May 23rd. **Exhibit 9 pp. 219-20.** Massey's employer, and all his other witnesses, testified that he wore his hair short, that he did not wear braids, and that he never wore braids. **Complaint ¶29.** Shawn Massey's relatives brought in a number of pictures of him over the years, such as his prom picture with his girlfriend and baby, none of which showed him with braids. The case for the defense closed with April Pride who, once again, denied that she had ever said that Shawn Massey had braids in his hair and, again,

---

[4] Graymont is more than 5 miles from the Emerald Bay Apartments on Cherry Crest Lane; Mr. Massey did not own an automobile at that time, **Tr. pp. 231-32.** It thus would have been impossible for Shawn Massey to have been in April Pride's apartment at 6:45am and then to have been picked up by his employer at between 6:45am and 7:00am, at his home, 5 miles away.

placed him at the Emerald Bay Apartments at 6:45am on May 23rd, **Exhibit 9 p. 281,** approximately the same time as his employer claimed that he was being picked up from his home on Graymont, some 5 miles away.

Shawn Massey did not testify in his own defense.

The Jury deliberated for approximately 2 hours and 35 minutes over the course of two days before finding Shawn Massey guilty on all counts. **Exhibit 9 pp. 310-11.** He was sentenced to between 103 and 113 months. **Complaint ¶31.**

Shawn Massey appealed his convictions, assigning two errors: (1) the failure to suppress his identification by Mrs. Wood, and (2) the sufficiency of the evidence. On February 21, 2001, the Court of Appeals, in an opinion authored by Judge James Wynn, found no error.[5] Specifically, it held that the identification by Mrs. Wood was reliable, was based on a photographic lineup that was "fair," and that there was no evidence that Mrs. Wood was induced to select Shawn Massey's photograph from the lineup. The Court further found that the evidence was sufficient to submit to the Jury. The Court did not mention either April Pride's testimony or Officer Esposito's testimony in its opinion and there is no indication that, in finding the evidence sufficient to go to the Jury, the Court of Appeals in any way relied on either for its conclusion.

<u>*The Postconviction Proceedings that Released Shawn Massey*</u>

The events that led to Shawn Massey's release on May 6, 2010, are set forth in a Motion filed by the District Attorney. **Exhibit 1.** That Motion indicated that, after Massey's conviction was affirmed on appeal, the Duke Law School Wrongful Convictions Clinic concluded that he was innocent and raised two issues: (1) "Massey's hair was not as described by the victim Wood," and (2) "Wood expressed doubt as to Massey being the one who committed the crimes

---

[5] A copy of the Court of Appeals decision in this matter is attached to this Memorandum.

to the Assistant District Attorney trying the case." **Exhibit 1 ¶2.** The Duke University Clinic presented to the District Attorney a number of additional pictures of Massey that were in the possession of the Sheriff's Department (apparently as mug shots) from 1991, 1995, 1996 and 1998 which showed Shawn Massey with "close cropped hair." As is customary with such photographs, they did "not show side views or the back of the head." **Exhibit 1 ¶4.** These additional photographs may have been enlargements of photos contained in the District Attorney's files and it was not clear that they were produced to defense counsel for trial. **Exhibit 1 ¶5.** Additionally, the Assistant District Attorney indicated that he did not disclose to defense counsel his conversation with Mrs. Wood before the preliminary hearing. **Exhibit 1 ¶6.**

The Motion indicated that, upon receiving this information, Shawn Massey agreed to and was given a polygraph examination. He tested deceptive on two issues: (1) his involvement in the crime and (2) his hair style at the time of the crime. **Exhibit 1 ¶5 (fifth bullet point).** In addition, Mrs. Wood was reinterviewed by investigators on March 16, 2010. She again identified Shawn Massey as the man who robbed her. **Exhibit 1 ¶5 (third bullet point).**

It was the District Attorney's assessment that the potential failure to produce other photographs of Shawn Massey, and the failure to disclose the Assistant District Attorney's conversation with Mrs. Wood, violated his Office's policies on discovery and that this additional evidence could create "reasonable doubt about whether [Shawn Massey] committed the offense." **Exhibit 1.** The District Attorney nonetheless believed that there was still "substantial evidence placing [Shawn Massey] in the area and identifying him as the perpetrator." **Exhibit 1.** However, in light of these two additional pieces of evidence, he concluded that sufficient reasonable doubt could exist on retrial such that "it cannot be said with certainty that the jury would have reached the same conclusion, nor can it be assured that the jury would have rendered

the same verdict." **Exhibit 1.** Thus, "out of an abundance of caution" he requested that the Superior Court set aside the jury verdicts so that he could then file a voluntary dismissal. **Exhibit 1.**

### Question Presented

Does the Plaintiff Have Valid Claims for Constitutional and State Law Torts When the Evidence Against Him, Excluding Any "Fabrication" is Sufficient to Establish Probable Cause and When the Alleged "Fabrication" was Not the Cause of His Conviction?

### Summary of Argument

The linchpin underlying each of Massey's claims against Officer Esposito is that Officer Esposito both fabricated the single line in his report concerning his interview of April Pride and that this fabrication resulted in Massey's arrest without probable cause, his subsequent prosecution and his ultimate conviction. The difficulty with this argument, however, is that even without this evidence, substantial evidence of Massey's guilt nonetheless still exists, evidence that both establishes probable cause and demonstrates why the claimed fabrication was not the cause of his conviction. Mrs. Wood was with her unmasked attacker for 30 minutes. She identified Massey in 1998 in a procedure that was found to be constitutionally adequate and again in 1999 after seeing him and hearing his voice. Theresa Savall identified Massey as the man who accosted her on the morning of the crime in the same apartment complex. There is no dispute that the attacker was familiar with the complex, was familiar with the fact that the walls were not soundproof, and had been in and around the complex enough to be able to observe Mrs. Wood and her husband to the point where he knew their schedules. April Pride's testimony and statement, shorn of the single disputed line, establishes that Shawn Massey was frequently at her apartment, thus providing him with the opportunity to learn about the complex and the comings and goings of the residents. Indeed, April Pride's testimony at trial undermined Massey's alibi

12

defense, for she made it impossible for Massey to have been picked up by his employer between 6:45am and 7:00am on the morning of the crimes at his home when, according to Ms. Pride, he was in her apartment when she left at 6:45 am.

## Argument

### *Judgment on the Pleadings*

To survive a motion for judgment on the pleadings, a plaintiff must allege "enough facts to state a claim to relief that is <u>plausible</u> on its face." *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570, 127 S.Ct. 1955, 1974 (2007) (emphasis in original). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S.Ct. at 1974. In making this determination, the Court assumes the Complaint's well-pleaded facts are true and draws all reasonable inferences from pleadings in plaintiff's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The Court need not, however, accept as true those factual allegations "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). The Court can consider any exhibits attached to either the Answer or the Complaint. *Eagle Nation, Inc. v. Mkt. Force, Inc.*, 180 F. Supp. 2d 752, 754 (E.D.N.C. 2001). Allegations in the Complaint that are inconsistent with the terms of a properly written document, or state mere legal conclusions, need not be accepted as true. *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006) ("We must accept the allegations in the complaint . . . unless they . . . contradict matters properly subject to judicial notice or by exhibit."); *Veney*, 293 F.3d at 730 ("Nor must we accept as true allegations that contradict matters properly subject to

judicial notice or by exhibit."); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).[6]

Officer Esposito absolutely denies that he fabricated April Pride's statement to him. Nonetheless, and for purposes of this Court's review on his Motion for Judgment on the Pleadings, Officer Esposito concedes that the Plaintiff's central assertion, that this single sentence was fabricated, must be assumed to be true. Despite this required concession, it is useful in evaluating the Plaintiff's claims to understand the totality of Officer Esposito's involvement in this case:

- Officer Esposito interviewed Theresa Savall and April Pride;

- Officer Esposito did not participate in the photo identification procedure with Mrs. Wood;

- Officer Esposito did not participate in the photo identification procedure with Theresa Savall;

- Officer Esposito did not obtain or serve the arrest warrants in this case;

- Officer Esposito did not appear before the Grand Jury nor was he listed as a witness before the Grand Jury; and,

- Officer Esposito's testimony comprised 13 pages of a 336 page transcript and was limited solely to corroboration (or lack of corroboration);

---

[6] The Fourth Circuit has held that a court's reliance on exhibits to a motion to dismiss does not convert the motion into one for summary judgment if "the facts to which the court so refer[s] [are] either alleged in the amended complaint or contained in the exhibits thereto." *Harrison v. U.S. Postal Service*, 840 F.2d 1149, 1152 n.7 (4th Cir. 1988). Thus, even a "binder of exhibits" included with a motion to dismiss can be considered without converting the motion to one for summary judgment so long as neither the motion nor the exhibits present matters outside the Complaint. *See Pueschel v. United States*, 369 F.3d 345, 353-54 & n.3 (4th Cir. 2004).

*The Defense of Qualified Immunity*

Officer Esposito has been sued in his individual capacity; he has raised as a defense the qualified immunity that protects him from liability for a federal constitutional violation. The Court must thus determine, first, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001). The answer to this question must be "yes," otherwise a Plaintiff cannot overcome the defense of qualified immunity. *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002); *Miller v. Prince George's County*, 475 F.3d 621, 627 (4th Cir. 2007). A similar inquiry takes place under the pendent state law claims, to which Officer Massey is entitled to the defense of public official immunity. Thus, and put simply, if the pleadings reveal that the Plaintiff cannot make out a constitutional violation, Officer Esposito is entitled to judgment on his behalf based on his immunity defenses.

*The Claims Against Officer Esposito Based on a Lack of Probable Cause Must Be Dismissed*

Three of the Plaintiff's five claims are explicitly based on, and require as one of their premises, a lack of probable cause. *See* **Complaint ¶44 (Count II)** ("Defendants knew, or reasonably should have known, that there was no probable cause for this prosecution of Mr. Massey"); **Complaint ¶50 (Count III)** ("Under color of state law, Defendants conspired . . . by charging and prosecuting him on charges of armed robbery, and kidnapping, which these Defendants knew were not supported by probable cause."); **Complaint ¶59 (Count IV)** ("Beginning on or around May 23, 1998, the Defendants . . . instituted or participated in the institution of criminal proceedings against Shawn Massey. These proceedings were not

supported by probable cause . . . ."). Counts II[7] and III proceed under Section 1983 based upon a violation of the Fourth Amendment; Count IV is a pendent state law claim for malicious prosecution.

There is no question that the "Fourth Amendment prohibits law enforcement officers from making unreasonable seizure and a seizure of an individual effected without probable cause." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996). When a Plaintiff alleges that an arrest warrant (or indictment) was procured through false or dishonest testimony, "in order to violate the Constitution, the false statements or omissions must be 'material,' that is, 'necessary to the [neutral and detached magistrate's] finding of probable cause.'" *Miller v. Prince George's County*, 475 F.3d 621, 628 (4th Cir. 2007) (*quoting Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674 (1978). To determine "materiality," in turn, the "court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.'" *Miller*, 475 F.3d at 628 (*quoting Wilson v. Russo*, 212 F.3d 781, 789 (3rd Cir. 2000). "If the 'corrected' warrant affidavit establishes probable cause," according to the Fourth Circuit, "no civil liability lies against the officer." *Id.* Put differently, a false or misleading statement in a warrant affidavit does not automatically constitute a Fourth Amendment violation. *Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir. 1994). Rather, the false statement must be so material that, without it, no probable cause would have existed to issue the arrest warrant or seek the indictment. *See Wilkes*, 28 F.3d at 1365 ("Here, probable cause for Wilkes arrest plainly existed *even in the absence of*

---

[7] While Count II purports to raise a "malicious prosecution" claim under Section 1983, the Fourth Circuit has explicitly held hat "there is no such thing as a '§1983 malicious prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000). Rather, such a claim is "simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution. . . ."

*Young's purported misrepresentation*; thus, even accepting Young's statement as a lie, it could not possibly have constituted a Fourth Amendment violation because the material falsely represented was altogether unnecessary to the magistrate's finding of probable cause.") (reversing jury verdict for the Plaintiff) (emphasis in original). A similar analysis exists for a claim under North Carolina law for malicious prosecution; that is, the Plaintiff must show an absence of probable cause before he may state a claim. *Best v. Duke University*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994).

It is axiomatic that "probable cause" only requires "enough evidence 'to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Wilkes*, 28 F.3d at 1365. *See State v. Crawford*, 125 N.C. App. 279, 282, 480 S.E.2d 422, 424 (1997) ("the degree of certainty necessary for probable cause is . . . less than 'preponderance of the evidence.'"). The facts as revealed in the Complaint and the exhibits in this case show plainly that, without the allegedly fabricated sentence, there was an abundance of probable cause in this matter. Mrs. Woods identified Shawn Massey as her attacker; two independent witnesses placed him in the Emerald Bay apartments on the morning of the crime, and one placed him there at about the time of the crime. The attacker was both familiar with the Emerald Bay Apartments and had been there often enough to be able to observe Mrs. Wood and her husband to the point that he knew their schedules. Moreover, April Pride's testimony contradicted Massey's alibi. Because Shawn Massey did not own a car, April Pride's testimony that he was at her apartment on the morning of the crime as late as 6:45am made it impossible for him to be at his grandmother's home more than 5 miles away to be picked up between 6:45am and 7:00am.

Based on Mrs. Wood's identification alone, there was probable cause to arrest and seek the indictment of Shawn Massey for these crimes: "[I]t is well-established that '[w]hen an officer

has received. . . information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause.'" *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999). Indeed, the Fourth Circuit has recognized that "[i]t is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker," as "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself." *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991). Accordingly, "[a]n eyewitness identification will constitute sufficient probable cause 'unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999).

These undisputed facts amount to substantial evidence from which a neutral and detached third-party - - be it a magistrate or a grand jury - - could conclude that there was probable cause that Shawn Massey committed these crimes. Indeed, a grand jury reached just this conclusion; its indictment of Shawn Massey, while not conclusive of the question of the existence of probable cause, is some evidence of probable cause, evidence which the allegations of the Complaint do not overcome. Significantly, the Complaint does not place any of these facts into dispute.[8] Consequently, whatever may be said of this alleged fabrication, the undisputed facts of this case show that it was not material to the existence of probable cause in this case.

---

[8] The Complaint's assertion that Shawn Massey is, in fact, innocent does not mean that there was no probable cause to believe that he did not commit the crime, nor does it mean that the evidence was not sufficient to submit to a jury and to uphold a conviction. Nor is the existence of probable cause inconsistent with actual innocence or with the existence of reasonable doubt.

Notwithstanding these undisputed facts, the Plaintiff seeks in his Complaint to call into question the reliability of Mrs. Wood's identification. This he cannot do in this litigation. Mrs. Wood's identification was challenged in the North Carolina courts and found to be both constitutional and sufficiently reliable to be submitted to a Jury. Under the *Rooker-Feldman* doctrine, the Plaintiff is barred "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005-06, 114 S. Ct. 2647 (1994). *See Washington v. Wilmore*, 407 F.3d 274, 279 (4th Cir. 2005). The *Rooker-Feldman* doctrine bars "lower federal courts from considering not only issues raised and decided in the state courts, but also issues that are 'inextricably intertwined with the issues that were before the state court." *Washington* 407 F.3d at 279.[9] While the doctrine would not bar the Plaintiff's claim of wrongful conviction or lack of probable cause based on Office Esposito's alleged fabrication, it plainly bars any re-examination of the legality, admissibility, or legal reliability of Mrs. Wood's identification. As such, the Plaintiff cannot attack the existence or the sufficiency of that identification. Similarly, the Plaintiff cannot challenge that the evidence set forth in the Court of Appeals opinion was legally sufficient to submit this criminal case to the jury. That opinion found that, based on Mrs. Wood's identification and the circumstances surrounding her attack that made that identification possible, the evidence was sufficient to be submitted to the Jury, a standard that exceeds a probable cause determination.

---

[9] Alternatively, "collateral estoppel applies when §1983 plaintiffs attempt to re-litigate in federal court issues decided against them in state criminal proceedings." *Allen v. McCurry*, 449 U.S. 90, 102, 101 S.Ct. 411 (1980) (Plaintiff could not revisit motion to suppress in §1983 claim denied in state court under guise of Fourth Amendment violation in federal court). *See Gray v. Farley*, 13 F.3d 142, 146-47 (4th Cir. 1993) (plaintiff collaterally estopped from bringing §1983 claim against jailers based on state criminal court denial of motion to suppress confession elicited by alleged beating).

19

As to Officer Esposito, there is an additional element lacking in the Plaintiff's case. It is undisputed that Officer Esposito did not obtain any arrest warrants against the Plaintiff, did not arrest the Plaintiff, was not listed as a witness before the Grand Jury, and did not testify before the Grand Jury. A necessary element of both an unreasonable arrest under the Fourth Amendment, and of malicious prosecution under North Carolina tort law, is that the defendant must have "initiated the proceeding" - - either by securing the arrest warrant, making the arrest without a warrant or providing testimony to the Grand Jury to secure an indictment. *Best v. Duke University*, 337 N.C. at 749; *Strickland v. Hedrick*, 194 N.C. App. 1, 22, 669 S.E.2d 61, 74 (2008).

Consequently, since the fabrication claimed by the Plaintiff was not material and since Officer Esposito did not arrest, cause the arrest, or cause the indictment of Shawn Massey, there is no constitutional violation stated in Counts II and III of the Complaint, and the Complaint fails to state a claim for malicious prosecution under North Carolina law under Count V.

*The Due Process Claims Against Officer Esposito Must Be Dismissed for Lack of Causation*

In Count I of the Complaint, the Plaintiff alleges a constitutional violation under the Fifth and Fourteenth Amendments, and specifically the Due Process Clause, premised on the allegation that his conviction was obtained as a result of Officer Esposito's alleged fabrication. **Complaint ¶¶ 37, 39, 41.**[10] The mere allegation that evidence was fabricated does not create a constitutional claim and, in fact, does not violate the Constitution. *See Zahrey v. Coffey*, 221 F.3d 342, 348 (2nd Cir. 2000) ("The manufacture of false evidence, 'in and of itself,' . . . does not

---

[10] Since the Complaint alleges that Officer Esposito was a state law enforcement officer, there is no claim under the Fifth Amendment against him; the Plaintiff must proceed solely under the Fourteenth Amendment. *See Winfield v. Bass*, 106 F.3d 525, 530 n.2 (4th Cir. 1997) (due process claim does not lie against state officials under Fifth Amendment).

impair anyone's liberty, and therefore does not impair anyone's constitutional rights.").[11] Rather, a deprivation under the Due Process Clause is based on "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity." 221 F.3d at 349. *See Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (*relying on and quoting Zahrey*). Thus, part and parcel of this right is the legal notion that the fabricated evidence must have *caused* the conviction. As expressed by the Second Circuit, this is simply a classic "but for" inquiry:

> The initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty, even in the absence of the antecedent misconduct; in that circumstance, "but for" causation could be claimed to be lacking.

221 F.3d at 352 n.8. In short, and as with his claim for his arrest without probable cause, the Plaintiff must show that the fabrication was the cause of his conviction such that, in its absence, the evidence would have been insufficient to convict him. Thus, courts have consistently recognized that an alleged fabrication must be "material" - - that is "likely to influence a jury's decision," *Ricciuti v. New York Transit Authority,* 124 F.3d 123, 130 (2nd Cir. 1996) - - and "the legally cognizable" cause of the conviction, *Zahrey*, 221 F.3d at 349-50 & n.5. As reasoned by one court:

> It is particularly critical to distinguish between an alleged fabrication that "precipitated the sequence of events that resulted in the deprivation of liberty" from other charges of fabrication of evidence. *Zahrey*, 221 F.3d at 350 n.5. As vile as any fabrication of evidence is, particularly when the offender is a law enforcement officer, it seems obvious that a defendant who achieves a favorable determination in a criminal case cannot properly be permitted to seek damages (and obtain a jury trial) simply by asserting, for example, that one of several

---

[11] *See, e.g., Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Let us suppose the prosecutors put Cruz on the rack, tortured him until he named Buckley as his confederate, and then put the transcript in a drawer, or framed it and hung it on the wall but took no other step, or began a prosecution that did not introduce the statement. Could Buckley collect damages under the Constitution? Surely not; Cruz himself would be the only victim.").

(equally incriminating) alleged admissions in a post-arrest statement was not in fact made.

*Richardson v. The City of New York*, 2006 U.S. Dist. LEXIS 69577, *21 n.4 (E.D.N.Y. 2006). That same court articulated the policy behind the requirement of materiality and "but for" causation, one that envisioned the precise situation in this case: "The availability of a cause of action based solely on a claim of fabrication, without the materiality and causation requirements, would unduly deter prosecutors' exercise of discretion to dismiss or abandon cases for a broad array of reasons having nothing to do with the defendant's guilt or the claimed fabrication." *Id.* *See Hovatter v. Widdowson*, 2006 U.S. Dist. LEXIS 14193 *20 (D. Md. 2006) ("the right enunciated in these cases [*Zahrey* and *Wilmore*] would not be violated, even where an investigative officer fabricates evidence, if that fabrication was not the 'cause' of the plaintiff's detention and conviction.") (granting summary judgment for the Defendant despite the existence of numerous statements that "at the very least, . . . are contradicted by other evidence in the record.").

The question then, is whether the Complaint, in light of the undisputed facts, demonstrates as a legal matter that "but for" the claimed fabricated sentence in Officer Esposito's report, Shawn Massey would not have been convicted of these crimes. That answer, like the similar question posed as to the materiality of this alleged fabrication in the determination of probable cause, is "no." At trial, Mrs. Wood testified at length about her opportunity to identify her attacker, testified about her identification of Shawn Massey from the photo array, and identified Shawn Massey in the courtroom as the person that assaulted and robbed her on the morning of May 23, 1998 at the Emerald Bay Apartments. Mrs. Wood identified Shawn Massey not merely by his appearance, but also by his voice, having heard him speak during the preliminary proceedings. Theresa Savall testified at length about her

22

identification of Shawn Massey as the man who propositioned her at the Emerald Bay Apartments at about the time of these crimes, an identification that firmly placed Shawn Massey in the complex that morning. The portion of April Pride's statement that is not in dispute, also placed Shawn Massey in the Emerald Bay Apartments that morning. Both Theresa Savall and April Pride's testimony directly contradicted and undermined Shawn Massey's alibi defense - - pointedly, if both are believed, then Shawn Massey was not at work on the morning of May 28 nor could he have been (let alone at his grandmother's house more than 5 miles away at between 6:45am and 7:00am). April Pride's testimony further established that Shawn Massey had the knowledge of the Emerald Bay Apartments exhibited by the attacker. This evidence, without mention of any impeachment of April Pride, was found to be sufficient by the Court of Appeals to uphold Shawn Massey's conviction on appeal, a determination that cannot be revisited in this federal civil action under the *Rooker-Feldman* doctrine.

As a matter of law, it is simply not "plausible" that this single sentence and its use solely for impeachment was the pivotal piece of evidence that convicted Shawn Massey. This is particularly true when the evidence presented by Shawn Massey in his defense about the length of his hair is considered. Numerous witnesses testified to the same thing that April Pride claimed at trial - - that Shawn Massey never wore braids in his hair and did not have braids at the time of the crimes. In short, even if it is assumed that this impeachment undermined April Pride's credibility, there was other substantial evidence about Shawn Massey and his hair style, including pictures of that style, evidence that was heard and ultimately rejected by a jury.

The Plaintiff's claim in this case - - indulging in the assumption that it is true[12] - - is the same as the "asserti[on], for example, that one of several (equally incriminating) alleged admissions in a post-arrest statement was not in fact made." *Richardson*, 2006 U.S. Dist. LEXIS 69577, *21 n.4. Neither are legally sufficient to be both material to the conviction and the "but for" cause of the conviction.

### The Claim Against Officer Esposito Based on a Conspiracy to Obstruct Justice Under North Carolina Law Should Either Be Dismissed for Lack of Actual Injury or, as a Prudential Matter, Pendent Jurisdiction Should Be Declined

The Plaintiff makes two claims for conspiracy: one under federal law for a conspiracy to violate his constitutional rights, and a second under North Carolina law for obstruction of justice. The federal conspiracy count (Count III) fails because his claims under Counts I and II fail given the lack of materiality of the claimed fabrication. This Court's jurisdiction over the claim for conspiracy under North Carolina law is wholly dependent upon the existence of valid federal claims, as there is no other ground for jurisdiction alleged in the Complaint. There is no question that North Carolina recognizes a claim for common law obstruction of justice for the creation of false evidence. *See Blackburn v. Carbone*, - N.C. App. -, 703 S.E.2d 788, 796 (2010). Part of that claim must be the existence of "actual injury" from the obstruction. *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 33 (2003) (Plaintiff must show that litigation "was in some way judicially prevented, obstructed, impeded or hindered by the acts of the defendants."). For the reasons set forth above, this the Plaintiff cannot do. However, and in a recent unpublished decision, the Fourth Circuit questioned the holding in *Broughton*, raising the issue of whether a conspiracy that results in an attempted obstruction of justice without actual

---

[12] Officer Esposito notes that, contrary to the Plaintiff's assertion that "Mrs. Pride never told Officer Esposito or anyone else that Mr. Massey ever wore his hair pulled back or in braids," the cross-examination by the Assistant District Attorney indicates that she had told him just that a few weeks before trial during his preparation. **Exhibit 9 pp. 98-99.**

injury would nonetheless be sufficient. *Reed v. Buckeye Fire Equipment*, 241 Fed. Appx. 917 (4th Cir. 2007). There, the Court reversed the District Court for the dismissal of a claim for obstruction of justice based on the lack of an actual injury.

The Defendant submits that, in light of the fact that the Plaintiff's claims for constitutional violations under the Fourth and Fifth Amendments, his claim for malicious prosecution, and his claim for conspiracy to violate his federal civil rights, should be dismissed, and given the conflict between the North Carolina Court of Appeals and the Fourth Circuit on this claim, that the Court should either dismiss the claim under *Broughton* (since *Reed* has no precedential value) or decline to exercise its pendent jurisdiction and dismiss this claim without prejudice for refiling in the courts of North Carolina.

### Conclusion

For the reasons set forth above, the Defendant requests that the Plaintiff's claims be dismissed and that his Motion for Judgment on the Pleadings be granted.

Respectfully submitted this the 28th day of November, 2011.

/s/ James P. Cooney III
James P. Cooney III
N.C. State Bar No. 12140

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, NC 28202-6037
Telephone: (704) 331-4980
Facsimile: (704) 338-7838
E-Mail: jcooney@wcsr.com

*Attorney for Defendant Officer Gerald J. Esposito*

25

# ATTACHMENT

Court of Appeals Decision in

*State of North Carolina v. Shawn Giovanni Massey*

by Judge James Wynn

NO. COA00-557

MECKLENBURG COUNTY
FILED #88
JAN 14 2001
AM_____M
CLERK OF SUPERIOR COURT

IN THE OFFICE OF
CLERK COURT OF APPEALS
OF NORTH CAROLINA

01 FEB 20 AM 7:07
FILED

NORTH CAROLINA COURT OF APPEALS

Filed: 20 February 2001

STATE OF NORTH CAROLINA

v.

Mecklenburg County
Nos. 98 CRS 33738, 33739,
33740, 33741, 141972

SHAWN GIOVANNI MASSEY

Appeal by defendant from judgment entered 17 September 1999 by Judge James L. Baker, Jr., in Superior Court, Mecklenburg County. Heard in the Court of Appeals 29 January 2001.

> *Attorney General Michael F. Easley, by Assistant Attorney General Victoria L. Voight, for the State.*
>
> *Public Defender Isabel Scott Day, by Assistant Appellate Defender Dean Paul Loven, for defendant-appellant.*

WYNN, Judge.

Defendant was found guilty as charged of robbery with a dangerous weapon, felonious breaking and entering, and three counts of second degree kidnapping. He was sentenced to a minimum term of 103 months and a maximum term of 133 months for robbery with a dangerous weapon. The remaining convictions were consolidated and defendant was sentenced to a minimum term of thirty-four months and a maximum term of fifty months.

The State presented evidence tending to show that at approximately 10:00 a.m. on 22 May 1998, the prosecuting witness was about to enter her apartment with her toddler daughter and infant son when she felt her daughter being pulled from her hand. She turned and saw a man holding a gun to her head. The man

gestured for her to enter the apartment. She walked into the apartment with her children, followed by the man. The intruder motioned for her to enter a bedroom. After entering the bedroom, the man pushed her onto the bed, and ordered her to lift her dress and to "give him some." She told him she was "on her monthly" and proved it to him. The intruder then ordered her to open doors and cabinets so he could look inside. He also ordered her to give him the money in her purse. Before leaving, the man recited her husband's work schedule and threatened to return to kill them if she called the police. Disregarding the threat, the prosecuting witness called the police to report the incident. She described the perpetrator, *inter alia*, as having braids in his hair. The next day she selected a photograph of defendant as looking like the perpetrator, except for the absence of braided hair and the presence of facial hair in the person depicted in the photograph. She positively identified defendant at trial as the perpetrator.

Defendant presented evidence tending to show that his hair was not braided on or about the date of the offenses and that he was at work on the date of the offenses.

Defendant assigns as error the denial (1) of his motion to suppress the identification testimony of the prosecuting witness and (2) of his motion to dismiss the charges on the ground that the evidence is insufficient to identify defendant as the perpetrator of the offenses.

Identification evidence must be excluded as violating a defendant's right to due process if a pretrial identification

procedure is so impermissibly suggestive that it engenders a "very substantial likelihood of irreparable misidentification." *State v. Harris*, 308 N.C. 159, 162, 301 S.E.2d 91, 94 (1983). A two-step process is used in determining whether due process is violated. *See State v. Leggett*, 305 N.C. 213, 220, 287 S.E.2d 832, 837 (1982). The court must first determine whether law enforcement authorities employed an impermissibly suggestive identification procedure, and if so, whether the procedure gave rise to a substantial likelihood of misidentification. *See id.* Factors the court must consider in determining the latter include: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the degree of attention paid by the witness; (3) the accuracy of a prior description given by the witness; (4) the level of certainty demonstrated by the witness in making the identification; and (5) the length of time between the criminal incident and the making of the identification. *See State v. Grimes*, 309 N.C. 606, 609-10, 308 S.E.2d 293, 294-95 (1983).

Defendant contends that the police created an impermissibly suggestive lineup by failing to inform the prosecuting witness that she may have seen one or more of the persons in the lineup around the apartment complex, and that she should not let such casual observations influence her review of the suspects. While he concedes, *arguendo*, that the prosecuting witness had adequate opportunity for observation and made her identification soon after the event from a lineup composed of persons with similar physical characteristics, he argues her out-of-court identification was not

reliable because she did not give an accurate and detailed prior description of her assailant and she did not make the identification with certainty. He also argues a showing was not made that the in-court identification originated with observation of the perpetrator at the time of the crime and not from a viewing of a photograph. We disagree.

To comply with due process, a photograph lineup must simply be fair and the officers conducting the lineup must "do nothing to induce the witness to select one participant or subject rather than another." *State v. Montgomery*, 291 N.C. 91, 100, 229 S.E.2d 572, 579 (1976). The photograph lineup submitted to this Court in the record on appeal is fair, since it is indeed composed of persons having similar physical characteristics and no single person stands out for distinction. The record in this case is also devoid of any evidence that any officer did or said anything to induce the witness to select defendant's photograph rather than others. We therefore conclude that the lineup is not impermissibly suggestive. Consequently, we need not determine whether the procedure gave rise to a substantial likelihood of irreparable misidentification. We hold the trial court properly denied the motion to suppress.

Defendant also contends that the evidence is insufficient to withstand his motion to dismiss the charges. He argues the State failed to present substantial evidence that he committed the crimes. He essentially maintains that the identification testimony of the prosecuting witness is not credible because of contradictions in the evidence and the lack of physical evidence

placing defendant inside the apartment.

In deciding a motion to dismiss, the court must consider the evidence in the light most favorable to the State, giving it the benefit of every reasonable inference that can be derived from the evidence. *See State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 652-53 (1982). Contradictions or discrepancies in the evidence are to be disregarded. *See id.* Generally, the credibility of identification testimony is for jury determination, but this rule does not apply when "the only evidence identifying the defendant as the perpetrator of the offense is inherently incredible because of undisputed facts, clearly established by the State's evidence, as to the physical conditions under which the alleged observation occurred." *State v. Miller*, 270 N.C. 726, 731, 154 S.E.2d 902, 905 (1967). If, however, "there is a reasonable possibility of observation sufficient to permit subsequent identification, the credibility of the witness' identification of the defendant is for the jury, and the court's doubt upon the matter will not justify granting a motion for judgment of nonsuit . . ." *Id.* at 732, 154 S.E.2d at 906.

In the case at bar, the evidence shows that the prosecuting witness did have a reasonable opportunity to observe her assailant and to make an identification. She viewed her assailant, whose face was undisguised and uncovered, in daylight and the lighting of her apartment from a close distance while in the same room for approximately thirty minutes. She made the identification from a lineup the day after the incident while the incident was fresh on

her mind. She also made a positive identification in court. We hold the trial court properly submitted the credibility of her identification for jury determination and properly denied the motion to dismiss.

No error.

Judges HUNTER and JOHN concur.

Report per Rule 30(e).

A TRUE COPY
CLERK OF THE COURT OF APPEALS
OF NORTH CAROLINA

BY _Pattie P. Wheler_
DEPUTY CLERK

March 12, 20 01

# ATTACHMENT

*Richardson v. The City of New York*
**2006 U.S. Dist. LEXIS 69577**



THEODORE RICHARDSON, Plaintiff, - against - THE CITY OF NEW YORK,
SUZANNE McDERMOTT, and UNDERCOVER # 7404, Defendants.

02 CV 3651 (JG)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK

*2006 U.S. Dist. LEXIS 69577*

September 27, 2006, Decided
September 27, 2006, Filed

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION
ONLY

**COUNSEL:** JON L. NORINSBERG, New York, New
York, Attorney for Plaintiff.

MICHAEL A. CARDOZO, Corporation Counsel of the
City of New York, New York, New York, By: Hillary A.
Frommer, Assistant Corporation Counsel, Attorney for
Defendants.

**JUDGES:** John Gleeson, U.S.D.J.

**OPINION BY:** John Gleeson

**OPINION**

MEMORANDUM AND ORDER

JOHN GLEESON, United States District Judge:

Theodore Richardson sued New York City Detective
Suzanne McDermott and an unnamed undercover New
York City police officer, identified as UC # 7404,
alleging that they falsely arrested him and knowingly
forwarded fabricated evidence against him to prosecutors,
thereby causing him to be deprived of his liberty until he
was eventually acquitted by a jury. The defendants have
moved for summary judgment on the ground, among
others, that Richardson has failed to produce sufficient
evidence from which a jury could reasonably conclude
that he was arrested and indicted without probable cause,
and that, in any event, they are entitled to qualified
immunity. The assigned Magistrate Judge, to whom I
referred the motion for a report and recommendation,
agreed with the defendants, and the plaintiff objected. For
[*2] the reasons set forth below, I conclude the
Magistrate Judge erred in holding that no genuine issues
of material fact remain to be tried. Accordingly, the
defendants' motion for summary judgment is, in large
part, denied. [1] Jury selection and trial will occur on
December 18, 2006 at 9:30 a.m. A pretrial conference
will be held on December 1, 2006 at 11:00 a.m.

> 1 As the caption shows, Richardson has also
> named the City of New York as a defendant
> pursuant to *Monell v. Department of Social
> Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed.
> 2d 611 (1978)*. At a conference held September 5,
> 2005, the Magistrate Judge granted the City's
> motion to bifurcate both discovery and trial as to
> the plaintiff's *Monell* claims. This motion
> accordingly does not concern whether any
> unconstitutional custom or policy of the City
> caused Richardson any harm.

BACKGROUND

On the night of January 23, 2000, Detective McDermott and UC # 7404 were part of a team working an undercover "buy and bust" operation. Before leaving the station house, the field [*3] team sergeant gave McDermott an amount of money with which UC # 7404 was to purchase drugs, and McDermott made photocopies of the bills so they could later be identified. She then gave the money to UC # 7404, and the team departed separately for the "set" of the operation, a bodega at the corner of Ferndale Avenue and Sutphin Boulevard in southeast Queens. McDermott was assigned as the arresting officer that night, and she, along with the field team sergeant, waited in an unmarked car a few blocks away while UC # 7404 approached the store and attempted to make a buy. UC # 7404 found two men on the corner, and she asked them if "anyone was working," Def. 56.1 Statement P 29, that is, selling drugs.

According to the defendant officers, Richardson was there outside the bodega, and he responded to UC # 7404's question by walking toward her with crack cocaine in his hand. UC # 7404 said that she wanted "two dimes," or twenty dollars' worth, and Richardson gave her two rocks of crack cocaine. She gave him a $ 50 bill from the money McDermott had furnished her and walked away. After reaching a safe distance, UC # 7404 used a handheld radio to notify McDermott that she had made a "positive [*4] buy" from a male black, approximately six feet tall with long dread locks; she also gave a description of the suspect's clothing.

McDermott and her field sergeant immediately proceeded to the location of the buy; she estimates it took them about one minute to arrive there. Meanwhile, UC # 7404 made a second radio transmission upon reaching her vehicle, repeating her previous description and adding that the suspect had gold teeth. McDermott approached Richardson, who fit that description, and placed him in handcuffs for her own safety. McDermott brought Richardson over to her vehicle to pat him down for weapons and then radioed for UC # 7404 to return to the set to make an identification. UC # 7404 drove by at about 15 miles per hour and, through her tinted windows, was able to confirm that it was Richardson who sold her the crack. She radioed that information to McDermott, who formally placed Richardson under arrest. A search of his person by McDermott resulted in the seizure of approximately $ 45 in cash, including two $ 20 bills. Moments later, while still at the scene, McDermott compared the two $ 20 bills found on Richardson to the

photocopy of the buy money and determined that [*5] one of them was a match.

Richardson has a different version of these events. He claims he went to the corner store at Ferndale and Sutphin that night at around 1 a.m. -- admittedly in violation of the 11:00 p.m. curfew that was a condition of his parole -- to buy a few cans of soda for his wife, who was feeling ill. He paid for the soda with a $ 50 bill and received $ 47.03 in change, though he does not recall in what denominations. Richardson walked out of the store with the sodas, and as he began to cross the street, two unmarked police cars pulled up quickly. Four police officers got out and approached him, Detective McDermott among them. She immediately put Richardson in handcuffs, threw him against the side of a car, and began asking, "Where are the drugs?" She also searched his person, but Richardson did not have any drugs on him. McDermott found only the $ 47 Richardson had just received in change from the store. Richardson maintains that he did not sell drugs to UC # 7404 and did not receive any money from her.

UC # 7404 and McDermott relayed their version of what happened to the Queens County District Attorney's office. The case was presented to a grand jury, resulting in [*6] Richardson's indictment for Criminal Sale of a Controlled Substance in the Third Degree. Richardson was also brought up on three charges that he violated the conditions of his parole: two dealt with the pending drug offense; the third, to which he pleaded guilty, charged that he violated his curfew the night he was arrested. He was sentenced on the curfew violation to the full remainder of his previous sentence, one year and eight days. As for the drug charge, Richardson was tried before a jury, and on February 5, 2001, he was acquitted and released. He thereupon brought this action.

DISCUSSION

Under *Rule 56 of the Federal Rules of Civil Procedure*, the moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The substantive law governing the case identifies the facts that are material, and "only disputes over facts that might affect the outcome [*7] of the suit under the governing law will properly preclude the entry of summary

judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Summary judgment is warranted only if "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Id.*

It is well-settled that "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *United States v. Rem, 38 F.3d 634, 644 (2d Cir.1994).* Moreover, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quotation marks omitted); *see also, e.g., Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000)* ("[W]e ... view [the facts] in the light most favorable to, and draw inferences in favor of, the non-moving party ...." (internal quotation marks omitted)). Once the moving party has met its burden, the opposing party "must do more than simply show that there [*8] is some metaphysical doubt as to the material facts .... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 586-87* (quoting *Fed. R. Civ. P. 56(e)*).

Richardson seeks damages pursuant to *42 U.S.C. § 1983*, claiming false arrest, malicious prosecution, malicious abuse of process, and denial of a fair trial in violation of the *Fourth, Fifth,* and *Fourteenth Amendments to the Constitution of the United States.* Although his several claims are in some ways doctrinally distinct, they generally rest upon the following two assertions, which Richardson makes based on his personal knowledge: (1) he did not sell drugs to UC # 7404 that night; and (2) he did not have any money from UC # 7404 on his person when McDermott arrested him and claimed to recover $ 20 in pre-recorded buy money. As Richardson points out, at this stage of the case, he is entitled to the assumption that a jury would believe his testimony to that effect and make all reasonable inferences in his favor. Though there are important nuances, particularly to the claim [*9] against McDermott, the primary questions on summary judgment are whether a jury could reasonably infer (1) that UC # 7404's misidentification of Richardson was more likely than not deliberate and (2) that McDermott more likely than not fabricated the evidence that she found the

pre-recorded buy money in Richardson's pocket.

## A. False Arrest

Richardson's first claim is that he was arrested without probable cause in violation of the *Fourth Amendment.* In making out a claim for damages upon such a violation under *§ 1983*, Richardson bears the burden of proving by a preponderance of the evidence the elements of a state law claim for false arrest, that is, that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York, 331 F.3d 63, 75 (2003).* The first three elements of this claim are not in dispute. As to the fourth element, the defendant officers were privileged to arrest Richardson if they had probable cause to believe he had committed a crime. If no rational juror could find an [*10] absence of probable cause based on the facts alleged by Richardson and the reasonable inferences that can be drawn in his favor from those facts, the defendants are entitled to summary judgment.

## 1. UC # 7404

The principal focus of Richardson's allegations of misconduct is not UC # 7404, but McDermott. Still, UC # 7404 is a named defendant, and implicit in Richardson's allegations is a claim that UC # 7404 either did not purchase drugs at all or did so from someone other than Richardson. At the very least, by Richardson's account, once UC # 7404 arrived at the scene of the arrest, she must have known immediately that McDermott had detained the wrong person, but she nonetheless falsely made a positive identification. Assuming Richardson's version is correct, all suspicion would have dissipated immediately had UC # 7404 owned up that Richardson was the wrong man.

Thus, the crucial questions with respect to Richardson's false arrest claim against UC # 7404 are (1) whether UC # 7404 purchased drugs at all; and (2) whether, assuming Richardson, at least, had not sold her any drugs, a jury could reasonably infer that UC # 7404 knew as much when she identified him at the show-up. Taking [*11] as fact that Richardson was not the seller but that UC # 7404 identified him as such only minutes after she claims to have made a buy, it would not be unreasonable for a jury to conclude that no purchase was made and/or that the mistake was deliberate. Of course,

neither would it be unreasonable for a jury to infer that even if Richardson is not proved to have been the real drug dealer, a purchase was made and he fit the general description of the seller and that UC # 7404 made a mistake at the show-up. But at this stage, Richardson is entitled both to have his testimony believed and to have all reasonable inferences that can be drawn therefrom made in his favor. And if UC # 7404 either fabricated a drug sale or knowingly made a false identification of Richardson as a seller, causing his arrest, then Richardson has a false arrest claim against her. Since no reasonably competent officer could believe that it was lawful to identify Richardson falsely, qualified immunity is unavailable for UC # 7404 at this summary judgment stage.

I respectfully disagree with the Magistrate Judge's reasoning that Richardson needs independent evidence corroborating his testimony that he did not sell drugs [*12] to UC # 7404 in order to survive this motion. *See* Report and Recommendation at 18. Richardson's testimony is itself admissible evidence, and, as mentioned, he is entitled at this stage to an assumption that the jury will believe him. That is enough.

## 2. McDermott

No jury could find that McDermott falsely arrested Richardson. It is undisputed that McDermott heard over the radio from UC # 7404 that a male black, approximately 6'2" tall with dread locks, had sold crack to the undercover officer. Within one minute, McDermott proceeded to the location of the sale and saw Richardson, who fit that description and was wearing clothes like those described by the undercover officer. [2] McDermott detained Richardson, handcuffed him, patted him down, secured the scene, and directed UC # 7404 to return to the scene to determine whether the person detained was in fact the seller. About three to five minutes later, the undercover officer positively identified Richardson. At that point, Richardson, who was admittedly already "seized" for *Fourth Amendment* purposes, was formally placed under arrest. [3]

  2  The dispute as to whether UC # 7404's description also included gold teeth is immaterial.
[*13]
  3  That these facts are undisputed is clear from defendants' Rule 56.1 Statement (PP 35, 36, 37, 41, 43, 45, 52) and plaintiff's responses thereto.

McDermott did precisely what we expect police officers to do in those circumstances. She obviously had a reasonable suspicion that Richardson had been involved in a drug sale, *see United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)* (requiring "some minimal level of justification"); she then conducted an investigative detention reasonably related in scope (both in terms of the force used and the duration) to its justification, *see Terry v. Ohio, 392 U.S. 1, 13, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*; and then upon receiving the identification that sealed her probable cause to arrest the plaintiff, she did just that.

Richardson offers no facts or even a factual theory to support an inference that McDermott ought to have known that UC # 7404's identification was, as Richardson claims, false. Rather, McDermott was entitled to rely in arresting Richardson on what UC # 7404 told her. *See Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003)* [*14] ("The false arrest claim was properly dismissed .... [because] [e]ven if Oggeri is assumed to have arrested Jocks, he had probable cause to do so. Unlike Tavernier, who knew of the valid defense according to Jocks, all that Oggeri had before him was the statement of a fellow police officer that he had been assaulted and Tavernier's obvious injuries.").

Richardson's theory of false arrest liability on McDermott's part is based solely on the claim that McDermott fabricated evidence, that is, falsely asserted that she recovered pre-recorded buy money from Richardson. But this alleged fabrication of evidence did not violate the plaintiff's right to be free from false arrests. *See Zahrey v. Coffey, 221 F.3d 342, 348 (2d Cir. 2000)* ("The manufacture of false evidence, in and of itself, ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."). As the classic example goes, writing a false confession and locking it away in a drawer is no constitutional violation. *See id.,* citing *Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980)* ("[W]e do not see how the existence of a false police report, [*15] sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws."). Rather, as will be discussed below, it was only in forwarding such evidence on to prosecutors and to the grand jury, thereby causing Richardson to be deprived of his liberty, that McDermott -- on Richardson's version of the facts -- may be liable for violating his rights. Under New York law, however, such a claim for damages flowing from

post-arraignment confinement is beyond the scope of the false arrest cause of action, which covers only pre-arraignment deprivations of liberty. *See Broughton v. State, 37 N.Y.2d 451, 459, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1975)* ("Where a plaintiff successfully establishes liability for false imprisonment his damages will be measured only to the time of arraignment or indictment whichever occurs first.").

In sum, Richardson's false arrest claim against UC # 7404 must be tried. McDermott, however, is entitled to summary judgment on that claim.

B. Malicious Prosecution and the Remaining Post-arraignment Claims

To make out a claim for malicious prosecution, Richardson must prove "(1) the initiation of a proceeding, (2) its termination favorably [*16] to plaintiff, (3) lack of probable cause, and (4) malice." *Savino, 331 F.3d at 72* (internal quotation marks omitted). The plaintiff must additionally show "a post-arraignment seizure for a *§ 1983* malicious prosecution claim; however, the requirements of attending criminal proceedings and obeying the conditions of bail suffice on that score." *Jocks, 316 F.3d at 136.* As with Richardson's claim for false arrest, the only element in dispute is whether the authorities had probable cause to proceed against him. Unlike with respect to the false arrest claim, however, the grand jury's indictment "creates a presumption of probable cause," which "may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Colon v. City of New York, 60 N.Y.2d 78, 82-83, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (1983).* At the summary judgment stage, the element of malice usually turns on the probable cause inquiry, since the "lack of probable cause generally raises [*17] an inference of malice sufficient to withstand summary judgment." *Ricciuti v. New York City Transit Auth., 124 F.3d 123, 131 (2d Cir. 1996).*

Taking Richardson's version of the facts as true, a jury could reasonably infer that UC # 7404 knowingly misidentified him and that McDermott fabricated the evidence that Richardson was in possession of the pre-recorded buy money. It is undisputed that the defendants passed that evidence along to the Queens County District Attorney's office, and that as a result Richardson was indicted and prosecuted. Those facts make out a malicious prosecution claim against UC # 7404, and that claim will be tried. Because the availability of qualified immunity will depend on the jury's factfindings (and specifically whether Richardson can prove a knowing false identification of him), summary judgment on that ground is denied as well.

As for McDermott, whether plaintiff's version of events establishes malicious prosecution, as opposed to a free-standing claim for fabrication of evidence or denial of a fair trial, is a matter of some doctrinal ambiguity. The principal case Richardson cites is *Ricciuti,* in which the Second Circuit explained [*18] as follows:

> Each of the defendants insists that so long as there was probable cause for Alfred Ricciuti's arrest -- independent of the allegedly fabricated evidence -- the fabrication of evidence is legally irrelevant. In essence, they argue that as long as the arrest complied with the *Fourth Amendment,* the Ricciutis can have no claim for post-arrest fabrication of evidence against them.
>
> This argument -- an ill-conceived attempt to erect a legal barricade to shield police officials from liability -- is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society. No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's [*19] knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known

false evidence works an unacceptable corruption of the truth-seeking function of the trial process ....

When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under *42 U.S.C. § 1983.*

*124 F.3d at 130; see also Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000)* (Newman, J.) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."). That passage from *Ricciuti* appears to support Richardson's claim that McDermott's fabrication of evidence denied him a fair trial. And the court in *Ricciuti* appeared to treat such a claim as an independent constitutional tort; it went on to analyze a malicious prosecution claim separately by stating the traditional rule that [*20] probable cause is a complete defense. *See 124 F.3d at 130-131.* However, in *Jocks,* the Second Circuit seems to have steered the rationale of *Ricciuti* into the malicious prosecution cause of action. Indeed, *Jocks* characterized the above-quoted discussion from *Ricciuti* as a ruling on a malicious prosecution claim:

> [T]he trial court, in dismissing the malicious prosecution claim against Oggeri, rejected the argument that the fabrication of evidence is a civil rights violation. In so doing, the district court erred. We have held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under *42 U.S.C. § 1983." Ricciuti, 124 F.3d at 130.* Oggeri asserts that *Ricciuti* only applies to false evidence created to justify an arrest without probable cause, but in *Ricciuti* we specifically held that the police had probable cause to arrest but nonetheless

reversed the [*21] district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence. *Id. at 128, 130.*

*316 F.3d at 138. Jocks,* reading *Ricciuti,* thus stands for the proposition that on a malicious prosecution claim, if it can be proved that a law-enforcement officer fabricated material evidence against a suspect and forwarded it to prosecutors, causing the suspect to be deprived of his liberty, *see Ricciuti, 124 F.3d at 130* (noting that recovery is limited to "the harm occasioned by" the fabrication), then not only is the presumption of probable cause overcome, but the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator. As discussed above, Richardson has put forward sufficient evidence from which a jury could reasonably conclude he is entitled to recover from McDermott under § 1983. [4]

> 4 Two important limitations on such a claim warrant emphasis: In order for a plaintiff to recover, the alleged fabrication must be both material, *i.e.,* "likely to influence a jury's decision," *Ricciuti, 124 F.3d at 130, and* "the legally cognizable" cause of the post-arrangement deprivation of liberty. *Zahrey, 221 F.3d at 350.* It is particularly critical to distinguish between an alleged fabrication that "precipitated the sequence of events that resulted in the deprivation of liberty" from other charges of fabrication of evidence. *Zahrey, 221 F.3d at 350 n.5.* As vile as any fabrication of evidence is, particularly when the offender is a law enforcement officer, it seem obvious that a defendant who achieves a favorable termination in a criminal case cannot properly be permitted to seek damages (and obtain a jury trial) simply by asserting, for example, that one of several (equally incriminating) alleged admissions in a post-arrest statement was not in fact made. The availability of a cause of action based solely on a claim of fabrication, without the materiality and causation requirements, would unduly deter prosecutors' exercise of discretion to dismiss or abandon cases for a broad array of reasons having nothing to do with the defendant's guilt or the claimed fabrication.

[*22] A similar analysis applies to Richardson's

claim for malicious abuse of process, an element of which is that the defendant had a "collateral purpose" in setting the judicial process against the plaintiff. *See Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir.1994)* ("[A] malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."). The "collateral purpose" Richardson claims is that the defendants wished to avoid the embarrassment of letting the real drug dealer go free. The question of whether the defendants, assuming they fabricated testimony and/or evidence against Richardson, did so to protect their own reputations or instead because they believed Richardson actually to be a drug dealer, will be submitted to the jury. [5]

> 5   There may be no need to occupy the jury's time with the "collateral purpose" inquiry at trial. If Richardson prevails on both his malicious prosecution claim based on *Ricciuti* and *Jocks,* and his false arrest claim against UC # 7404, then he can recover the full measure of damages he suffered without need of proving a collateral purpose.

[*23] C. Damages

The defendants' last argument is that Richardson cannot recover damages for the period of time in which he was incarcerated for his curfew violation, to which he pleaded guilty, on the theory that his guilty plea was an intervening act that severed the chain of causation between the defendants' alleged constitutional violations and the result of his confinement. I note initially that there appears to be a dispute as to how much "parole time" Richardson actually served: Richardson was not charged with parole violations until February 3, 2000, at which time his senior parole officer indicated that he was being held at Riker's Island on the drug charge in lieu of a $ 5000 bond. Norinsberg Declaration, Ex. G. The senior parole officer further recorded, in making the charges, that "Arresting Officer, Detective S. McDermott stated that she did not observe the sale to the undercover, however, she did recover the pre-recorded buy money." *Id.* The decision of the Administrative Law Judge who

sentenced Richardson on the curfew violation, rendered March 29, 2000, purports to revoke his parole for the full remainder of his previous term, one year and eight days. However, [*24] a "Parole Jail Time Certificate" appears to reflect that Richardson only served from February 4, 2000 to August 25, 2000 "as a parole violator." Pl. Reply in Support of Obj. to R&R, Ex. B. It is undisputed that Richardson was released the day he was acquitted, February 5, 2001, one year and 13 days after he was arrested.

Thus, at least some of the time Richardson spent in jail after his arrest could not possibly be attributed to his curfew violation. In any event, the defendants' entire causation argument is flawed. Richardson contends that the pending drug charge against him was one of the crucial factors his parole officials took into account both in charging him with violations and in imposing the maximum sentence on a first-offense, two-hour curfew violation. In order to recover for whatever "parole time" he actually served, Richardson's burden at trial will be to prove that the defendants' constitutional violations more likely than not were the cause of his detention on the parole violation. It seems to me plain that the ALJ could very well have given Richardson the maximum because of the pending drug charge, or at least a jury could reasonably so conclude. The defendants' motion [*25] to limit Richardson's potential damages is accordingly denied.

CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted only as to Richardson's false arrest claim against McDermott. It is otherwise denied. The matter is set for jury selection and trial on December 18, 2006 at 9:30 a.m.; a pre-trial conference will be held on December 1, 2006 at 11:00 a.m.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York

September 27, 2006

# ATTACHMENT

*Hovatter v. Widdowson*
**2006 U.S. Dist. LEXIS 14193**





Positive
As of: Oct 21, 2011

WALTER HOVATTER v. LOGAN WIDDOWSON, et al.

Civil No. CCB-03-2904

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

*2006 U.S. Dist. LEXIS 14193*

March 29, 2006, Decided

**SUBSEQUENT HISTORY:** Affirmed by *Hovatter v. Widdowson, 2007 U.S. App. LEXIS 12170 (4th Cir. Md., May 24, 2007)*

**PRIOR HISTORY:** *Hovatter v. Widdowson, 2004 U.S. Dist. LEXIS 18646 (D. Md., Sept. 15, 2004)*

**COUNSEL:** [*1] For Walter James Hovatter, Plaintiff: Robert S Malone, Law Office of Robert T Malone, Washington, DC; Matthew Evan Bennett, Futrovsky Nitkin and Scherr Chtd, Rockville, MD.

For Logan Widdowson, individually, George Jacobs, individually, Defendants: H. Scott Curtis, Maryland State Police Headquarters, Office of the Attorney General Legal, Counsel Unit, Pikesville, MD; J Joseph Curran, Jr, Office of the Attorney General of Maryland, Baltimore, MD.

For Hunter Nelms, individualy, and in his official capacity as the Sheriff of Wicomico County, Martin Fisher, individually, Stephen Matthews, individually, Defendants: J Joseph Curran, Jr, Office of the Attorney General of Maryland, Baltimore, MD; Daniel Karp, Bryant Karpinski Colaresi and Karp PA, Baltimore, MD.

For Allen Handy, in their individual capacity as States, Attorney and police officers, Defendant: John F Breads, Jr., Local Government Insurance Trust, Columbia, MD.

For The State Of Maryland, Defendant: H. Scott Curtis, Maryland State Police Headquarters, Office of the Attorney General Legal, Counsel Unit, Pikesville, MD.

**JUDGES:** Catherine C. Blake, United State District Judge.

**OPINION BY:** Catherine C. Blake

**OPINION**

MEMORANDUM

[*2] Now pending in this civil rights case is the defendants' motion for summary judgment. The issues were fully briefed and a hearing was held on December 20, 2005. For the reasons stated below, the defendants' motion will be granted.

I. Background

On March 13, 1990, Charles Payne, Jr. ("Payne") was shot and killed at his home in Princess Anne, Maryland. His wife, Deborah Payne ("Debbie"), subsequently told the police that she had discussed with her cousin, Kirk Jenkins ("Jenkins"), on numerous occasions, the idea of paying a third party to kill her husband. She also told police that in April 1990 Jenkins told her that he had in fact paid someone to kill her husband.

Around 1993, the investigation into Payne's murder began to focus on the plaintiff, Walter Hovatter ("Hovatter"), as the third party who had been paid to murder Payne. Hovatter claims that suspicion turned on him only after the murder investigation was assigned to defendant Corporal George Jacobs ("Jacobs"), a Maryland State Police officer. According to Hovatter, Jacobs conducted an intentionally misleading investigation, under the direction of State's Attorney for Somerset County Logan Widdowson ("Widdowson"), [*3] by falsifying witness statements, making intentional misstatements of fact, and ignoring evidence that exculpated Hovatter and implicated other suspects. Hovatter alleges that Jacobs made numerous intentionally false, misleading, and inaccurate representations in the statement of probable cause that led to Hovatter being charged with the Payne murder.

On April 29,1994, Widdowson charged Hovatter by a criminal information filed in Somerset County, Maryland with first degree murder, conspiracy to commit murder, and the use of a handgun in the commission of a crime. An arrest warrant was issued, and Hovatter was arrested by Jacobs on May 2, 1994. At Hovatter's initial appearance later that day and at a bail review hearing the following day, he was determined to be ineligible for pretrial release and was ordered held without bail. [1] Hovatter's initial trial on the Payne murder charges in September 1994 resulted in a hung jury. In his first retrial, in January 1995, he was convicted by a jury for first degree murder, but the Maryland Court of Special Appeals reversed the conviction in April 1996. The state subsequently retried Hovatter in January 1998, June-July 1999, May 2000, and October [*4] 2000, and he was finally acquitted of all charges on October 26, 2000. Hovatter remained in pretrial detention from the time of his arrest until May 2000, when Judge Frederick J. Price reduced his bond to $ 5,000.

1 Hovatter then waived his right under *Md. Code*

*Ann., Crim. Proc. § 4-103* to a preliminary hearing.

Hovatter filed this lawsuit in October 2003 against the present defendants, as well as several others, under federal and state law. After the defendants filed a motion to dismiss, the court issued an order which granted that motion in part and denied it in part. *See Hovatter v. Widdowson,* 2004 U.S. Dist. LEXIS 18646, No. CCB-03-2904, 2004 WL 2075467, Order of Sept. 16, 2004 *("Hovatter I")* [2]

> 2 Specifically, all claims against defendants Hunter Nelms, John Doe, and the Boards of Commissioners of Wicomico and Somerset Counties were dismissed. All state law claims against defendants Martin Fisher and Stephen Matthews also were dismissed. The claims for false arrest, false imprisonment, intentional infliction of emotional distress, and civil conspiracy were dismissed as to Widdowson and Jacobs, and the claim for invasion of privacy false light was dismissed as to Jacobs.

[*5] At this stage, Hovatter still brings a federal claim under *42 U.S.C. § 1983*, claims under the Maryland Declaration of Rights, [3] and a state law claim for malicious prosecution, all against defendants Widdowson and Jacobs. [4] With the close of discovery, defendants submitted a motion for summary judgment, which Hovatter opposed. The court heard oral argument from both counsel on December 20, 2005.

> 3 Although the amended complaint does not invoke Article 26, plaintiff stated in his opposition brief that he had intended to bring a claim under this provision as well, and that the defendants did not oppose any such amendment. (Pl.'s Opp'n, at 1.) The court will construe the defendants' motion as seeking summary judgment on the Article 26 claim as well.
> 4 Hovatter has voluntarily dismissed his remaining claims against defendants Fisher and Matthews, and has abandoned his claim for invasion of privacy/false light claim against Widdowson.

II. Standard of review

*Rule 56(c) of the Federal Rules of Civil Procedure* [*6] provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings,' but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003)* (alteration in original) (quoting *Fed. R. Civ. P. 56(e)* [*7] ). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002)*, but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat, 346 F.3d at 526* (internal quotation marks omitted) (quoting *Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993)*, and citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265(1986))*.

III. Analysis

A. The nature of plaintiff's § 1983 claim

In order to assess the evidence in this case properly, the precise nature of the plaintiff's § 1983 claim must be reexamined. In *Brooks v. City of Winston-Salem, 85 F.3d*

*178 (4th Cir. 1996)*, the Fourth Circuit held that the plaintiff stated a valid § 1983 claim under the *Fourth Amendment* by alleging that the police "seized him pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor," *id. at* [*8] *183-84*, and noted that such a claim was most analogous to a common law tort for malicious prosecution. *Id. at 182.* [5]

[5]

In *Lambert v. Williams, 223 F.3d 257 (4th Cir. 2000)*, the Fourth Circuit clarified that:

There is no such thing as a § 1983 malicious prosecution' claim. What we termed a "malicious prosecution" claim in *Brooks* is simply a claim founded on a *Fourth Amendment* seizure that incorporates elements of the analogous common law tort of malicious prosecution . . .

*Id. at 262.*

In its earlier ruling in this case, the court stated that at least some of Hovatter's allegations-namely that "officials made false and misleading statements to support a finding of probable cause for this arrest warrant, testified falsely and procured the false testimony of others, and pursued a prosecution despite the lack of probable cause" -- could establish a *Fourth Amendment* violation. *Hovatter I*, 2004 WL 2075467, at *4. Noting the limits of constitutional protections as to pre-trial [*9] detention, the court held that "Hovatter initially is limited to a § 1983 claim akin to malicious prosecution based on any alleged *Fourth Amendment* violations for the time period prior to May 2 and 3, 1994" (when he went before a magistrate). *Id.*

The focus of the plaintiff's *Fourth Amendment* theory is the Application for Statement of Charges prepared by Jacobs at the end of his investigation. (Pl.'s Opp'n, Ex. 6) [hereinafter "Application"]. There is no question that were everything in the Application accepted at face value, it would support probable cause to arrest and prosecute Hovatter. The plaintiff's contention, therefore, is that the Application is so tainted by intentional misrepresentations that, in fact, it could not have established probable cause. However, the Fourth Circuit

has emphasized that even deliberate falsehoods in a probable cause statement do not violate the *Fourth Amendment* unless they are necessary to the finding of probable cause. *Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994)*. In *Wilkes*, Gloria Wilkes brought a *§ 1983* action under the *Fourth Amendment* against a South Carolina county and LeGrand Young, its Director of Buildings and Grounds, [*10] based on her arrest for failing to appear in court as required by a parking summons. She alleged that Young made a false statement in the affidavit he prepared, which led a magistrate to issue a warrant for her arrest. *Id. at 1364*. The court held that even assuming the jury found the statement in question to be false, Young committed no *Fourth Amendment* violation:

> It is well-established that a false or misleading statement in a warrant affidavit does not constitute a *Fourth Amendment* violation unless the statement is "necessary to the finding of probable cause." *Franks v. Delaware, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978)*; *see, e.g., United States v. George, 971 F.2d 1113, 1123 at n. 15 (4th Cir. 1992)*. Here, probable cause for Wilkes' arrest plainly existed *even in the absence of Young's purported misrepresentation*; thus, even accepting Young's statement as a lie, it could not possibly have constituted a *Fourth Amendment* violation because the material falsely represented was altogether unnecessary to the magistrate's finding of probable cause.

*Id. at 1365* (emphasis in original); *see also Simmons v. Poe, 47 F.3d 1370, 1384-86 (4th [*11] Cir. 1995)* (applying the *Franks* rule in a *§ 1983* action against a police officer, and holding that no violation occurred because the search warrant supported probable cause even disregarding the allegedly impermissible reference to race); *Freeland v. Childress, 177 F.Supp.2d 422, 430 (D.Md. 2001)*. [6]

6

> Other circuit courts analyzing *§ 1983* claims against a police officer based on alleged fabrications in a probable cause statement have similarly utilized a *Franks* analysis, in other words, asking whether the document would support probable cause in the absence of any intentional misstatements. *See, e.g., Hindman v. City of Paris, 746 F.2d 1063, 1066-68 (5th Cir. 1984)*; *Olson v. Tyler, 771 F.2d 277, 281 (7th Cir. 1985)*; *DeLoach v. Bevers, 922 F.2d 618, 623 (10th Cir. 1990)*; *cf. Smith v. Reddy, 101 F.3d 351, 355 (4th Cir. 1996)* (applying an objective reasonableness standard, rather than the *Franks* test, in a qualified immunity context).

Therefore, a central question regarding [*12] the plaintiffs *Fourth Amendment* theory is whether the Application would validly support probable cause even if all the misrepresentations alleged by the plaintiff were redacted. *See U.S. v. Gillenwaters, 890 F.2d 679, 681-82 (4th Cir. 1989)* (upholding the district court's determination, after a *Franks* hearing, that probable cause existed based on "the totality of the circumstances presented in the untainted portion of the affidavit"); *U.S. v. Friedemann, 210 F.3d 227, 229-30 (4th Cir. 2000)*. [7]

7

> When probable cause is challenged by a criminal defendant in a *Franks* suppression hearing, it is an issue for the court to resolve. *See, e.g., U.S. v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990)*; *Gillenwaters, 890 F.2d at 682*. However, in a civil *§ 1983* case, when a plaintiff challenges the sufficiency of a probable cause statement in light of intentional misrepresentations, the question is suitable for a jury. *See Hindman, 746 F.2d at 1067 (5th Cir. 1984)*. Even so, the issue is still subject to judgment as a matter of law where there is "no legally sufficient evidentiary basis for a reasonable jury to find" that probable cause was lacking. *Fed.R.Civ.P. 50(a)*; *see Wilkes, 28 F.3d at 1365-66* (finding that probable cause existed as a matter of law, thereby reversing a jury verdict in a *§ 1983* action).

[*13] Because the plaintiff alleges that Jacobs and Widdowson acted deliberately in falsifying evidence and/or fabricating probable cause, however, his claim should also be viewed in light of *Washington v. Wilmore, 407 F.3d 274 (4th Cir. 2005)*. In that case, Earl Washington, Jr., after being pardoned for a rape/murder, brought a *§ 1983* claim against Curtis Wilmore, a

Virginia State Police investigator, based on Wilmore's false statement that Washington possessed nonpublic knowledge about the crime, which constituted crucial evidence against Washington throughout his criminal proceedings. *Id. at 276-78.* In affirming the denial of qualified immunity, the court framed the constitutional right at issue as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Id. at 282* (quoting *Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000)).* [8]

8

The *Wilmore* court did not specify the precise constitutional source of this right, but in an unpublished per *curiam* decision, *White v. Wright, 150 Fed.Appx. 193 (4th Cir. 2005)*, the court stated that the claim in *Wilmore* was rooted in substantive due process. *Id. at 198.* There is no reason to bar consideration of the implications of *Wilmore* on the nature of plaintiff's claim at this stage in the proceedings. The court's earlier decision in this case was issued prior to *Wilmore*; at the same time, the Fourth Circuit held that the enunciated right in that case was clearly established as of 1967. *Wilmore, 407 F.3d at 283-84.* In addition, to the extent the right in *Wilmore* is grounded in the *Fourteenth Amendment*, the plaintiff's amended complaint invoked that provision in addition to the *Fourth Amendment*, and the plaintiff relied on *Wilmore* in his opposition to the motion for summary judgment.

[*14] The *Wilmore* court emphasized, however, that causation is a crucial element of a *§ 1983* claim based on this right, and framed the issue in this way:

The proper inquiry . . . is whether Washington's conviction was a reasonably foreseeable result of Wilmore's initial act of fabrication -- the police report. *See Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)* (recognizing applicability to *§ 1983* claims of the rule of tort liability "that makes a man responsible for the natural consequences of his actions"), *overruled on other grounds, Monell v. Dep't of Soc.*

*Servs., 436 U.S. 658, 695-701, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir.1988)* ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial -- none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").

*407 F.3d at 283.* The court noted that discovery as to causation had not been conducted in the case, for example as to "whether Wilmore's false statement in the police report [*15] influenced the decision to bring charges against Washington and the manner in which the prosecution was conducted." *Id.* The court, however, referred to evidence presented at trial and appeared to put great weight on the fact that the fabricated evidence "has been important throughout the history of the case," from the decision to prosecute, to the conviction, to the governor's decision not to pardon Washington. *Id. at 283.*

The Second Circuit's decision in *Zahrey*, on which *Wilmore* relies heavily, addressed the issue of causation in greater detail, and in particular the issue of whether the causal link between the deliberately deceptive acts of a police officer and the claimant's injury can be broken by the independent judgment of another decision-maker, such as a prosecutor or magistrate. *See 221 F.3d at 349-55.* Ultimately, the Second Circuit concluded that even if the intervening decision-maker was not misled or coerced, the initial wrongdoer should still be liable where he could "reasonably foresee that his misconduct will contribute to an independent' decision that results in a deprivation of liberty." *Id. at 352.* This statement is followed, however, by a [*16] salient footnote, which reads:

The initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty even in the absence of the antecedent misconduct; in that circumstance, "but for" causation could be claimed to be lacking.

*Id. at 352 n.8.* Under the court's reading of *Wilmore* and *Zahrey,* the right enunciated in these cases would not be

Page 6

violated, even where an investigative officer fabricates evidence, if that fabrication was not the "cause" of the plaintiff's detention and conviction.

The court will now proceed to analyze the evidence presented in the case in light of this understanding of the plaintiff's *§ 1983* claim. Ultimately, the court concludes that the plaintiff cannot establish such a claim under either the Fourth or the *Fourteenth Amendment*.

B. Widdowson

As an initial matter, the court finds that the plaintiff has not presented sufficient evidence to establish that Widdowson violated *§ 1983* under any theory. As stated in the court's earlier opinion, Widdowson would not be entitled to absolute immunity for any actions taken pursuant to the investigative, as opposed to prosecutorial, [*17] aspects of Hovatter's case. *Hovatter I*, 2004 WL 2075467, at *3 (citing cases). Although the plaintiff has demonstrated Widdowson's substantial involvement in the investigative component of Hovatter's case, such involvement by a prosecutor is not necessarily unusual or overzealous, especially in a first degree murder case. The plaintiff cannot, however, demonstrate that Widdowson intentionally fabricated any evidence, or induced Jacobs to do so. For example, the plaintiff adverts to Jacobs' testimony that he and/or Widdowson "preferred charges against Mr. Hovatter and Mrs. Payne and Mr. Jenkins" (Trial Tr., *State v. Hovatter*, 99-0783C, May 2000, at 111) [hereinafter "May 2000 Trial Tr."]. In this context, "preferring charges" is often used as a term of art for bringing criminal charges; even under the plaintiff's reading, however, this statement would not actually suggest that Widdowson encouraged Jacobs to fabricate probable cause in order to bring those charges.

The plaintiff also points to the fact that Widdowson personally paid trial-related expenses for Greg Bell; however, the government openly revealed the payments at the beginning of Bell's testimony and Hovatter's [*18] counsel was free to cross-examine Bell on that basis. (Trial Tr., *State v. Hovatter*, 4662, January 1995, at 290) [hereinafter "1995 Trial Tr."]. Furthermore, as discussed below, Brett Wilson, Hovatter's counsel for the 1994 trial, testified at the May 2000 trial as to statements made by Reese Hales ("Hales"), to the effect that Hales felt coerced into making statements against Hovatter, and that he was dissatisfied with Widdowson at that trial. (Trial Tr., *State v. Hovatter*, No. 990783-C, Oct. 2000, at 155-56) [hereinafter "Oct. 2000 Trial Tr."]. This

evidence, reflecting several layers of hearsay, is of dubious admissibility, and it does not even directly implicate Widdowson.

Plaintiff also submitted an affidavit by Archibald McFadden, counsel for his last two trials, who stated that after the May 2000 trial ended in a mistrial, he asked Widdowson how many times the state would retry Hovatter, and Widdowson replied "with something to the effect of, I'll have Hovatter doing life on the installment plan for all I care.'" (Affidavit of Archibald McFadden P 6.) Although this statement might suggest that the prosecutor harbored some animus towards Hovatter, that does not mean [*19] that he crossed the line at any time by fabricating evidence or improperly pressuring witnesses. [9]

> [9] In addition, Widdowson's decision to continue retrying Hovatter may have been a questionable exercise of prosecutorial discretion, even in a murder case, but it does not in itself establish a constitutional violation.

In sum, even viewed in a light most favorable to the plaintiff, the evidence does not demonstrate a genuine issue as to whether Widdowson intentionally violated the plaintiff's rights. [10] Accordingly, the court will hereafter focus only on the question of whether the plaintiff can establish a claim against Jacobs.

> [10]
>
> Without evidence suggesting misconduct in the investigative aspect of the case by Widdowson, Hovatter cannot otherwise establish a *§ 1983* claim against Widdowson. Even if Hovatter could prove that the state lacked probable cause, Widdowson would be entitled to absolute immunity for his decision to prosecute Hovatter. *Imbler v. Pachtman, 424 U.S. 409, 430-31, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976).*

[*20] C. Jacobs' Application for Statement of Charges

At the culmination of his investigation in the Payne murder case, Jacobs completed the Application, which he presented to Widdowson prior to the latter's filing the criminal information. *(See* Pl.'s Opp'n, Ex.6.) The plaintiff has argued that this document is replete with intentional misrepresentations, and the court finds that, at the very least, it contains numerous statements that are

contradicted by other evidence in the record. The court concludes, however, that even if it agrees with the plaintiff as to each of the deliberate misrepresentations alleged, the document nonetheless supports probable cause with the suspect material redacted. To explain this conclusion, the court will examine those portions of the Application that the plaintiff challenges, and then will assess the information that remains once the questionable elements have been excised.

First, however, the court will address the defendants' contention that because the Application was never actually signed or filed, it is irrelevant to the issue of probable cause. *See Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980)* ("[W]e do not see how [*21] the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws."); *Zahrey, 221 F.3d at 348* (quoting same); *White, 150 Fed.Appx. at 199* (quoting same). Jacobs stated in his deposition that he completed the Application with the intention that it would be the vehicle by which Hovatter was charged, and he submitted it to Widdowson for his review prior to the filing of the criminal information against Hovatter. (Deposition, of George Jacobs, at 150-51; *see also* Police report of George Jacobs, Mar. 28, 1994.) In addition, a pre-printed return of service on the arrest warrant, signed by Jacobs, indicates that he "delivered a copy of the Statement of Charges to the Defendant." (Defs.' Mot., Ex. 2, at 20.) Thus, there is evidence that this document was relevant, if not instrumental, in the decision to arrest and prosecute Hovatter. On the other hand, the court considers the fact that it was not the actual charging document potentially significant in two ways. First, Widdowson might have in fact questioned the veracity of certain portions of the Application, and second, it might not have [*22] contained all of the evidence on which Widdowson based his decision to prosecute. [11]

[11] Unfortunately, Widdowson has not been available for deposition for medical reasons. He has submitted a conclusory affidavit denying the plaintiff's factual allegations, which must be disregarded in the absence of any opportunity for cross-examination. The plaintiff's motion to strike this affidavit will be granted.

Turning to the content of the Application, the plaintiff first takes issue with its statement that "witnesses observed a blue 73 Ford pickup truck leaving the

driveway of the Payne residence immediately after the shooting." (Application, at 1.) The plaintiff points to several police reports, trial testimony, and Jacobs' answers to interrogatories to undermine the veracity of this statement. While several witnesses observed a vehicle near the time and place of the shooting, no single witness ever described the truck in question with the specificity of the Application. *(See, e.g.,* 1995 Trial Tr., at 147, [*23] 151 (Mike Ake), 160-61 (Robert Lloyd), 165-67 (Cynthia Lloyd).) More importantly, no witness described the truck as leaving the driveway of the Payne residence immediately after the shooting. [12] This sentence in the Application is particularly significant due to another statement that the "investigation has revealed that Walt Hovatter had owned a 73 pickup truck, dark blue in color matching the description of the vehicle seen leaving the Payne residence immediately after the shooting." (Application, at 6.) The blue truck was the only purported evidence connecting Hovatter to the scene of the crime, in the absence of any other physical evidence that did so. (Jacobs Dep., at 99.) The plaintiff disputes whether he even owned such a truck; although there was evidence that he sold his brother Donald Hovatter a blue Ford truck (Police report of George Jacobs, Mar. 28, 1994), counsel contended at oral argument that it was inoperable at the time of the murder. In addition, the Application fails to mention a police report stating that the "vehicle in question was found to belong to Warren Thomas Miller," a neighbor of the Paynes who was never suspected in the murder. (Police report of Darin [*24] Fisher, Mar. 24, 1990.) [13]

[12] In his deposition, Jacobs admitted that no witness had told him a vehicle was seen leaving the Payne residence; at most he was told that the vehicle was on Cherree Lane, in the area of the Payne residence. (Jacobs Dep., at 289-90.)

[13] Although, in general, a statement of probable cause does not contain a material falsehood merely due to an omission of exculpatory information, *see Colkley, 899 F.2d at 301,* a court can consider whether the officer disregarded "readily available exculpatory evidence." *Torchinsky v. Siwinski, 942 F.2d 257, 264 (4th Cir. 1991).*

The plaintiff next points to another key piece of evidence in the Application, regarding an exchange of money between Hovatter and Jenkins some time after the date of the murder. Jacobs' account of this transaction in

the Application differs significantly from the later trial testimony of two witnesses to this exchange, LeAnn Boykin ("Boykin"), who worked for Jenkins at the time, and her sister Carol Gordy [*25] ("Gordy"). For example, the Application describes two separate occasions on which Jenkins gave Hovatter money at his office (Application, at 2-3.), whereas Gordy and Boykin both testified as remembering only one such occasion (1995 Trial Tr., at 312-14 (Gordy), 399 (Boykin).) In addition, the Application states that the day after $ 9,650 was stolen from the Paynes' home, Jenkins was seen in his office with a large amount of cash not accounted for through his business dealings, that his first transaction with Hovatter occurred that same day, and that he personally gave Hovatter a quantity of cash. (Application, at 2.) According to Gordy and Boykin, Jenkins gave Boykin a sealed envelope for Hovatter to pick up, the money might have been related to a business transaction, and neither could remember on what date the exchange occurred. (1995 Trial Tr., at 312-16 (Gordy), 339-40 (Boykin); May 2000 Trial Tr., at 142, 145-46.) [14] Although Gordy and Boykin did witness a transaction between Hovatter and Jenkins, the Application portrays the incident in a more incriminating light.

14 In addition, the Application states that Gordy, Boykin, and another boarder at Jenkins' residence, "had several occasions to witness Kirk, Debbie, and Walt together" prior to the murder, and that Boykin and Gordy "had regular contact with Kirk, Debbie a[n]d Walt for a month or two period around the murder." (Application, at 8-9.) However, Debbie testified, both at a 1993 telephone harassment trial against Hovatter and at the 1995 murder trial, that she had never personally met Hovatter prior to 1993. (Pl.'s Opp'n, Ex. 16, at 10; 1995 Trial Tr., at 406.) Similarly, while Gordy and Boykin testified to seeing Jenkins and Hovatter together, and Jenkins and Debbie together, they never indicated that they saw the three together. The Application thus makes an incriminating, but misleading, suggestion that the three were seen together around the time of the murder. Although the plaintiff does not challenge these statements, the court will disregard them in its probable cause analysis.

[*26] Another significant passage in the Application regards Hovatter's July 1993 criminal trial

for harassing Debbie Payne over the telephone, at the end of which he was acquitted. (See Pl's Opp'n, Ex. 16, at 87.) The Application states that "while under oath, Debbie Payne accused Walter Hovatter of murdering her husband." (Application, at 5.) Jacobs repeated this observation initially during his deposition; it was only after reviewing the transcript of the telephone harassment trial that Jacobs acknowledged that Debbie only indicated that Walter was a suspect in the murder investigation, and that his earlier statements to the contrary were incorrect. (Jacobs Dep., at 153-54.)

The Application also contains summaries of incriminating statements by three past employees of Hovatter. Although none of the three are identified by name, plaintiffs' counsel suggested that Reese Hales was the first employee described in the Application, based on a comparison with his testimony elsewhere. [15] Although Hales testified at the 1994 trial, he refused to testify at the 1995 trial, for which he was held in contempt of court. Hovatter has produced a trial transcript for the October 2000 trial, in [*27] which Brett Wilson, Hovatter's counsel for the January 1995 trial, testified about a meeting he had with Hales in March 1995 at the latter's initiation:

15 Based on a comparison between the Application and their testimony at the 1995 trial, Nathaniel White and Greg Tingle appear to be the second and third unnamed formed employees, respectively.

Hales told me that he had been coerced into being a witness against Mr. Hovatter; that he had been coerced into making statements against Mr. Hovatter, and that he had been coerced into testifying about those statements, that he felt his statements were misrepresented . . . He indicated that he had been given a written script to follow in this case to testify; and he indicated that he was dissatisfied with Mr. Widdowson in the case.

(Oct. 2000 Trial Tr., at 155-56.) The delineation Hales made between "making statements" and "testifying about those statements," suggests that the former refers to statements Hales made during the investigation.

Although, [*28] as noted, the court has serious doubts as to the admissibility of this testimony, the court will assume, for the purposes of this opinion, that the account of Hales' statements in the Application is wholly tainted.

Having examined the major statements the plaintiff challenges in the Application, the court will turn to the question of whether it supports probable cause in the absence of these statements. First, the plaintiff does not challenge the Application's initial discussions of Debbie's motive against her husband, the theft of $ 9,650 from the Payne residence shortly before the murder, and the extensive interactions between Debbie and Jenkins; this evidence lays the foundation for the theory that Debbie and Jenkins conspired to hire a third party to murder Payne. The Application then describes Hovatter's communications with Debbie in 1993 where he demanded $ 3,700 from her, and notes that "by this time, Debbie was aware that it was Walt Hovatter whom Kirk Jenkins had hired to kill Charlie." (Application, at 5.) [16] Although the court disregards Debbie's direct accusation against Hovatter during the telephone harassment trial, her other uncontroverted statements still cast Hovatter [*29] in a suspicious light. The Application also relates Hovatter's testimony at that trial, namely that he had been unsuccessful in recovering money he loaned -- without any paperwork -- to Jenkins, who told him to get the money from Debbie. The Application notes that, in an interview, Jenkins stated that he had never borrowed money from Hovatter. *(See* Police Report of George Jacobs, Oct. 14, 1993.) The Application suggests that it was because of this trial that Hovatter became the focus of the Payne investigation.

16   The Application also says that Hovatter told Debbie that "if she did not pay up, she would end up like Charlie." (Application, at 5.) During the 1995 trial, however, Debbie testified that Hovatter did not actually state that the money he sought had any connection with the death of her husband, which the Application seems to imply. (1995 Trial Tr., at 406.) The court has disregarded this particular statement in the Application.

In addition, even disregarding Reese Hales' statements in their [*30] entirety, the Application also relates statements by two other former employees of Hovatter, Nathaniel White ("White") and Greg Tingle ("Tingle"). White stated that, while working for Hovatter during the year after the murder, Hovatter told him that

he had killed a weightlifter a short time prior. [17] The Application relates two key statements by Tingle: first, that Hovatter had confided in him that he had been paid to kill Payne for Jenkins and Debbie, and second, that Hovatter described how Jenkins had driven him to Payne's house so that Hovatter could shoot Payne. (Application, at 8.) Testifying at the 1995 trial, Tingle indicated that Hovatter never actually said Payne's name, but that Tingle had surmised he was the victim from "little things that were said." (1995 Trial Tr., at 335.) He also indicated that Hovatter told him the shooting "was over Kirk Jenkins." *(Id.* at 329.) In light of this testimony, the court will disregard the second statement, but will consider Tingle's statement that Hovatter told him that he had killed Payne for Jenkins.

17   At the 1995 trial, White stated that Hovatter told him he had killed a "musclebound guy." (1995 Trial Tr., at 258.) Based on its context, "musclebound" appears to have been an appropriate description of Payne, a fact which neither party challenges. On the other hand, according to the Application, Hovatter indicated to White that the person he killed lived in Princess Anne (Application, at 7), whereas White testified in 1995 that, at most, Hovatter indicated that the person he killed was in Somerset County. (1995 Trial Tr., at 257-59, 263-64.) (Princess Anne is located in Somerset County.) This is one of numerous examples in which the Application appears to recast information that is already damaging to Hovatter in an even more incriminating light. This factor has largely contributed to the unique and challenging nature of this case. Nonetheless, although the court disregards the precise information that appears to be incorrect or misleading, it considers the surrounding information in its analysis.

[*31] Finally, although the court disregards the Application's statement that Boykin, Gordy, and another woman actually saw Debbie, Jenkins, and Hovatter all together several times prior to the murder, the document nonetheless states that the three women were "very sure that something terrible was being planned," and after the murder "it was obvious to them that Debbie and Kirk hired Walt to kill Charlie." (Application, at 8-9.)

In sum, the connection drawn between Debbie's and Jenkins' discussions about hiring someone to kill Payne

and Hovatter's subsequent demands for money from the two constitutes the core evidence implicating Hovatter, which is further supported by the statements by Tingle, White, Boykin, and Gordy. Based on this analysis, the court finds that, even viewing the Application with the considerable quantity of suspect material redacted, no reasonable jury could find that it did not support probable cause to arrest and prosecute Hovatter based on the "totality of the circumstances." *See Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); see also Wilkes, 28 F.3d at 1365* ("Probable cause only requires enough evidence to warrant a man of reasonable cause in the belief that [*32] an offense has been or is being committed.'") (quoting *Brinegar v. United States, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949))*. Accordingly, the court concludes that even if the plaintiff could prove that Jacobs intentionally misrepresented some of the evidence in the Application, he cannot establish that Jacobs violated his *Fourth Amendment* rights.

D. 1995 trial testimony

In addition to the Application, the court has taken account of the significant incriminating evidence presented at the 1995 trial, some of which was not mentioned in the Application and some of which appeared there in a different form. [18] For example, Boykin and Gordy testified that Jenkins gave Boykin an envelope containing an unknown amount of cash, which she gave to Hovatter at Jenkins' business. (1995 Trial Tr., at 312-14, 339-40.) White testified that Hovatter asked him whether he had heard of a murder in Somerset County, and told White that he had killed someone once for money. (*Id.* at 256-60.) As discussed, Tingle testified that Hovatter admitted shooting someone "over Kirk Jenkins," and that he inferred that Payne was the victim from "just little things that were said" by Hovatter. (*Id.* at 328-29, 335.) Hovatter's [*33] brother Donald testified that during a conversation in May 1994, he asked Walter whether he had murdered Payne, to which Walter replied "with a sarcastic attitude" that he had done so. (*Id.* at 231.) Greg Bell, a cellmate of Hovatter's during pre-trial detention, testified that Hovatter confessed to the murder, giving him a very detailed account of the act that even included picking up the envelope of cash from Boykin. (*Id.* at 293-96.) Finally, Debbie Payne testified at length as to her discussions with Jenkins regarding her husband's death, the theft of the $ 9,650 from their home, and Jenkins' initial efforts to get money from her for the

hired killer. (*Id.* at 375-97.) She further testified that in 1993, Hovatter began seeking $ 3,700 from her, claiming that it was owed to him by Jenkins. (*Id.* at 398-401.) She then related how she sought the help of Hales, an associate of Hovatter, in order to locate Hovatter; Hales took her to a carnival where Jenkins was also present, and she witnessed a tense interaction between Hovatter and Jenkins. (*Id.* at 402-04.) [19]

18

The defendants have urged the court to apply the rule, as applied in *Zablonsky v. Perkins, 230 Md. 365, 187 A.2d 314 (Md. 1963)* and numerous other cases, providing that the conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively or presumptively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means. *Id. at 316* (citing RESTATEMENT OF TORTS § 667); *see also 86 A.L.R.2d 1090* (listing cases). Defendants argue that because Hovatter was convicted in the 1995 trial -- even though the conviction was overturned on appeal -- and he cannot establish fraud at the trial, the state possessed probable cause as a matter of law. As an initial matter, some federal courts have questioned the rule's applicability in *§ 1983* cases. *See Montgomery v. De Simone, PTL, 159 F.3d 120, 125 (3d Cir. 1998)* (holding that "the Restatement's rule that an overturned municipal conviction presumptively establish [*sic*] probable cause contravenes the policies underlying the Civil Rights Act and therefore does not apply to a *section 1983* malicious prosecution action"); *Meehan v. Town of Plymouth, 167 F.3d 85, 91 (1st Cir. 1999)* (expressing doubt as to whether the rule applies but declining to decide the issue); *Gray v. Maryland, 2004 U.S. Dist. LEXIS 19298, 2004 WL 2191705, at *7 (D.Md., Sept. 24, 2004)* (Blake J.) (citing the Third Circuit's decision in *Montgomery*); *cf Cramer v. Crutchfield, 648 F.2d 943, 945 (4th Cir. 1981)* (applying the rule as a matter of Virginia law); *Asuncion v. City of Gaithersburg, 73 F.3d 356, 1996 WL 1842, at *2 (4th Cir. 1996)* (unpublished table disposition) (applying the rule as a matter of Maryland law). Given its present holding, the court sees no need to determine the rule's application in this case.

Nonetheless, one rationale supporting the rule is that the evidence eventually presented by the prosecution at trial relates back to the sufficiency of its initial probable cause determination. Accordingly, the evidence presented at the 1995 trial could be relevant to the ultimate issue of whether the state possessed probable cause to prosecute Hovatter. *See Meehan, 167 F.3d at 91-92.*

[*34]

19  Deputy Martin Fisher also testified that he saw a meeting between Jenkins and Hovatter at the carnival, in order to corroborate Debbie's testimony. *(Id.* at 428-37.) The trial court prevented the defense from asking Fisher about his termination from a police department, which became the basis for the Court of Special Appeals' reversal of the conviction. *See Hovatter v. State,* Maryland Court of Special Appeals, Slip. Op. No. 695/1995.

This body of evidence, at the very least, significantly distinguishes the facts of this case from those in the *Wilmore* case. As discussed above, Wilmore's alleged initial fabrication as to Washington's nonpublic knowledge was a crucial piece of evidence that was repeated throughout the course of Washington's criminal proceedings. *407 F.3d at 283.* Here, it cannot be said that any misstatements in the Application were repeated as such at trial; the witnesses testified in their own words and often in ways that differed from their statements in the Application. Jacobs himself only testified briefly at the 1995 trial, and did not recount the information [*35] presented in the Application. [20] The 1995 testimony thus negates the inference of a causal link between the false Application and the continued detention and trials of Hovatter, given that Widdowson did not rely on the Application in his presentation of evidence to the juries; moreover, this evidence undoubtedly demonstrates that the state had probable cause. [21] Accordingly, the court concludes that the plaintiff cannot prove that his deprivation of liberty came about "as a result" of any falsifications by Jacobs, and thus cannot establish that Jacobs committed a violation of the right enunciated in *Wilmore* and *Zahrey.*

20  The plaintiff alleges that Jacobs lied when he testified in 1995 that there were only two working theories -- one that Debbie hired someone to kill her husband, and the other that Payne never paid

off a debt and the killer got tired of waiting -- and that the second theory was abandoned because "there was no information gained." (1995 Trial Tr., at 442.) Although the plaintiff correctly points out that there were numerous suspects in the investigation when Jacobs took over the case, Jacobs' characterization of the investigation was elicited during cross-examination, not offered as proof by the state, and Hovatter's counsel could have further challenged Jacobs on this point. In any event, Jacobs cannot be held liable for his testimony at trial. *Wilmore, 407 F.3d at 283* (citing *Briscoe v. LaHue, 460 U.S. 325, 345-46, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)).*

[*36]

21  The causal link also was attenuated by Widdowson's decision to use an information, rather than the Application, as the charging document holding Hovatter in custody. Hovatter could have sought a preliminary hearing to challenge the probable cause for his detention, but did not do so.

E. Other claims

A lack of probable cause is an essential element for a malicious prosecution claim under Maryland law. *Montgomery Ward v. Wilson, 339 Md. 701, 664 A.2d 916, 922 (Md. 1995).* Because, as the above discussion makes clear, the plaintiff cannot establish a lack of probable cause, his state law malicious prosecution claim must fail as well. *Cf. Zablonsky, 187 A.2d at 316* (adopting as Maryland law the rule that a conviction, even if overturned on appeal, is conclusive proof of probable cause, unless the conviction was obtained through fraud, perjury, or other corrupt means).

As stated in the court's earlier opinion, the Maryland Court of Appeals has directed that Articles 24 & 26 of the Maryland Declaration of Rights be construed *in pari materia* with their federal counterparts. *HovatterI, 2004* [*37] WL 2075467, at *8 (citing *Carter v. State, 367 Md. 447, 788 A.2d 646, 652 (Md. 2002)* and *Pickett v. Sears, Roebuck & Co., 365 Md. 67, 775 A.2d 1218, 1224 (Md. 2001)).* Thus, the court's holding as to Hovatter's § 1983 claim applies equally to his claims under Articles 24 & 26.

The court's conclusions also obviate the need to rule on the defendants' claims for qualified immunity under federal law and/or for state law-based immunity.

Likewise, the court need not consider whether the plaintiff could have sought punitive damages in this action.

IV. Conclusion

This case has presented the court with a constellation of challenging circumstances, both factually and legally. Charles Payne was killed in his own home and, as far as the court can tell, no one has been convicted of the crime. Over the course of six years, the plaintiff endured six trials for first-degree murder and was eventually acquitted. He spent almost that entire time in pre-trial detention, where he undoubtedly suffered many deprivations. There is considerable evidence to suggest that Jacobs prepared his probable cause statement in a reckless, if not intentionally misleading, manner. The applicable law is at times opaque and the [*38] focus of the legal theories has shifted during the pendency of this lawsuit. Nonetheless, the court must ultimately conclude that the state possessed probable cause to prosecute Hovatter, and that Hovatter's continued detention was not the "result" of any false statements by Jacobs. Accordingly, the defendants are entitled to judgment as a matter of law.

A separate Order follows.

March 29, 2006

Date

Catherine C. Blake

United State District Judge

**ORDER**

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. The defendants' motion for summary judgment (docket entry no. 70) is **GRANTED;**

2. the plaintiff's motion to strike the affidavit of Logan Widdowson (docket entry no. 78) is **GRANTED;**

3. copies of this Order and the accompanying Memorandum shall be sent to counsel of record; and

4. the clerk of the court shall **CLOSE** this case.

March 29, 2006

Date

Catherine C. Blake

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2011, I electronically filed the foregoing **Memorandum in Support of Motion for Judgment on the Pleadings** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David S. Rudolf
Rudolf, Widenhouse & Fialko
225 East Worthington Avenue, Suite 200
Charlotte, NC 28203
dsrudolf@rwf-law.com
*Attorney for Plaintiff*

David N. Allen
Parker Poe Adams & Bernstein LLP
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
davidallen@parkerpoe.com
*Attorney for Officer J.J. Ojaniit*

Daniel E. Peterson
Assistant City Attorney
Office of the City Attorney
600 East Fourth Street
Charlotte, NC 28202
dpeterson@charlottenc.gov
*Attorney for Officer Tom G. Ledford and Does*


/s/ James P. Cooney III
James P. Cooney III
**Attorney for Officer Gerald J. Esposito**